# United States Court of Appeals for the Federal Circuit

---

ALLERGAN USA, INC., ALLERGAN HOLDINGS UNLIMITED CO.,
ALLERGAN PHARMACEUTICALS INTERNATIONAL LTD.,
JANSSEN PHARMACEUTICA NV, EDEN BIODESIGN, LLC,

*Plaintiffs-Appellants,*

– v. –

MSN LABORATORIES PRIVATE LTD., MSN PHARMACEUTICALS, INC.,
SUN PHARMACEUTICAL INDUSTRIES LIMITED,

*Defendants-Appellees.*

---

*On Appeal from the United States District Court for the District
of Delaware in Nos. 1:19-cv-01727-RGA, 1:21-cv-01064-RGA,
1:21-cv-01065-RGA and 1:20-cv-01479-RGA,
Honorable Richard G. Andrews, Judge*

---

## CORRECTED BRIEF FOR PLAINTIFFS-APPELLANTS

LISA B. PENSABENE
HASSEN A. SAYEED
JAMES Y. LI
O'MELVENY & MYERS LLP
Times Square Tower
Seven Times Square
New York, NY 10036
(212) 326-2000
lpensabene@omm.com
hsayeed@omm.com
jli@omm.com

ERIC W. DITTMANN
MELANIE R. RUPERT
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
ericdittmann@paulhastings.com
melanierupert@paulhastings.com

STEPHEN B. KINNAIRD
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
(202) 551-1700
stephenkinnaird@paulhastings.com

*Counsel for Plaintiffs-Appellants*

DECEMBER 28, 2023



## **EXEMPLARY CLAIMS**

Claim 40 of U.S. Patent No. 7,741,356

**40.** A compound selected from the group consisting of

and

Appx14483-14484.

Claim 7 of U.S. Patent No. 11,007,179

**1.** An abuse-deterrent, mono-phasic pharmaceutical tablet comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid,

about 60-80% by weight silicified microcrystalline cellulose;

crospovidone;

about 5-15% by weight mannitol; and

optionally, a glidant and/or lubricant.

**3.** The tablet of claim **1,** comprising about 65-75% by weight silicified microcrystalline cellulose, and about 7.5-12.5% by weight mannitol.

**4.** The tablet of claim **3,** comprising about 3-7% by weight crospovidone and a lubricant.

**5.** The tablet of claim **4,** wherein the lubricant is magnesium stearate present in an amount of about 0.55-0.95% by weight.

**6.** The tablet of claim **5,** comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg-450 mg of silicified microcrystalline cellulose;

about 18 mg-42 mg crospovidone;

about 45 mg-75 mg of mannitol; and

about 3.3 mg-5.7 mg of magnesium stearate.

**7.** The tablet of claim **6,** comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg-450 mg of silicified microcrystalline cellulose;

about 30 mg of crospovidone;

about 60 mg of mannitol; and

about 4.5 mg of magnesium stearate.

Appx96-97.

<u>Claim 26 of U.S. Patent No. 11,311,516</u>

**1.** A pharmaceutical tablet comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid,

about 60-80% by weight filler;

about 2-8% by weight disintegrant; and

about 10% by weight mannitol.

**26.** The pharmaceutical tablet of claim **1**, comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg-450 mg silicified microcrystalline cellulose;

about 30 mg crospovidone;

about 60 mg mannitol;

about 4.5 mg magnesium stearate; and

about 18 mg of a film coating,

wherein the nominal weight of the tablet without the film coating is about 600 mg and the total weight of the tablet is about 618 mg.

Appx205-206.

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Allergan USA, Inc., Allergan Holdings Unlimited Co., Allergan Pharmaceuticals International Ltd., Janssen Pharmaceutica NV, and Eden Biodesign, LLC certifies the following:

| 1. Provide the full names of all entities represented by undersigned counsel in this case. | 2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | 3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
|---|---|---|
| Allergan USA, Inc., Allergan Holdings Unlimited Co., Allergan Pharmaceuticals International Ltd., Janssen Pharmaceutica NV, and Eden Biodesign, LLC | AbbVie Inc. as real party in interest for Allergan Holdings Unlimited Co. with respect to New Drug Application No. 206940 for Viberzi® brand eluxadoline tablets | AbbVie Inc. (for Allergan USA, Inc., Allergan Holdings Unlimited Co., Allergan Pharmaceuticals International Ltd., and Eden Biodesign, LLC)<br><br>Johnson & Johnson (for Janssen Pharmaceutica NV) |

1.      The names of all law firms and the partners or associates that appeared for the party now represented for the entities in the originating court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

MORRIS, NICHOLS, ARSHT & TUNNELL LLP:  Jack B. Blumenfeld, Jeremy A. Tigan

O'MELVENY & MYERS LLP:  Daniel O'Boyle, Carolyn S. Wall, Mark A. Hayden, Amy Jing Ying Zhao

QUINN EMANUEL URQUHART & SULLIVAN, LLP:  Peter J. Armenio, P.C., Anne S. Toker, Colleen Tracy James, Sky C. Adams, Allyson E. Parks, Amanda K. Antons

BAKER & HOSTETLER: Jeffrey J. Lyons

2.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

     None

3.      Information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

     Not Applicable

     Respectfully submitted,

Dated:  December 28, 2023     /s/ Eric W. Dittmann
     Eric W. Dittmann
     PAUL HASTINGS LLP
     200 Park Avenue
     New York, NY 10166
     (212) 318-6000
     ericdittmann@paulhastings.com

     *Counsel for Plaintiffs-Appellants*

# **TABLE OF CONTENTS**

                                                  **Page**

INTRODUCTION ...................................................................... 1

JURISDICTION.......................................................................... 3

STATEMENT OF ISSUES ........................................................ 3

STATEMENT OF THE CASE .................................................. 4

I.      BACKGROUND .................................................................. 4

     A.    The Innovative Compound Eluxadoline ............................. 4

     B.    The Claims at Issue ........................................................... 5

          1.    Claim 40 of the '356 Patent ....................................... 5

          2.    Claim 26 of the '516 Patent and Claim 7 of the '179 Patent......7

II.    THE PROCEEDINGS BELOW....................................................... 8

     A.    Plaintiffs' Hatch-Waxman Action....................................... 8

     B.    The District Court Declared the Asserted Claims Invalid ................... 9

          1.    Obviousness-Type Double Patenting........................ 10

          2.    Written Description................................................. 10

SUMMARY OF THE ARGUMENT ...................................... 12

ARGUMENT ........................................................................... 18

I.      STANDARD OF REVIEW ........................................................ 18

II.    OBVIOUSNESS-TYPE DOUBLE PATENTING DOES NOT JUSTIFY TRUNCATING THE TERM OF A FIRST-FILED, FIRST-ISSUED PATENT BASED ON ITS OWN PROGENY ................. 19

     A.    ODP Prevents Unjustified Extensions of Patent Term ....................... 20

     B.    The URAA Did Not Change the Fundamental Rule That ODP Restricts Only Unjustified Timewise Extensions of Patent Term ......22

     C.    *Cellect* Did Not Resolve Whether Later-Filed Patents Can Serve as ODP Reference Patents with Respect to First-Filed, First-Issued Patents ................. 25

          1.    The Patentee in *Cellect* Waived Any Challenge to the ODP Reference Patents ......................... 26

i

2.    The District Court Erred in Treating *Cellect* as Dispositive ....29

D.    ODP Cannot Be Applied to Truncate the Term of a First-Filed, First-Issued Patent Based on Later-Filed Family Members ..............31

1.    The Term of a First-Filed, First-Issued Patent Establishes the Original Patent Monopoly and Does Not "Extend" the Term of Subsequent Patents ..............31

2.    This Court Has Ruled That ODP Should Not Truncate a Statutorily Mandated Term of a First-Filed, First-Issued Patent...........................................38

3.    The District Court's Ruling Violates 35 U.S.C. § 154 .............41

E.    ODP Should Not Apply to Invalidate Claim 40 of the '356 Patent....44

F.    If *Cellect* Is Overturned, This Court May Also Reverse....................46

III.   THE DISTRICT COURT ERRED IN FINDING LACK OF WRITTEN DESCRIPTION.......................................47

A.    The District Court Improperly Treated Claim 26 as Containing a "Glidant-Optional" Limitation ..................................47

B.    The District Court Improperly Added a Functional Requirement to the Invention Based on Extrinsic Evidence..............51

C.    The District Court Misinterpreted *ICU Medical* to Impose a Freestanding Written-Description Inquiry into the Necessity of Unclaimed Features.............................55

D.    The District Court Improperly Placed the Burden on Plaintiffs to Show That the Specification Disclosed Glidants Were Optional .......58

E.    The District Court Improperly Conflated the Written-Description and Enablement Requirements .........................59

F.    The Specification Discloses Formulations Lacking a Glidant............60

CONCLUSION .....................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
    764 F.3d 1366 (Fed. Cir. 2014) ........................................................20, 25, 31, 39

*Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*,
    C.A. No. 20-985-GBW, 2023 WL 8622048, (D. Del. Dec. 13, 2023)........*passim*

*Alcon Research Ltd. v. Barr Lab'ys, Inc.*,
    745 F.3d 1180 (Fed. Cir. 2014) ........................................................47, 51, 59

*Allergan, Inc. v. Sandoz Inc.*,
    796 F.3d 1293 (Fed. Cir. 2015) ........................................................50, 51

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ........................................................49

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) ........................................................56, 59, 62

*In re Barnett*,
    155 F.2d 540 (C.C.P.A. 1946) ........................................................35

*In re Braat*,
    937 F.2d 589 (Fed. Cir. 1991) ........................................................21, 22, 41, 46

*In re Braithwaite*,
    379 F.2d 594 (C.C.P.A. 1967) ........................................................36, 37

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003) ........................................................53, 54

*Cadence Pharms. Inc. v. Exela Pharmsci Inc.*,
    780 F.3d 1364 (Fed. Cir. 2015) ........................................................54, 55

*In re Cellect*,
    81 F.4th 1216 (Fed. Cir. 2023) ........................................................*passim*

*In re Chandler*,
    319 F.2d 211 (C.C.P.A. 1963) ........................................................35

*In re Clark*,
  97 F.2d 628 (C.C.P.A. 1938) ................................................................35

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*,
  291 F.3d 1317 (Fed. Cir. 2002) ..........................................................53

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*,
  635 F.3d 1373 (Fed. Cir. 2011) .......................................56, 59, 60, 62

*In re Eckel*,
  393 F.2d 848 (C.C.P.A. 1968) .......................................................35, 36

*Evans v. Eaton*,
  20 U.S. 356 (1822).............................................................................50

*In re Fallaux*,
  564 F.3d 1313 (Fed. Cir. 2009) ..........................................................28

*Genentech, Inc. v. Chiron Corp.*,
  112 F.3d 495 (Fed. Cir. 1997) ............................................................49

*Gilead Scis., Inc. v. Lee*,
  778 F.3d 1341 (Fed. Cir. 2015) ..........................................................22

*Gilead Scis., Inc. v. Natco Pharma Ltd.*,
  753 F.3d 1208 (Fed. Cir. 2014) ...................................................*passim*

*GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*,
  744 F.3d 725 (Fed. Cir. 2014) .....................................................49, 50

*Godfrey v. Eames*,
  68 U.S. 317 (1863).............................................................................35

*Honeywell Int'l, Inc. v. United States*,
  609 F.3d 1292 (Fed. Cir. 2010) ..........................................................62

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  645 F.3d 1336 (Fed. Cir. 2011) ....................................................47, 56

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
  558 F.3d 1368 (Fed. Cir. 2009) .............................................55, 56, 57

*Intra-Cellular Therapies, Inc. v. Iancu*,
   938 F.3d 1371 (Fed. Cir. 2019) ..........................................................22

*Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*,
   590 F.3d 1326 (Fed. Cir. 2010) .....................................................18, 19

*In re Longi*,
   759 F.2d 887 (Fed. Cir. 1985) .................................................21, 42, 43

*Markem-Imaje Corp. v. Zipher Ltd.*,
   657 F.3d 1293 (Fed. Cir. 2011) ..........................................................54

*Merck & Co., Inc. v. Kessler*,
   80 F.3d 1543 (Fed. Cir. 1996) ............................................................22

*Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc.*,
   217 F. Supp. 3d 782 (D. Del. 2016).....................................................37

*Miller v. Eagle Mfg. Co.*,
   151 U.S. 186 (1894)............................................................................31

*Minerva Surgical, Inc. v. Hologic, Inc.*,
   141 S. Ct. 2298 (2021).........................................................................36

*Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc.*,
   934 F.3d 1344 (Fed. Cir. 2019) ..........................................................19

*Novartis AG v. Ezra Ventures LLC*,
   909 F.3d 1367 (Fed. Cir. 2018) ....................................................*passim*

*Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*,
   909 F.3d 1355 (Fed. Cir. 2018) ....................................................*passim*

*Odiorne v. Amesbury Nail Factory*,
   18 F. Cas. 578 (C.C.D. Mass. 1819)..............................................20, 34

*Perez v. Dep't of Justice*,
   480 F.3d 1309 (Fed. Cir. 2007) ..........................................................30

*In re Peters*,
   723 F.2d 891 (Fed. Cir. 1983) ......................................................57, 58

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
　572 U.S. 663 (2014)......................................................................43

*Pfizer, Inc. v. Apotex, Inc.*,
　480 F.3d 1348 (Fed. Cir. 2007) ...............................................59

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
　566 F.3d 989 (Fed. Cir. 2009) .................................................21

*In re Robeson*,
　331 F.2d 610 (C.C.P.A. 1964) ................................................35

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
　580 U.S. 328 (2017)......................................................................43

*ScriptPro, LLC v. Innovation Assocs., Inc.*,
　762 F.3d 1355 (Fed. Cir. 2014) ...............................................47

*ScriptPro LLC v. Innovation Assocs., Inc.*,
　833 F.3d 1336 (Fed. Cir. 2016) ..........................................57, 61

*United States v. Am. Bell Tel. Co.*,
　167 U.S. 224 (1897)........................................................23, 34, 41

*Vas-Cath Inc. v. Mahurkar*,
　935 F.2d 1555 (Fed. Cir. 1991) ...............................................49

*In re White*,
　405 F.2d 904 (C.C.P.A. 1969) ................................................36

**Statutes**

35 U.S.C.
　§ 101..................................................................................................20
　§ 112............................................................................................16, 17
　§ 120..................................................................................................35
　§ 154..........................................................................................*passim*
　§ 156..............................................................................................5, 44
　§ 253(b).............................................................................................21
　§ 282............................................................................................47, 59
　§ 286..................................................................................................43

1994 Uruguay Rounds Agreement Act,
Pub. L. No. 103-465, § 532(a), 108 Stat. 4809 (1994) ............................... *passim*

Leahy-Smith America Invents Act,
§ 3(b)(2), 125 Stat. 285, 287 (2011) .................................................................42

Patent Term Guarantee Act of 1999,
Pub. L. No. 106-113, § 4402, 113 Stat. 1501, 1501A-557 (1999) ....................22

## Other Authorities

145 Cong. Rec. H6,943-44 (daily ed. Aug. 3, 1999) ...............................................23

145 Cong. Rec. S13,258-59 (daily ed. Oct. 27, 1999) ...........................................23

150 Cong. Rec. S7521 (daily ed. June 25, 2004) ........................................24, 38, 42

Daniel Kazhdan, *Obviousness-Type Double Patenting: Why It Exists And When It Applies*, 53 AKRON L. REV. 1017, 1046 (2019) ...........................37

Director's Response to Cellect, LLC's Petition for Rehearing En Banc, *In re Cellect* (No. 22-1293) (Dec. 14, 2023) ...........................................27

H.R. Rep. No. 106-287 (1999) ...............................................................................23

## <u>STATEMENT OF RELATED CASES</u>

No other appeals have been taken in this case, and counsel for

Plaintiffs-Appellants Allergan USA, Inc., Allergan Holdings Unlimited Co.,

Allergan Pharmaceuticals International Ltd., Janssen Pharmaceutica NV, and Eden

Biodesign, LLC (collectively, "Plaintiffs") are aware of no other cases pending in

any court or agency that will directly affect, or be directly affected by, this Court's

decision in the instant appeal.

## **INTRODUCTION**

The district court committed fundamental errors in its invalidity rulings. It became the first court ever to invalidate a first-filed, first-issued patent for obviousness-type double patenting ("ODP") over later-filed, later-issued patents from the same family, inverting the logic and purpose of ODP. The awarded term of a first-filed, first-issued patent for an invention defines the original period of patent monopoly and the inventor's bargain with the public, establishing when the public will be free to use that invention. Such a patent does not and cannot *extend* the term of *later-filed*, *later-issued* continuation patents, regardless of whether these later patents expire earlier because they did not suffer delay at the U.S. Patent and Trademark Office ("PTO").

The district court's ruling is contrary to the traditional equitable concerns that underlie ODP, which cannot be invoked to truncate the statutorily guaranteed term of a first-filed, first-issued patent over later-filed family members, as this Court has ruled. Applying ODP in this manner also violates Section 154 of the Patent Act, which guarantees a minimum statutory term to a diligent applicant. Nor is there evidence particular to the challenged patent that creates a basis in equity for shortening its term.

The district court likewise erred in ruling that the two representative claims contested at trial—claim 26 of U.S. Patent No. 11,311,516 ("the '516 patent") and

claim 7 of U.S. Patent No. 11,007,179 ("the '179 patent")—are invalid for lack of written description. Claim 26 is a structural, picture-type pharmaceutical tablet claim. There is no dispute that the specification describes the precise combination of ingredients of the claimed tablet in the specified amounts. This should have ended the written-description inquiry for that claim.

Instead, the district court proceeded to commit legal error by failing to adhere to the claim language in its written-description analysis. Unlike certain other claims of the asserted patents, claim 26 in particular does not recite a glidant-optional limitation, and Plaintiffs are not required to show possession of the claimed formulation without a glidant. The district court's analysis of whether written description support exists for claims in which "a glidant is optional or not included," Appx24-25, simply has no applicability to claim 26.

Regardless, the district court's analysis of both representative claims reflects fundamental legal error. For both claim 26 of the '516 patent and claim 7 of the '179 patent, the court disregarded that a written-description inquiry begins and ends with the specification. Focusing almost exclusively on extrinsic evidence, the district court rewrote the invention by inserting a "sufficient flow characteristics" requirement that it associated with use of a glidant—a functional limitation found in neither the claims nor the specification. In doing so, the district court (i) ignored the claim language as written, (ii) improperly shifted the burden of proving

2

invalidity from the patent challenger to the patentee (to prove that certain unclaimed features are "unimportant"), and (iii) improperly conflated the written-description and enablement requirements. Further, the court ignored the specification's teachings, which expressly disclose formulations without glidants. The district court's ruling contravenes the law and the intrinsic record.

This Court should reverse both the ODP and written-description rulings.

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), and issued a final judgment on October 12, 2023. Appx1-4. That same day, Allergan timely appealed. Appx16303-16306. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1. Whether, under the ODP doctrine, a later-filed, later-issued, but earlier-expiring continuation patent can invalidate the first-filed, first-issued patent from that family and truncate that patent's mandatory statutory term.

2. Whether the district court erred in finding representative claim 26 of the '516 patent and representative claim 7 of the '179 patent invalid for lack of written description.

## STATEMENT OF THE CASE

## I.  BACKGROUND

### A.    The Innovative Compound Eluxadoline

Irritable bowel syndrome ("IBS") is characterized by abdominal discomfort and unpredictable bowel habits, and its treatment has long represented a significant, but unmet, medical need.  Appx14533.  Afflicting approximately 20% of U.S. adults, IBS impairs quality of life, reduces productivity, and burdens the health-care system.  Appx14533.  IBS is often chronic and debilitating. Appx14579.  Because IBS is a "conglomerate of several pathological mechanisms," effective therapies have proven difficult to develop.  Appx15564.

The inventors of the patents-in-suit pioneered the development of eluxadoline, a novel opioid receptor modulator that mitigates the symptoms of irritable bowel syndrome with diarrhea, or "IBS-D."  *Id*.  Eluxadoline, a mu- and kappa-opioid agonist and a delta-opioid antagonist, is "thought to regulate gastrointestinal motility, intestinal secretion, and visceral sensation and provide central analgesia."  *Id*.  The U.S. Food and Drug Administration ("FDA") approved the New Drug Application for Plaintiffs' eluxadoline-based drug, VIBERZI®, for treating IBS-D in adults in 2015.  Appx4908.

**B.    The Claims at Issue**

**1.    Claim 40 of the '356 Patent**

The inventors filed U.S. Patent Application No. 11/079,647 ("the '647 application") on March 14, 2005, initially disclosing, *inter alia*, their invention of eluxadoline.  Appx14407-14485; Appx4929.  The inventors subsequently assigned the '647 application to Plaintiff-Appellant Janssen Pharmaceutica N.V. ("Janssen").  Appx4929.  The '647 application issued on June 22, 2010, as U.S. Patent No. 7,741,356 ("the '356 patent").  Appx14408.  Claim 40 thereof recites eight chemical compounds, including eluxadoline.  Appx14483.

To account for PTO delay, the '356 patent received a patent term adjustment ("PTA") of 1,107 days.  Appx14485.  It also received 1,068 days of patent term extension ("PTE") under 35 U.S.C. § 156 to compensate for FDA delay in approving VIBERZI®.  Appx4929.  While securing the PTE, Janssen disclaimed all but 467 days of the '356 patent's PTA, thus reducing its PTA-adjusted term to June 24, 2026.  Appx4929.  The '356 patent term, inclusive of PTA, is 16 years and 2 days.  The '356 patent was the first-filed, first-issued patent to cover eluxadoline. Appx4929 (¶ 212).

Two other patents owned by Janssen are relevant to the ODP issue in this appeal, U.S. Patent Nos. 8,344,011 ("the '011 patent") and 8,609,709 ("the '709

patent"). Both descend from the '356 patent and claim the same priority date. Appx4928-4929.

The '011 patent was filed on July 19, 2010, as a divisional of U.S. Patent No. 7,786,158 (a continuation of the '356 patent), and issued on January 1, 2013. Appx44. In the '011 patent, Janssen pursued certain non-elected inventions from the '647 application. Claim 33 of the '011 patent covers a method administering eluxadoline or one of seven other compounds. Appx45; Appx4929. Because it claims priority to the '356 patent's filing date and there was no PTO delay during its prosecution, the '011 patent expires on March 14, 2025, resulting in a term of roughly 12 years. Appx4928-4929.

The '709 patent was filed on November 30, 2012, as a continuation of the '011 patent, and issued on December 17, 2013. Appx44. Claim 5 of the '709 patent is directed to eluxadoline, a species of the genus of compounds claimed by the '356 patent. Appx4929. On July 25, 2013, Janssen filed a terminal disclaimer tying its expiration date to that of the '356 patent. '709 patent, cover page. Because no PTO delay affected its prosecution, the '709 patent also expires on March 14, 2025, which provides a patent term of roughly 11 years. Appx4929.

### 2.    Claim 26 of the '516 Patent and Claim 7 of the '179 Patent

Two representative claims were tried.  The first was claim 26 of the

'516 patent,[1] which is recited below:

> 26. The pharmaceutical tablet of claim 1, comprising:
>
> about 75 mg of [eluxadoline];
>
> about 390 mg-450 mg silicified microcrystalline cellulose;
>
> about 30 mg crospovidone;
>
> about 60 mg mannitol;
>
> about 4.5 mg magnesium stearate; and
>
> about 18 mg of a film coating,
>
> wherein the nominal weight of the tablet without the film coating is about 600 mg and the total weight of the tablet is about 618 mg.

Appx206.  Claim 1, from which claim 26 depends, is directed to a pharmaceutical

tablet containing about 75 mg of the active ingredient eluxadoline and percentage

weights of a filler, a disintegrant, and mannitol.  Claim 26 thus narrowly recites a

tablet formulation wherein the weights of eluxadoline, four precise excipients, the

film coating, and the overall tablet are specified.

Each recited component of claim 26 and its corresponding amount can be

readily identified in the '516 patent specification, *see*, *e.g.*, Appx194 (11:23-12:3);

Appx196 (Table 1), which the parties' experts do not dispute, *see*, *e.g.*, Appx5942,

Appx5970-5974 (Gemeinhart 227:5-14, 255:9-259:1); Appx6089-6090 (Berkland

---

[1] Appx4782 (stipulating that claim 26 is representative of claims 6 and 16 of U.S. Patent No. 11,160,792 ("the '792 patent") and claim 29 of the '516 patent).

374:15-375:19).  As confirmed by Defendant-Appellee Sun Pharmaceutical

Industries Limited's formulation expert, Dr. Richard Gemeinhart, the sole

difference between the tablet formulations of claim 26 and the precise formulations

disclosed in Table 1 of the specification is that the latter include colloidal silica,

Appx5975-5976 (Gemeinhart 260:9-19), a glidant that can improve the flowability

of powder during manufacture, Appx15-16.

The other representative claim is claim 7 of the '179 patent,[2] which is the

grandparent of the '516 patent and shares the same specification.  Appx12.

Claim 7 recites a mono-phasic pharmaceutical tablet comprising eluxadoline and

various identified ingredients in specified weights, and additionally requires a

functional "abuse-deterrent" property.  Claim 7 depends from (*inter alia*) claim 1,

which expressly recites that "a glidant and/or a lubricant" is "optionally" included.

Appx96-97 (cls. 1, 3-7).

## II.  THE PROCEEDINGS BELOW

### A.    Plaintiffs' Hatch-Waxman Action

In 2019, Sun submitted an Abbreviated New Drug Application ("ANDA")

seeking FDA approval to manufacture and sell a generic version of VIBERZI®

before the relevant patents expired.  Appx4915.  On October 8, 2020, Sun sent a

---

[2] Appx4782 (stipulating that claim 7 is representative of claims 7 and 19 of U.S.
Patent No. 11,090,291 ("the '291 patent") and claim 18 of the '179 patent).

notice letter pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) to Janssen and Allergan USA, Inc., Allergan Holdings Unlimited Company, and Allergan Pharmaceuticals International Limited (collectively, "Allergan"), the exclusive licensee of the '356 patent. Appx4916. Sun contended that the '356 patent claims are invalid, unenforceable, and not infringed by the manufacture, use, importation, sale, or offer for sale of Sun's ANDA Products. Appx4916.

On October 29, 2020, Plaintiffs filed a complaint against Sun alleging infringement of claim 40 of the '356 patent under 35 U.S.C. § 271(e)(2)(A), and later consolidated the complaint with a parallel action alleging infringement of the asserted formulation patents against Sun and other defendants.[3] Appx4916-4919. The parties stipulated that Sun would pursue an ODP defense only against claim 40 of the '356 patent over certain claims of the '011 and '709 patents, Appx4931, and that Sun's ANDA Products would infringe all asserted claims, Appx4931-4932.

### B. The District Court Declared the Asserted Claims Invalid

After trial, the district court found all claims asserted against Sun to be invalid. Appx46-47.

---

[3] The complaints were all later consolidated; the plaintiffs against Sun are Allergan, Janssen, and Eden Biodesign, LLC.

### 1.     Obviousness-Type Double Patenting

In finding claim 40 of the '356 patent invalid for ODP, the district court relied on a recent decision of this Court, *In re Cellect*, 81 F.4th 1216, 1229 (Fed. Cir. 2023), *petition for reh'g en banc filed* (Nov. 13, 2023), for the proposition that "ODP for a patent that has received PTA, regardless whether or not a terminal disclaimer is required or has been filed, must be based on the expiration date of the patent after PTA has been added." Appx45. The district court considered itself bound by this rule, for which it found no exception whatsoever, including for first-filed, first-issued patents. Appx46. Despite ODP's equitable nature, the court also ruled that the doctrine "should not [be] influenced by equitable concerns." *Id*. The court invalidated claim 40 of the '356 patent because its PTA-adjusted expiration date fell after the expiration of the '011 and '709 patents, even though the '356 patent was both filed and issued first. *Id*. The district court did not identify any evidence of gamesmanship, as Sun proffered none.

### 2.     Written Description

The district court held representative claim 26 of the '516 patent and claim 7 of the '179 patent invalid for lack of written description based on its determination that the "patent specification does not disclose that a formulation would have sufficient flow characteristics or work without a glidant." Appx26.

The district court began its written-description analysis by recognizing that these claims do "not list a glidant as a limitation,"[4] while at the same time noting that a glidant can be "used to improve the flow characteristics of a powder mixture." Appx16. The court then focused on expert testimony and other extrinsic evidence to find that "a POSA would understand that a formulation needs to have sufficient flow," Appx21, because, "without that ability to flow, you won't have a good final product," Appx16. Based on this extrinsic evidence-based finding, the court evaluated whether Allergan had shown that the patent specification discloses eluxadoline formulations where a glidant was optional and would either (i) "have sufficient flow characteristics" or (ii) otherwise "work without a glidant." Appx26; Appx6272-6273 (557:20-558:3). The court then ruled that "[n]one of the formulations disclosed in the patent specification … are made without a glidant," and reasoned that "[a] POSA reading the patent specification would not have understood the patentee to possess a formulation of eluxadoline in which a glidant is optional." Appx16. As a result, the district court concluded that "the asserted claims here lack written description …." Appx18.[5]

---

[4] The court also stated that claim 7 "depends from an independent claim that recites a glidant-optional limitation." Appx16.

[5] Sun raised, but later expressly waived, an enablement defense. Appx6287 (572:11-18); Appx16122 n.3. Sun therefore argued only that the asserted claims are invalid for lack of written description and, in the alternative, for alleged obviousness (which the district court did not address). Appx9.

## SUMMARY OF THE ARGUMENT

1.      ODP is an equitable doctrine designed to prevent a patentee from *extending* its exclusive right to an invention through claims in a later-filed, later-expiring patent that are not patentably distinct from claims in an earlier-filed, earlier-expiring patent.  The district court turned ODP upside down by finding—in a first-of-its-kind decision—a *first-filed, first-issued* patent invalid over *later-filed, later-issued*, but earlier-expiring patents from the same family that did not even exist when the former was granted.

The district court purported to derive a universal, rigid rule that any earlier-expiring patent can serve as an ODP reference patent from this Court's decision in *Cellect*.  As a preliminary matter, this Court has held that expiration dates alone are not always dispositive.  *See Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1364 (Fed. Cir. 2018) ("*Breckenridge*") (holding that earlier-expiring post-URAA patent could not be used to invalidate later-expiring pre-URAA patent).  Regardless, *Cellect* did not resolve any question as to what patents can and cannot serve as ODP reference patents.  It certainly did not address whether a first-filed, first-issued patent can be invalidated by a later-filed, later-issued, earlier-expiring patent from the same family.  Indeed, the patentee in *Cellect* waived any challenge as to whether the asserted reference patents could properly serve as a basis for ODP, instead arguing only (i) a

12

sweeping legal challenge that ODP can never be invoked to negate a PTA and (ii) that ODP should not apply in that case on equitable grounds because there was no strategic manipulation of patent term or risk of separate ownership. *Cellect* does not resolve this appeal.

ODP does not invalidate a first-filed, first-issued patent just because a later-filed, later-issued patent in the same patent family expires first. The first-filed, first-issued patent establishes the original patent term for the invention and the bargain with the public, denoting when the latter is free to use that invention or obvious variants thereof. The issuance of a first-filed, first-issued patent does not "extend" (let alone improperly extend) the term of later continuation patents that did not exist when the first-filed patent issued. Indeed, there is no previously claimed subject matter to "double patent," nor any original monopoly to extend, *until* the first-filed, first-issued patent issues. Nor is it possible to file a terminal disclaimer upon issuance of a first-filed, first-issued patent when a so-called reference patent (or even a later-filed application) does not yet exist, which underscores that ODP cannot apply in such a circumstance. In short, the bargain with the public struck by the issuance of the first-filed, first-issued patent is simply not broken by the issuance of later-filed, earlier-expiring continuation patents.

The district court's reduction of ODP to a mechanical comparison of the expiration dates of any two commonly owned patents also violates Section 154. Through that provision, Congress expressly guaranteed diligent applicants a minimum 17-year term to create harmony with the fixed 17-year terms that prevailed before the 1994 Uruguay Rounds Agreement Act ("URAA"). Congress implemented that guarantee by mandating patent term adjustments for PTO delay. The district court's ruling violates Section 154 by denying a first-filed, first-issued patent the full patent term to which it is statutorily entitled. Under the separation of powers, a judge-made doctrine cannot override legislative mandates.

To be sure, Congress contemplated the application of ODP, but only where necessary to prevent unjust *extensions* of an awarded patent term. Consistent with the principles espoused in *Breckenridge*, ODP should therefore not be invoked to *truncate* a mandated statutory term—particularly with respect to a first-filed, first-issued patent. 909 F.3d at 1364 ("At the time the [first-filed, later-expiring] patent issued, it cannot be said that [patentee] improperly captured unjustified patent term. The [later-filed, earlier-expiring] patent had not yet issued, and the [first-filed, later-expiring] patent … was confined to a [statutorily-granted] patent term.").

There is no inequity in preserving the full statutory term of the '356 patent. Janssen diligently prosecuted its application, yet PTO examination delays pushed

issuance back 1,107 days. The '356 patent issued from the first application filed on any invention disclosed therein, and was the first patent granted from that family. The full term of that patent thus represents the bargain struck with the public: It was the single, original patent monopoly establishing when the public would gain the right to use the invention or obvious variants thereof. The alleged reference patents, on the other hand, are continuations filed years later, which expire earlier merely due to the happenstance that the PTO did not delay their examinations.

Despite Congress's guarantee of a minimum 17-year term to the diligent applicant, upholding the district court's decision would mean Janssen receives only 14 years, 9 months, and 2 days of statutory patent term. Nothing in ODP doctrine or this Court's precedent warrants that unjust result. Indeed, another judge from the same district recently rejected the district court's *Cellect* analysis, correctly holding that a later-filed patent cannot serve as a reference patent for ODP purposes. *Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, C.A. No. 20-985-GBW, 2023 WL 8622048, at *7 n.4 (D. Del. Dec. 13, 2023). *A fortiori*, a later-filed, later-issued continuation patent cannot serve as an ODP reference patent to invalidate the first-filed, first-issued patent in the family—the circumstance presented here.

2.    Assessing the adequacy of written description under 35 U.S.C. § 112 requires a court to evaluate a patent's specification to determine whether, as of the patent's filing date, a person of ordinary skill in the art ("POSA") would have understood that the applicant was in possession of the *claimed* invention.

The district court began by committing legal error in interpreting the scope of one of the two representative claims, claim 26 of the '516 patent. Claim 26 is a picture-type claim directed to a particular pharmaceutical tablet comprising specific amounts of eluxadoline, four particular excipients, and a film coating. The specification expressly discloses that the inventors possessed the recited formulation, and Sun's own expert acknowledged that a POSA reading the patent "could pick out that embodiment [of claim 26]." Appx5973-5974 (Gemeinhart 258:6-259:7). This should have resolved any written-description inquiry with respect to that claim.

Instead, the district court committed reversible legal error by requiring written description of requirements not recited in claim 26. The district court interpreted that claim to recite "a formulation that does not have a glidant or where a glidant would be understood as optional," and found lack of written description because purportedly the specification did not disclose such a formulation. Appx18. But claim 26 simply claims a pharmaceutical tablet comprising the recited components—none of which is a glidant—in precise amounts. It does not recite a

glidant-optional limitation. The '516 patent therefore need not disclose that the inventor was in possession of "glidant-optional" formulations, as the district court incorrectly required.

With respect to both representative claims, the district court committed further reversible legal error by requiring the inventive tablets to have certain allegedly essential functional properties—*i.e.*, "sufficient flow characteristics," Appx19—based almost exclusively on extrinsic evidence, and then invalidating the claims for failing to recite an ingredient (a glidant) that can be associated with that function. This Court has admonished that Section 112 does not permit courts to divine unclaimed elements that are purportedly essential to the invention, and then invalidate claims for lacking such elements. This applies with even greater force to unclaimed elements sourced from evidence extrinsic to the patent. Here, neither claim 26 nor claim 7 recites any "flow"-type language, and the specification never even discusses "flow characteristics" or the necessity of glidants—much less declares them essential or important to the invention. Nor were "flow properties" ever discussed in either of the two *Markman* proceedings below.

The district court compounded this error by (i) shifting the burden to Allergan to prove that glidants and sufficient flow were *unimportant* to the claimed formulation and (ii) analyzing whether the claimed formulations would "work without a glidant." Appx26; Appx21. This former approach is contrary to

precedent of this Court, which makes clear that any burden to show that glidants are *important* to the claimed invention should have fallen on Sun. And the latter is at best a question of enablement—a defense Sun explicitly waived at trial—not written description.

Beyond the district court's multiple legal errors, the specification itself does not support the district court's recasting of the invention as a formulation that must include glidants to achieve sufficient flow characteristics. Instead, the specification discloses embodiments where eluxadoline may be combined with *one or more* of five inert ingredients—only one of which is a glidant. Similar embodiments can also be found in the originally filed claims, further confirming that the written-description requirement is met here.

## **ARGUMENT**

## I. STANDARD OF REVIEW

ODP is a legal issue premised on underlying factual inquiries. *Novartis AG v. Ezra Ventures LLC*, 909 F.3d 1367, 1372 (Fed. Cir. 2018) ("*Ezra*"). When facts are undisputed, this Court reviews the district court's ultimate ODP conclusion without deference. *Id.* Likewise, the relationship between ODP and statutory-patent-term mandates is a legal question this Court reviews *de novo*. *Id.*

The determination of claim scope is a legal question reviewed *de novo*. *Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1336

(Fed. Cir. 2010).  Whether a claim lacks written-description support is a fact question reviewed for clear error.  *Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc.*, 934 F.3d 1344, 1349-50 (Fed. Cir. 2019).

## II.   OBVIOUSNESS-TYPE DOUBLE PATENTING DOES NOT JUSTIFY TRUNCATING THE TERM OF A FIRST-FILED, FIRST-ISSUED PATENT BASED ON ITS OWN PROGENY

The district court misinterpreted this Court's *Cellect* decision as establishing a hard-and-fast rule that, unless a terminal disclaimer is filed, ODP always invalidates claims that are patentably indistinct from those in any other patent having an earlier expiration date.  *See* Appx46.  ODP, however, does not and cannot apply to invalidate the claims of a first-filed, first-issued patent based solely on a later-filed, later-issued, earlier-expiring continuation patent.  This is because, as this Court has held, "[t]he key purpose of [ODP] is to prevent a patent owner from *extending* the exclusivity rights over his invention *beyond a full patent term*." *Breckenridge*, 909 F.3d at 1367.[6]  By definition, that first patent does not and cannot extend the term of any later-filed, later-issued continuation patent from that family.  And likewise, a later-filed, later-issued, earlier-expiring continuation patent does not and cannot extend the term of the first patent.

---

[6] Unless otherwise noted, all internal citations and quotations have been omitted, and all emphasis has been added.

Here, the district court's perfunctory misapplication of *Cellect* deprived Allergan of a statutorily guaranteed, original patent term, and penalized Allergan merely for applying for and receiving a later continuation patent.  ODP cannot be invoked to truncate such an original patent term in defiance of the minimum statutory guarantees of Section 154(b).  No equitable considerations or other evidence support this finding.  This Court should reverse.

## A.     ODP Prevents Unjustified Extensions of Patent Term

Section 101 of the Patent Act provides that, "[w]hoever invents or discovers any new and useful process ... may obtain *a* patent therefor ...."  35 U.S.C. § 101. A patent represents a bargain struck with the public:  "[I]n exchange for a patent, an inventor must fully disclose his invention and promise to permit free use of it at the end of his patent term."  *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1212 (Fed. Cir. 2014) ("*Gilead*").  ODP thus "ensures that the public gets the benefit of the invention after the *original period* of monopoly expires."  *AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1373 (Fed. Cir. 2014); *see also id.* at 1372 (ODP preserves the public's "'right to use the invention at the expiration of the term *specified in the original grant*'") (quoting *Odiorne v. Amesbury Nail Factory,* 18 F. Cas. 578, 579 (C.C.D. Mass. 1819)).

The "traditional concern with" ODP is "*extending* … exclusive rights to an invention through claims in a *later-filed* patent that are not patentably distinct from claims in the earlier[-]filed patent." *Ezra*, 909 F.3d at 1374.  Accordingly, ODP "prevent[s] a patent owner from extending his exclusive rights to an invention through claims in a later-filed patent that are not patentably distinct from claims in the earlier[-]filed patent."  *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009).  A patentee may avoid invalidation of such a later-filed patent by disclaiming any portion of its term that would extend beyond the original term.  *See* 35 U.S.C. § 253(b); *In re Longi*, 759 F.2d 887, 894 (Fed. Cir. 1985).

ODP was usually simple in application before the URAA; since patents received a standard 17-year term, a first-filed, first-issued patent for an invention always expired first.  Accordingly, "courts looked at the issuance dates of the respective patents."  *Breckenridge*, 909 F.3d at 1362.  But issuance date was not always dispositive pre-URAA; this Court refused to apply ODP to invalidate an earlier-filed, later-issued patent that extended the term of a later-filed, earlier-issued patent in certain circumstances where the PTO was solely responsible for delay.  "The rationale behind this proposition [wa]s that an applicant (or applicants), who files applications for basic and improvement patents should not be penalized by the rate of progress of the applications through the

PTO, a matter over which the applicant does not have complete control." *In re Braat*, 937 F.2d 589, 593 (Fed. Cir. 1991).

**B.     The URAA Did Not Change the Fundamental Rule That ODP Restricts Only Unjustified Timewise Extensions of Patent Term**

In 1994, Congress passed the URAA to, *inter alia*, "harmonize the term provision of United States patent law with that of our leading trading partners," *Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996), by "chang[ing] the term for a U.S. patent from seventeen years from the patent issue date to twenty years from the earliest effective filing date," URAA, Pub. L. No. 103-465, § 532(a), 108 Stat. 4809, 4983-85 (1994)).  Because the URAA provided patent term adjustments only in limited situations, "delays in the patent examination process decrease[d] the length of an applicant's patent term." *Gilead Scis., Inc. v. Lee,* 778 F.3d 1341, 1344 (Fed. Cir. 2015).

Congress remedied this problem in the Patent Term Guarantee Act of 1999, Pub. L. No. 106-113, § 4402, 113 Stat. 1501, 1501A-557 (1999) (codified as amended at 35 U.S.C. § 154(b)); *Intra-Cellular Therapies, Inc. v. Iancu*, 938 F.3d 1371, 1374 (Fed. Cir. 2019).  *First*, Congress provided a "[g]uarantee of prompt patent and trademark office responses" by extending patent term for PTO delays in taking certain actions.  35 U.S.C. § 154(b)(1)(A).  *Second*, Congress "guaranteed no more than 3-year application pendency" where the PTO, and not the applicant, was responsible for delay.  35 U.S.C. § 154(b)(1)(A),(B) (cleaned up).  *Third*,

22

Congress maintained the URAA's "[g]uarantee of adjustments for delays due to derivation proceedings, secrecy orders, and appeals." 35 U.S.C. § 154(b)(1)(C).

The statute is thus a regime of mandatory compensation for PTO examination delays to diligent applicants, continuing Congress's longstanding policy of not penalizing patentees for such delays. *See, e.g.*, *United States v. Am. Bell Tel. Co.*, 167 U.S. 224, 246 (1897). The legislative history buttresses the statute's express guarantees. *See* H.R. Rep. No. 106-287, pt.1, at 32 (1999) (PTAs are necessary because a diligent patent applicant can "lose years of effective patent term due to delays in the PTO and other *circumstances beyond her control*"); *id.* at 49-50 (1999 amendments "compensate patent applicants for certain reductions in patent term that are *not the fault* of the applicant," and penalize only "those who purposely manipulate the system"). As a bill co-sponsor explained, the goal was to "assure a minimum patent term of 17 years from the date a patent is granted" via the "guarantee that the PTO will extend the patent term as necessary to assure a term of 17 years from filing for non-dilatory applicants … essentially giv[ing] back to the non-dilatory patent holder … a guaranteed 17 year patent term." 145 Cong. Rec. H6,944 (daily ed. Aug. 3, 1999) (statement of Rep. Rohrbacher).[7]

---

[7] *See also id.* at H6,943 (discussing goal of "extending patent term completely to compensate for delays … resulting from actions taken by anyone else *other than the patent applicant*"); *accord* 145 Cong. Rec. S13,258-59 (daily ed. Oct. 27, 1999) (statements of Sen. Hatch and Sen. Leahy) (same).

Congress recognized that patentees may still need to file terminal disclaimers when a commonly owned, original patent has exhausted the monopoly for that invention. It therefore provided that "[n]o patent the term of which has been disclaimed beyond a specified date may be adjusted under this section beyond the expiration date specified in the disclaimer." 35 U.S.C. § 154(b)(2)(B). But this limitation, by its plain language, applies only to a patent whose term "has been disclaimed"—which could never be required of a first-filed, first-issued patent based on later-filed patents from the same family. That is, there is no need to even consider a terminal disclaimer when the first-filed, first-issued patent is granted, as there are no other then-existing patents in the family to justify a disclaimer. *Cf. Gilead*, 753 F.3d at 1216-17 (explaining that, even for copending applications, a terminal disclaimer is required only "for the later of the two applications"). Here, the applications resulting in the putative '011 and '709 reference patents were not even pending. Nor does the statute suggest any alteration of the ODP doctrine, especially not the core principle that ODP guards against only improper *extensions* of patent terms.

This provision is therefore consistent with congressional intent to protect PTAs from attack based on later-filed, later-issued patents. At the very least, ODP cannot be twisted to abrogate the original term Congress guaranteed to diligent applicants, as the district court did. *See* 150 Cong. Rec. S7521 (daily ed. June 25,

2004) (statement of Sen. Hatch) ("[ODP] can invalidate claims in any *later or concurrently issued patent* … determined to represent double patenting with respect to any of the claims in *a first-issued patent*.").  Indeed, while this Court has adjusted the ODP doctrine to the URAA's application-based framework for determining patent terms, it has never deviated from the fundamental rule that ODP only prevents unjustified timewise *extensions* of statutory term.  *See, e.g.*, *Gilead*, 753 F.3d at 1210 (invalidating later-filed patent over earlier-filed patent to prevent patent monopoly extension by strategic manipulation of priority dates); *AbbVie*, 764 F.3d at 1374 (invalidating later-filed, later-issued, later-expiring patent because patentee was "not entitled to an extra six years of monopoly solely because it filed a separate application"); *Breckenridge*, 909 F.3d at 1367 (refusing to invalidate earlier-filed, earlier-issued pre-URAA patent that did not extend term of later-filed post-URAA patent, even though the latter expired first).

### C.    *Cellect* Did Not Resolve Whether Later-Filed Patents Can Serve as ODP Reference Patents with Respect to First-Filed, First-Issued Patents

The district court improperly interpreted this Court's decision in *Cellect* to establish a rigid rule that ODP always invalidates claims that are patentably indistinct from those in any other patent having an earlier expiration date. Appx45-46.  To the contrary, *Cellect* rejected a broad challenge that ODP can

never limit a statutory PTA adjustment, and applied ODP in a very different circumstance from that presented here.

### 1.    The Patentee in *Cellect* Waived Any Challenge to the ODP Reference Patents

The ODP claims in *Cellect* were factually complex.  An annotated prosecution timeline of the *Cellect* patents is reproduced below:



U.S. Patent No. 6,862,036 ("the '036 patent") was invoked as a reference patent for U.S. Patent No. 6,424,369, which in turn was invoked as the reference patent for U.S. Patent Nos. 6,982,742 and 6,452,626, the latter of which served as the reference patent for U.S. Patent No. 7,002,621.  *Cellect*, 81 F.4th at 1220.  The Patent Trial and Appeal Board had found that the interplay of this complex web of patents meant that none could extend past the term of the earliest-expiring

'036 patent, which was effectively deemed to serve as the ODP reference patent for all challenged patents (two of which were issued after the '036 patent). *Id.*

Notably, the ODP challenge in *Cellect* did not involve the first-filed, first-issued patent in the family—U.S. Patent No. 6,275,255 ("the '255 patent"), represented in green above—as either a reference or challenged patent. *See id.* at 1219. This was recently recognized by the PTO. *See* Director's Response to Cellect, LLC's Petition for Rehearing En Banc at 12 n.2, *In re Cellect* (No. 22-1293) (Dec. 14, 2023) ("[T]he challenged claims [in *Cellect*] are not themselves 'parent' claims; rather they are 'child' claims that claim priority to the same parent application, and thus the scenario[]" at issue here is "not implicated."). Because the '255 patent played no part in the analysis, this Court in *Cellect* did not have the opportunity to address the present facts.[8]

The patentee raised two ODP legal challenges to the Board's unpatentability rulings, namely: (i) that ODP cannot be applied "based on the date of expiration of a patent that includes any duly granted PTA pursuant to 35 U.S.C. § 154"; and (ii) that "the Board erred in failing to consider the equitable concerns underlying the finding of ODP" (*i.e.*, that the Cellect patents neither involved any strategic

---

[8] *Cellect* did not analyze whether any claims in the four challenged patents were patentably distinct over any '255 patent claim. Moreover, the '255 patent had not received any PTA, and therefore had the same expiration date as the '036 reference patent. *See* U.S. Patent No. 6,275,255; U.S. Patent No. 6,862,036.

manipulation of patent term nor risked harassment of infringers by separate patent owners).  *Cellect*, 81 F.4th at 1222, 1229-30.

Critically, because it brought only these two legal challenges, the patentee in *Cellect* never disputed that the reference patents could properly serve as the basis for finding ODP.  A party waives ODP "reference propriety" arguments when they are not raised, and this Court can subsequently use the unvetted reference in an ODP determination without addressing its propriety.  *In re Fallaux*, 564 F.3d 1313, 1315 n.1 (Fed. Cir. 2009).  Thus, the Court did not resolve any question regarding the propriety of the asserted ODP reference patents, and certainly not the question presented here:  whether a later-filed, later-issued patent can serve as an ODP reference against a first-filed, first-issued patent in the same family.  As one district court ruled in distinguishing *Cellect*, the patentee there "opted not to challenge the availability of the reference patents being used in and [ODP] challenge, and 'instead focused its argument on whether or not [ODP] could cut short a grant of PTA.'"  *Acadia*, 2023 WL 8622048, at *7 (quoting *Cellect*, 81 F.4th at 1222).

After finding all challenged claims invalid for ODP over the '036 patent, the *Cellect* Court immediately clarified "that the non-asserted claims in the challenged patents are entitled to their full term, including the duly granted PTA, unless they are found to be *later-filed obvious variations of earlier-filed, commonly owned claims*."  81 F.4th at 1230.  The Court also repeatedly emphasized that ODP "limits

the term of a patent or, at least, ties *later-filed*, commonly owned, obvious

variations to the expiration date of an *earlier-filed reference patent.*"  *Id.* at 1226;

*see also id.* at 1231 (a "terminal disclaimer [ties] the expiration of the *later-filed*

claims to the *earlier-filed* reference claims").  Thus, because the patentee waived

the issue, the Court never had the occasion to determine which "earlier-filed"

patents could be properly used as the basis for finding ODP.  *Acadia*, 2023 WL

8622048, at *7.  In all events, the first-filed, first-issued patent in the family was

not at issue.

### 2.     The District Court Erred in Treating *Cellect* as Dispositive

This case presents a different question of law on different facts.  In contrast

to *Cellect*, this case presents the question of whether the first-filed, first-issued

patent in a family (*i.e.*, the '356 patent) can be invalidated for ODP over later-filed,

later-issued continuation patents (*i.e.*, the '011 and '709 patents).



In only two paragraphs of its opinion, the district court nonetheless ruled that *Cellect* disposed of this case. After quoting the general statement that "'any extension past the ODP reference patent's expiration date constituted an inappropriate timewise extension for the asserted claims of the challenged patents,'" the district court declared that *Cellect* "recognizes no exception to the rule it announced, whether for first-filed, first-issued claims or otherwise." Appx46 (quoting *Cellect*, 81 F.4th at 1229). But such "[b]road statements in judicial opinions must be interpreted in light of the issue before the court, and cannot uncritically be extended to significantly different situations." *Perez v. Dep't of Justice*, 480 F.3d 1309, 1312 (Fed. Cir. 2007). At a minimum, the district court's unsupported "no exception" declaration sits at odds with the reasoning of this Court's *Breckenridge* decision. *See* Section II.D.2 *infra*.

The district court's reliance on this pronouncement begs the doctrinal question of whether (i) a later-filed family member can serve as a reference patent for the first-filed, first-issued patent of that family and (ii) the latter patent's term can be regarded as an "extension" of the former. And the district court could not rely on the above-quoted isolated statement from *Cellect* while not considering *Cellect*'s equally definitive pronouncement—appearing two sentences later—that "claims in … challenged patents are entitled to their full term, including [any] duly granted PTA, unless they are found to be *later-filed* obvious variations of

30

*earlier-filed*, commonly owned claims." *Cellect*, 81 F.4th at 1230; *see Acadia*, 2023 WL 8622048, at *7, *7 n.4 (rejecting reliance in decision on appeal on *Cellect* given its failure to address the above statement). The question of whether a later-filed continuation patent can invalidate the first-filed, first-issued patent for ODP is an open question for this Court to decide on the merits.

### D.    ODP Cannot Be Applied to Truncate the Term of a First-Filed, First-Issued Patent Based on Later-Filed Family Members

#### 1.    The Term of a First-Filed, First-Issued Patent Establishes the Original Patent Monopoly and Does Not "Extend" the Term of Subsequent Patents

The prohibition on double patenting has always forbade a patentee from "extend[ing] or prolong[ing] the monopoly beyond the period allowed by law." *Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 198 (1894). This Court has repeatedly affirmed this foundational principle with respect to obvious variants of the invention in post-URAA ODP cases. *See, e.g.*, *AbbVie*, 764 F.3d at 1373; *Ezra*, 909 F.3d at 1374 ("traditional concern" of "extending his exclusive rights" not implicated where "it is the earlier-filed, earlier-issued" patent "that has the later expiration date"). *No court* before the district court in this matter has *ever* held that the first-filed, first-issued patent is invalid for ODP simply because a later-filed patent in the same patent family has an earlier expiration date.

Determining what constitutes the original patent monopoly that cannot be extended can sometimes be complex under the URAA, given that the baseline

patent term is defined by the application's effective filing date. *See* 35 U.S.C. § 154(a)(2). For example, in *Gilead*, this Court held that an *earlier-filed* patent could serve as a reference patent even if it did not issue first. *See Acadia*, 2023 WL 8622048, at *8. There, the patentee had "crafted a separate 'chain' of applications [with] a later priority date," resulting in issued patents that were "not part of the same family of patents and were not before the same patent examiner." *Gilead*, 753 F.3d at 1210. "Because the patents do not claim priority to any common application, they [would] expire at different times as governed by the provisions of the [URAA]." *Id*. Although the later-filed patent issued first, by virtue of the later application date, it expired 22 months after the term of the first-filed patent:



*Id.* at 1210-11; *see also id.* at 1214. Thus, in *Gilead*, the applicant had received the full statutory term to which it was entitled for the first-filed patent, but extended the monopoly of the invention by pursuing patentably indistinct claims in a separate application chain.

The Court noted that, "[i]n the URAA, Congress clearly limited the one period of exclusivity an inventor can obtain for each of his inventions to twenty years from the filing date of the *earliest application* to which the inventor claims priority—with some limited exceptions." *Id.* at 1215. This Court further reasoned that, post-URAA, looking to "issuance date only" in an ODP analysis would create perverse incentives for applicants to engage in "significant gamesmanship during prosecution," *id.*, including "orchestrat[ing] patent term extensions" and creating "significant vacillations in an inventor's period of exclusivity over his invention and its obvious variants," *id.* at 1215-16. As a result, the Court concluded that "Congress could not have intended to inject the potential to disturb the consistent application of the doctrine of double patenting by passing the URAA." *Id.*

In doing so, *Gilead* twice emphasized that its holding was limited to the circumstances of that case. At the outset of its analysis, the Court stated that it was deciding only a "*narrow question*" of "[c]an a patent that issues after but expires before another patent qualify as a [ODP] reference for that other patent," and held only that, "*under the circumstances* of this case … it *can*." *Id.* at 1211-12, 1217 ("We therefore hold that an earlier-expiring patent *can* qualify as an [ODP] reference for a later-expiring patent *under the circumstances here.*"). The application of ODP to first-filed, first-issued patents, particularly based on

later-filed patents from the same family, was not at issue in *Gilead*, which limited

its holding to the facts presented.

None of *Gilead*'s analysis applies to first-filed, first-issued patents. *See*

*Acadia*, 2023 WL 8622048, at *8. The awarded term of a first-filed, first-issued

patent for an invention is not an extension of any other patent term. There is

literally no previously claimed subject matter to "double patent," nor any original

monopoly to extend, *until* the issuance of the first-filed, first-issued patent. *Cf.*

*Gilead*, 753 F.3d at 1216-17 (explaining that only "the later of … two

applications" is subject to ODP rejection in the case of copending applications).

The grant of the first-filed, first-issued patent for an invention forms the bargain

between the patentee and the public; the inventor is entitled to the full, original

statutory term as a matter of right, and the public's inchoate interest in the use of

the invention vests only with the expiration of that original term. *See Odiorne*, 18

F. Cas. at 579. "As the lawmaking power has prescribed what the public will give,

specified the terms and conditions of purchase, indicated the time and methods of

determining the right of compensation, [the patentee] on his part has an absolute

legal right to avail himself of all the provisions thus made." *Am. Bell Tel. Co.*, 167

U.S. at 250.

Nor does it makes sense to view a first-filed, first-issued patent as somehow

extending the term of a future patent that does not even exist at the time of the

grant.  Congress codified the PTO's longstanding continuation practice in Section 120 of the Patent Act.  35 U.S.C. § 120.  Pursuant to that provision, parent and continuing applications "are to be considered as parts of the same transaction, and both as constituting one continuous application, within the meaning of the law." *Godfrey v. Eames*, 68 U.S. 317, 326 (1863).  This Court and its predecessor, in line with the statute, have long permitted continuation applications to pursue patentably indistinct claims.  The well-settled law of claiming, both before and after the 1952 Patent Act, permits the inventor to "express the same invention in more than one claim" so long as "undue multiplicity" is avoided.  *In re Barnett*, 155 F.2d 540, 546 (C.C.P.A. 1946) (quoting *In re Clark*, 97 F.2d 628, 631 (C.C.P.A. 1938)); *In re Chandler*, 319 F.2d 211, 225 (C.C.P.A. 1963).  This practice allows the patentee to frame the invention in multiple ways to protect the invention in view of the vagaries of language and interpretation.  *Barnett*, 155 F.2d at 546.

This Court's predecessor approved the practice of terminal disclaimers *in continuation patents* (not original patents) to ensure efficient claiming without extending the original patent monopoly.  *See In re Robeson*, 331 F.2d 610, 614 (C.C.P.A. 1964).  Before that time,

> an inventor who discovered an obvious improvement on or obvious modification of an invention on which he had already filed a patent application could obtain patent protection specific to his new invention only by filing a new patent application disclosing both his original and his new invention, and abandoning his first application.  This procedure

> would result in disclosure to the public of his original invention being
> delayed, perhaps for several years.

*In re Eckel*, 393 F.2d 848, 857 (C.C.P.A. 1968).  With a terminal disclaimer,

the inventor

> may allow his first application to issue, and claim his new invention in
> a separate application having a terminal disclaimer.  By this procedure,
> the inventor can obtain no claims which he would not have been entitled
> to under the previous practice.  The decisions have, therefore, in no way
> enlarged the scope of patent protection available to the inventor.
> However, they do have the salutary effect of making public the
> inventor's original disclosure at an earlier date than would have been
> the case under previous practice.

*Id.*; *In re White*, 405 F.2d 904, 906 (C.C.P.A. 1969) (same).

The district court's rule contravenes ODP's central purpose.  When a

judge-made doctrine applies to a statutory scheme, it "reaches only so far as the

equitable principle long understood to lie at its core."  *Minerva Surgical, Inc. v.*

*Hologic, Inc.*, 141 S. Ct. 2298, 2302 (2021).  The district court's unwarranted

application of ODP to first-filed, first-issued patents has nothing to do with

equitable prevention of extensions of the original monopoly, nor preserving the

inventor's bargain with the public.  *Acadia*, 2023 WL 8622048, at *7.  "Assuming

dominating claims in his patent, all [the patentee] is getting from this [later-filed]

application—and for only the remainder of the same term—are additional, more

specific claims which would serve as a second line of defense if the dominating

claims should prove to be vulnerable."  *In re Braithwaite*, 379 F.2d 594, 601

(C.C.P.A. 1967).  To dissuade or prevent patentees from prosecuting such continuation applications "would principally serve to deprive the public of the knowledge contained in the added disclosures."  *Id.*

Original patents often require prolonged examination to ensure patentability over prior art.  Continuation and other related applications, however, may subsequently have shorter examination times, and therefore may end up expiring first—even when later-filed and later-issued.  Forcing innovators to make the Hobson's choice between abandoning later applications, and risking that they may be used to cut off the terms of first-filed parents upon their issuance—potentially substantially—cannot be squared with the ODP doctrine.  *See, e.g.*, *Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc.*, 217 F. Supp. 3d 782, 787 (D. Del. 2016) (rejecting the "oddity of using [a continuation patent] as a reference patent to cut short … the first issued parent patent"); Daniel Kazhdan, *Obviousness-Type Double Patenting: Why It Exists And When It Applies*, 53 AKRON L. REV. 1017, 1046 (2019) ("It is common practice for inventors to file continuation applications, but if continuation applications can commit patent patricide, those continuation applications may not be worth it.").

There is also no risk that a split in ownership could lead to harassment of patent infringers by multiple owners in this case.  *See Cellect*, 81 F.4th at 1230. The first-filed, first-issued patent establishes the bargain with the public, and any

later-filed, later-issued continuation patents would properly have terminal

disclaimers as needed.  150 Cong. Rec. S7521 (daily ed. June 25, 2004) (statement

of Sen. Hatch) ("[T]he disclaimer must be filed in the patent with the patentably

indistinct claims and must reference the first-issued patent against which the

disclaimer applies.  Thus, the disclaimer only affects the ability to enforce the

disclaimed patent …. while the first-issued patent's enforceability is unaffected.").

ODP only bars unjustified timewise *extensions* of an original patent

monopoly.  It does not authorize a court to truncate the awarded term of a

first-filed, first-issued patent of a family.  *See Acadia*, 2023 WL 8622048, at *7

("If a later-filed patent is used as a reference, the logic and purpose of [ODP] is

flipped on its head: rather than preventing a patent owner from unjustifiably

extending the term of a patent, [ODP] would operate to cut off a patent term that

would have been valid but for a later-filed patent.").

### 2. This Court Has Ruled That ODP Should Not Truncate a Statutorily Mandated Term of a First-Filed, First-Issued Patent

This Court reached a similar result in *Breckenridge*, rejecting the notion that

ODP can be determined solely by a mechanical comparison of expiration dates.

*Breckenridge*, 909 F.3d at 1364-66.  The district court ignored *Breckenridge* in its

analysis.

38

*Breckenridge* concerned two commonly owned patents having a shared priority date that contained patentably indistinct claims. 909 F.3d at 1359. The first-filed, first-issued patent was governed by pre-URAA law, and received the statutorily guaranteed 17-year term from the date of issuance. *Id.* The later-filed, later-issued patent was governed by the URAA, and so its term was governed by the effective filing date, which expired before the first-filed pre-URAA patent. *Id.* at 1357-58.

This Court held that the later-filed, later-issued, but earlier-expiring patent could not be a potentially invalidating ODP reference under these circumstances. *Id.* at 1358. "At the time the [earlier-filed] patent issued, it cannot be said that [the patentee] improperly captured unjustified patent term. The [later-filed] patent had not yet issued, and the [earlier-filed] patent" was guaranteed a minimum "17-year patent term." *Id.* at 1364. Moreover, the patentee "did not structure the priority claim of its [later-filed] patent to capture additional patent term beyond the term it was granted for its [earlier-filed] patent. In fact, the [later-filed] patent's term expired before the [earlier-filed] patent's *original* 17-year term." *Id.* at 1364 (distinguishing *Gilead*, 753 F.3d 1208, and *AbbVie*, 764 F.3d 1366). As the Court explained, ODP does not apply to "truncate the term statutorily assigned to the [earlier-filed, earlier-issued] patent." *Id.* at 1358; *see also id.* at 1366 ("truncat[ing] any portion of the statutorily-assigned term of a pre-URAA patent

that extends beyond the term of a post-URAA patent would be inconsistent with the URAA transition statute").

The Court held that this approach is consistent with "[t]he key purpose of" ODP, namely "to prevent a patent owner from extending the exclusivity rights over his invention beyond a full patent term." *Id.* at 1367. And "[h]ere, critically, [the patentee] did *not seek to extend its patent rights* over its … invention beyond one patent term." *Id.* Instead, it merely sought to preserve its original period of monopoly, the first-filed "patent's statutorily-granted 17-year patent term." *Id.* As the Court noted, "[t]o find that [ODP] applies here because a post-URAA patent expires earlier would abrogate [the patentee's] right to enjoy one full patent term on its invention." *Id.*

Although *Breckenridge* addressed whether a later-issued, earlier-expiring post-URAA patent can serve as an ODP reference against an earlier-issued, later-expiring pre-URAA patent, the rationale of that decision applies equally here. The first-filed, first-issued '356 patent is not an extension of another patent term that impairs the rights of the public, and ODP has no application to shorten a statutorily guaranteed term. The district court did not even address *Breckenridge*, which alone provides a sufficient basis for reversal.

### 3.    The District Court's Ruling Violates 35 U.S.C. § 154

The district court's reduction of ODP to a simplistic comparison of the expiration dates of any two commonly owned patents is not compelled by precedent and contravenes the purposes of the ODP doctrine.  Furthermore, just as in *Breckenridge*, it directly contradicts the statute.  A first-filed patent and a later-filed continuation patent have the same effective filing date, and their terms are both determined by that date, subject to adjustments under Section 154(b).  It has long been a principle of patent law not to penalize the patentee for PTO delay.  *See Am. Bell Tel. Co.*, 167 U.S. at 246 ("if the delay is caused solely through the negligence or inattention of the tribunal before which the application is pending it is something for which the applicant is not responsible, and which does not affect his legal rights").  Even pre-URAA, this Court restricted ODP when a later improvement patent issued and expired before the basic patent because the patentee "should not be penalized by the rate of progress of the applications through the PTO, a matter over which the applicant does not have complete control."  *Braat*, 937 F.2d at 593.

Here, to guarantee the non-dilatory applicant at least a 17-year patent term, Congress has mandated that the 20-year statutory term from the patent's effective filing date be adjusted for PTO delay.  *Supra* at 22-23.  Congress would have understood that the first-filed, first-issued patent, if duly prosecuted without

41

applicant delay, would (as here) entitle the patent to receive the full statutorily guaranteed original term. It would further have understood that continuation applications can be filed years after the effective filing date, and may have short terms regardless of any applicant or PTO delay. In fact, Congress indisputably considered these facts with awareness that "[t]he double patenting doctrine can invalidate claims in any *later or concurrently issued patent* if those claims are determined to represent double patenting *with respect to any of the claims in a first-issued patent*." 150 Cong. Rec. S7521 (daily ed. June 25, 2004) (statement of Sen. Hatch) ("For clarity, any later or concurrently issued patent that creates double patenting can simply be termed a 'patentably indistinct patent' with respect to the first-issued patent.").[9]

Thus, Congress promulgated 35 U.S.C. § 154(b) knowing that the first-issued patent could not be challenged for ODP based on any later-issued patents, and intended for the first-issued patent to retain any duly granted PTA. As a result, "the present problem is definitively resolved by important legislative history ... on the effect the legislation would have on the judicially created double

---

[9] The uncodified AIA § 3(b)(2) incorporates by reference the legislative history of the CREATE Act, effectively giving it the force of law. Leahy-Smith America Invents Act, § 3(b)(2), 125 Stat. 285, 287 (2011) ("The [USPTO] shall administer [35 U.S.C. section 102(c)] in a manner consistent with the legislative history of the CREATE Act ....").

patenting doctrine." *Longi*, 759 F.2d at 895.  It contravenes Section 154 to deny a

first-filed, first-issued patent the full, original patent term to which it is statutorily

entitled simply because a later-filed child patent happens to expire earlier because

the PTO did not delay its examination.  *Cf. Breckenridge*, 909 F.3d at 1366 ("[T]o

require patent holders to truncate any portion of the statutorily-assigned term of a

[first-issued] patent that extends beyond the term of a [later-issued] patent would

be inconsistent with the URAA transition statute.").

Applying the district court's ODP rule in the parent-child context would run

afoul of the separation of powers.  In *SCA Hygiene Prods. Aktiebolag v. First

Quality Baby Prods., LLC*, the Supreme Court rejected application of the equitable

doctrine of laches to bar infringement claims brought within the six-year statute of

limitations of § 286 of the Patent Act.  580 U.S. 328 (2017).  The Court found that,

by enacting § 286, Congress "sp[oke] directly" to a claim's timeliness.  *Id.* at 334.

Thus, allowing a judge-made doctrine to bar an infringement claim brought within

the statutory limitations period would have "give[n] judges a 'legislation-

overriding' role that is beyond the Judiciary's power."  *Id.* at 335 (quoting *Petrella

v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 680 (2014)); *see also Ezra*, 909 F.3d

at 1375 ("a judge-made doctrine" cannot "cut off a statutorily-authorized time

extension").  So too here, where Congress has mandated a minimum PTA-adjusted

statutory term, 35 U.S.C. § 154(a)(2), (b)(1), and has prescribed the scope of ODP

43

in the terminal-disclaimer provision, *id.* §154(b)(2)(B), applying ODP to override the statutory scheme would impinge upon legislative power.  This Court should refuse to apply ODP here to avoid a constitutional question.

Congress contemplated ODP would still apply to post-URAA patents, and rejected PTA adjustments beyond disclaimed terms.  *See supra* at 23-25.  Under *Cellect*, ODP can apply to a patent having a PTA.  For example, if there were a PTA on a later-filed, later-issued continuation patent that extended beyond the full statutory term of the parent patent, ODP may invalidate a patentably indistinct claim in the child patent to avoid an unjustified timewise extension of the original monopoly, absent a terminal disclaimer.  But ODP cannot be invoked to *truncate* the statutory term of a first-filed, first-issued patent, and thus deny the patentee the guaranteed minimum term of exclusive rights over the invention.

### E.    ODP Should Not Apply to Invalidate Claim 40 of the '356 Patent

The '356 patent was the first-filed (March 14, 2005) and first-issued (June 22, 2010) application claiming priority to the '342 provisional application.  Janssen was a diligent applicant; absent 467 days of PTO delay,[10] the patent would have issued on March 12, 2009, and expired on March 14, 2025, entitling Janssen to a

---

[10] Janssen was initially granted 1,107 days of PTA (and thus a patent term of roughly 17 years, 9 months).  Sun does not challenge this assessment of PTO delay.  As noted above, Janssen subsequently terminally disclaimed a portion of that PTA to avoid capping its PTE.  ODP does not affect PTE under 35 U.S.C. § 156, as Sun acknowledges.  *See, e.g.*, *Ezra*, 909 F.3d at 1375; Appx45 n.10.

statutory term of roughly 16 years.  That was the bargain struck with the public; the public understood when exclusivity would end.  ODP does not justify truncating that awarded term by more than 15 months simply because patents from later-filed applications will expire earlier (*i.e.*, on March 14, 2025) due to no PTA.

Here, a PTA was granted only with respect to the first-filed, first-issued claims in the family (the '356 patent).[11]  The subsequent grant of later-filed patents is irrelevant because they do not qualify as ODP reference patents.  Without proper ODP references, the Court cannot conduct an ODP analysis.  There was simply no attempt to "extend ... exclusive rights to an invention through claims in a later-filed patent that are not patentably distinct from claims in the earlier-field patent." *Ezra*, 909 F.3d at 1374-75 & n.4 (rejecting later-filed patent as an ODP reference patent).  Nor has Sun pointed to any equitable considerations supporting the application of ODP in this case.

The grant of the '356 patent established the original monopoly.  Were it not for PTO delay, the patent would have issued on March 12, 2009, and expired on March 24, 2025 (the same date on which the '011 and '709 patents expired).  All

---

[11] Although the '356 patent and '709 patent share a common priority date, the '709 patent is "later-filed" for ODP purposes because the application from which it issued was filed after the '356 patent application. *Breckenridge*, 909 F.3d at 1357-58 (characterizing patent sharing common priority date as "later-filed" based on the filing date of the application that led to patent issuance).

the PTA did was shift the days that Allergan lost to PTO delay during prosecution to the back end of the term.



This Court should reverse the invalidation of claim 40 of the '356 patent. The '356 patent did not extend the terms of the subsequent '011 and '709 patents, as their respective applications had not even been filed at the time of the '356 patent's issuance. Even if this Court were to conclude otherwise, at a minimum, the allowance of that patent's full statutory term to compensate for PTO delay is not an "*unjustified*" extension of any patent monopoly. *Braat*, 937 F.3d at 595 (emphasis in original); *Acadia*, 2023 WL 8622048, at *7.

**F.    If *Cellect* Is Overturned, This Court May Also Reverse**

For all the foregoing reasons, this Court should reverse the district court's ODP ruling notwithstanding *Cellect*. But if *Cellect* is overturned, and either this

Court *en banc* or the Supreme Court holds that ODP cannot restrict a PTA-adjusted

patent term, this would provide an alternative basis for reversal.

## III. THE DISTRICT COURT ERRED IN FINDING LACK OF WRITTEN DESCRIPTION

To overcome the statutory presumption of validity, 35 U.S.C. § 282, a patent

challenger has the burden to prove by clear and convincing evidence that a claim

lacks written description. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d

1336, 1351 (Fed. Cir. 2011). To do so, the patent challenger must demonstrate that

the patent's disclosure does not convey to a POSA the inventor's possession of the

claimed invention as of the priority date. *Alcon Research Ltd. v. Barr Lab'ys, Inc.*,

745 F.3d 1180, 1190-91 (Fed. Cir. 2014). Assessing this disclosure "requires an

objective inquiry into the four corners of the specification." *Id.* Moreover, "[i]t is

common, and often permissible, for particular claims to pick out a subset of the full

range of described features, omitting others." *ScriptPro, LLC v. Innovation

Assocs., Inc.*, 762 F.3d 1355, 1359 (Fed. Cir. 2014) ("*ScriptPro I*").

The district court disregarded these settled principles and committed several

reversible legal errors in its written-description rulings.

### A. The District Court Improperly Treated Claim 26 as Containing a "Glidant-Optional" Limitation

The district court committed claim-construction error regarding claim 26 of

the '516 patent, which is a picture-type claim for a pharmaceutical tablet

comprising specific amounts of eluxadoline, four excipients (*i.e.*, silicified microcrystalline cellulose, crospovidone, mannitol, and magnesium stearate), and a film coating. Appx206. As a structural claim, it contains no operational or other limitations directed to any manufacturing-related properties. *See, e.g.*, Appx5784 (Costello 69:04-10).

The district court first went astray by interpreting the invention recited in claim 26 as a tablet "where a glidant is optional or not included." Appx26; *see also* Appx17, Appx18, Appx24, Appx25. Neither party requested any construction of claim 26, each relying instead on its plain language. Indeed, Plaintiffs specifically emphasized to the court that "[a]sserted Claim 26 of the '516 Patent does not include any ['glidant-optional'] language; neither it nor the independent Claim 1 on which it relies recites any limitation relating to colloidal silica or a glidant." Appx16107-16108 n.2. The district court likewise acknowledged that claim 26, unlike other claims in the asserted patents, does "not list a glidant as a limitation." Appx16.

Despite this acknowledgement, the district court committed legal error by requiring the '516 patent specification "to disclose a formulation that does not have a glidant or where a glidant would be understood as optional." Appx18. But unlike, for example, claim 1 of the '179 patent (which is not being asserted), *see* Appx96, claim 26 does not contain any limitation regarding the inclusion or not of

glidants; it simply claims any tablet with the recited ingredients in the required amounts, regardless of what other features are present.

As such, the '516 patent does not need to disclose that the inventor was in possession of such "glidant-optional" formulations. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) ("The invention is, for purposes of the 'written description' inquiry, *whatever is now claimed.*") (emphasis in original). An open-ended "comprising" claim like claim 26 simply means that the *accused* tablet infringes so long as it has the recited ingredients and weights (*i.e.*, practices the invention)—whether or not it has a glidant or any other unclaimed feature. *See, e.g.*, *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' … means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). By analogy, by claiming a car comprising a specific type of catalytic converter, an inventor is not claiming possession of a car without a steering wheel (and the specification need not describe such a car). But if someone makes a car without a steering wheel that has the claimed catalytic converter, they infringe.

Because "the patentee need only describe the invention as claimed," *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1333 (Fed. Cir. 2003), the inquiry is simply whether the written description "matches the claim scope," *GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 731 (Fed. Cir.

49

2014).  A structural claim that recites no performance property "raises no issue of insufficient structural, creation-process, or other descriptions to support such a property." *Id.* at 729-30.  Here, the proper inquiry should have been whether the '516 patent specification discloses tablets that include the recited ingredients and their respective weights.  This fulfills the purpose of the written-description requirement:  namely, "to put the public in possession of what the party claims as his own invention, so as to ascertain if he claim[s anything] that is in common use, or is already known, and to guard against prejudice or injury from the use of an invention which the party may otherwise innocently suppose not to be patented." *Evans v. Eaton*, 20 U.S. 356, 434 (1822).

The '516 patent specification adequately discloses the invention of claim 26. It expressly discloses the inventors' possession of a tablet formulation with the specified amounts of eluxadoline, the four recited excipients, and the film coating. *See, e.g.*, Appx194, Appx196 (11:21-12:2, Table 1).  Sun's formulation expert, Dr. Richard Gemeinhart, admitted as much, confirming that a POSA reading the patent "could pick out that embodiment [of claim 26]."  Appx5968-5974 (Gemeinhart 253:23-259:07).  That should have ended the inquiry.  *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1308-09 (Fed. Cir. 2015) (upholding validity finding because "the specifications thus disclose the claimed formulation as

characterized by those ingredients, and the skilled artisan would immediately discern the claimed formulation in that disclosure").[12]

### B.    The District Court Improperly Added a Functional Requirement to the Invention Based on Extrinsic Evidence

Even if both claim 26 and representative claim 7 of the '179 patent were deemed to recite glidant-optional formulations, the district court's written-description analysis as to both claims was legally defective.  The district court erred as a matter of law by requiring written-description support for the functional property of "sufficient flow characteristics"—a phrase found nowhere in the intrinsic record—as allegedly "necessary" to the invention.  Appx18-19.  And it compounded its error by imposing this requirement based almost exclusively on extrinsic evidence.

The district court did not rely on any clear indication *in the specification* that the invention had a narrower scope than claimed.  *See, e.g.*, *Alcon Research*, 745 F.3d at 1191 (written description "requires an objective inquiry into the four corners of the specification").  Instead, the district court relied on extrinsic evidence to conclude that tablet compositions need "sufficient flow characteristics" to be manufactured properly.  Appx17-18, Appx21.  In doing so, the court relied

---

[12] For purposes of this appeal, Plaintiffs do not contest the district court's implicit determination that claim 7 of the '179 patent, which depends from claim 1, contains a glidant-optional limitation.

heavily on the testimony of Sun's expert regarding the general formulation art, *see* Appx16; Appx5815-5816 (Gemeinhart 100:23-101:04), finding that (i) a glidant's function is to "improve the flow characteristics of a powder mixture" and (ii) consequently, a "POSA would understand that a glidant would be used when it was necessary" and is not "an optional excipient," Appx15-16.

After improperly looking outside the patent in the first instance, the district court then considered whether the patent itself supported its new functional requirement. Perhaps unsurprisingly, the district court determined that a functional limitation based on evidence *outside* the patent did not appear *inside* the patent. The specification did not expressly discuss "sufficient flow characteristics" because the district court looked outside the patent to find this functional concept in the first place.

From this inverted perspective, the district court attempted to bolster its "sufficient flow" requirement with support from the specification's preferred embodiments. Specifically, the court interpreted the inclusion of a particular glidant (colloidal silica) in preferred embodiments to mean both that the claimed formulations *must* have "sufficient flow," and that colloidal silica is "necessary" to achieve that flow. *See* Appx19 ("[A] POSA would understand that using a glidant in a formulation would be a signal that it *was necessary* in order to achieve sufficient flow properties, *unless noted otherwise*.").

As an initial matter, this Court has disavowed the inquiry that the district court undertook at Sun's behest. *See, e.g.*, *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317, 1323 (Fed. Cir. 2002) ("[W]e did not announce a new 'essential element' test mandating an inquiry into what an inventor considers to be essential to his invention and requiring that the claims incorporate those elements").  The district court had no warrant to define the functional property of "sufficient flow" as essential to the invention, and proceed to invalidate the structural claim 26 (or the mixed structural/functional claim 7 that recites a *different* abuse-deterrent functional limitation that is not tied to flowability) for failing to recite an ingredient that would supposedly perform the unclaimed function of generating sufficient flow (*i.e.*, a glidant).  Regardless, neither the specification, claims, nor prosecution history discusses the need for "sufficient flow," *see, e.g.*, Appx5967-5968 (Gemeinhart 252:25-253:18), which alone suffices to reject the district court's written-description analysis.

In any event, the district court's logic is flawed.  Even if colloidal silica enhances flow, this does not mean that a particular formulation would necessarily lack sufficient flow without it (or be guaranteed to have sufficient flow with that ingredient).  And embodiments—even preferred ones—do not define the invention. As this Court has explained,

> The statements from the description of the preferred embodiment are simply that ….  Those statements do not indicate that the invention can

53

> only be used in such a manner.  Absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context.

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003).[13]

Under the district court's logic, *any* tablet formulation invention in *any* patent disclosing a glidant would inherently require "sufficient flow characteristics" to form "a good final product."  Appx16, Appx19.  This is not grounds to incorporate functional limitations into structural claims like claim 26, or to add unclaimed functional limitations to mixed structural/functional claims like claim 7.  *See, e.g.*, *Markem-Imaje Corp. v. Zipher Ltd.*, 657 F.3d 1293, 1300-01 (Fed. Cir. 2011) ("That [an invention] will only operate if certain elements are included is not grounds to incorporate those elements into the construction of the claims.").  Similarly, for written-description purposes, a court may not import functional limitations into the specification's description of the invention.

The district court therefore erred by requiring specification support for an operational requirement, namely "sufficient flow," where nothing in the claims or the intrinsic record warrants any such functional requirement.  *See, e.g., Cadence*

---

[13] Sun never invoked specification disclaimer, and, in any event, no clear-and-unequivocal evidence establishes that the specification necessarily requires glidants, much less "sufficient flow."

*Pharms. Inc. v. Exela Pharmsci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015)

(holding "plain and ordinary meaning of 'buffering agent' does not include specific

efficacy and concentration limitations," as there was "nothing in the intrinsic

record to warrant adding requirements of effective concentration or resistance to

material change").

### C.     The District Court Misinterpreted *ICU Medical* to Impose a Freestanding Written-Description Inquiry into the Necessity of Unclaimed Features

The district court suggested that its approach to the written-description

analysis was justified by *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558

F.3d 1368 (Fed. Cir. 2009).  Appx17-18.  But *ICU Medical* does not command a

freestanding inquiry, detached from the specification, into whether a POSA would

regard unclaimed features as necessary to the invention's operation when the

specification itself does not restrict the invention.

Rather, unlike the district court, *ICU Medical* limited its inquiry to the

claims and the four corners of the specification.  In *ICU Medical*, the patented

invention involved "medical valves used in the transmission of fluids to or from a

medical patient, such as when using an IV."  558 F.3d at 1371.  The patent

included claims to valve structures with spikes and without spikes.  *Id.* at 1377.

This Court found the "spikeless" claims invalid for lack of written

description.  *Id.* at 1379.  First, based on the specification, the *ICU Medical* court

determined that spikeless valves had to perform specific *functions*, namely "compression of the preslit seal by a medical implement opens the slit to create a fluid pathway and decompression of the seal upon removal of the medical implement closes the seal." *Id.* at 1378. This Court also found that the specification required a spike to accomplish those necessary functions. Relying entirely on disclosures in the four corners of the specification, the Court found that "[t]he specification describes the preslit seal as facilitating piercing and resealing, rather than as eliminating the need for piercing," and "repeatedly and uniformly describes the spike as a *pointed* instrument for the *purpose of piercing a seal* inside the valve." *Id.* at 1374-75, 1378. No other structure that could have operated without a spike was disclosed. *Id.* at 1378. Moreover, in contrast to the present case, *see infra* at 61-62, "the asserted spikeless claims were not filed with the original application," *ICU Medical*, 558 F.3d at 1377.

Thus, *ICU Medical* simply stands for the proposition that, where the *specification* describes a structural component as necessary to the invention, there is no written description for a claim without that structure. *See, e.g.*, *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1382 (Fed. Cir. 2011) ("These claims show, as *Ariad* recognized many original claims do, that the applicants had in mind the invention as claimed."); *Hynix*, 645 F.3d at 1352 ("the spike was used to pierce a seal inside the valve to effectuate the

56

invention, and … no other method was disclosed to effectuate the fluid pathway

because the specification describes only medical valves with spikes"); *ScriptPro*

*LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016) ("*ScriptPro*

*II*") ("the [*ICU Medical*] specification[] clearly limited the scope of the inventions

in ways that the claims clearly did not" because it "describes only medical valves

with spikes and the claims did not include a spike limitation").  Nothing in *ICU*

*Medical* supports relying on extrinsic evidence to declare a certain feature of a

preferred embodiment necessary to the invention and invalidating claims on that

basis, as the district court did.

　　　As this Court held in *In re Peters*, 723 F.2d 891 (Fed. Cir. 1983), when the

specification itself does not describe a feature as essential or critical to the

invention, a claim does not lack written-description support because it omits

features from certain embodiments of the invention.  In *Peters*, the applicant had

claimed a display device, in which each support wall had a metal tip compressed

between it and the front wall.  *Id.* at 892-94.  The question was whether a claim

with no required tip shape was described when the specification's embodiments all

had tapered tips.  *Id.* at 892-94.  In rejecting the written-description challenge, the

Court reasoned that "nothing in the original disclosure indicates or suggests that

the tapered shape of the tips was *essential or critical* to either the operation or

patentability of the invention," nor was tip shape used to overcome or distinguish

prior art. *Id.* at 893-94. Here, the extrinsic evidence did not establish the necessity of glidants, *see* Appx6092-6093 (Berkland 377:22-378:16), but regardless, extrinsic evidence cannot be invoked to redefine the invention described in the specification. In short, no precedent of this Court supports the district court's aberrant analysis.

### D. The District Court Improperly Placed the Burden on Plaintiffs to Show That the Specification Disclosed Glidants Were Optional

Compounding the above errors, and turning the relevant inquiry on its head, the district court faulted Allergan because "the specification makes no disclosure about whether the use of a glidant *is unimportant or just an optional component* to include in the disclosed formulations." Appx21; *see also* Appx6272-6273 (557:20-558:3) ("[I]f the spec doesn't disclose [that the glidant is optional], it doesn't matter whether people know that possibility from the prior art, does it?"). In doing so, the district court improperly "flipped" the burden of proving invalidity.

Rather than requiring *Sun* to show that the specification disclosed "sufficient flow" as critical, and thus restricted the inventive formulations to this unclaimed feature, the district court instead required *Allergan* to demonstrate that the specification disclosed a glidant as "unimportant." *See, e.g.*, Appx18 ("For all the formulations disclosed in the specification, a glidant is used *without any indication that it was not required* to practice the invention."); Appx19 ("[A] POSA would understand that using a glidant in a formulation would be a signal that it *was*

*necessary* in order to achieve sufficient flow properties, *unless noted otherwise*."). This was clear legal error. As the patent challenger, Sun maintains the burden of proving invalidity at all times. 35 U.S.C. § 282; *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359-60 (Fed. Cir. 2007).

### E.    The District Court Improperly Conflated the Written-Description and Enablement Requirements

The district court also evaluated whether the specification disclosed a formulation that would "work." *See, e.g.*, Appx20 ("[I]n instances where the flow is not sufficient, a glidant is necessary, not optional."); Appx26 ("The patent specification does not disclose that a formulation would have sufficient flow characteristics *or work without a glidant*."). But whether or not an invention "works" is an analysis of enablement, not written description, and conflating the two is improper. *See, e.g.*, *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1340 (Fed. Cir. 2010).

The district court's inquiry into whether the claim 26 formulations "work" due to "sufficient flow" during manufacturing is at best a question of enablement. "[W]ritten description is … not about whether the patentee has proven to the skilled reader that the invention works, or how to make it work, which is an enablement issue." *Alcon Research*, 745 F.3d at 1191; *see also Crown Packaging*, 635 F.3d at 1382 ("[Defendant's] argument here boils down to whether the specification 'describe[s] the manner and process of making and using the

invention …. However, [Defendant] has never asserted an enablement challenge

….").  Sun waived any enablement arguments.  Appx6287 (572:11-18).

### F.    The Specification Discloses Formulations Lacking a Glidant

Even apart from its legal errors, the district court committed clear error in

finding that "none of the formulations disclosed in the patent specification of the

asserted patents are made without a glidant."  Appx16.

Even the "Summary of Disclosure" section makes plain that the inventive

tablet formulation can be composed of eluxadoline and just *one* (or more) of a total

of five "inert ingredient[s] selected from" SMCC, colloidal silica, mannitol,

crospovidone, and magnesium stearate.  *See* Appx190-191 (4:01-5:27).  Sun's

expert, Dr. Gemeinhart, agreed that a POSA "would read the words 'an inert

ingredient selected from' to mean one or more of these excipients," and that the

"selected from" language envisions embodiments that do *not* include all of the

listed excipients.  Appx5970-5972 (255:09-259:07), Appx5971 (256:3-6);

Appx6092 (Berkland 377:4-21).  Sun likewise admits that this "broad disclosure"

includes "hundreds or thousands of formulations."  *See* Appx15611 (¶¶ 44-45).  Of

these formulations, a glidant (*i.e.*, the colloidal silica) would be found only in

certain of them.  Appx6157 (442:5-13), Appx5829 (114:2-6).

This is confirmed by the "preformulation" portion of the "Description of

Illustrative Embodiments," which discloses using "*one or more* pharmaceutical

excipients" to make "formulations of the present disclosure." Appx194 (12:47-54); Appx5975 (260:9-19). Once again, only one of these excipients is a glidant. Appx25. This section also discusses a "homogenous" mixture, *i.e.*, the end result from "good flow." Appx5814 (Gemeinhart 99:3-5) (testifying that "[y]ou have to have good flow so that -- that what enters the tablet die is uniform and *homogenous*…."). But as this portion of the specification discloses, only a "preferred embodiment" need be a "homogenous mixture." Appx194 (12:47-54). Accordingly, the specification makes abundantly clear that a glidant, such as colloidal silica, is "optional," which Dr. Gemeinhart admitted. Appx5975 (Gemeinhart 260:9-19).

The original claims of the application leading to the '179 and '516 patents mirror this disclosure. "[O]riginal claims are part of the specification and in many cases will satisfy the written description requirement." *ScriptPro II*, 833 F.3d at 1341. The '516 patent ultimately claims priority to, and shares a specification with, U.S. Application No. 13/829,984 ("the '984 application"). Original claim 1 of the '984 application recites a "solid pharmaceutical dosage formulation comprising [eluxadoline] and *an* inert ingredient selected from [SMCC], colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate." U.S. Patent Application No. 13/829,984 (claims filed March 14, 2013). Original claim 5 and 6 depend from claim 1 and recite the amount of eluxadoline to be about 75 mg and

61

100 mg, respectively. *Id.* In other words, the originally filed claims recite an invention comprising a tablet formulation containing specific doses of eluxadoline, where only *one or more* of five specified excipients is required—further confirming that the inventors had in mind a formulation without a glidant. *Crown Packaging*, 635 F.3d at 1381 ("These claims show, as *Ariad* recognized many original claims do, that the applicants had in mind the invention as claimed.").

The district court dismissed these express specification disclosures as simply the "basic idea to create a formulation of eluxadoline with some combination of excipients in some proportions," Appx25, and the "basic idea of mixing eluxadoline with excipients and then subdividing the mixture into dosage amounts in some form," Appx24. These specification statements, however, identify the various embodiments of the invention and demonstrate to a POSA, a formulator, that there was no reason to limit the claim to any preferred embodiment. *See Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1301 (Fed. Cir. 2010) (where specification referred to "other display transducers" and "a wide variety of display and vision aid devices," there was "no reason" to limit the scope of the invention to an embodiment). Dr. Gemeinhart admitted that these sections described a glidant as optional and disclosed embodiments without a glidant. Appx5975 (260:9-19), Appx5970-5974 (255:09-259:07), Appx5971 (256:3-6). The district court clearly erred in substituting its interpretation for that of a POSA.

The district court's written-description analysis cannot stand.

## <u>CONCLUSION</u>

This Court should reverse the judgment as to claim 40 of the '356 patent, claim 26 of the '516 patent (including the claims it represents, *i.e.*, claim 29 of the '516 patent and claims 6 and 16 of the '792 patent), and claim 7 of the '179 patent (including the claims it represents, *i.e.*, claims 7 and 19 of the '291 patent and claim 18 of the '179 patent).

Respectfully submitted,

Lisa B. Pensabene        /s/ Eric W. Dittmann

Lisa B. Pensabene
Hassen A. Sayeed
James Y. Li
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
lpensabene@omm.com
hsayeed@omm.com
jli@omm.com

/s/ Eric W. Dittmann
Eric W. Dittmann
Melanie R. Rupert
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
ericdittmann@paulhastings.com
melanierupert@paulhastings.com

Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
stephenkinnaird@paulhastings.com

Dated:  December 28, 2023      *Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Circuit Rule 32(b)(3) and Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing Principal Brief of Plaintiffs-Appellants complies with the type-volume limitations in Federal Circuit Rule 32(b)(1), because it contains 13,998 words, excluding the exempted parts under Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

I future certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because the brief was prepared using Microsoft Word 365 in 14-point Times New Roman font.

/s/ *Eric W. Dittmann*

Eric W. Dittmann

# ADDENDUM

# TABLE OF CONTENTS

| Page No. | Date | Description |
|---|---|---|
| Appx1 | 10/12/2023 | Final Judgment |
| Appx5 | 9/27/2023 | Trial Opinion |
| Appx73 | 5/18/2021 | U.S. Patent No. 11,007,179 |
| Appx183 | 4/26/2022 | U.S. Patent No. 11,311,516 |
| Appx14407 | 6/22/2010 | U.S. Patent No. 7,741,356 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN USA, INC., ALLERGAN HOLDINGS UNLIMITED COMPANY and EDEN BIODESIGN, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 19-1727 (RGA) (Consolidated) |
| MSN LABORATORIES PRIVATE LIMITED, MSN PHARMACEUTICALS, INC., and SUN PHARMACEUTICAL INDUSTRIES LIMITED, | ) ) ) ) ) | |
| Defendants. | ) | |

**<u>FINAL JUDGMENT</u>**

This action, having been tried before the Court from November 7 through November 9,

2022, Honorable Richard G. Andrews, District Judge presiding, the evidence and testimony of

witnesses of each side having been heard and a decision having been rendered:

**IT IS HEREBY ORDERED AND ADJUDGED** this __12th__ day of October 2023, for

the reasons set forth in the Opinion dated September 27, 2023 (D.I. 483) that:

1.      Judgment is entered in favor of Defendant Sun Pharmaceutical Industries, Ltd.

("Sun") and against Plaintiffs Allergan USA, Inc., Allergan Holdings Unlimited Company,

Allergan Pharmaceuticals International Limited, Janssen Pharmaceutica NV, and Eden Biodesign,

LLC ("Plaintiffs") on Sun's counterclaim for invalidity of asserted Claims 7 and 18 of U.S. Patent

No. 11,007,179 ("the '179 Patent"), asserted Claims 7 and 19 of U.S. Patent No. 11,090,291 ("the

'291 Patent"), asserted Claims 6 and 16 of U.S. Patent No. 11,160,792 ("the '792 Patent"), and

asserted Claims 26 and 29 of U.S. Patent No. 11,311,516.

2.    Judgment is entered in favor of Sun and against Plaintiffs on Sun's counterclaim for invalidity of asserted Claim 40 of U.S. Patent No. 7,741,356.

3.    Judgment is entered in favor of Defendants MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc. (together, "MSN") and against Plaintiffs on MSN's counterclaim for invalidity of asserted Claims 11 and 23 of the '291 Patent, and asserted Claim 27 of the U.S. Patent No. 11,229,627.

4.    Judgment is entered in favor of Plaintiffs and against Sun on Sun's counterclaims and defenses of unclean hands and patent misuse.  (D.I. 444; D.I. 457 at 3:3-4:20.)  All other counterclaims asserted by Sun and/or MSN in this action are hereby dismissed without prejudice as moot.

5.    The following Complaints (or Counts of Complaints) alleging patent infringement against Sun and MSN are hereby dismissed with prejudice as part of this final judgment:

   a.  Count 4 of the original Complaint alleging patent infringement by the product described in MSN's ANDA No. 213576 (*see* PTX-038) of the '587 and '632 Patents (D.I. 1);

   b.  Count 5 of the original Complaint alleging patent infringement by the product described in Sun's ANDA No. 213447 (*see* PTX-070) of the '587 and '632 Patents (D.I. 1);

   c.  Complaint against MSN alleging patent infringement by the product described in MSN's ANDA No. 213576 (*see* PTX-038) of the '179 Patent, the '291 Patent, and the '792 Patent (D.I. 257);

    d.   Complaint against Sun alleging patent infringement by the product described in Sun's ANDA No. 213447 (*see* PTX-070) of the '179 Patent, the '291 Patent, and the '792 Patent (D.I. 259);

    e.   Complaint against MSN alleging patent infringement by the product described in MSN's ANDA No. 213576 (*see* PTX-038) of the '627 Patent and the '516 Patent (D.I. 341);

    f.   Complaint against Sun alleging patent infringement by the product described in Sun's ANDA No. 213447 (*see* PTX-070) of the '627 Patent and the '516 Patent (D.I. 343).

6.    This Final Judgment resolves all claims and counterclaims asserted in this consolidated action (19-1727), and in related cases 1:21-cv-1064; 1:22-cv-181; 1:21-cv-1065; 1:22-cv-182; and 1:20-cv-1479.

7.    The deadline for seeking costs under Fed. R. Civ. P. 54(d) and/or Local Rule 54.1 is hereby stayed until thirty (30) days after: (a) the issuance of any mandate from any appeal taken in this action; or (b) the date after which the deadline for filing a notice of appeal in this matter has expired, whichever is later. The parties shall each bear their own attorneys' fees.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*
_____
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*
_____
Dominick T. Gattuso (#3630)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorney for Defendant Sun Pharmaceutical Industries Limited*

3

Appx3

STAMOULIS & WEINBLATT LLC

*/s/ Richard C. Weinblatt*

———————————————————
Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
800 N. West Street, Third Floor
Wilmington, DE  19801
(302) 999-1540
stamoulis@swdelaw.com
weinblatt@swdelaw.com

*Attorneys for Defendants MSN Laboratories*
*Private Limited and MSN Pharmaceuticals, Inc.*

October 11, 2023

SO ORDERED this ___12th___ day of _____October_____, 2023.

/s/ Richard G. Andrews
———————————————————
UNITED STATES DISTRICT JUDGE

4

Appx4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLERGAN USA, INC., ALLERGAN
HOLDINGS UNLIMITED COMPANY, and
EDEN BIODESIGN, LLC.,

　　　　　Plaintiffs,

　　v.

MSN LABORATORIES PRIVATE LIMITED,
MSN PHARMACEUTICALS INC., and SUN
PHARMACEUTICAL INDUSTRIES
LIMITED,

　　　　　Defendants.

ALLERGAN USA, INC., ALLERGAN
HOLDINGS UNLIMITED COMPANY,
ALLERGAN PHARMACEUTICALS and
JANSSEN PHARMACEUTICA NV,

　　　　　Plaintiffs,

　　v.

SUN PHARMACEUTICAL INDUSTRIES
LIMITED,

　　　　　Defendant.

Civil Action No. 19-1727-RGA

(consolidated)

Civil Action No. 20-1479-RGA

TRIAL OPINION

Jack B. Blumenfeld, Jeremy A. Tigan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP,
Wilmington, DE; Lisa B. Pensabene, Hassen A. Sayeed, Daniel O'Boyle, Carolyn S. Wall,
James Y. Li, Mark A. Hayden, O'MELVENY & MYERS LLP, New York, NY.

　　　　Attorneys for Plaintiffs.

Dominick T. Gattuso, HEYMAN ENERGIO GATTUSO & HIRZEL LLP, Wilmington, DE;
Charles B. Klein, Jovial Wong, WINSTON & STRAWN LLP, Washington, DC; Kevin J. Boyle,
Annie R. Steiner, WINSTON & STRAWN LLP, Chicago, IL.

1

Appx5

Attorneys for Defendant Sun Pharmaceutical Industries Limited.

Richard C. Weinblatt, Stamatios Stamoulis, STAMOULIS & WEINBLATT LLC, Wilmington, DE; Ronald M. Daignault, Richard Juang, DAIGNAULT IYER LLP, Vienna, VA.

Attorneys for Defendants MSN Laboratories Private Limited and MSN Pharmaceuticals Inc.

September 27, 2023

**ANDREWS, U.S. DISTRICT JUDGE:**

Allergan brought this action against Sun Pharmaceutical Industries Limited ("Sun"), MSN Laboratories Private Limited and MSN Pharmaceuticals Inc. (together, "MSN") for patent infringement under 35 U.S.C. § 271(e)(2)(A).

Allergan asserts Sun infringes U.S. Patent Nos. 11,007,179 (the "'179 patent"), 11,090,291 (the "'291 patent"), 11,160,792 (the "'792 patent"), 11,311,516 (the "'516 patent") and 7,741,356 (the "'356 patent"). (D.I. 469, ¶ 1; D.I. 461, ¶ 14; D.I. 414-1, Ex. 1, ¶ 113).[1] Sun contends the asserted claims of those patents are invalid. (D.I. 461, ¶¶ 3-4).

Allergan asserts MSN infringes U.S. Patent No. 11,229,627 (the "'627 patent") and the '291 patent. (D.I. 461, ¶ 16; D.I. 469, ¶ 2). MSN contends the asserted claims of the two patents are invalid. (D.I. 461, ¶ 3).

I held a three-day bench trial. (D.I. 457-459).

I have considered the parties' post-trial submissions. (D.I. 461, 462, 468, 469, 471, 477, 478). Having considered the documentary evidence and testimony, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I.     **BACKGROUND**

Allergan holds New Drug Application ("NDA") No. 206940 for VIBERZI® eluxadoline[2] tablets. "VIBERZI® is approved for the treatment of irritable bowel syndrome with diarrhea ("IBS-D") in adults." (D.I. 414-1, Ex. 1, ¶ 81).

---

[1] References to the docket are to C.A. 19-1727, unless otherwise noted.

[2] "Eluxadoline is the S,S configuration of the compound having the chemical name 5-({[2-Amino-3- (4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}- methyl)-2-methoxy benzoic acid." (D.I. 414-1, Ex. 1, ¶ 6).

Appx7

Sun submitted Abbreviated New Drug Application ("ANDA") No. 213447 under § 355(j)

of the Federal Food, Drug, and Cosmetic Act seeking FDA approval to engage in the commercial

manufacture, market, and sell a generic version of Allergan's VIBERZI® eluxadoline tablets. (D.I.

414-1, Ex. 1, ¶ 107). In doing so, Sun filed "Paragraph IV" certifications pursuant to 21 U.S.C. §

355(j)(2)(A)(vii)(IV) for U.S. Patent Nos. 9,675,587 (the "'587 patent") and 10,188,632 (the "'632

patent"). (*Id.*, Ex. 1, ¶¶ 107-08). Sun later filed a Paragraph IV certification for the '356 patent.

(*Id.*, Ex. 1, ¶ 110).

MSN submitted ANDA No. 213576 under § 355(j) of the Federal Food, Drug, and

Cosmetic Act seeking FDA approval to engage in the commercial manufacture, market, and sell a

generic version of Allergan's VIBERZI® eluxadoline tablets. (*Id.*, Ex. 1, ¶ 90). In doing so, MSN

filed Paragraph IV certifications for U.S. Patent Nos. 8,691,860 (the "'860 patent"), 9,115,091 (the

"'091 patent"), 9,364,489 (the "'489 patent"), 9,789,125 (the "'125 patent"), and the '587 and '632

patents. (*Id.*, Ex. 1, ¶ 90).

Allergan filed its Complaint against MSN alleging infringement of the '860, '091, '489,

'587, '125, and '632 patents. (D.I. 1 at 26). On that same day, Allergan filed its Complaint against

Sun alleging infringement of the '587 and '632 patents. (*Id.*).

Over the course of the litigation in this case, Allergan filed continuation applications and

prosecuted patents belonging to the patent family at issue. Allergan later obtained U.S. Patent Nos.

11,007,179 (the "'179 patent"), 11,090,291 (the "'291 patent"), and 11,160,792 (the "'792

patent"), 11,229,627 (the "'627 patent") and 11,311,516 (the "'516 patent") and asserted them

against Sun and MSN as the patents issued. (*See* D.I. 414-1, Ex. 1, ¶¶ 94-106, 114-129). "The

'587, '632, '179, '291, '792, '516, '627, and '356 patents have been listed for NDA No. 206940

in the Orange Book." (*Id.*, Ex. 1, ¶ 84).

2

Appx8

Allergan filed a separate action alleging infringement of the '356 patent by Sun. (C.A. 20-1479, D.I. 1). That action was consolidated with this one. (D.I. 365).

Allergan and Sun stipulated that Sun would infringe the asserted claims of the '179, '291, '792, '516, and '356 patents if the claims are valid (D.I. 409; C.A. No. 20-1479-RGA, D.I. 53). Allergan and Sun stipulated to the dismissal of claims and counterclaims concerning the '587 and '632 patents. (D.I. 443).

At trial, the only issues between Allergan and Sun were whether the asserted claims of the '179, '291, '792, '516, and '356 patents are invalid. Sun argues the asserted claims of the '179, '291, '792, and '516 patents are invalid for lack of written description. (D.I. 462 at 5-13). If I were to find that the asserted claims have sufficient written description, then Sun argues the asserted claims of those patents are obvious. (*Id.* at 21-23). Sun contends that the asserted claim of the '356 patent is invalid for obviousness-type double patenting. (*Id.* at 23-25).

Allergan and Sun stipulated that claim 26 of the '516 patent and claim 7 of the '179 patent are representative of the asserted claims of the '179, '291, '792, and '516 patents. (D.I. 433 at 2).

The relevant claims from the '516 patent read as follows:

1. A pharmaceutical tablet comprising:
about 75 mg of [eluxadoline],
about 60-80% by weight filler;
about 2-8% by weight disintegrant;
about 10% by weight mannitol.

(JTX-006, cl. 1).

26. The pharmaceutical tablet of claim 1, comprising:
about 75 mg of [eluxadoline];
about 390 mg-450 mg silicified microcrystalline cellulose;
about 30 mg crospovidone;
about 60 mg mannitol;
about 4.5 mg magnesium stearate; and
about 18 mg of a film coating,

3

wherein the nominal weight of the tablet without the film coating is about 600 mg
and the total weight of the tablet is about 618 mg.

(JTX-006, cl. 26).

The relevant claims of the '179 patent read as follows:

1. An abuse-deterrent, mono-phasic pharmaceutical tablet comprising:
about 75 mg of [eluxadoline],
about 60-80% by weight silicified microcrystalline cellulose;
crospovidone;
about 5-15% by weight mannitol; and
optionally, a glidant and/or lubricant.

(JTX-002, cl. 1).

3. The tablet of claim 1, comprising about 65-75% by weight silicified
microcrystalline cellulose, and about 7.5-12.5% by weight mannitol.

4. The tablet of claim 3, comprising about 3-7% by weight crospovidone and a
lubricant.

5. The tablet of claim 4, wherein the lubricant is magnesium stearate present in an
amount of about 0.55-0.95% by weight.

6. The tablet of claim 5, comprising:
about 75 [eluxadoline];
about 390 mg-450 mg of silicified microcrystalline cellulose;
about 18 mg-42 mg crospovidone;
about 45 mg-75 mg of mannitol; and
about 3.3 mg-5.7 mg of magnesium stearate.

7. The tablet of claim 6, comprising:
about 75 mg of [eluxadoline];
about 390 mg-450 mg of silicified microcrystalline cellulose;
about 30 mg of crospovidone;
about 60 mg of mannitol; and
about 4.5 mg of magnesium stearate.

(JTX-002, cl. 3-7).

Allergan and MSN stipulated to dismissal of the claims and counterclaims concerning the

'860, '091, '489, '125, '356, '792, '179, '632, '516, and '587 patents. (D.I. 353; D.I. 452). Allergan

4

and MSN stipulated that MSN would infringe the asserted claims of the '291 and '627 patent if the claims are valid. (D.I. 408 at 2; 414-1, Ex. 1, ¶¶ 174-75).

At trial, the only issues between Allergan and MSN were whether the asserted claims of the '627 and '291 patents are invalid. MSN argues the asserted claims are invalid for lack of written description and lack of enablement. (D.I. 462 at 13-21). If I were to find the asserted claims have adequate written description and are enabled, then MSN argues the asserted claims are obvious. (*Id.* at 21-23).

Allergan and MSN stipulated that claim 27 of the '627 patent and claim 11 of the '291 patent are representative of all asserted claims against MSN. (D.I. 432 at 1-2).

Claim 27 of the '627 patent reads as follows:

27. A pharmaceutical tablet comprising:
about 75 mg or about 100 mg of [eluxadoline];
about 60-80% by weight filler;
about 7.5-12.5% by weight mannitol;
about 3-7% by weight disintegrant;
colloidal silicon dioxide; and
about 0.45-1 % by weight magnesium stearate.

(JTX-005, cl. 27).

Claim 11 of the '291 patent reads as follows:

11. An abuse-deterrent, mono-phasic pharmaceutical tablet comprising:
about 75 mg of [eluxadoline];
about 390 mg[-]450 mg filler;
about 12 mg[-]48 mg disintegrant;
about 60 mg of mannitol;
colloidal silica; and
magnesium stearate.

(JTX-003, cl. 11).

5

Appx11

The asserted patents, except for the '356 patent, have a shared specification. (D.I. 469, ¶ 10).[3]

## II.   LEGAL STANDARDS

### A.   Written Description

The written description requirement contained in 35 U.S.C. § 112 requires that the specification "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (alteration in original). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* "When determining whether a specification contains adequate written description, one must make an 'objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.'" *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) (quoting *Ariad*, 598 F.3d at 1351). The written description inquiry is a question of fact. *Ariad*, 598 F.3d at 1351.

### B.   Enablement

A patent's "specification must enable the full scope of the invention as defined by its claims." *Amgen Inc. v. Sanofi*, 143 S. Ct. 1243, 1254 (2023). For a patent claim to be enabled, the patent specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same[.]" 35 U.S.C. § 112(a). "The enablement requirement is met where one skilled in the art,

---

[3] Unless otherwise noted, I cite only to the specification of the '179 patent (JTX-002) when referring to the patent specification of the asserted patents.

Appx12

having read the specification, could practice the invention without 'undue experimentation.'" *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) (citation omitted); *see also Amgen*, 143 S. Ct. at 1255 ("[A] specification may call for a reasonable amount of experimentation to make and use a patented invention. What is reasonable in any case will depend on the nature of the invention and the underlying art."). Factors for assessing whether a disclosure would require undue experimentation include:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

"Enablement is a question of law based on underlying facts." *Wyeth & Cordis Corp. v. Abbott Lab'ys,* 720 F.3d 1380, 1384 (Fed. Cir. 2013). The party challenging validity must prove lack of enablement by clear and convincing evidence. *Cephalon, Inc. v. Watson Pharms., Inc.,* 707 F.3d 1330, 1336 (Fed. Cir. 2013).

### C.   Obviousness

A patent claim is invalid as obvious under 35 U.S.C. § 103 "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-07 (2007). "As patents are presumed valid, a defendant bears the burden of proving invalidity by clear and convincing evidence." *Shire, LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1306 (Fed. Cir. 2015) (cleaned up). "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to

Appx13

be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." *KSR*, 550 U.S. at 406 (citations and quotation marks omitted).

A court is required to consider secondary considerations, or objective indicia of nonobviousness, before reaching an obviousness determination, as a "check against hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1078-79 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

### D.    Obviousness-Type Double Patenting

"Obviousness-type double patenting is a judicially-created doctrine designed to prevent claims in separate applications or patents that do not recite the 'same' invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection." *In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013) (internal quotation marks omitted). Under this doctrine, the court must determine "whether the claimed invention in the application for the second patent would have been obvious from the subject matter of the claims in the first patent, in light of the prior art." *In re Longi*, 759 F.2d 887, 893 (Fed. Cir. 1985). In order to do so, the court applies a two-step analysis: "First, the court construes the claim[s] in the earlier patent and the claim[s] in the later patent and determines the differences. Second, the court determines whether those differences render the claims patentably distinct." *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Trust*, 764 F.3d 1366, 1374 (Fed. Cir. 2014)

8

(internal quotation marks omitted). "A later claim that is not patentably distinct from ... an earlier

claim is invalid for obviousness-type double patenting." *Id.* (internal quotation marks omitted).

For a patent to qualify as an obviousness-type double patenting ("ODP") reference, its

expiration date must fall before that of the challenged patent. *Gilead Scis., Inc. v. Natco Pharma

Ltd.*, 753 F.3d 1208, 1215-17 (Fed. Cir. 2014). "ODP for a patent that has received [patent-term

adjustment ("PTA")], regardless [of] whether or not a terminal disclaimer is required or has been

filed, must be based on the expiration date of the patent after PTA has been added." *In re Cellect,

LLC*, ___ F.4th ___, 2023 WL 5519716, at *9 (Fed. Cir. Aug. 28, 2023).

## III.   WRITTEN DESCRIPTION (SUN)

### A.   Findings of Fact

1.  A person of ordinary skill in the art (POSA) is a person who possesses a Ph.D. in chemistry, pharmaceutical sciences, or related disciplines and at least one year's experience formulating pharmaceutical products and the ability to operate independently on formulation development activities. (D.I. 461, ¶¶ 19-20; D.I. 469, ¶¶ 36-37). Alternatively, a POSA may have a lesser degree but would have more than one year of experience working in those fields, such that the total level of knowledge would be equivalent. (D.I. 461, ¶¶ 19-20; D.I. 469, ¶¶ 36-37). Furthermore, because drug development involves a multidisciplinary approach, a POSA may interface, consult, or work in a group with individuals having specialized expertise, for example, a physician with experience in the administration, dosing, and efficacy of drugs for the treatment of a particular disease state. (D.I. 461, ¶ 19-20; D.I. 469, ¶¶ 36-37).[4]

2.  The priority date of the '179, '291, '792, and '516 patents is March 14, 2013. (D.I. 414-1, Ex. 1, ¶ 196).

3.  A POSA would understand that the term "glidant" is a common category of excipient used in pharmaceutical formulations. (D.I. 469, ¶ 8; D.I. 461, ¶ 22; Tr. 197:11-23: (Gemeinhart)). A POSA would understand that a glidant is an agent used to improve the flow characteristics of a powder mixture. (D.I. 461, ¶ 26; D.I. 469, ¶ 8; Tr. 68:20-21, 69:6-

---

[4] Allergan's and Defendants' definitions of POSA differ slightly. "Both [Allergan's] and Defendants' experts agree that their opinions would be the same regardless of whether the Court adopts [Allergan's] or Defendants' definition of a POSA." (D.I. 469, ¶ 38; *see also* D.I. 461, ¶ 18). Therefore, while I adopt Defendants' definition, I note that adopting Allergan's definition instead would not change my conclusions.

9

8 (Costello); Tr. 101:22-102:2, 103:7-8 (Gemeinhart); JTX-023 (Ansel) at 36; JTX-060 (Remington) at 862; JTX-008 (Armstrong) at 7).

4. A POSA would understand that in some cases a glidant may be necessary. (JTX-008 (Armstrong) at 10); Tr. 247:10-18, 312:5-9 (Gemeinhart)). A POSA would understand that a glidant would be used when it is necessary. (Tr. 247:10-18 (Gemeinhart); JTX-008 (Armstrong) at 10). A POSA would not understand that a glidant is, "by definition," an optional excipient.

5. A POSA would recognize that colloidal silica and colloidal silicon dioxide are glidants. (Tr. 177:5-8 (Gemeinhart); Tr. 383:22-24 (Berkland)).

6. None of the formulations disclosed in the patent specification of the asserted patents are made without a glidant. (Tr. 141:13-142:13 (Gemeinhart); Tr. 421:1-18 (Berkland)).

7. The discussion in the patent specification regarding preparing a preformulation composition (JTX-002 ('179 patent) at col. 12:52-67) refers to an overview of the general manufacturing process of the invention, not a preliminary testing step. A POSA would not understand this paragraph to disclose that a glidant was optional or that the patentee was in possession of a glidant-optional formulation.

8. A POSA reading the patent specification would not have understood that a glidant was an optional excipient for practicing the invention.

9. A POSA reading the patent specification would not have understood the patentee to possess a formulation of eluxadoline in which a glidant is optional.

**B.    Conclusions of Law**

Sun asserts there is no written description support for claims that do not require a glidant.

(D.I. 462 at 5-13). Claim 26 of the '516 patent (JTX-006 ('516 patent), cl. 26) and claim 7 of the '179 patent do not list a glidant as a limitation. Claim 7 of the '179 patent depends from an independent claim that recites a glidant-optional limitation. (*See*, JTX-002 ('179 patent), cl. 1, 3-7).

A glidant is an agent that is used to improve the flow characteristics of a powder mixture.

(D.I. 461, ¶ 26; D.I. 469, ¶ 8; Tr. 68:20-21, 69:6-8 (Costello); Tr. 101:22-102:2, 103:7-8 (Gemeinhart)). "[W]ithout that ability to flow, you won't have a good final product." (Tr. 101:2-4

(Gemeinhart); *see generally* Tr. 100:16-101:16 (Gemeinhart); Tr. 363:19-364:3, 366:3-16 (Berkland)).

Sun contends that because the specification only discloses formulations that contain a glidant and "nothing in the specification describes, or even suggests, that the inventors possessed a formulation without a glidant" (D.I. 462 at 6), the claims are invalid for lack of written description. Sun argues that this case is analogous to *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368 (Fed. Cir. 2009). (D.I. 462 at 6). I agree.

As of the priority date, eluxadoline, as a compound, was already known in the art. (*See* JTX-024 (Breslin) at 96; Tr. 172:8-22 (Gemeinhart); 472:14-473:6 (Berkland)). The inventions of the asserted patents are oral formulations of eluxadoline and the processes for preparing and administering those formulations. (*See, e.g.*, JTX-002 ('179 patent) at col. 1:23-28). The patent specification, however, only discloses a relatively narrow group of eluxadoline formulations. (Tr. 421:1-3 (Berkland)). In each of those formulations, a glidant (e.g., colloidal silica) is used. (Tr. 142:3-9 (Gemeinhart); *see, e.g.*, JTX-002 ('179 patent) at col. 11:23-12:3, 13:1-56, 16:10-17:40). The patent specification does not disclose that the patentee possessed a formulation of eluxadoline that either lacks a glidant or signaled to a POSA that the inclusion of a glidant in those formulations is optional (e.g., that the formulation(s) would have sufficient flow without a glidant).

I agree with Sun that this case is analogous to *ICU Med.*, 558 F.3d 1368. In *ICU Med.*, the patent specification only described medical valves with spikes, but the patent claimed medical valves without spikes (i.e., spikeless medical valves or "spike-optional" medical valves). *Id.* at 1377. The Federal Circuit reasoned that a POSA "would not understand the . . . patents to have invented the spikeless medical valve" because "the specification describes only medical valves with spikes." *Id.* at 1378. Just as spikeless claims in *ICU Med.* lacked adequate written description

11

because the specification failed to disclose a spikeless valve, the asserted claims here lack written description because the specification fails to disclose a formulation that does not have a glidant or where a glidant would be understood as optional.

For all the formulations disclosed in the patent specification, a glidant is used without any indication that it was not required to practice the invention. For example, there is nothing to signal to a POSA that without a glidant the formulations would have sufficient flow characteristics. Of course, patents are not limited to the specific embodiments disclosed in the specification. But the specification here fails to show that the patentee was in possession of a formulation in which the inclusion of the glidant was optional. Therefore, I find that a POSA would not understand the specification to indicate that a glidant is optional.

Allergan counters with three arguments. I address each one in turn.

First, Allergan argues that a POSA would understand that a glidant, "by definition" (D.I. 469, ¶ 43), is optional, and therefore the patent specification does not need to explicitly disclose that a glidant is optional (*see* D.I. 468 at 12 ("The shared specification need not have explained to a POSA that glidants are optional manufacturing aids; that was already a well-known fact."); *see also* D.I. 468 at 10-12). I understand Allergan to be arguing that a POSA would presume that a glidant is not required to practice the invention. Allergan cites for support a pamphlet of PROSOLV SMCC, which discloses that a glidant is typically not required when PROSOLV SMCC is used (D.I. 468 at 10; D.I. 469, ¶ 39 (citing (JTX-025 at 3)), and Desai, which discloses that silicified microcrystalline cellulose (SMCC) has "superior flow properties" without the addition of a glidant (D.I. 468 at 10; D.I. 469 ¶ 39 (citing JTX-011 (Desai) at 6)).   The asserted claims against Sun recite using SMCC as a claim limitation. (JTX-006 ('516 patent), cl. 26; JTX-

12

Appx18

002 ('179 patent), cl. 7). Allergan maintains that a POSA would possess this knowledge and a POSA would understand from this knowledge that a glidant is optional in the invention.

I disagree with Allergan that a POSA would understand that a glidant, by definition, is an optional excipient. While a glidant may not be required to produce all pharmaceutical formulations, a POSA would understand that a glidant can be necessary in some instances and, more importantly, that a glidant is used when it is necessary. (JTX-008 (Armstrong) at 10 ("Almost invariably a lubricant must be added, and a glidant and a disintegrating agent included when necessary.")). While Dr. Berkland testified that a glidant is not required for a formulation to form (Tr. 364:18-21, 365:5-6), he qualified his answer by explaining that "as long as all the ingredients mix well, you would not need to add [a glidant]" (Tr. 365:5-8). This is consistent with Dr. Gemeinhart's testimony (Tr. 312:5-9), as well as Armstrong (JTX-008 at 7, 10). I find a POSA would generally understand that a glidant can be necessary for some formulations (e.g., those that have insufficient flow characteristics or do not mix well) and a POSA would understand that using a glidant in a formulation would be a signal that it was necessary in order to achieve sufficient flow properties, unless noted otherwise.

I do not think the PROSOLV SMCC pamphlet (JTX-025), nor Desai (JTX-011) discloses that a glidant is optional "by definition." The PROSOLV SMCC pamphlet is not cited to nor incorporated into the patent specification. Even if it were, the PROSOLV SMCC pamphlet merely discloses that a glidant is not needed under typical uses, not that a glidant is never required when PROSOLV SMCC is used. (JTX-025 at 3 (listing "No additional CSD/glidants needed" as a "typical" reduction in excipient when used); Tr. 439:2-12 (Berkland)). Similarly, Desai just discloses that SMCC has enhanced flow properties without the addition of a glidant (JTX-011 at 6 ("Controlled optimal particle size and particle-size distribution ensures superior flow properties

13

of coprocessed excipients without the need to add glidants.")), but it does not state that a glidant is never required when SMCC is used. (JTX-011 (Desai) at 6; Tr. 244:13-20 (Gemeinhart)). Therefore, I disagree that a POSA's knowledge about SMCC would lead a POSA to understand that a glidant is optional "by definition," let alone optional in the claimed invention.

Allergan seems to equate something that is sometimes necessary as being optional, but those conditions do not mean the same thing. As discussed above, in instances where the flow is not sufficient, a glidant is necessary, not optional. Therefore, I do not think Allergan's first argument demonstrates that a POSA would understand a glidant to be optional for practicing the claimed invention.

Second, Allergan argues that a glidant is not essential to the invention and that a POSA would understand that whether a glidant is included in the formulation is not important to the invention. (D.I. 468 at 8-10). Allergan cites *In re Peters*, 723 F.2d 891 (Fed. Cir. 1983), to argue that a formulation without a glidant does not need to be described because the inclusion of a glidant is not essential to practicing the invention. Allergan contends the present case is analogous to *Peters* because "no prior art was distinguished or rejection overcome by relying on a glidant as a feature, and a POSA would understand that a glidant was unimportant to the invention." (D.I. 468 at 10).

But *Peters* is distinguishable. In *Peters*, the Federal Circuit determined that there was adequate written description for a display device that did not have tapered tips, despite the specification only providing examples with tapered tips. The Federal Circuit determined that the claims that lacked the tapered tip limitation omitted an "unnecessary limitation." *Peters*, 723 F.2d at 893. The Federal Circuit explained, "Most importantly, one skilled in the art would readily

14

understand that in practicing the invention it is unimportant whether the tips are tapered, and the

board erred in determining the contrary." *Id*. The Federal Circuit further elaborated,

> What is important, says the patent, is that the tips withstand forces of atmospheric
> pressure loading. The teaching of the patent that metal tips permit a less thick
> support member than is possible with the glass support walls of the prior art is not
> affected by whether the metal tips are tapered.

*Id*. at 894. *Peters* is distinguishable because the knowledge of a POSA and the specification

supported the reasoning that tapered tips were unnecessary.

As discussed above, I do not believe that a POSA would "readily understand" that

including a glidant is unimportant in pharmaceutical formulations. Furthermore, the specification

in *Peters* explained what was required of the tips (i.e., withstanding forces of atmospheric pressure

loading) and that the disclosure of tapered metal tips was an example to satisfy that requirement.

In the present case, however, the specification makes no disclosure about whether the use of a

glidant is unimportant or just an optional component to include in the disclosed formulations. *See*

*infra* Section III.B.1-2. While a POSA would understand that a formulation needs to have

sufficient flow, a POSA would not understand that the formulations of the claimed invention would

have sufficient flow without a glidant based on the disclosure of the patent specification.

Therefore, I find *Peters* to be inapposite and I reject Allergan's second argument.

Third, Allergan contends that the specification describes that a glidant is optional. (D.I.

468 at 13-14). Allergan cites a paragraph it characterizes as "the description of the 'general

process'" (JTX-002 ('179 patent) at col. 12:52-67) and a discussion in the background section that

describes embodiments that include eluxadoline and only one other excipient (JTX-002 ('179

patent) at col. 4:4-5:33). (D.I. 468 at 12).

**1.  Preformulation Process Description**

The first paragraph Allergan relies upon recites,

> For preparing formulations of the present disclosure, such as tablets, [eluxadoline] is mixed with one or more pharmaceutical excipients to form a solid preformulation composition containing, in preferred embodiments, a homogeneous mixture of the excipient(s) with the active ingredient. When referring to these preformulation compositions as "homogeneous," it is meant that the active ingredient are [sic] dispersed evenly throughout the composition so that the composition may be readily subdivided into equally effective unit dosage forms such as tablets or capsules. This solid preformulation is then subdivided into unit dosage forms of the type described above containing from, for example, about 10 to about 200 milligrams of the active ingredient.

(JTX-002 ('179 patent) at col. 12:52-67). The parties dispute the meaning of the term "preformulation" in this paragraph, which is relevant to interpreting what this paragraph is describing. Before addressing whether this paragraph provides written description of a glidant-optional formulation, I must first determine what "preformulation" means in this context.

### a. Meaning of "Preformulation"

Allergan argues that this paragraph describes the general process for preparing the formulations of eluxadoline. Allergan cites to Dr. Gemeinhart's testimony that this paragraph "describes generally preparing formulations of the present disclosure." (D.I. 468 at 13 (citing Tr. 227:19-228:4)).

Sun contends that this paragraph does not describe the process of making formulations generally, but instead describes "early-stage research to test whether excipients are compatible with the drug." (D.I. 462 at 7). Sun cites to Dr. Gemeinhart's testimony (Tr. 309:18-310:9) and Lieberman (JTX-033 at 21) to show that, to a POSA, the term "preformulation" refers to an initial stage of research, not the first step in the manufacturing process.[5]

---

[5] Dr. Berkland offered testimony at trial regarding the meaning of "preformulation" in this paragraph. I separately struck that testimony. (D.I. 480).

I agree with Allergan that this paragraph is describing the general process of making formulations, and not an early-stage test. I credit Dr. Gemeinhart's testimony that a POSA would normally understand "preformulation" as an early-stage research test. I, however, think the plain language of the specification and the context of this paragraph show that "preformulation" is not used in the normal way.

First, the paragraph recites, "For preparing formulations of the present disclosure. . . ." (JTX-002 ('179 patent) at col. 12:52). This phrase indicates the paragraph is describing a process for making the invention, not testing. Second, "preformulation" in this paragraph refers to the mixture of eluxadoline with excipients (*see id.* at col. 12:57-64), not to "preformulation testing" or a "preformulation step." Third, I think this paragraph must be considered in context with the paragraphs that follow. The paragraphs that follow provide specific examples of preparing eluxadoline formulations. (*Id.* at col. 13:1-56). I think a POSA would, therefore, read this paragraph as a general overview, and the succeeding paragraphs as specific examples of different types of preparation processes.

Therefore, I agree with Allergan that this paragraph describes the general manufacturing process of the invention, not a preliminary testing step.

### b. The Cited Paragraph Does Not Provide Sufficient Written Description

Allergan argues that because the paragraph describes mixing eluxadoline with one or more excipients, it presents the possibility that a formulation does not include a glidant or that a glidant is an optional excipient.(D.I. 468 at 13). Therefore, Allergan contends, this paragraph provides written description for a formulation where a glidant is optional or not included.

Sun contends that this paragraph does not disclose a "manufacturing process (preformulation or otherwise) where the glidant colloidal silica is optional." (D.I. 462 at 8).

The hallmark for written description is whether a POSA would understand the patentee to possess the claimed invention. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) ("[T]he specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed."). I find that a POSA would not understand the paragraph to disclose that a glidant is optional nor that the patentee possessed formulations in which a glidant is optional or not included.

Allergan's position that this paragraph provides sufficient written description goes too far. Allergan's interpretation of this paragraph implies that because the paragraph states the invention in the broadest possible terms, that is, eluxadoline and any possible combination of excipients, the paragraph provides written description for any formulation that is more than pure eluxadoline. The content, or the lack thereof, of this paragraph does not support possession of such a broad invention. This paragraph just outlines the basic idea of mixing eluxadoline with excipients and then subdividing the mixture into dosage amounts in some form. (Tr. 227:15-228:15 (Gemeinhart)). There is no disclosure of specific combinations or proportions of excipients used. As the Federal Circuit has explained, "'[T]he appearance of mere indistinct words in a specification or a claim, . . . , does not necessarily satisfy' § 112, ¶ 1 because it may not both put others on notice of the scope of the claimed invention and demonstrate possession of that invention." *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1380 (Fed. Cir. 2019) (quoting *Enzo Biochem, Inc. v. Gen–Probe Inc.*, 323 F.3d 956, 968-69 (Fed. Cir. 2002)). This paragraph fails to do both.

At most, this paragraph may render making a formulation without a glidant obvious, but "a description that merely renders the invention obvious does not satisfy the [written description] requirement." *Ariad*, 598 F.3d at 1352. It is the paragraphs that follow the cited paragraph that

18

provide an adequate written description for the invention. And those paragraphs uniformly disclose eluxadoline formulations with a glidant. (JTX-002 ('179 patent) at col. 13:1-56). The cited disclosure is not sufficient to demonstrate that the patentee possessed a formulation of eluxadoline, or a process for creating a formulation of eluxadoline, where a glidant is optional or not included.

### 2. Background of Invention Section

Allergan argues that Columns 4 and 5 disclose that a glidant is optional. (D.I. 468 at 14 (citing JTX-002 ('179 patent) at col. 4:4-5:33). A sample portion of the specification recites,

> One embodiment of the disclosure provides a solid pharmaceutical formulation comprising [eluxadoline] and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide,[6] crospovidone (polyvinylpolypyrrolidone; highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magnesium stearate. In a specific embodiment, this pharmaceutical formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a pharmaceutical formulation consisting of [eluxadoline] and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate.

(JTX-002 ('179 patent) at col. 4:4-21).

Allergan contends that this paragraph, as well as the similar ones that follow, demonstrates that a glidant is optional because it describes an embodiment where eluxadoline and only one other ingredient, which does not have to be a glidant (i.e., colloidal silicon dioxide), is disclosed. I find this paragraph and the ones that follow (JTX-002 ('179 patent) at col.4:4-5:33) are insufficient to meet the written description requirement for the same reasons as the preformulation paragraph. This paragraph just outlines the basic idea to create a formulation of eluxadoline with some combination of excipients in some proportions. (*See* Tr. 113:9-16 (Gemeinhart); Tr. 443:8-20

---

[6] "Colloidal silicon dioxide" and "colloidal silica" are both glidants and the terms are used interchangeably for each other. (Tr. 177:5-8 (Gemeinhart); Tr. 383:22-24 (Berkland); *see also* D.I. 140 at 14).

19

(Berkland)). That is not sufficient to demonstrate possession of a formulation where a glidant is optional or not included.

Allergan contends that the specification must be read as a whole, and that these paragraphs read with the remaining parts of the specification provides written description for a formulation in which a glidant is optional or not included. (D.I. 468 at 14). I disagree. The specification discloses examples of formulations that contain a glidant. Actual reduction to practice of a formulation in which a glidant is optional or not included is not required, but the specification must at least provide constructive reduction to practice of a formulation in which a glidant is optional or not included. *See Ariad*, 598 F.3d at 1352. The patent specification does not disclose that a formulation would have sufficient flow characteristics or work without a glidant. I do not think that these generic descriptions of mixing eluxadoline with excipients demonstrate that the patentee possessed a formulation where a glidant is optional or not included.

For these reasons, I find that the Sun has shown by clear and convincing evidence that the asserted claims of the '179, '291, '792, and '516 patents are invalid for lack of written description.

## IV.   WRITTEN DESCRIPTION (MSN)

### A.    Findings of Fact

1. The priority date of the '627 and '291 patents is March 14, 2013. (JTX-003 ('291 patent); JTX-006 ('627 patent); D.I. 461, ¶ 103; D.I. 469, ¶ 28).

2. A POSA would understand that terms "diluent" and "filler" are interchangeable. (Tr. 215:15-16 (Gemeinhart); Tr. 360:14-19 (Berkland)).

3. A POSA would understand that the term "filler" is a common category of excipient used in pharmaceutical formulations. (D.I. 469, ¶ 8; D.I. 461, ¶ 22; Tr. 97:19-98:5 (Gemeinhart)). A POSA would understand that a filler is an inert substance that creates the bulk of a dosage form. (D.I. 461, ¶ 23; D.I. 469, ¶ 8). A POSA would be able to recognize examples of fillers. (Tr. 215:23-216:22 (Gemeinhart); Tr. 357:18-358:1 (Berkland)).

20

4. A POSA would understand that the term "disintegrant" is a common category of excipient used in pharmaceutical formulations. (D.I. 469, ¶ 8; D.I. 461, ¶ 22; Tr. 97:19-98:5 (Gemeinhart)). A POSA would understand that a disintegrant is a substance added to a tablet to facilitate its breakup or disintegration after administration. (D.I. 461, ¶ 25; D.I. 469, ¶ 8). A POSA would be able to recognize examples of disintegrants. (Tr. 215:23-216:22 (Gemeinhart); Tr. 357:18-358:1 (Berkland)).

5. A POSA would understand that "U.S. Patent No. 7,741,356 to Breslin, et al." is incorporated by reference in its entirety. (JTX-002 ('179 patent) at col. 2:7-8). PCT Application No. WO 2005/090315 (JTX-024) (hereinafter, "Breslin") and "U.S. Patent No. 7,741,356 to Breslin, et al." share the same description. (D.I. 461 at 11 n.2; D.I. 469 at 6 n.3; Tr. 208:21-209:8 (Gemeinhart)). Breslin provides examples of fillers and disintegrants that are commonly used in pharmaceutical formulations. (JTX-024 at 64-65).

6. The patent specification only discloses formulations of eluxadoline that use mannitol, silicified microcrystalline cellulose (SMCC), crospovidone, and a glidant. (D.I. 468 at 23; D.I. 462 at 14; Tr. 147:8-23 (Gemeinhart); Tr. 464:3-465:8 (Berkland)).

7. A POSA would understand the "Function" column of Table 1 in the patent specification to describe the role an excipient is performing in the formulation (JTX-002 ('179 patent) at col. 16:28-56), not that any other member of the same functional category could be substituted for the excipient. (Tr. 153:4-154:19, 155:7-23 (Gemeinhart)).

8. The claimed genus covers dozens to hundreds of combinations of fillers and disintegrants. (*See, e.g.*, JTX-024 (Breslin) at 64-65; JTX-026 (Ansel) at 35-36; JTX-057 (Lachman) at 30).

9. The state of the art of creating formulations of eluxadoline with different fillers and disintegrants on March 14, 2013, was not so predictable such that disclosing one representative species is sufficient for meeting the written description requirement.

10. A POSA reading the specification would not understand the patentee to have invented a formulation that includes using fillers other than mannitol and SMCC.

11. A POSA reading the specification would not understand the patentee to have invented a formulation that includes using a disintegrant other than crospovidone.

12. The patent specification lacks adequate written description for claims covering formulations using any filler and any disintegrant.

21

B.      **Conclusions of Law**

MSN argues that the asserted claims of the '291 and '627 patents are invalid for lack of

written description. (D.I. 462 at 13-19; D.I. 471 at 8-12). Allergan contends the asserted claims

have adequate written description. (D.I. 468 at 18-29).

1.  **Incorporation of Breslin into the Patent Specification**

The patent specification incorporates "U.S. Patent No. 7,741,356 to Breslin, et al." by

reference. (JTX-002 ('179 patent) at col. 2:7-8;[7] D.I. 469, ¶ 61; D.I. 462 at 16). Incorporation by

reference is "a method for integrating material from various documents into a host document[] . .

. by citing such material in a manner that makes clear that the material is effectively part of the

host document as if it were explicitly contained therein." *Paice LLC v. Ford Motor Co.*, 881 F.3d

894, 906 (Fed. Cir. 2018) (alteration in original) (quoting *Advanced Display Sys., Inc. v. Kent State

Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)).

Both parties agree that PCT. Application No. WO 2005/090315 (JTX-024) (hereinafter,

"Breslin") and "U.S. Patent No. 7,741,356 to Breslin, et al." share the same description. (D.I. 461

at 11 n.2; D.I. 469 at 6 n.3; Tr. 208:21-209:8 (Gemeinhart)). The parties dispute the scope of

incorporation. (D.I. 462 at 16-17; D.I. 468 at 25). Because the test for written description "requires

an objective inquiry into the four corners of the specification from the perspective of a person of

ordinary skill in the art," *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir.

2010), I must first determine which parts of Breslin are incorporated into the patent specification.

"To incorporate material by reference, the host document must identify with detailed

particularity what specific material it incorporates and clearly indicate where that material is found

---

[7] The '179 patent (JTX-002) is not one of the patents asserted against MSN. As noted above, the asserted patents against MSN share a specification with the '179 patent. (*See supra* n.3).

22

Appx28

in the various documents." *Advanced Display*, 212 F.3d at 1282. "[T]he standard of one reasonably

skilled in the art should be used to determine whether the host document describes the material to

be incorporated by reference with sufficient particularity." *Paice*, 881 F.3d at 907 (alteration in

original) (quoting *Advanced Display*, 212 F.3d at 1283).

> The patent specification incorporates Breslin with the following sentence,

> [Eluxadoline] is an opioid receptor modulator that effects simultaneous agonism of the μ opioid receptor (MOR) and antagonism of the δ opioid receptor (DOR) and may be useful in the treatment and prevention of various mammalian disease states, for example pain and gastrointestinal disorders such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders (for example, see U.S. Pat. No. 7,741,356 to Breslin, et al., which is incorporated herein in its entirety).

(JTX-002 ('179 patent) at col. 1:63-2:8).

> The disputed portion of Breslin recites,

> For preparing solid pharmaceutical compositions such as tablets, the principal active ingredient is mixed with a pharmaceutical carrier, e.g. conventional tableting ingredients such as diluents, binders, adhesives, disintegrants, lubricants, antiadherents and gildants [sic]. Suitable diluents include, but are not limited to, starch (i.e. corn, wheat or potato starch, which may be hydrolized [sic]), lactose, . . . , sucrose, sucrose-based diluents . . . , dextrose, inositol, mannitol, sorbitol, microcrystalline cellulose . . . , dicalcium phosphate, calcium sulfate dihydrate, calcium lactate trihydrate and the like. . . . Suitable disintegrants include, but are not limited to, starches (corn, potato, etc.), . . . , sodium starch glycolates, pregelatinized starches, clays (magnesium aluminum silicate), celluloses . . . , alginates, pregelatinized starches (i.e. corn starch, etc.), gums . . . , cross-linked polyvinylpyrrolidone and the like.

(JTX-024 (Breslin) at 64-65).

MSN argues that, based on the context in which Breslin is cited in the specification, "a

POSA would understand Breslin to be incorporated only for its discussion about how eluxadoline

can be used to treat gastrointestinal disorders along with the identification of the eluxadoline

molecule and its mechanism of action." (D.I. 462 at 16). MSN contends that a POSA would not

23

understand Breslin's discussion of diluents (i.e., fillers) and disintegrants to be incorporated by reference. (*Id.*).

Allergan argues that the excerpted portion of Breslin is incorporated into the patent specification because the specification states that Breslin is incorporated in its entirety. (D.I. 468 at 25; *see* JTX-002 ('179 patent) at col. 1:63-2:8). I agree.

The specification recites, "for example, see U.S. Pat. No. 7,741,356 to Breslin, et al., which is incorporated in its entirety." (JTX-002 ('179 patent) at col. 2:7-8). The Federal Circuit has interpreted similar language as being "broad and unambiguous" that a reference is incorporated in its entirety. *See Paice*, 881 F.3d at 907 (interpreting "which is incorporated herein by this reference" to incorporate a patent in its entirety). The sentence here identifies Breslin as the specific material to be incorporated (i.e., the entirety of U.S. Pat. No. 7,741,356 to Breslin, et al.) and where the material can be found (i.e., in U.S. Pat. No. 7,741,356 to Breslin, et. al). "Such language is plainly sufficient to incorporate [Breslin] in its entirety." *Id.*

MSN is correct that the incorporation clause must be read in the context of the specification. *See Paice*, 881 F.3d at 909. But I disagree that the context of the specification limits the scope of incorporation. MSN's argument seems to be that Breslin's discussion of disintegrants and fillers should not be incorporated because the specification does not explicitly reference that discussion or apply it to the claims of the invention. (D.I. 462 at 16; D.I. 471 at 11). The Federal Circuit, however, has cautioned, "The applicability of a document's disclosed features and the incorporation of the document itself are distinct concepts, and one does not imply the other." *Paice*, 881 F.3d at 908. I think MSN is improperly conflating the two concepts.

Starting with the incorporation of Breslin, there is nothing in the specification that would limit the scope of incorporation. *See, e.g.*, *id.* at 907-08. Statements that limit the extent of

24

incorporation are typically clearer. *See Zenon Env't, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1379 (Fed. Cir. 2007) (finding the phrase "[two identified references], the relevant disclosures of each of which are included by reference thereto as if fully set forth herein" as limiting incorporation to only relevant disclosures and not the entire documents); *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1375–76 (Fed. Cir. 2006) (limiting extent of incorporation to one specific procedure when the specification stated "the procedure for preparing intestinal submucosa" was incorporated by reference).

Furthermore, Dr. Gemeinhart testified that a POSA would understand the entirety of Breslin to be incorporated into the patent specification. (Tr. 208:21-210:10). While Dr. Gemeinhart also testified that the context in which Breslin is cited in the specification would lead a POSA to read Breslin for its disclosure of eluxadoline as a treatment option (Tr. 320:24-324:8), I think that testimony is relevant to the applicability of Breslin's disclosures, not its scope of incorporation. *See Paice*, 881 F.3d at 907-08. Therefore, I find that Breslin is incorporated in its entirety.

Turning to the issue of whether Breslin's discussion of disintegrants and fillers applies to the claimed invention, I find that it does. Breslin's disclosure of fillers and disintegrants is consistent with how a POSA would understand these terms. (*See* Tr. 215:17-216:22 (Gemeinhart); Tr. 357:18-358:1 (Berkland)). Incorporating Breslin's discussion does not improperly expand the scope of the claims nor is it contrary to other parts of the specification. *Cf. Fifth Generation Computer Corp. v. Int'l Bus. Machines Corp.*, 416 F. App'x 74, 80 (Fed. Cir. 2011) ("In light of such clear claim language, it is inappropriate to look to the incorporated references to arrive at a stretched reading of those claim limitations."); *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1553 (Fed. Cir. 1996) (declining to import a definition from an incorporated reference when it was contradicted by other intrinsic evidence), *abrogated by Festo Corp. v. Shoketsu*

25

*Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000). I am not persuaded by Dr. Gemeinhart's testimony that a POSA would read Breslin only for its discussion of eluxadoline (Tr. 320:24-324:8) because, as discussed, Breslin's disclosure aligns with the patent specification and a POSA's understanding of the claim terms.

Therefore, in evaluating whether there is adequate written description, I will treat Breslin (JTX-024) in its entirety as part of the specification.

### 2. Lack of Written Description

As discussed above, eluxadoline was already known as of the priority date of the asserted patents. (*See* JTX-024 (Breslin) at 96; Tr. 172:8-22 (Gemeinhart); 472:14-473:6 (Berkland)). The asserted patents cover oral formulations of eluxadoline and the processes for preparing and administering those formulations. (*See, e.g.*, JTX-002 ('179 patent) at col. 1:23-28). The asserted claims against MSN cover formulations of eluxadoline that use a "filler" and a "disintegrant" at specific amounts or weight percentages. (*See* JTX-005 ('627 patent), cl. 27; JTX-003 ('291 patent), cl. 11; D.I. 462 at 13; D.I. 468 at 18-19). Thus, the asserted claims cover formulations of eluxadoline using any filler and any disintegrant with the claimed amounts, which is a broad genus.

"[W]ritten description of a broad genus requires description not only of the outer limits of the genus but also of either a representative number of members of the genus or structural features common to the members of the genus, in either case with enough precision that a relevant artisan can visualize or recognize the members of the genus." *Regents of the Univ. of Minnesota v. Gilead Scis., Inc.*, 61 F.4th 1350, 1356 (Fed. Cir. 2023).

The specification here only discloses formulations made with the same disintegrant (crospovidone) and fillers (mannitol and SMCC). (D.I. 468 at 13; D.I. 462 at 14; Tr. 147:8-23 (Gemeinhart); Tr. 464:3-465:8 (Berkland)). Indeed, the specification is explicit about using these

26

specific excipients, not functional groups, as it repeatedly recites using SMCC and crospovidone. For example, the Summary of Disclosure section of the specification describes 11 different embodiments and each one recites SMCC and crospovidone as potential ingredients. (JTX-002 ('179 patent) at col. 4:4-5:46). The specification also discloses five embodiments for preparing formulations of eluxadoline. (*Id.* at col. 13:1-60). Each one uses SMCC and crospovidone. (*Id.*). None of them discuss using other fillers (except for mannitol[8]) or other disintegrants. (*Id.*).

The specification further describes "[a]buse deterrent formulations of the present invention" as including eluxadoline, a glidant, SMCC, mannitol, and crospovidone. (JTX-002 ('179 patent) at col. 11:23-12:3)). In describing the present invention, the patentee referred to using a glidant, a common functional category (D.I. 469, ¶ 8; D.I. 461, ¶ 22; Tr. 197:11-23: (Gemeinhart)), and then provided colloidal silica as a preferred embodiment. (JTX-002 ('179 patent) at col. 11:47-52). Thus, this description of the present invention implies that the patentee would refer to functional categories explicitly, instead of through examples, when they intended to do so. In contrast to glidant, the patentee did not use a similar descriptive framework for filler and disintegrant (e.g., listing "disintegrant" and then providing crospovidone as a preferred embodiment). The patentee, instead, specified using SMCC and crospovidone. (*Id.* at col. 11:38-46; 11:58-64). I think this supports the conclusion that a POSA would read the specification to only disclose a formulation with SMCC and crospovidone, not a formulation using any filler and any disintegrant.

---

[8] Mannitol is listed as a separate claim limitation. (JTX-003 ('291 patent), cl. 11; JTX-005 ('627 patent), cl. 27).

27

Appx33

In short, the specification discloses many "embodiments" and each one uses, or lists, SMCC and crospovidone as excipients. None of the embodiments recite using fillers or disintegrants generally.

Allergan, however, maintains there is adequate written description because the patent specification discloses both common structural features of the claimed genus and a representative number of species within the scope of the genus. (D.I. 468 at 19). I disagree.

### a. Common Structural Features

The specification does not disclose common structural features for fillers and disintegrants. As discussed above, the specification only discloses formulations of eluxadoline using SMCC, mannitol, crospovidone, and a glidant. Nowhere does the specification inform a POSA what structural or chemical properties permits excipients to be viable fillers or viable disintegrants, let alone a viable combination of the two, in the claimed invention. Neither does the specification disclose that SMCC or crospovidone could be substituted with other fillers and disintegrants, respectively.[9] I find that a POSA would not understand the patentee to possess the broad genus of formulations of eluxadoline that could be made with any filler and any disintegrant based on the limited disclosure of the specification.

---

[9] Claims reciting "filler" and "disintegrant" were not part of the original patent that issued. The '291 and '627 patents were filed on February 21, 2021, and October 21, 2021, respectively. They are both continuations of patent applications that trace back to patent application No. 13/829,984, which was filed on March 14, 2013. Patent application No. 13/829,984 eventually issued as the '587 patent. The claims of the '587 patent recite SMCC and crospovidone, not "filler" and "disintegrant," as limitations. ('587 patent, cls.1-17). While the '587 patent is not part of the trial record, I take judicial notice of its content. *Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 932 n.3 (Fed. Cir. 2014) ("It is also well-established that a court may take judicial notice of patents or patent applications.").

28

Allergan raises two arguments that common structural features are sufficiently disclosed. I address each in turn.

### i.     Disclosure of Excipient "Functions" in Table 1

Allergan cites Table 1 in the specification. (JTX-002 ('179 patent) at col. 16:28-56). Allergan argues "a POSA would understand the terms 'filler' and 'disintegrant,' as used in Table 1 of the specification, to reference their respective excipient categories." (D.I. 468 at 21). Allergan contends a POSA would read Table 1 to indicate that other excipients belonging to these functional categories could be used to practice the invention. Allergan cites for support Dr. Berkland's testimony and comments from the patent examiner of the '291 patent, who came to the same conclusion. (*Id.* at 22-23). I disagree that a POSA would read Table 1 this way.

First, Dr. Gemeinhart testified that a POSA would read the "Function" column in Table 1 as stating the function of the corresponding component in the formulation, not that any excipient that performs that function could be used or substituted for the specific excipient listed. (Tr. 153:4-154:19, 155:7-23).

Second, while Dr. Berkland testified to the contrary (Tr. 375:21-376:12), I think other parts of his testimony undercuts his, and Allergan's, position.

At trial, I asked Dr. Berkland if a POSA would read Table 1 to provide written description support for a claim that, instead of reciting any specific excipients, just recited the generic functional categories (e.g., replacing "mannitol" in the claim with "filler"). (Tr. 482:17-483:5). As part of his answer, Dr. Berkland testified that mannitol has specific characteristics such as that it "help[s] with the breakup of the tablet," that it is a soluble filler, and that it contributes to the disintegrating properties of the formulation. (Tr. 483:6-10). I asked Dr. Berkland whether the "special characteristics" of mannitol, as opposed to SMCC, "might make it not subject to just being

29

the category." (Tr. 485:13-16). Dr. Berkland testified that was a "fair" statement. (Tr. 485:17). Dr. Berkland further elaborated, "You could potentially select another filler that behaves like mannitol, but mannitol really does the job nicely." (Tr. 485:17-19).

I think Dr. Berkland's testimony about mannitol is inconsistent with his testimony about how a POSA would understand Table 1. Mannitol and SMCC are both identified as "Filler" in the "Function" category of Table 1. (JTX-002 ('179 patent) at col. 16:37, 16:43). Dr. Berkland testified a POSA would read the "Filler" label for SMCC to mean that other fillers could be used in its place. (Tr. 375:21-376:12). But he indicated that a POSA would not read the "Filler" label for mannitol as referring to the fact that other fillers could be used in place of mannitol because of mannitol's special characteristics. (Tr. 485:13-19). Dr. Berkland further testified that, mannitol could potentially be substituted with "another filler that behaves like mannitol." (Tr. 485:17-29). The genus of fillers like mannitol seems narrower than the genus of fillers generally, given mannitol's "special characteristics." (Tr. 485:13-17 (Berkland)).

Thus, Dr. Berkland's testimony seems to be that a POSA would read the "Filler" label for SMCC to indicate that any filler could be used to replace SMCC, but a POSA would not read "Filler" to mean the same thing for mannitol. I don't think Dr. Berkland's testimony on how a POSA would read the labels in Table 1 is credible given the inconsistency as to how he is interpreting identical labels in the "Function" column for the different excipients. I think, instead, his testimony supports that a POSA would read Table 1 as describing the functions of the different excipients listed as this would align with his testimony regarding mannitol. (*See* Tr. 485:13-19).

The patent examiner who examined the '291 patent considered how to read Table 1 and reached the opposite conclusion. (JTX-050 at 393-94). While a patent examiner is "deemed to have experience in the field of the invention" and "act from this viewpoint," *In re Sang Su Lee*,

Appx36

277 F.3d 1338, 1345 (Fed. Cir. 2002), the examiner's determination is not dispositive. At most, it may be persuasive. *See Cooper Notification, Inc. v. Twitter, Inc.*, 867 F. Supp. 2d 485, 492 (D. Del. 2012); *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 763 F. Supp. 2d 800, 817 (E.D. Va. 2011), *aff'd*, 466 F. App'x 882 (Fed. Cir. 2012). I think the testimony of Drs. Gemeinhart and Berkland make it clear that a POSA would read Table 1 to describe the function of the individual excipients listed, not that other members of the different functional categories could be used. In weighing the patent examiner's comments against the testimony of both experts, I credit the expert testimony. I therefore disagree with the patent examiner's conclusion. I find a POSA would not read the "Function" column of Table 1 to indicate that other excipients of the same functional category could be used. I find a POSA, instead, would read the "Function" column of Table 1 only to indicate the function performed by the listed excipient.

Therefore, I find that Table 1 in the specification does not provide adequate written description for using any filler and any disintegrant.

      **ii.   Disintegrant and Filler Are Terms of Art**

Allergan argues there is adequate written description because "filler" and "disintegrant" are well-known terms of art and a POSA would be able to recognize the members of the two categories. (D.I. 468 at 20-22). Allergan contends the specification indicates that the invention is not limited to the examples. (D.I. 468 at 27; *see, e.g.*, JTX-002 ('179 patent) at col. 16:3-8 ("The examples are not intended to limit the disclosure, . . . .")).

Both parties, and their experts, agree that a POSA would understand "filler" and "disintegrant" to be terms of art and a POSA would be able to recognize members of both genera. (D.I. 462 at 14; D.I. 468 at 20-21; Tr. 215:17-22 (Gemeinhart); Tr. 359:19-360:11, 361:17-362:19

31

Appx37

(Berkland)). In addition, the specification, by incorporating Breslin by reference, recites numerous examples of both types of excipients. *See* Section IV.B.1 *supra*.

I, however, think Allergan's argument misses the mark. The relevant genus here is neither fillers nor disintegrants, but formulations of eluxadoline using any filler and any disintegrant. A POSA would know what a filler and a disintegrant refers to, but the question here is whether a POSA would recognize that the patentee possessed such a broad genus of formulations from the specification. I think not.

"[T]he hallmark of written description is disclosure." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The written description requirement does not demand "that the specification recite the claimed invention *in haec verba*," *id.* at 1352, but "the specification must describe an invention understandable to [a] skilled artisan and show that the inventor actually invented the invention claimed," *id.* at 1351. The specification does not teach which properties of fillers and disintegrants would permit other excipients, including combinations of fillers and excipients, to be used to practice the invention.

This Court addressed a similar issue in *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435 (D. Del. 2021). In that case, for a subset of the claims at issue, Lipocine argued the written description requirement was satisfied because the claims included "particular classes of excipients" like "solubilizer" and "dispersant." *Id.* at 466, 466 n.20. The Court rejected this argument because "there [was] nothing in the specification to indicate that compositions containing those particular excipients in varying amounts and in combination with various other excipients c[ould] achieve the PK parameters recited by the claims." *Id.* The Court explained,

> The underlying problem with the claims that require different combinations of excipients is that there is no basis from which to conclude that the functional limitations of any of those claims will be satisfied, except with respect to the few

32

Appx38

specific formulations that were the subjects of the clinical tests and simulations reported in the Data Examples.

*Id.* at 467.

I think the specification here is deficient for similar reasons. Allergan relies on the knowledge of a POSA, rather than what is disclosed in the specification, to recognize the common structural features of viable fillers and viable disintegrants and understand that they would work in place of SMCC and crospovidone, respectively. The specification indicates that the invention is not limited to the examples disclosed and that a POSA would recognize other techniques and methods could be used (JTX-002 ('179 patent) at col. 16:3-8), but the specification does not disclose that SMCC, as a filler, can be substituted with other fillers and that crospovidone, as a disintegrant, can be substituted with other disintegrants. I do not think the "not limited" statement is enough to show possession of such a broad genus.

Breslin, which is incorporated by reference, discloses that active ingredients, generally, can be mixed with excipients, including disintegrants and fillers. (JTX-024 at 64). I do not find this disclosure provides adequate written description for using any filler or any disintegrant in the claimed invention. The portion from Breslin discusses the general idea of mixing an active pharmaceutical ingredient with excipients. (*Id.*). Neither Breslin nor the patent specification indicate the patentee possessed formulations where any of the other fillers and disintegrants could be used in place of SMCC or crospovidone. *See Lipocine*, 541 F. Supp. 3d at 463 ("What is lacking in the list of excipients is the critical step of showing which of those excipients, in combination with other components of the [] formulations, will satisfy the [] limitations of the claims."). The patent specification, with Breslin, may make using, or attempting to use, other fillers and disintegrants obvious, but "a description that merely renders the invention obvious does not satisfy

33

the [written description] requirement." *Ariad*, 598 F.3d at 1352. I do not find Breslin's disclosure sufficient to provide common structural features.

Therefore, I find that the patent specification does not disclose common structural features to provide adequate written description for the asserted claims.

**b. Representative Number of Species**

**i. There Is Only One Representative Species**

Allergan argues that the written description requirement is satisfied because Breslin (JTX-024), which is functionally part of the specification, *see Paice*, 881 F.3d at 906, discloses a variety of examples of both fillers and disintegrants. Allergan contends this disclosure provides a representative number of species of the filler and disintegrant categories. (D.I. 468 at 24-25).

I agree with Allergan that Breslin gives examples of fillers and disintegrants. (JTX-024 (Breslin) at 64-65). That Breslin gives multiple examples of fillers and disintegrants, however, does not mean it gives multiple examples of the claimed species (i.e., the combinations of fillers and disintegrants that can be used to make formulations of eluxadoline). Breslin says nothing about examples of viable combinations of fillers and disintegrants. *See Lipocine*, F. Supp. 3d at 463. The examples of formulations of eluxadoline in the specification all use SMCC as a filler and crospovidone as a disintegrant. Therefore, I find that the patent specification discloses one representative species.

**ii. One Representative Species Is Not Sufficient**

Allergan contends that disclosure of one representative species is sufficient to satisfy the written description requirement. (D.I. 468 at 23-24). Allergan cites a handful of cases that found one representative species to be sufficient. (D.I. 469 at 24 (citing *Allergan Sales, LLC v. Sandoz, Inc.*, 717 F. App'x 991, 995 (Fed. Cir. 2017); *Hologic, Inc. v. Smith & Nephew, Inc.*, 884 F.3d

34

1357 (Fed. Cir. 2018); *In re Herschler*, 591 F.2d 693, 695, 687-98, 700-02 (C.C.P.A. 1979); *In re Smythe*, 480 F.2d 1376, 1383 (C.C.P.A. 1973))).

Those cases, however, do not stand for the rule that one representative species is always sufficient. The level of detail or number of representative species that must be disclosed varies with the particular facts of the case. *See Ariad*, 598 F.3d at 1351-52. The Federal Circuit has "set forth a number of factors for evaluating the adequacy of the disclosure, including 'the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue.'" *Id.* at 1351.

The facts of the cases Allergan cites, which Allergan does not discuss, illustrate why this is not a case where the disclosure of one representative species is sufficient. For example, the claimed genus was relatively narrow in *Allergan Sales*, 717 F. App'x at 995 (finding disclosure of a single species sufficient when genus covered six species), and *Herschler*, 591 F.2d at 701 (finding disclosure of a single steroid sufficient to describe the subgenus of steroids when the great-grandparent application disclosed a broader array of example materials of the larger genus and steroids were chemically similar). *See Ariad*, 598 F.3d at 1351 ("Specifically, the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology."). In *Hologic*, the art was well understood and not unpredictable. 884 F.3d at 1361-62. And in *Smythe*, the C.C.P.A. found sufficient written description because the specification disclosed information about the properties and functions of the claimed genus in the specification. 480 F.2d at 1382-83.

In *Lipocine*, the Court addressed a similar issue. One of the asserted claims recited a formulation comprised "a solubilizer in an amount from about 50-86% by weight of the formulation." *Lipocine*. F. Supp. 3d at 459. The Court determined the claim lacked written

35

description "because the universe of solubilizers is immense, . . . , and the Data Examples demonstrate only that a formulation containing two such solubilizers," and a broader category of solubilizers, could produce the functional limitation of the claims. *Id.* I think the present case is more similar to *Lipocine* than the cases Allergan cites.

In the present case, the genus is broad. Allergan contends there are 63 possible combinations based on Ansel (JTX-026 at 35-36) (disclosing nine fillers and seven disintegrants). (D.I. 468 at 30). MSN argues there are dozens to hundreds of combinations. (D.I. 462 at 14). Breslin, by itself, discloses 12-17 examples of fillers and 9-15 examples of disintegrants, while also indicating that those lists are not comprehensive. (JTX-024 at 64-65). Breslin supports MSN's characterization that the genus covers dozens to hundreds of combinations. Therefore, I find this is hardly a narrow genus.

In the present case, the art is not so predictable that one representative species is sufficient to show possession of the broader genus. The patent specification cautions that "formulations for every [eluxadoline] are different and different formulations containing the same [eluxadoline] may have very different stability and drug delivery (e.g., pharmacokinetic) properties." (JTX-002 ('179 patent) at 1:53-62). Indeed, Dr. Gemeinhart testified this part of the specification would inform a POSA that different formulations would have different properties and that "it's an early field." (Tr. 111:8-18, 145:16-146:9, 225:2-8).

Allergan contends this description in the specification informs a POSA that "[e]ntirely different formulation strategies will result in varying characteristics; here, however, there is a single limited formulation strategy." (D.I. 468 at 24 n.9). I take Allergan to be arguing that any formulation adhering to the claims would not have varying characteristics. I disagree. I think the plain words of the specification would apply to formulations that use different excipients than

those disclosed in the specific examples in the specification (e.g., formulations using different fillers, disintegrants, or both). Dr. Gemeinhart's testimony supports this interpretation. (Tr. 111:8-18, 145:16-146:9, 225:2-8). Dr. Gemeinhart further testified that substituting fillers and disintegrants could have an effect on the manufacturing process as well. (Tr. 157:4-22).

Allergan maintains that substituting members of functional categories for each other is known and their ability to be substituted is predictable. (D.I. 468 at 21-22, 27; D.I. 469, ¶ 59). Allergan cites to Babul (JTX-021 at 77) and the testimony of Drs. Gemeinhart (Tr. 282:21-283:23) and Berkland (Tr. 357:9-358:1) to argue that a POSA would know that members of the same functional category can be substituted for each other.

I think Allergan's argument goes too far. While this may not be the most unpredictable of chemical and pharmaceutical arts, I think a POSA would consider the patent specification's warning (JTX-002 ('179 patent) at 1:53-62), would understand that different formulations can have different properties, and would be aware that using different excipients could affect the manufacturing process. (Tr. 111:8-18, 145:16-146:9, 225:2-8 (Gemeinhart)). I do not think a POSA would understand the outcome of replacing multiple excipients to be so predictable that disclosure of a single combination of ingredients—a formulation using SMCC as a filler and crospovidone as a disintegrant—is sufficient. Therefore, I find the art of substituting fillers and disintegrants in formulations of eluxadoline is not so predictable that one representative species is sufficient.

Given the breadth of the genus and level of predictability of the art, I think more than one representative species is required to claim the broad genus of formulations of eluxadoline made with any disintegrant and any filler. *See Lipocine*, 541 F. Supp. 3d at 459. Because only one

37

representative species is disclosed, I find the patent specification does not disclose a representative number of species to provide adequate written description for the asserted claims.

For these reasons, I find that MSN has met its burden of showing the asserted claims are invalid for lack of written description.

## V.    ENABLEMENT (MSN)

MSN argues that the asserted claims are invalid under 35 U.S.C. § 112 for lack of enablement. Because I have determined that the asserted claims are invalid under § 112 for lack of written description, I do not address this argument.

## VI.    OBVIOUSNESS (SUN AND MSN)

Sun and MSN argue that if I were to find the asserted claims have adequate written description and are enabled, then the asserted claims are obvious. (D.I. 462 at 21-23). Because I have found the asserted claims are invalid under § 112 for lack of written description, I do not address this argument.

## VII.    OBVIOUSNESS-TYPE DOUBLE PATENTING (SUN)

### A.    Findings of Fact

1. U.S. Patent Nos. 8,344,011 (the "'011 patent") and 8,608,709 (the "'709 patent") and the '356 patent are commonly owned by and assigned to Janssen Pharmaceutica NV. (D.I. 414-1, Ex. 1, ¶ 210). "The '709 Patent is a continuation of the '011 Patent, which is a divisional of U.S. Patent No. 7,786,158, which is a continuation of the '356 Patent." (*Id.*, Ex. 1, ¶ 204).

2. The '356, '011, and '709 patents are part of the same family with the same priority date. The '356 patent issued before the '011 and '709 patents. (*Id.*, Ex. 1, ¶ 211).

3. The '011 and '709 patents expire on March 14, 2025. (*Id.*, Ex. 1, ¶ 2215).

4. The '356 patent was awarded PTA under 35 U.S.C. § 154(b). (*Id.*, Ex. 1, ¶ 205). "The '356 [p]atent is entitled to 467 days of [PTA] for Patent Office delays, which when added to March 14, 2025, would cause the '356 [p]atent to expire on June 24, 2026." (*Id.*).

Appx44

5. The '356 patent was issued before the other two patents, but expires after them due to the PTA.[10] (*Id.*, Ex. 1, ¶¶ 205, 215).

6. "Claim 40 of the '356 [p]atent covers eluxadoline, as well as 7 other compounds." (*Id.*, Ex. 1, ¶ 207).

7. "Claim 33 of the '011 [p]atent discloses a method of administering eluxadoline." (*Id.*, Ex. 1, ¶ 208).

8. "Claim 5 of the '709 [p]atent covers eluxadoline." (*Id.*, Ex. 1, ¶ 209).

9. Claim 40 of the '356 patent, claim 5 of the '709 patent, and claim 33 of the '011 patent are not patentably distinct from each other. (*Id.*, Ex. 1, ¶¶ 207-09; D.I. 462 at 24; *see* D.I. 468 at 38-40 (failing to argue the claims are patentably distinct).

10. Claim 40 of the '356 patent is invalid.

**B.    Conclusions of Law**

The issue here is a legal one: whether the fact the '356 patent expires after the '011 and '709 patents makes it invalid for obviousness-type double patenting over those two patents.

The Federal Circuit recently addressed the issue of how ODP is applied to a patent that has received PTA. "ODP for a patent that has received PTA, regardless whether or not a terminal disclaimer is required or has been filed, must be based on the expiration date of the patent after PTA has been added." *In re Cellect*, 2023 WL 5519716, at *9. Allergan argues the present case is distinguishable from *In re Cellect* as this case involves a "first-filed, first-issued patent having a [PTA]." (D.I. 482 at 1). Allergan maintains that the distinct facts of this case do not raise the same equitable concerns present in *In re Cellect*, namely the risk of separate ownership or potential for

---

[10] "The '356 [p]atent is also entitled to 1,068 days of Patent Term Extension under 35 U.S.C. § 156, which addresses delays in FDA approval of a claimed drug product. Sun does not contend that obviousness-type double patenting applies to shorten Patent Term Extension." (D.I. 414-1, Ex. 1, ¶ 206).

gamesmanship, and I should therefore conclude that ODP does not invalidate claim 40 of the '356 patent. (*Id.* at 2-6).

The "first-filed, first-issued" distinction is immaterial. When analyzing ODP, a court compares patent expiration dates, rather than filing or issuance dates. *Gilead*, 753 F.3d at 1215-17; *In re Cellect*, 2023 WL 5519716, at *9. Allergan nevertheless proposes that I consider these dates, among other facts, as part of a case-by-case review of equitable considerations to determine if a patent owner received an unjust time extension and ODP should therefore invalidate a challenged claim. (D.I. 482 at 5-6). The court in *In re Cellect* rejected such analysis, holding that ODP depends solely on patent expiration dates and should not influenced by equitable concerns. "[A]ny extension past [the ODP reference patent's expiration] date constituted an inappropriate timewise extension for the asserted claims of the challenged patents." *In re Cellect*, 2023 WL 5519716, at *10. "An applicant's ability to show that it did not engage in gamesmanship in obtaining a grant of PTA is not sufficient to overcome a finding that it has received an unjust timewise extension of term. *Id.* at *11. *In re Cellect* recognizes no exception to the rule it announced, whether for first-filed, first-issued claims or otherwise. I am bound by the Federal Circuit's holding. I have reviewed Allergan's remaining arguments and find them unpersuasive. As a result, I apply the rule dictated in *In re Cellect*.

As stated above, claim 40 of the '356 patent is not patentably distinct from the asserted claims of the '011 and '709 patents. The expiration date of the '356 patent, after addition of PTA, falls after the expiration dates of the '011 and '709 patents. ODP therefore invalidates the challenged claim.

For these reasons, I find claim 40 of the '356 patent is invalid.

40

**VIII.  CONCLUSION**

For the foregoing reasons, I find the asserted claims of the '627, '291, '179,'792, and '516 patents invalid for lack of written description. I find the asserted claim of the '356 patent to be invalid for obviousness-type double patenting. The parties shall submit a final judgment consistent with this memorandum opinion within one week.

41



8285216

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**

August 18, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,007,179*
ISSUE DATE: *May 18, 2021*

By Authority of the
**Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office**

Wanda Montgomery
Certifying Officer

Joint Exhibit
**JTX-002**
1:19-cv-01727-RGA



US011007179B2

(12) **United States Patent**
Costello et al.

(10) Patent No.: **US 11,007,179 B2**
(45) Date of Patent: ***May 18, 2021**

(54) **OPIOID RECEPTOR MODULATOR DOSAGE FORMULATIONS**

(71) Applicant: **Allergan Holdings Unlimited Company**, Dublin (IE)

(72) Inventors: **Tim Costello**, Rockville, MD (US); **Jens Jozef Ceulemans**, Beerse (BE); **Eugeen Maria Jozef Jans**, Beerse (BE); **Philip Erna H. Heyns**, Beerse (BE)

(73) Assignee: **Allergan Holdings Unlimited Company**, Dublin (IE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 17/066,072

(22) Filed: **Oct. 8, 2020**

(65) **Prior Publication Data**

US 2021/0030720 A1    Feb. 4, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 16/795,044, filed on Feb. 19, 2020, now abandoned, which is a continuation of application No. 16/459,947, filed on Jul. 2, 2019, now abandoned, which is a continuation of application No. 16/213,083, filed on Dec. 7, 2018, now abandoned, which is a continuation of application No. 15/588,304, filed on May 5, 2017, now Pat. No. 10,188,632, which is a continuation of application No. 13/829,984, filed on Mar. 14, 2013, now Pat. No. 9,675,587.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 31/4174* | (2006.01) |
| *A61K 9/50* | (2006.01) |
| *A61K 9/20* | (2006.01) |
| *A61K 47/26* | (2006.01) |
| *A61K 9/28* | (2006.01) |
| *A61P 25/04* | (2006.01) |

(52) **U.S. Cl.**

CPC ............ ***A61K 31/4174** (2013.01); ***A61K 9/20** (2013.01); ***A61K 9/2004** (2013.01); ***A61K 9/2018** (2013.01); ***A61K 9/2027** (2013.01); ***A61K 9/2054** (2013.01); ***A61K 9/2866** (2013.01); ***A61K 9/501** (2013.01); ***A61K 47/26** (2013.01); ***A61P 25/04** (2018.01)

(58) **Field of Classification Search**

CPC ...... A61K 9/20; A61K 9/2018; A61K 9/2004; A61K 9/2054; A61K 31/4174; A61K 9/501; A61P 25/04

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 553,266 | A | 1/1896 | Schuman |
| 3,980,766 | A | 9/1976 | Shaw et al. |
| 5,312,821 | A | 5/1994 | Connor et al. |
| 5,574,159 | A | 11/1996 | Chang et al. |
| 6,013,658 | A | 1/2000 | Lau et al. |
| 6,060,504 | A | 5/2000 | Stein et al. |
| 6,518,292 | B1 | 2/2003 | Robl et al. |
| 6,528,522 | B2 | 3/2003 | Shih et al. |
| 7,741,356 | B2 | 6/2010 | Breslin et al. |
| 7,786,158 | B2 | 8/2010 | Breslin et al. |
| 7,994,206 | B2 | 8/2011 | Anzalone et al. |
| 8,344,011 | B2 | 1/2013 | Breslin et al. |
| 8,609,709 | B2 | 12/2013 | Breslin et al. |
| 8,609,865 | B2 | 12/2013 | Anzalone et al. |
| 8,691,860 | B2 | 4/2014 | Anzalone et al. |
| 8,772,325 | B2 | 7/2014 | Breslin et al. |
| 8,859,604 | B2 | 10/2014 | Anzalone et al. |
| 9,115,091 | B2 | 8/2015 | Anzalone et al. |
| 9,205,076 | B2 | 12/2015 | Breslin et al. |
| 9,364,489 | B2 | 6/2016 | Anzalone et al. |
| 9,675,587 | B2 | 6/2017 | Costello et al. |
| 9,700,542 | B2 | 7/2017 | Breslin et al. |
| 10,188,632 | B2 | 1/2019 | Costello et al. |
| 2005/0203143 | A1 | 9/2005 | Breslin et al. |
| 2009/0263476 | A1* | 10/2009 | Jobdevairakkam .... A61K 9/006 424/452 |
| 2010/0249045 | A1 | 9/2010 | Babul |
| 2010/0324051 | A1* | 12/2010 | Breslin .............. A61K 31/4174 514/249 |
| 2011/0002985 | A1 | 1/2011 | Shah et al. |
| 2012/0065221 | A1* | 3/2012 | Babul ................... A61K 9/2086 514/289 |
| 2012/0282336 | A1 | 11/2012 | Abebe et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102786476 A | 11/2012 |
| EP | 1055655 A2 | 11/2000 |

(Continued)

OTHER PUBLICATIONS

"Formulation and Process Development for Oral Dosage Forms," 8th Annual PTI Training Program, Aug. 27-31, 2012.

Ananthan "Opioid ligands with mixed μ/δ opioid receptor interactions: an emerging approach to novel analgesics," AAPS Journal, 8(1): E118-E125 (2006).

Bagnol et al., "Cellular localization and distribution of the cloned mu and kappa opioid receptors in rat gastrointestinal tract," Neuroscience, 81(2): 579-591 (1997).

(Continued)

*Primary Examiner* — Mark V Stevens
(74) *Attorney, Agent, or Firm* — Foley Hoag LLP

(57) **ABSTRACT**

Abuse deterrent solid dosage formulations containing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and processes for the preparation and administration of these formulations.

**30 Claims, 2 Drawing Sheets**

US 11,007,179 B2

Page 2

(56)          References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2014/0256779 | A1 | 9/2014 | Breslin et al. |
| 2014/0271854 | A1 | 9/2014 | Costello et al. |
| 2016/0030393 | A1 | 2/2016 | Breslin et al. |
| 2016/0354389 | A1 | 12/2016 | Anzalone et al. |
| 2017/0304268 | A1 | 10/2017 | Costello et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1208143 A1 | 5/2002 |
| EP | 2653465 A1 | 10/2013 |
| WO | WO-02/36116 A2 | 5/2002 |
| WO | WO-03/033486 A1 | 4/2003 |
| WO | WO-03/092688 A2 | 11/2003 |
| WO | WO-2003097051 A2 | 11/2003 |
| WO | WO-2005/053587 A1 | 6/2005 |
| WO | WO-2005/090315 A1 | 9/2005 |
| WO | WO-2008068471 A1 | 6/2008 |
| WO | WO-2009122431 A2 | 10/2009 |

OTHER PUBLICATIONS

Balboni et al., "Opioid pseudopeptides containing heteroaromatic or heteroaliphatic nuclei," Peptides, 21(11): 1663-1671 (2000).
Barber, A. et al., A pharmacological profile of the novel, peripherally-selective k-opioid receptor agonist, EMD 61753, Br. J. Pharmacol., 113:1317-1327 (1994).
Barber, Andrew et al., "Review: Central & Peripheral Nervous Systems—Novel developments with selective, non-peptidic kappa-opioid receptor agonists," Expert Opinion on Investigational Drugs, 6(10): 1351-1368 (1997).
Binder et al., "Effect of the peripherally selective K-opioid agonist, asimadoline, on adjuvant arthritis," Br. J. of Pharmacol., 124(4): 647-654 (1998).
Bitar et al., "Specific opiate receptors on isolated mammalian gastric smooth muscle cells," Nature, 297(5861): 72-74 (1982).
Black et al., "The kappa opioid receptor is associated with the perception of visceral pain," Gut, 43: 312-313 (1998).
Brandt et al., "An evidence-based position statement on the management of irritable bowel syndrome", The American journal of gastroenterology, 104 (Suppl 1): S1-S35 (2009).
Breslin et al., "Identification of a dual δ or antagonist/μ agonist as a potential therapeutic for diarrhea-predominant irritable bowel syndrome (IBS-d)," Bioorganic & Medicinal Chemistry Letters, 22 (14): 4869-4672 (2012).
Callahan, Michael J., "Irritable Bowel Syndrome Neuropharmacology: A Review of Approved and Investigational Compounds," J. of Clinical Gastroenterology, 35(Suppl. 1): S58-S67 (2002).
Camilleri, M. et al., "Consensus report: clinical perspectives, mechanisms, diagnosis and management of irritable bowel syndrome," Alimentary Pharmacol. & Therap., 16: 1407-1430 (2002).
Camilleri, M. et al., "Visceral hypersensitivity: facts, speculations, and challenges," Gut, 48: 125-131 (2001).
Camilleri, Michael, "Management of the irritable bowel syndrome," Gastroenterology, 120(3): 652-668 (2001).
Coleman et al., "New Pharmaceutical Approaches to the Treatment of IBS: Future Development & Research," Annals of Gastro, 15(3): 278-279 (2002).
Colorcon, Opadry II, Data sheet, Aug. 2009.
Corazziari, Enrico, et al., "Gut Dysfunction in IBS: Role of opioid ligands in irritable bowel syndrome," Canadian J. of Gastroenterol., 13(Supp. A): 71A-75A (1999).
De Schepper, H.U, et al., "Review: Opioids and the gut: pharmacology and current clinical experience," Neurogastroenterol. Motil 16:383-394 (2004).
Delgado-Aros et al., "Effects of a -opioid agonist, asimadoline, on satiation and GI motor and sensory functions in humans," Am. J. Physiol. Gastrointest. Liver Physiol., 284: G558-G566 (2003).
Delvaux, M., et al., "Effect of asimadoline, a K opioid agonist, on pain induced by colonic distension in patients with irritable bowel syndrome," Aliment Pharmacol. Ther., 20: 237-246 (2004).

Dietis et al., "Simultaneous targeting of multiple opioid receptors: a strategy to improve side-effect profile," British Journal of Anaesthesia, 103 (1): 38-49 (2009).
Dokray, "Physiology of Enteric Neuropeptides," in Johnson LR ed Physiology of the Gastrointestinal Track 3rd ed New York Raven, 1194, 169-209 (1994).
Drossman "The functional gastrointestinal disorders and the Rome III process," Gastroenterology, 130(5): 1377-1390 (2006).
Drossman, Rome III The Functional Gi Disorders, 3rd Edition, Lawrence: Allen Press Inc., 2006.
Dufour, E., et al., "Synthesis of amidrazones using an engineered papain nitrile hydratase," FEBS Letters, 433: 78-82 (1998).
Extended Search Report for European Patent Application No. 14774006.2, dated Jul. 26, 2016 12 pages.
Holzer, "Opioid receptors in the gastrointestinal tract," Regulatory Peptides, 155(1-3): 11-17 (2009).
International Preliminary Report on Patentability for International (PCT) Patent Application No. PCT/US2014/022666, dated Sep. 24, 2015 12 pages.
International Search Report and Written Opinion for International (PCT) Patent Application No. PCT/US2014/022666, dated Jul. 9, 2014 14 pages.
Joshi, S.K., et al., "K-Opioid Receptor Agonists Modulate Visceral Nociception at a Novel, Peripheral Site of Action," J. of Neuroscience, 20(15): 5874-5829 (2000).
Liu, Bao-Hua, et al., "Effects of mu and kappa opioid receptor agonists and antagonists on contraction of isolated colon strips of rats with cathartic colon," World J. Gastroenterol., 10(11): 1672-1674 (2004).
Lovell et al., "Global prevalence of and risk factors for irritable bowel syndrome: a meta-analysis," Clinical gastroenterology and hepatology, 10(7): 712-721 (2012).
Malagelada, J.-R., "Review article: clinical pharmacology models of irritable bowel syndrome," Alimentary Pharmacol. & Therap., 13(Supp. 2): 57-64 (1999).
Mertz, H., "Review article: visceral hypersensitivity," Alimentary Pharm & Therap., 17(5): 623-633 (2003).
Non Final Office Action dated Feb. 7, 2017 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.
Non Final Office Action dated Jan. 8, 2015 for U.S. Appl. No. 14/459,514, filed Aug. 14, 2014.
Non Final Office Action dated Jul. 12, 2016 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.
Non Final Office Action dated Jun. 16, 2014 for U.S. Appl. No. 14/282,828, filed May 20, 2014.
Non Final Office Action dated Sep. 17, 2014 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.
Non Final Office Action dated Jun. 30, 2015 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.
Non Final Office Action dated Dec. 31, 2015 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.
Notice of Allowance for U.S. Appl. No. 13/829,984, dated Feb. 7, 2017.
Official Action for Eurasia Patent Application No. 201591768, dated May 16, 2017 4 pages.
Official Action with English Translation for China Patent Application No. 2014800026522.7, dated Jan. 13, 2017 23 pages.
Official Action with English Translation for Eurasia Patent Application No. 201591768, dated Oct. 5, 2016 5 pages.
Ozaki, Noriyuki, et al., "Differential Effects of μ, δ- and K-Opioid Receptor Agonists on Mechanosensitive Gastric Vagal Afferent Fibers in the Rat," The Am. Physiological Society, 83(4): 2209-2216 (1999).
Porreca et al., "Potential for Development of Novel Analgesic Agents," Pain: Understanding, Emerging Therapies, and Novel Approaches to Drug Discovery, 407-419 (1st Ed. Taylor & Francis Group LLC) (2003).
Reynolds, James C., "Challenges in the treatment of colonic motility disorders," Am. J. Health-System Pharmacy, 53(Supp 3): S17-S26 (1996).
Riviera et al., "Opioid Receptors: Targets for New Gastrointestinal Drug Development," Drug Development: Molecular Targets for GI Diseases p. 203-38 (Gaginella, T.S., and Guglietta, A., Eds. 2000).

US 11,007,179 B2

Page 3

(56)           References Cited

OTHER PUBLICATIONS

Riviere, Pierre J.-M., "Review: peripheral kappa-opioid agonists for visceral pain," Br. J. of Pharm., 141: 1331-1334 (2004).
Schreiber, Rainer, et al., "The κ-opioid receptor agonist asimadoline inhibits epithelial transport in mouse trachea and colon," Eur. J. of Pharmacol., 503(1-3): 185-190 (2004).
Talley, Nicholas J., "Evaluation of drug treatment in irritable bowel syndrome," Br. J. Clin. Pharmacol., 56(4): 362-369 (2003).
Talley, Nicholas J., "Irritable Bowel Syndrome: Physiology and Management," Medscape Gastroenterology (posted Jun. 7, 2002).
Truberzi Summary of Product Characteristics dated Sep. 19, 2016.
U.S. Appl. No. 14/459,514, filed Aug. 14, 2014, Anzalone et al.
Wade et al., "Modulation of gastrointestinal function by MuDelta, a mixed μ.opioid receptor agonist/ μ. opioid receptor antagonist," British Journal of Pharmacology, 167(5): 1111-1125 (2012).
Zhang Xingfang "Performance Manual of the Raw Materials of Foreign Propellants and Explosives," Weapon Industry Press, Nov. 1991, p. 283, 3 pages.

* cited by examiner

Figure 1



Appx77

## Figure 2







US 11,007,179 B2

**1**

# OPIOID RECEPTOR MODULATOR DOSAGE FORMULATIONS

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 16/795,044, filed Feb. 19, 2020, currently pending; which is continuation of U.S. patent application Ser. No. 16/459,947, filed on Jul. 2, 2019, currently abandoned; which is a continuation of U.S. application Ser. No. 16/213,083, filed on Dec. 7, 2018, currently abandoned; which is a continuation of U.S. patent application Ser. No. 15/588,304 filed on May 5, 2017, now U.S. Pat. No. 10,188,632, granted on Jan. 29, 2019; which is a continuation of U.S. patent application Ser. No. 13/829,984 filed on Mar. 14, 2013, now U.S. Pat. No. 9,675,587, granted on Jun. 13, 2017. The disclosures of the foregoing references are hereby incorporated by reference in their entireties.

## FIELD OF THE DISCLOSURE

The present disclosure relates to oral dosage formulations containing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and processes for the preparation and administration of these formulations.

## BACKGROUND OF THE DISCLOSURE

Delivering an active pharmaceutical ingredient ("5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid") to a patient requires more than just identifying a molecule and its use. An 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid must be formulated for delivery to a patient and this formulation (in addition to the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid activity) is evaluated by regulatory agencies such as the US Food and Drug Administration (FDA) and the European Medicines Agency (EMA). The FDA evaluates the formulation for, among other properties, delivery properties, stability, consistency, and manufacturing controls. An important factor in determining these properties of a particular formulation is the composition and form of the dosage formulation of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. The formulations for every 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid are different and different formulations containing the same 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid may have very different stability and drug delivery (e.g., pharmacokinetic) properties.

5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid is an opioid receptor modulator that effects simultaneous agonism of the μ opioid receptor (MOR) and antagonism of the δ opioid receptor (DOR) and may be useful in the treatment and prevention of various mammalian disease states, for example pain and gastrointestinal disorders such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders (for example, see U.S. Pat. No. 7,741,356 to Breslin, et al., which is incorporated herein in its entirety). Irritable bowel syndrome is a common functional gastrointestinal disorder that affects approximately 10-15% of the population in western countries (Lovell et al., Clin Gastroenterol Hepatol 2012; 10(7):712-21). Irritable bowel syndrome is characterized by recurrent abdominal discomfort and pain associated with altered bowel habits (Drossman D A, Gastroenterol 2006; 130(5):1377-1390). Currently irritable bowel syndrome subtypes include diarrhea (IBS-D), constipation (IBS-C), or mixed constipation and diarrhea (IBS-M). Irritable bowel syndrome can negatively impact individual's quality of life and results in significant direct and indirect costs (Drossman D A. Rome III The Functional GI Disorders. 3rd Edition. Lawrence: Allen Press, Inc. 2006). Current safe and effective pharmacologic treatments for IBS-D are limited and include antispasmodics, antidepressants, antidiarrheal agents, and alosetron (Brandt et al., Am J Gastroenterol 2009; 104(Suppl 1):S1-35).

Opioid receptors, including mu, delta, and kappa are expressed along the gastrointestinal tract and play a key role in regulating gastrointestinal motility, secretion and visceral sensation (Bagnol et al., Neuroscience 1997; 81(2):579-591; Dokray G J, Physiology of Enteric Neuropeptides. In: Johnson L R ed. Physiology of the Gastrointestinal Tract 3rd ed. New York: Raven, 1994; 169-209; Bitar et al., Nature 1982; 297(5861):72-74). Exogenous opioids reduce gastrointestinal transit through activation of MOR and can treat diarrhea in acute situations (Holzer P., Regulatory Peptides 2009; 155:11-17). Agents that simultaneously activate MOR while antagonizing DOR have differential gastrointestinal effects and may possess increased analgesic potency compared to pure MOR agonists (Ananthan S. Opioid ligands with mixed μ/δ opioid receptor interactions: an emerging approach to novel analgesics. AAPS Journal 2006; 8(1):E118-E125; Dietis et al., British Journal of Anaesthesia 2009; 103(1): 38-49). Such a mixed MOR agonist/DOR antagonist profile may offer an advantage in treating both the diarrhea and abdominal pain associated with IBS-D.

5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid may be particularly useful for reducing pain and diarrhea in patients with irritable bowel syndrome with diarrhea (IBS-D) without constipating side effects. In vitro, it reduces contractility in intestinal tissue and inhibits neurogenically-mediated secretion (Wade et al., Br J Pharmacol 2012; 167(5):1111-1125). In vivo, it reduces gastrointestinal transit and fecal output in stressed and non-stressed mice over a wide dose-range without fully inhibiting gastrointestinal transit (ibid). In contrast, loperamide had a narrow dose range in the same stressed and non-stressed models and completely prevented fecal output in a dose-dependent manner (ibid.).

5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1h-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and methods of making this molecule are disclosed in U.S. Pat. No. 7,741,356. Example 9 of U.S. Pat. No. 7,741,356 makes the hydrochloride salt of 5-({[2-amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1h-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Applicants have

US 11,007,179 B2

3

also discovered a process of making the zwitterion of 5-({[2-amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propio-nyl]-[1-(4-phenyl-1h-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and two novel crystals of this zwitterions (for example, see U.S. Patent Publication No. 2011/0263868 to Anzalone, et. al., which is incorporated herein in its entirety).

Oral administration of 5-({[2-amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1h-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid is efficacious in normalizing gastrointestinal (GI) motility in stressed subjects and providing anti-visceral hyperalgesic effects in rats by acting at peripheral opioid receptors in the gastrointestinal tract. It has also been noted that parenteral administration of 5-({[2-amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid results in CNS-related effects in animal models, which is believed to be due to the mu-opioid receptor ("MOR") agonist properties.

The recent draft guidance issued for industry by the US Food and Drug Administration (Food and Drug Adminis-tration 2010) for the assessment of abuse potential of drugs provides general instructions for in vitro laboratory assess-ment procedures. This draft guidance states that "informa-tion should be obtained on how much drug substance might be released and any changes that could take place in the rate of release of the drug from the drug product if it is misused either intentionally or unintentionally." The guidance further states that the "effects of pH, temperature, and solvent polarity on disruption of the drug product matrix should be evaluated. Additional experimental variables may include exposure times to the solvent, agitation, varying the surface area (such as from intact to being ground, crushed, or cut into pieces), and ease of crushing tablets or destroying the dosage from matrix." These guidelines pertain to com-pounds perceived to have any potential for abuse, misuse and/or diversion, which include, but are not limited to, opioid receptor agonists. The goal is to determine the effects that certain formulations may have in limiting or preventing abuse of the active ingredient, in this instance, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, in order to decrease abuse or diversion of the marketed dosage formu-lations and prevent harm and addiction in the public to the extent possible.

Therefore an abuse liability assessment of oral dosage formulations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was undertaken to identify oral formulation compositions and characteristics that may provide effective treatment of opioid receptor disorders while minimizing or elimination potential for abuse or diversion of these oral formulations.

SUMMARY OF DISCLOSURE

The present inventors have discovered solid oral pharma-ceutical formulations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with improved stability and shelf life and unique physico-chemical features that may deter or limit abuse of the active ingredient or diversion of the oral formulations. Thus, embodiments provided by this disclosure include an abuse deterrent pharmaceutical formulation of 5-({[2-

4

Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

One embodiment of the disclosure provides a solid phar-maceutical formulation comprising 5-({[2-Amino-3-(4-car-bamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon diox-ide, crospovidone (polyvinylpolypyrrolidone; highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magne-sium stearate. In a specific embodiment, this pharmaceutical formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a pharmaceutical formulation consist-ing of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and mag-nesium stearate.

One embodiment of the disclosure provides a solid phar-maceutical formulation comprising 5-({[2-Amino-3-(4-car-bamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and inert ingredients including silicified microcrystalline cellulose, colloidal silicon diox-ide, crospovidone (polyvinylpolypyrrolidone; highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magne-sium stearate. In a specific embodiment, this pharmaceutical formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a pharmaceutical formulation consist-ing of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and the inert ingredients silicified microcrystalline cellulose, colloi-dal silicon dioxide, crospovidone, mannitol, and magnesium stearate.

One embodiment of the disclosure provides a solid oral dosage formulation comprising 5-({[2-Amino-3-(4-carbam-oyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-di-hydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon diox-ide, crospovidone (polyvinylpolypyrrolidone; highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magne-sium stearate. In a specific embodiment, this solid oral dosage formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a solid oral dosage formulation con-sisting of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phe-nyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cel-lulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate. In these embodiments, the oral dosage formulations may be coated, including sugar coated, gelatin coated, film coated or enteric coated, by standard techniques.

Another embodiment of the disclosure provides an oral tablet formulation comprising 5-({[2-Amino-3-(4-carbam-oyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-di-hydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon diox-ide, crospovidone (polyvinylpolypyrrolidone; highly cross-

US 11,007,179 B2

5

linked polyvinylpyrrolidone (PVP)), mannitol, and magnesium stearate. In a specific embodiment, this oral tablet formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides an oral tablet formulation consisting of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate. In these embodiments, the oral tablet formulations may be coated, including sugar coated, gelatin coated, film coated or enteric coated, by standard techniques.

Another embodiment of the disclosure provides a film-coated, oral tablet formulation comprising 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone (polyvinylpolypyrrolidone, highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magnesium stearate, and a film coating. In a specific embodiment, this film-coated, oral tablet formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a film-coated, oral tablet formulation consisting of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate, and a film coating. In these embodiments, the film coating may be an aqueous film coating.

A specific embodiment is an abuse deterrent, mono-phasic pharmaceutical composition suitable for single dose administration for treating or ameliorating a condition mediated by an opioid receptor consisting essentially of about 20 mg/dose to about 200 mg/dose of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, from about 60-80% by weight of silicified microcrystalline cellulose, from about 2-8% by weight of colloidal silica, from about 50-90% by weight of mannitol, from about 20-50% by weight of crospovidone, and from about 2-8% by weight of magnesium stearate.

Another embodiment provided by this disclosure is a method of treating or ameliorating a condition mediated by an opioid receptor by administering 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a solid oral formulation of this disclosure to a subject in need of such treatment. In a specific embodiment, this administration may be made in the absence of the separate or concurrent administration of an opioid antagonist, such as naloxone. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount between 20 mg and 200 mg.

In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount between about 10 mg and about 125 mg. In specific embodiments, these methods may

6

include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount between about 50 mg and about 100 mg. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount of about 75 mg. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount of about 100 mg.

In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject between two administrations per day and eight administrations per day. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject between two administrations per day and six administrations per day. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject between two administrations per day and four administrations per day. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on a twice-daily dosing regimen. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on a once-daily dosing regimen.

This Summary of the Disclosure is neither intended nor should it be construed as being representative of the full extent and scope of the present disclosure. Moreover, references made herein to "the present disclosure," or aspects thereof, should be understood to mean certain embodiments of the present disclosure and should not necessarily be construed as limiting all embodiments to a particular description. The present disclosure is set forth in various levels of detail in the Summary of the Disclosure as well as in the attached drawings and the Description of Embodiments and no limitation as to the scope of the present disclosure is intended by either the inclusion or non-inclusion of elements, components, etc. in this Summary of the Disclosure. Additional aspects of the present disclosure will become more readily apparent from the Description of Embodiments, particularly when taken together with the drawings.

BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 depicts the manufacturing process for 75-mg and 100-mg oral tablets of the present disclosure.

US 11,007,179 B2

7

FIG. 2, shows representative time course plots of cumulative percent recovery of active ingredient under different extraction conditions: A, ground vs. whole tablet; B, 25° C. vs. 95° C.; C, water vs. 0.1M HCl.

## DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

The present disclosure is drawn to solid dosage formulations containing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that deter or minimize the abuse or diversion of these formulations, as well as processes for the preparation and administration of these formulations.

For the purposes of this disclosure, reference to "5-{[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-amino}-methyl)-2-methoxy-benzoic acid" also means "5-{[[(2-amino-3-[4-(aminocarbonyl)-2,6-dimethylphenyl]-1-oxopropyl]-[1-(4-phenyl-1H-imidazol-2-yl)ethyl]amino)methyl]-2-methoxybenzoic acid", and it is intended that the two chemical names can be used interchangeably. Reference to the "active ingredient" includes 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and pharmaceutically acceptable enantiomers, diastereomers, racemates, zwitterions, and salts thereof.

Because 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid includes at least two chiral centers, it may exist as diastereomers. These isomers may be separated by conventional techniques such as preparative chromatography and may be prepared in racemic form or as individual diastereomers by either stereospecific synthesis or by resolution. The compounds may, for example, be resolved into their component diastereomers by standard techniques, such as the formation of stereoisomeric pairs by salt formation with an optically active acid, such as (–)-di-p-toluoyl-D-tartaric acid and/or (+)-di-p-toluoyl-L-tartaric acid followed by fractional crystallization and regeneration of the free base. The compounds may also be resolved by formation of stereoisomeric esters or amides, followed by chromatographic separation and removal of the chiral auxiliary. Alternatively, the compounds may be resolved using a chiral HPLC column. It is to be understood that all stereoisomers, racemic mixtures, diastereomers and enantiomers are encompassed within the scope of any reference to "5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid" or the "active ingredient" in this disclosure.

For example, reference to "5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid" or the "active ingredient" specifically includes:

a) 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid,

b) 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid,

8

c) 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and/or

d) 5-({[[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, as well as

e) a hydrobromic, hydriodic, perchloric, sulfuric, nitric, phosphoric, acetic, propionic, glycolic, lactic, succinic, maleic, fumaric, malic, tartaric, citric, benzoic, mandelic, methanesulfonic, hydroxyethanesulfonic, benzenesulfonic, oxalic, pamoic, 2-naphthalenesulfonic, p-toluenesulfonic, cyclohexanesulfamic, salicylic, saccharinic or trifluoroacetic acid salt of any one of these compounds, or

f) a benzathine, chloroprocaine, choline, diethanolamine, ethylenediamine, meglumine, procaine, aluminum, calcium, lithium, magnesium, potassium, sodium, or zinc salt of any one of these compounds.

Similarly, reference to "5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid" or the "active ingredient" specifically includes a compound having the chemical structure:



, and/or



, and/or



, and/or

9                                                              10

-continued



as well as a hydrobromic, hydriodic, perchloric, sulfuric, nitric, phosphoric, acetic, propionic, glycolic, lactic, succinic, maleic, fumaric, malic, tartaric, citric, benzoic, mandelic, methanesulfonic, hydroxyethanesulfonic, benzenesulfonic, oxalic, pamoic, 2-naphthalenesulfonic, p-toluenesulfonic, cyclohexanesulfamic, salicylic, saccharinic or trifluoroacetic acid salt, or a benzathine, chloroprocaine, choline, diethanolamine, ethylenediamine, meglumine, procaine, aluminum, calcium, lithium, magnesium, potassium, sodium, or zinc salt of any one of these chemical structures.

As used in this disclosure, the terms "subject," "patient," "individual," etc. are not intended to be limiting and can be generally interchanged. That is, an individual described as a "patient" does not necessarily have a given disease, but may be merely seeking medical advice.

As used herein, the terms "treat" and "prevent" are not intended to be absolute terms. Treatment can refer to any delay in onset, reduction in the frequency or severity of symptoms, amelioration of symptoms, improvement in patient comfort and/or gastrointestinal function, etc. The effect of treatment can be compared to an individual or pool of individuals not receiving a given treatment, or to the same patient prior to, or after treatment.

The term "prevent" or "ameliorate" refers to a decrease in the occurrence of opioid receptor disease or disorder symptoms in a patient. The prevention or amelioration may be complete (no detectable symptoms) or partial, such that fewer symptoms are observed than would likely occur absent treatment.

The phrase "opioid receptor related disorders" refers to various mammalian disease states including, for example, pain and gastrointestinal disorders such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders, as described in greater detail in U.S. Pat. No. 7,741,356 to Breslin, et al., which is incorporated herein in its entirety.

The term "abusive" or "abusive manner" refers to uses of the formulations of this disclosure beyond oral administration, such as by injecting or snorting.

The term "abuse deterrent", as used herein, refers to a formulation of the present invention which possesses physico-chemical characteristics that allow the therapeutic use of the opioid receptor modulator active ingredient by oral administration to a subject in need of such treatment with very limited potential for abuse or misuse of the formulation, i.e., by extracting and ingesting the active ingredient by snorting or injection.

The term "therapeutically effective amount," as used herein, refers to that amount of the therapeutic agent sufficient to treat or ameliorate the disease or disorder, as described above. For example, for the given parameter, a therapeutically effective amount will show an increase or decrease of at least about 5%, 10%, 15%, 20%, 25%, 30%, 40%, 50%, 60%, 70%, 80%, 90%, or 100%. Therapeutic efficacy can also be expressed as "-fold" increase or decrease. For example, a therapeutically effective amount can have at least a 1.2-fold, 1.5-fold, 2-fold, 5-fold, or more effect over a control value. Therapeutic efficacy related to irritable bowel syndrome, preferably diarrhea-predominant irritable bowel syndrome, can be expressed in measurements of worst abdominal pain (WAP) or stool consistency score (Bristol Stool Scale or BSS).

The term "solid dosage formulation" as used herein includes tablets, capsules, pills and like and may be present as conventional or extended-release compositions.

The terminology used herein is for describing particular embodiments and is not intended to be limiting. As used herein, the singular forms "a," "and" and "the" include plural referents unless the content and context clearly dictate otherwise. Thus, for example, a reference to "a marker" includes a combination of two or more such markers. Unless defined otherwise, all scientific and technical terms are to be understood as having the same meaning as commonly used in the art to which they pertain. For the purposes of the present disclosure, the following terms are defined below.

Also, the use of "or" means "and/or" unless stated otherwise. Similarly, "comprise," "comprises," "comprising," "include," "includes," and "including" are interchangeable and not intended to be limiting.

It is to be further understood that where descriptions of various embodiments use the term "comprising," those skilled in the art would understand that in some specific instances, an embodiment can be alternatively described using language "consisting essentially of" or "consisting of."

In some embodiments related to the treatment of opioid receptor related disorders, the dose of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that can be incorporated into the formulations of the present disclosure depends on the desired treatment dosage to be administered and can range from about 20 mg to about 200 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In some embodiments, the dose of the active ingredient can range from about 10 mg to about 125 mg. In some embodiments, the dose of the active ingredient in the formulations of this disclosure is between about 10 mg and about 200 mg, e.g., 10 mg, 15 mg, 20 mg, 25 mg, 30 mg, 35 mg, 40 mg, 45 mg, 50 mg, 55 mg, 60 mg, 65 mg, 70 mg, 75 mg, 80 mg, 85 mg, 90 mg, 95 mg, 100 mg, 105 mg, 110 mg, 115 mg, 120 mg, 125 mg, 130 mg, 135 mg, 140 mg, 145 mg, 150 mg, 155 mg, 160 mg, 165 mg, 170 mg, 175 mg, 180 mg, 185 mg, 190 mg, 195 mg, or 200 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In one embodiment, the dose is about 75 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In another embodiment, the dose is about 100 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-

US 11,007,179 B2

11

12

dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In another embodiment, the dose is about 50 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In yet another embodiment, the dose is about 150 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In yet another embodiment, the dose is about 37.5 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

Dose proportionality occurs when increases in the administered dose are accompanied by proportional increases in a pharmacokinetic parameter. The dosage formulations of the present disclosure are preferably designed as a dose proportional formulation in the range of 25 mg to 100 mg of the active ingredient 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

Abuse deterrent formulations of the present invention include solid pharmaceutical dosage formulations containing:

from about 5-20% by weight of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, preferably from about 10-15% by weight of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, preferably about 12.5% by weight of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

from about 60-80% by weight of silicified microcrystalline cellulose (USP Silicified Microcrystalline Cellulose; intimately associated microcrystalline cellulose and colloidal silicon dioxide particles; in a preferred example, high density silicified microcrystalline cellulose "HD-90"); preferably from about 65-75% by weight of silicified microcrystalline cellulose, preferably about 71% by weight of silica fine microcrystalline cellulose;

from about 0.45-1.0% by weight of a glidant, e.g., colloidal silica, preferably from about 0.55-0.95% by weight of colloidal silica, in one preferred embodiment, about 0.65%-0.85% by weight of colloidal silica, in another preferred embodiment, about 0.75% by weight of colloidal silica;

from about 1-20% by weight of mannitol (mannitol, USP), preferably from about 5-15% by weight of mannitol, in one preferred embodiment, about 7.5%-12.5% by weight of mannitol, in another preferred embodiment, about 10% by weight of mannitol;

from about 2-8% by weight of crospovidone (highly cross-linked modification of polyvinylpyrrolidone (PVP)), preferably from about 3-7% by weight of crospovidone, in one preferred embodiment, about 4-6% by weight of crospovidone, in another preferred embodiment, about 5% by weight of crospovidone; and,

from about 0.45-1% by weight of magnesium stearate (Magnesium Stearate USP), preferably from about 0.55-0.95% by weight of magnesium stearate, in one preferred embodiment, about 0.65%-0.85% by weight of magnesium stearate, in another preferred embodiment, about 0.75% by weight of magnesium stearate.

In some embodiments, the abuse deterrent solid pharmaceutical dosage formulations are coated with a film coating. In some embodiments, the coating is a water-soluble, pH-independent film coating. Such coating allows for immediate disintegration for fast, active release of the contents of the solid dosage formulation. One such commercially available coating useful in the solid dosage formulations of the present disclosure is Opadry(®), and preferably Opadry II(®) In specific embodiments, the abuse deterrent solid pharmaceutical dosage formulations include a film coating present in an amount of from about 0.5-5.5% by weight film coating, preferably from about 1-5% by weight film coating, in one preferred embodiment, about 2-4% by weight film coating, in another preferred embodiment, about 3% by weight film coating.

In some instances, opioid receptor agonist drugs have been formulated and marketed with an opioid antagonist (such as the opioid antagonist naloxone), to render the formulation abuse resistant. The present invention is also based, at least in part, on the surprising discovery, that the formulations of the present disclosure have abuse deterrent characteristics. For example, such formulation is non-tamperable thereby limiting case of isolation and purification of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the formulation. Thus, in specific embodiments of the present disclosure, the formulations are substantially free of naloxone. In related embodiments of the present disclosure, the formulations are completely free of naloxone. Such formulations are advantageous because they can provide effective abuse deterrence in the absence of naloxone.

The formulations can also optionally include an inert pharmaceutically acceptable dissolution-rate-modifying agent, a pharmaceutically acceptable plasticizer, a pharmaceutically acceptable coloring agent (e.g., FD&C Blue #1) a pharmaceutically acceptable opacifier (e.g., titanium dioxide), pharmaceutically acceptable anti-oxidant (e.g., tocopherol acetate), a pharmaceutically acceptable preservative, flavorants (e.g., saccharin and peppermint), neutralizing agents (e.g., sodium hydroxide), buffering agents (e.g., monobasic, or tribasic sodium phosphate), or combinations thereof. Preferably, these components are individually present at no more than about 1% of the final weight of the formulation, but the amount may vary depending on the other components of the formulation.

For preparing formulations of the present disclosure, such as tablets, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid is mixed with one or more pharmaceutical excipients to form a solid preformulation composition containing, in preferred embodiments, a homogeneous mixture of the excipient(s) with the active ingredient. When referring to these preformulation compositions as "homogeneous," it is meant that the active ingredient are dispersed evenly throughout the composition so that the composition may be readily subdivided into equally effective unit dosage forms such as tablets or capsules. This solid preformulation is then subdivided into unit dosage forms of the type described above containing from, for example, about 10 to about 200 milligrams of the active ingredient.

US 11,007,179 B2

13                                                    14

According to one embodiment, a solid dosage formulation of the present disclosure is prepared by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipi-ents silicified microcrystalline cellulose, mannitol, col-loidal silica and crospovidone;

ii) comilling the above blend with the addition of mag-nesium stearate;

iii) compressing the dry blend into suitably sized tablets, or filling into capsules.

According to another embodiment, a solid dosage formu-lation is prepared using direct compression, by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipi-ents silicified microcrystalline cellulose, mannitol, col-loidal silica, and crospovidone;

ii) lubricating the blend by the addition of magnesium stearate;

iii) compressing the blend into suitably sized tablets.

According to another embodiment, capsules may be for-mulated by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipi-ents silicified microcrystalline cellulose, mannitol, col-loidal silica, and crospovidone;

ii) lubricating the blend by the addition of magnesium stearate,

iii) filling the blend into capsule shells.

According to another embodiment, capsules may also be formulated by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipi-ents silicified microcrystalline cellulose, mannitol, col-loidal silica, and crospovidone;

ii) comilling the above blend,

iii) adding magnesium stearate to lubricate the blend,

iv) filling the blend into capsule shells.

According to another embodiment, capsules may also be formulated by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipi-ents silicified microcrystalline cellulose, mannitol, col-loidal silica, and crospovidone;

ii) comilling the above blend,

iii) adding magnesium stearate to lubricate the blend,

iv) compressing the blend into tablets.

In these embodiments of preparing the dosage formula-tions of this disclosure, the tablets or capsules may be film coated and/or packaged in bulk or unit-dosage packaging (i.e. blister packaging).

The active ingredient in the formulations of the present disclosure are useful opioid receptor modulators. In particu-lar, certain compounds are opioid receptor agonists useful in the treatment or amelioration of conditions such as pain and gastrointestinal disorders. Examples of pain intended to be within the scope of the present invention include, but are not limited to, centrally mediated pain, peripherally mediated

pain, structural or soft tissue injury related pain, pain related to inflammation, progressive disease related pain, neuro-pathic pain and acute pain such as caused by acute injury, trauma or surgery, and chronic pain such as caused by neuropathic pain conditions, diabetic peripheral neuropathy, post-herpetic neuralgia, trigeminal neuralgia, post-stroke pain syndromes or cluster or migraine headaches. The active ingredient in the formulations of the present disclosure are preferably useful for treating or ameliorating abdominal pain. Examples of gastrointestinal disorders intended to be within the scope of this invention include, but are not limited to, diarrheic syndromes, motility disorders such as irritable bowel syndrome including diarrhea-predominant, constipa-tion-predominant or alternating irritable bowel syndrome, and visceral pain and diarrhea associated with inflammatory bowel disease including ulcerative colitis and Crohn's dis-ease.

Examples of gastrointestinal disorders where -({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid may be useful include constipation-predominant irritable bowel syndrome, post-operative ileus and constipation, including but not limited to the constipation associated with treatment of chronic pain with opiates. Modulation of more than one opioid receptor subtype is also useful as follows: a com-pound that is a mixed mu OR agonist and delta OR antago-nist could have antidiarrheal properties without being pro-foundly constipating. A compound that is a mixed mu OR agonist and delta OR agonist are useful in cases of severe diarrhea that are refractory to treatment with pure mu OR agonists, or has additional utility in treating visceral pain associated with inflammation and diarrhea.

The daily dose of a solid dosage formulation of the present disclosure may be a dose that is therapeutically effective for the treatment of irritable bowel syndrome, preferably diarrhea-predominant irritable bowel syndrome, wherein a patient has an average decrease of daily WAP scores from the patient's baseline WAP (for example a baseline WAP score of ≥3.0 (on a 0-10 numerical rating scale, where 0 indicates no pain and 10 worst pain imagin-able) of about ≥10%, preferably a decrease in WAP score of about ≥20%, more preferably a decrease in WAP score of about ≥30%. The daily dose of a dosage formulation of the present disclosure may be a dose that is therapeutically effective for the treatment of irritable bowel syndrome, preferably diarrhea-predominant irritable bowel syndrome, wherein a patient achieves an average BSS score (wherein 1 equals hard, lumpy stools and 7 equals watery, liquid stools) of between 2 and 5, preferably 3 or 4.

The daily dose of a solid dosage formulation of the present disclosure may be varied over a wide range from about 20 mg to about 7000 mg of the active ingredient per adult human per day; preferably the dose will be in the range of from about 50 mg to about 2100 mg of the active ingredient per adult human per day. For oral administration, the formulations are preferably provided in the form of film-coated tablets containing about 75, about 100 or about 200 milligrams, more preferably about 75 or about 100 milligrams, of the active ingredient for the symptomatic adjustment of the dosage to the subject to be treated. Advantageously, dosage formulations of the present disclo-sure may be administered in a single daily dose or the total daily dosage may be administered in divided doses of two, three or four times daily. If administered twice daily, each dose may be administered at about 6 hours to about 12 hours apart per day, preferably about 8 hours to about 12 hours

US 11,007,179 B2

15      16

apart per day, preferably about 10 hours to about 12 hours apart per day, preferably about 10 hours apart per day, or preferably about 12 hours apart per day. In these preferred embodiments, the total daily dose is administered twice daily.

In certain embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on an every-other-day (qod) dosing regimen, or on a thrice-weekly dosing regimen, or on a twice-weekly dosing regimen, or on a once-weekly dosing regimen.

In certain embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on a twice-monthly dosing regimen, or on a once-monthly dosing regimen.

In certain embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on an as-needed (prn) dosing regimen.

Thus, an embodiment provided by this disclosure is a method of treating or ameliorating an opioid receptor related disorder by administering a formulation of this disclosure to a subject in need of such treatment. In one embodiment, this administration may be made in the absence of the separate or concurrent administration of the opioid antagonist naloxone. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount between about 20 mg and about 200 mg, preferably about 75, about 100 or about 200 milligrams, more preferably about 75 or about 100 milligrams.

In another embodiment, this administration may be made in the absence of, prior to or concurrent with, the administration of food. In one embodiment, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid is administered to the subject with one or more daily meals, more preferably with breakfast and dinner.

Another embodiment of the disclosure relates to any of the formulations of this disclosure for use in the treatment or amelioration of a condition mediated by an opioid receptor, for example, any pain and gastrointestinal disorders disclosed herein, preferably such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders.

Another embodiment of the disclosure relates to the use of any of the formulations of this disclosure in the preparation of a medicament for the treatment or amelioration of a condition mediated by an opioid receptor, for example pain and gastrointestinal disorders disclosed herein, such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders.

The disclosure now being generally described will be more readily understood by reference to the following examples, which are included merely for the purposes of illustration of certain aspects of the embodiments of the present disclosure. The examples are not intended to limit the disclosure, as one of skill in the art would recognize from the above teachings and the following examples that other techniques and methods can satisfy the claims and can be employed without departing from the scope of the claimed disclosure.

EXAMPLES

Example 1—Description and Composition of Two Formulations of Disclosure

Description of the Dosage Form

The active ingredient, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was formulated as 75-mg and 100-mg film-coated tablets. The formulation was composed of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and the inactive components listed in Table 1.

Composition

TABLE 1

| Composition of Tablets, 75-mg and 100-mg | | | | | |
|---|---|---|---|---|---|
| | | Strength (label claim) | | | |
| Component and | | 75 mg | | 100 mg | |
| Quality Standard (and Grade) | Function | Quantity per mg | % | Quantity per mg | % |
| Active ingredient | Active | 75 | 12.5 | 100 | 12.5 |
| Silicified Microcrystalline cellulose (HD90) (NF, Ph. Eur.) | Filler | 426 | 71.0 | 568 | 71.0 |
| Colloidal silica (NF, Ph. Eur.) | Glidant | 4.5 | 0.75 | 6 | 0.75 |
| Mannitol (USP, Ph. Eur.) | Filler | 60 | 10.0 | 80 | 10.0 |
| Crospovidone (PolyP XL10) (NF, Ph. Eur.) | Disintegrant | 30 | 5.0 | 40 | 5.0 |
| Magnesium stearate (NF, Ph. Eur.) | Lubricant | 4.5 | 0.75 | 6 | 0.75 |
| Nominal Tablet Weight | — | 600 | 100 | 800 | 100 |
| Opadry II 85F1 8422 (Company Specification) | Film coat | 18 | 3.0 | 24 | 3.0 |
| Purified water, USP | Film coat solvent | —[a] | — | —[a] | — |
| Total | | 618 | — | 824 | — |

[a]Removed during processing

Example 2—Description of One Manufacturing Process (and Process Controls)

The flow chart for the method of manufacture for the 75- and 100-mg oral tablets is presented in FIG. 1.

Description of the Manufacturing Process of FIG. 1

1. Screen silicified microcrystalline cellulose, mannitol, crospovidone and colloidal silica through a 20 mesh screen and magnesium stearate through a 30 mesh screen.

Appx86

US 11,007,179 B2

17

2. Transfer the following into a 650-L tote bin: half of the silicified microcrystalline cellulose, all of the active ingredient, mannitol, colloidal silica, crospovidone, and the remaining half of silicified microcrystalline cellulose. Blend at 12 rpm for 10 minutes. Add the magnesium stearate, blend at 12 rpm for 5 minutes and sample.

3. Compress the tablets using a Stoke 34D tablet press or similar with a speed of 35-45 rpm. Collect samples throughout the compression run.

4. Prepare the coating suspension by dispersing the Opadry II 85F18422 in water and mixing. Apply the coating suspension with a spray gun at 300 g/min in a 48 inch Accela Cota coater with following parameters:

TABLE 2

Tablet Coating Parameters

| Coating Parameter | Setting |
|---|---|
| No. of Baffles | 4 |
| Number of Spray Guns | 4 |
| Spray Apparatus | Schlick (Module 9347-1535 with pattern and atomization adjustments) |
| Nozzle Diameter/Air Cap | 1.2 mm/Air Cap 4 mm |
| Delivery System | Peristaltic Pump |
| Gun to Bed Distance<sup>a</sup> | 9″ (8-11″) |
| Set Point Delivery Rate<sup>a</sup> | 300 ± 50 g/min/4 Guns |
| Pan Speed<sup>a</sup> | 4.5 (4-8) rpm |
| Atomizing Air<sup>a</sup> | 30 ± 5 psi |
| Pattern Air<sup>a</sup> | 25 ± 5 psi |
| Inlet Air Temperature<sup>a</sup> | 60 ± 10° C. |
| Air Volume (Inlet)<sup>a</sup> | 1500 ± 500 cfm |

<sup>a</sup>Guideline only-adjust as required to achieve a suitable coating process

5. Cool the tablets and store in tared, labeled high density polyethylene (HDPE) containers lined with double polyethylene bags with twist ties.

6. Prepare final packaging in ACLAR blisters or HDPE bottles.

Example 3—Abuse Liability Assessment of Oral Formulation

An abuse liability assessment was undertaken in rhesus monkeys to determine the doses and systemic exposure levels following acute intravenous administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that would provide a discriminative stimulus in morphine-conditioned monkeys and positive reinforcing effects (self-administration) in heroin-conditioned monkeys. The drug discrimination studies revealed that morphine-trained monkeys discriminated between saline at an IV dose of ≥10 mg/kg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Self-administration studies revealed that in monkeys conditioned to self-administer heroin, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid (3.2 mg/kg/IV infusion) provided reinforcement for self-administration. However, 1 mg/kg did not produce a signal in either morphine- or heroin-conditioned primates.

Thus, at least in animals, oral administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-

18

amino}-methyl)-2-methoxy-benzoic acid does not produce CNS effects that are prototypic of abused drugs. However, parenteral administration does appear to produce these effects. Typically, when this pattern of effects is observed in animals, it is recommended to conduct a human laboratory abuse potential study using both the therapeutic route (i.e., oral), as well as the IV route, which would represent a "worst case scenario."

In addition the recommendation to conduct in vitro studies to determine the ease and feasibility of preparing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid for abuse through alternative routes of administration such as injection or snorting (e.g., in vitro extractability/tamperability studies). This is consistent with the draft "Guidance for Industry: Assessment of Abuse Potential of Drugs" (FDA, 2010). This example discloses the findings of such in vitro extractability/tamperability studies.

Based on the FDA guidance, a series of in vitro laboratory assessment studies were designed to explore the abuse potential of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Specific areas that were identified for laboratory assessment were as follows:

Physical manipulations and pretreatment effects

Aqueous and organic solvent extractions

Syringeability assessments

Simulated smoking assessments

Laboratory experiments were targeted toward outcomes that could produce tampered product suitable for administration by alternate routes of administration including injection, intranasal administration and smoking. Experiment design began with a consideration of the physical and chemical properties of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and formulation excipients. The solubility profile of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid has been characterized as ranging from "slightly soluble" (1-10 mg/mL) in water to "sparingly soluble" 10-33 mg/mL in acidic pH2 buffered solutions to "freely soluble" (100-1000 mg/mL) in 0.1N NaOH solution. Consequently, a core group of laboratory assessments were directed toward experiments that characterized the "extractability" of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the formulation matrix. The formulation tested was the 75 mg and 100 mg tablets described in Example 1, Table 1.

The first phase of the study consisted of assessing the formulation for ease of physical manipulation (e.g., crushing, film coating removal, and pretreatment), extractability with selected aqueous and organic solvents, effects of filtration on assay results, simulated smoking experiments, and syringeability.

It was determined that first phase assessments of physical manipulations (cutting/crushing/grinding assessments, pretreatment by freezing and heating, and coating removal), and simulated smoking experiments provided a clear and complete body of data on these topics and no further assessments were needed. The first phase assessments of extraction provided a basis for a second, formal phase study of extractions from this formulation.

US 11,007,179 B2

19                                                           20

All assessments of these tablet formulations were performed with the 100 mg 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid dosage tablet (total tablet weight=824 mg) with the exception of physical manipulation experiments and the Time Course study which were performed with the 75 mg strength tablet. The two dosage strengths are dose proportional in relation to excipients (common blend) and have the same coating.

To assure production of reliable, accurate data, the experimental design of laboratory protocols included the following elements: use of sufficient replicates to assess method variability; inclusion of controls for comparison where appropriate, investigation over a broad range of chemical and physical conditions, verification of analytical methods; and use of independent laboratories to whom validated methodologies had been transferred.

A. Physical Manipulations and Pretreatments

The ease of cutting and crushing of the tablets was assessed with a range of readily available household items including razor blades, spoons, pliers, tablet crushers, hammer, rolling pin, and mortar and pestle. The effect of tablet pretreatment by freezing at −20° C. or heating at 100° C. was also assessed. Coating removal was assessed by rubbing tablets with wet paper towels.

Result Summary and Discussion

Although the tablets were slightly difficult to "crack", crushing could readily be accomplished with a variety of common household tools. Freezing or oven heating of the tablets did not affect tablet "crushability." Coating removal could be accomplished easily with a wet paper towel.

B. Extractions

Solvent Extraction

Experiments designed to simulate preparation of the tablets for injection were conducted by extracting a single powdered or intact tablet at 25° C. with 10 mL of solvent for 15, 30 and 60 minutes with aqueous- and organic-based solvents (water, 0.1M HCl, ethanol, hexane, pH 2.0 buffer, pH 4.0 buffer, pH 7.0 buffer, pH 10.0 buffer, saline, 10% ethanol, acetone, and isopropyl alcohol). The water and ethanol extractions were repeated at 95° C.

Result Summary and Discussion

Percent recoveries of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2- yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid for solvent extractions at 25° C. were variable with solvent type. Aqueous-based solvents were more efficient than non-polar organic solvents (e.g., hexane). Acidic and basic solvents were more efficient than water or ethanol. Unusual high recoveries of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid were observed unexpectedly for isopropyl alcohol (80% at 60 minutes/25° C. and water (118% at 60 minutes/95° C.). It was noted that these experiments were conducted with unfiltered aliquots leading to the suspicion that un-dissolved particles of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid were being transferred and dissolved in the HPLC media during analysis, thereby falsely raising the true percent of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid undergoing dissolution (extraction).

Effects of Filtration on 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid Extractability

With the suspicion that unfiltered extractions might be a combination of true extracted (dissolved) 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and suspensions of undissolved material, additional extractions were performed to determine the effect of filtration. Extracts were first filtered through 0.45 μm PTFE filters prior to HPLC analysis. Single whole and ground tablets were extracted at 25° C. with 10 mL solvent for 15, 30 and 60 minutes with water, acetone, isopropyl alcohol, ethanol, pH 2.0 buffer, pH 4.0 buffer, pH 7.0 buffer, pH 10.0 buffer.

Result Summary and Discussion

Addition of the filtration step reduced recoveries for all solvents. The greatest decreases were observed with the organic solvents. A comparison of the % 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phe-nyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid extracted for ground tablets at 60 minutes (25° C. with 10 mL solvent) is shown in Table 3, below. Clearly, undissolved particles led to falsely increased estimates of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid recovery and considerable scatter in individual determinations.

TABLE 3

| Comparison of the % 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid extracted from ground tablets | | |
| --- | --- | --- |
| Solvent | % Recovery, Unfiltered | % Recovery, Filtered |
| Water | 63 | 38 |
| Acetone | 30 | 2 |
| Isopropyl Alcohol | 80 | 0 |
| Ethanol | 52 | 5 |
| pH 2 Buffer | 103 | 36 |
| pH 4 Buffer | 58 | 12 |
| pH 7 Buffer | 81 | 22 |
| pH 10 Buffer | 100 | 33 |

C. Syringeability

Experiments were conducted to determine the syringeability of tablet extracts. These assessments were performed on the remainder of solutions (following aliquot removal for determination of % 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid recovery) produced in the first phase extractions at 25° C. Solutions were aspirated into disposable syringes equipped with 25 gauge needles.

Result Summary and Discussion

All solutions were successfully loaded into disposable syringes equipped with a 25 gauge needle indicating that extracted solutions offered no resistance to syringeability.

D. Simulated Smoking Assessment

Simulated smoking of the active ingredient was assessed by heating ground or intact tablets in a test tube fitted with an apparatus that collected vaporized 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-

US 11,007,179 B2

21

4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. As heat from a heating block was applied to the sealed test tube, air was drawn through the tube and over the surface of the heated product. The air exited through a collector cartridge (C18 Sep-Pak cartridge) situated over the heated product. Product was heated to 225° C. until the material was charred (usually approximately 5 minutes). Samples were heated for a total of 10 minutes. In addition, pure 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was treated in the same manner. The capacity for the apparatus to collect vaporized 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)- ethyl]-amino}-methyl)-2-methoxy-benzoic acid was verified with a series of tests involving passing a standard solution of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid through the cartridge, and testing for "breakthrough" with serially connected cartridges. Recoveries of standard amounts of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid refer-ence material trapped by the collector were essentially quantitative. Heating ground and intact tablets with a torch to extremely high temperatures was also attempted followed by collection of vaporized material with a bubbler collector.

Result Summary and Discussion

Browning and charring was evident when tablets and ground product were heated to 225° C. in the heating block or to extreme heat with a torch. No detectable 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was vaporized from ground or intact tablets when heated by either method. Only extremely minor traces of 5-({[2-Amino-3-(4-carbam-oyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-di-hydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid were vaporized when pure 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was heated under the same conditions. Mass balance analysis was attempted by analyzing the remaining 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in the heated test tubes. Generally, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid recoveries from the heated tube were low likely indicating that heating under these conditions produced thermal decomposition of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Consequently, it seems safe to conclude that smoking is not a viable route of administration for the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

E. Aqueous Solvent Extraction

Small volume extractions were conducted with various household solvents and buffers to simulate extraction pro-cedures that might be used for preparation of solutions for injection. Extractions were performed on six replicates of ground and intact tablets at 25° C. and 95° C. with 10 mL

22

of solvent for 10 minutes. The extractions were shaken on an orbital shaker at 100 rpm, and then aliquots were removed and filtered with 0.45 µm PTFE filters for HPLC analysis. The solvents utilized in these assessments were water, saline, vinegar, 0.1M HCl, 10% ethanol, 40% ethanol, pH 2.0 buffer, pH 4.0 buffer, pH 7.0 buffer, and pH 10.0 buffer. Results were expressed in Table 4 below as % recovery (% label claim) and as concentration (mg/mL).

Result Summary and Discussion

TABLE 4

Summary of mean results (n = 6) is shown in the table below.

| Solvent | ° C. Temp | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|
| Water | 25 | 22.1 | 16.4 | 2.2 | 1.6 |
| | 95 | 39.9 | 38.7 | 4.0 | 3.9 |
| Saline | 25 | 13.7 | 17.0 | 1.4 | 1.7 |
| | 95 | 38.9 | 61.4 | 3.9 | 6.1 |
| Vinegar | 25 | 80.0 | 24.2 | 8.0 | 2.4 |
| | 95 | 77.7 | 77.9 | 7.8 | 7.8 |
| 0.1M HCl | 25 | 33.5 | 50.1 | 3.3 | 5.0 |
| | 95 | 65.4 | 59.6 | 6.5 | 6.0 |
| 10% Ethanol | 25 | 19.3 | 12.6 | 1.9 | 1.3 |
| | 95 | 80.9 | 70.8 | 8.1 | 7.1 |
| 40% Ethanol | 25 | 23.9 | 27.9 | 2.4 | 2.8 |
| | 95 | 91.6 | 64.6 | 9.2 | 6.5 |
| pH 2 Buffer | 25 | 56.1 | 32.7 | 5.6 | 3.3 |
| | 95 | 67.5 | 73.2 | 6.8 | 7.3 |
| pH 4 Buffer | 25 | 8.8 | 8.1 | 0.9 | 0.8 |
| | 95 | 27.8 | 24.2 | 2.8 | 2.4 |
| pH 7 Buffer | 25 | 10.8 | 14.7 | 1.1 | 1.5 |
| | 95 | 41.3 | 40.0 | 4.1 | 4.0 |
| pH 10 Buffer | 25 | 38.5 | 38.3 | 3.9 | 3.8 |
| | 95 | 83.9 | 65.4 | 8.4 | 6.5 |

Although there was considerable variability among rep-licates, generally, the average amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phe-nyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid release (% recovery) was comparable between ground and intact tablets. As expected, extraction at near boiling conditions (95° C.) increased drug release. The most efficient solvents for extraction (<50%) of ground tablets at 25° C. were vinegar and pH 2 buffer. At elevated temperature, the solvents that allowed >50% recov-ery for ground product were vinegar, 0.1M HCl, 10% ethanol, 40% ethanol, pH 2 buffer, and pH 10 buffer. Extract concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from ground and intact tablets across all conditions ranged from 0.8 mg/mL to 9.2 mg/mL.

F. Organic Solvent Extraction

This series of extractions was performed in a similar manner as the aqueous solvent extractions previously described. Ground and intact tablets were extracted in 10 mL of solvent for 10 minutes on an orbital shaker at 100 rpm. Aliquots were removed and filtered with 0.45 µm PTFE filters for HPLC analysis. The solvents utilized in these assessments were 95% ethanol, isopropyl alcohol, acetone and hexane.

Result Summary and Discussion

Organic solvent extraction of tablets was inefficient (<10%) across all conditions. The most efficient solvent utilized in this assessment was 95% ethanol that provided an average % recovery of 8.2% 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-

US 11,007,179 B2

23

1H-imidazol-2- yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid (range, 6.0%-10.3%).

### G. Syringe Evaluation

Extracted solutions remaining from the aqueous extractions were assessed for syringeability. In this assessment, a 10 mL syringe fitted with a 25 gauge needle was utilized to withdraw as much of the remaining 7 mL volume of extracted solution as possible into the syringe. A cotton ball was used to filter the solution by inserting the needle in the cotton ball during aspiration of the solution. The volume of solution successfully aspirated into the syringe was estimated and an aliquot was tested to determine the milligram amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid loaded into the syringe.

### Result Summary and Discussion

Of the remaining 7 mL volume of solution remaining from extraction of a powdered tablet, the typical volume that could be loaded into a 10 mL syringe fitted with a 25 gauge needle (cotton ball filtration) was 4-5 mL of solution. Thus, the loss of available solution ranged from approximately 30% to 43% in this simulated assessment of preparing a solution for intravenous injection. The absolute amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid varied with the type of solvent. Overall, there was no evidence of resistance to syringeability in these assessments.

### H. Multiple Tablet Extraction

This initial series of extractions was designed to assess the extraction efficiency of selected aqueous-based solvents for preparation of tablets for injection. The extractions were performed with water and 0.1M HCl on ground tablets with equivalent weight of 2 and 4 tablets. The extraction was conducted with 10 mL of solvent for 10 minutes on an orbital shaker at 100 rpm at 95° C. Following extraction, aliquots were removed and filtered with 0.45 μm PTFE filters for HPLC analysis. The rationale for the design of this study was that individuals might attempt to extract a larger dose of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid through the use of heat, larger volumes and possibly use of acidic media. Although 10 mL volume is large for injection purposes, it is plausible that such a volume might be attempted, especially given the limited solubility of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Also, it should be noted that although injection of a highly acid solution (0.1M HCl) would likely result in discomfort and tissue injury, some individuals may attempt such procedures.

### Result Summary and Discussion

The mean extraction efficiencies and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in this extraction assessment are shown in Table 5.

24

### TABLE 5

| | Mean extraction efficiencies of active ingredient in extraction assessment | | |
| Solvent | Number of Tablet Equivalents | % Recovery | Concentration, mg/mL |
|---|---|---|---|
| Water | 2 | 41.2 | 8.2 |
| | 4 | 22.4 | 9.0 |
| 0.1M HCl | 2 | 76.8 | 15.4 |
| | 4 | 46.1 | 18.5 |

It would appear that both water and 0.1M HCl have nearly reached capacity for dissolution of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)- ethyl]-amino}-methyl)-2-methoxy-benzoic acid under the two tablet equivalent extraction condition at 95° C. The effect of doubling the amount of potentially extractable 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to four equivalents provided nearly equal concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in both water and acid solution. At the same time, % recovery for the 4 tablet condition was approximately one-half of the two tablet condition indicating each solvent had reached a capacity limiting condition.

### I. Large Volume Extraction

Given that the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)- ethyl]-amino}-methyl)-2-methoxy-benzoic acid exhibits limited solubility in some solvents, extraction with a larger volume might be attempted by individuals to isolate the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid for administration by non-intended routes. This extraction assessment was performed with ground or intact tablets. Extractions were conducted with 30 mL volume of solvents (water, 0.1M HCl, 10% ethanol, and 95% ethanol) at 25° C. for 10 minutes and 24 hours on an orbital shaker at 100 rpm, then filtered with a 0.45 μm PTFE filter for HPLC analysis.

### Result Summary and Discussion

The mean extraction efficiencies and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in this extraction assessment are shown in Table 6 below.

### TABLE 6

| | Extraction efficiencies of active ingredient in extraction assessment | | | | |
| Solvent | Extraction Time | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|
| Water | 10 min | 19.8 | 0.9 | 0.7 | 0.03 |
| | 24 hr | 22.1 | 18.4 | 0.8 | 0.7 |
| 0.1M HCl | 10 min | 67.6 | 2.9 | 2.3 | 0.1 |
| | 24 hr | 68.1 | 35.9 | 2.5 | 1.3 |

US 11,007,179 B2

<table>
<tr><td>25</td><td>26</td></tr>
</table>

**25**

TABLE 6-continued

| | | Extraction efficiencies of active ingredient in extraction assessment | | | |
| Solvent | Extraction Time | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|
| 10% Ethanol | 10 min | 26.7 | 5.1 | 0.9 | 0.2 |
| | 24 hr | 28.8 | 47.7 | 1.1 | 1.8 |
| 95% Ethanol | 10 min | 27.0 | 0.06 | 0.9 | 0.0 |
| | 24 hr | 29.9 | 5.8 | 1.1 | 0.2 |

There was little difference in percent recovery of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the ground tablet following a 10 minute extraction period as compared to extending the extraction period to 24 hours. In contrast, extraction of intact tablets for 10 minutes was considerably less efficient than for 24 hours. It is likely that the increased surface area of the ground material was responsible for the rapidness of the 10 minute extraction outcome. All concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in the different solvent extracts were consistently <3 mg/mL.

J. Small Volume Extraction

Smaller volume extractions are commonly used by individuals attempting to prepare a solution for injection. Water and saline are commonly used solvents for injection and were included in this study. Although it seems unlikely that 0.1M HCl would be used as a solvent because of it toxic effects, it was included as a "worst-case scenario" in consideration of the solubility properties of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in the tablets. This extraction assessment was performed with ground and intact tablets. Extractions were conducted with 5 mL volume of solvents (water, saline, and 0.1M HCl) at 25° C. and 95° C. for 10 minutes and 24 hours on an orbital shaker at 100 rpm, then filtered with a 0.45 μm PTFE filter for HPLC analysis.

Result Summary and Discussion

The mean extraction efficiencies and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-amino}-methyl)-2-methoxy-benzoic acid in this extraction assessment are shown in Table 7 below.

TABLE 7

| | | | Extraction efficiencies of active ingredient in extraction assessment | | | |
| Solvent | Temp., ° C. | Ex-traction Time | % Re-covery, Ground | % Re-covery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|---|
| Water | 25 | 10 min | 16.2 | 16.4 | 3.2 | 3.3 |
| | 95 | 10 min | 34.7 | 32.4 | 6.9 | 6.5 |
| | 25 | 24 hr | 17.1 | 17.2 | 3.4 | 3.5 |
| | 95 | 24 hr | 28.3 | 25.9 | 5.7 | 5.2 |
| Saline | 25 | 10 min | 16.9 | 17.5 | 3.4 | 3.5 |
| | 95 | 10 min | 46.2 | 41.0 | 9.2 | 8.2 |
| | 25 | 24 hr | 17.6 | 17.7 | 3.5 | 3.6 |
| | 95 | 24 hr | 24.1 | 23.5 | 4.8 | 4.7 |

**26**

TABLE 7-continued

| | | | Extraction efficiencies of active ingredient in extraction assessment | | | |
| Solvent | Temp., ° C. | Ex-traction Time | % Re-covery, Ground | % Re-covery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|---|
| 0M HCl | 25 | 10 min | 100.6 | 86.2 | 20.1 | 17.2 |
| | 95 | 10 min | 90.2 | 102.3 | 18.1 | 20.5 |
| | 25 | 24 hr | 91.8 | 95.1 | 18.4 | 19.0 |
| | 95 | 24 hr | 79.1 | 83.9 | 15.8 | 16.8 |

Increasing the extraction temperature from 25° C. to 95° C. enhanced recovery and solubility of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in water and saline; however extending extraction time did not appear to extract additional drug. Concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in water and saline was consistently <10 mg/mL. The use of 0.1M HCl substantially enhanced recovery (nearly quantitative) and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in solution although extraction for 24 hr at 95° C. appeared to produce loss of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid (decomposition). Concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in the acid extracts were in the range of 16-21 mg/mL.

K. Filter Evaluation

With the discovery that suspensions of material containing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid were falsely elevating measures of drug release and recovery, an assessment was performed to determine how different types of filtration systems might affect drug release measurements. Extractions were performed on ground and intact tablets. Extractions were conducted with 5 mL volume of solvent (water, 0.1M HCl, 10% ethanol and 95% ethanol) at 25° C. for 10 minutes on an orbital shaker at 100 rpm. Following extraction, extracts were filtered as follows: unfiltered (control); 0.45 μm PTFE filter; cotton ball filter; cigarette filter; and coffee paper filter.

Result Summary and Discussion

The mean extraction efficiencies and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in this extraction assessment are shown in Table 8 below.

US 11,007,179 B2

**27**

TABLE 8

Extraction efficiencies of active ingredient in extraction assessment

| Solvent | Filter Type | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|
| Water | Unfiltered | 49.1 | 61.9 | 9.8 | 12.4 |
| | 0.45 µm PTFE filter | 16.5 | 16.9 | 3.3 | 3.4 |
| | Cotton Ball | 18.2 | 16.8 | 3.6 | 3.4 |
| | Cigarette Filter | 18.5 | 16.9 | 3.7 | 3.4 |
| | Coffee Filter | 16.8 | 17.1 | 3.4 | 3.4 |
| 0.1M HCl | Unfiltered | 74.3 | 83.2 | 14.9 | 16.6 |
| | 0.45 µm PTFE filter | 76.7 | 87.4 | 15.3 | 17.5 |
| | Cotton Ball | 56.6 | 86.3 | 11.3 | 17.3 |
| | Cigarette Filter | 37.6 | 82.8 | 7.5 | 16.6 |
| | Coffee Filter | 63.2 | 85.3 | 12.6 | 17.1 |
| 10% Ethanol | Unfiltered | 90.7 | 76.4 | 18.1 | 15.3 |
| | 0.45 µm PTFE filter | 22.4 | 23.5 | 4.5 | 4.7 |
| | Cotton Ball | 24.0 | 23.7 | 4.8 | 4.8 |
| | Cigarette Filter | 24.9 | 24.4 | 5.0 | 4.9 |
| | Coffee Filter | 22.6 | 22.9 | 4.5 | 4.6 |
| 95% Ethanol | Unfiltered | 62.0 | 0.1 | 12.4 | 0.03 |
| | 0.45 µm PTFE filter | 7.3 | 0.1 | 1.5 | 0.02 |
| | Cotton Ball | 26.7 | 0.04 | 5.3 | 0.01 |
| | Cigarette Filter | 16.0 | 0.02 | 3.2 | 0.0 |
| | Coffee Filter | 10.4 | 0.03 | 2.1 | 0.01 |

Filtration had a substantial effect on apparent drug release in extractions with solvents that exhibit limited solubility (i.e. water, 10% ethanol, 95% ethanol) for the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Without filtration, the evidence appears persuasive that particle suspension was the cause of these differences. When suspensions were prepared for assay by HPLC, the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid became soluble in the HPLC mobile phase and this accounted for the elevated "readings" (measurements). In contrast, extraction with 0.1M HCl showed little difference in drug release and recovery with or without

**28**

filtration. Since the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid exhibits considerably greater solubility in 0.1M HCl, there were not suspended particles that would have been filtered out. It should be noted that this somewhat unusual behavior (forming particle suspensions in solvents with limited solubility for the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid) adds a source of considerable variability that would be highly dependent upon conditions employed during extraction. This unique property of the formulation is not expected to be easily discoverable by individuals that might attempt extraction with common household solvents.

The sustained amount of time that an extraction solvent is in contact with a formulation can substantially influence how much active is released (and dissolved in the extraction solvent). This is particularly true for actives that exhibit limited solubility in the chosen solvent. Review of data generated in the study involving extraction with 30 mL of solvent for 10 minutes and 24 hours generally indicated greater variability (% RSD) for the shorter extraction time compared to the 24 hour extraction. To assess the influence to extraction time, a detailed time course study was conducted to determine the impact of extraction time on data variability and on percent recovery of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the tablets.

Extractions were performed on single ground and intact tablets (75 mg strength). Extractions were conducted with 22.5 mL volume of solvent (water, 0.1M HCl, vinegar, and pH 7 buffer) at 25° C. and 95° C. on an orbital shaker at 100 rpm. A 2 mL aliquot was withdrawn at each time point. The time points were as follows: 10, 20, 30, 45 and 60 minutes, 4, 12, and 24 hours. Extracts were filtered with a 0.45 µm PTFE filter for HPLC analyses.

Result Summary and Discussion

The mean extraction efficiencies of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid over time and % RSD (n=6 replicates) in this extraction assessment are shown in the Table 9, below.

TABLE 9

Extraction efficiencies of active ingredient over time

| | Time Vessel | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Water Ground—25° C. | | | | | | | | |
| Mean | 27.21 | 30.10 | 31.45 | 33.55 | 35.51 | 44.16 | 53.07 | 59.37 |
| RSD | 28.6 | 21.7 | 19.0 | 21.7 | 16.3 | 15.7 | 13.5 | 11.0 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (A) Water Whole—25° C. | | | | | | | | |
| Mean | 2.04 | 12.59 | 18.75 | 20.86 | 25.40 | 36.81 | 51.21 | 55.07 |
| RSD | 43.8 | 63.7 | 32.8 | 38.2 | 24.6 | 11.8 | 4.6 | 4.0 |

US 11,007,179 B2

29
30

TABLE 9-continued

Extraction efficiencies of active ingredient over time

| | | | Time Vessel | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Water Ground—95° C. | | | | | | | | |
| Mean | 56.90 | 64.63 | 70.42 | 75.04 | 81.27 | 91.07 | 94.43 | 94.42 |
| RSD | 45.1 | 33.9 | 26.6 | 20.6 | 14.4 | 4.4 | 3.6 | 3.0 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Water Whole—95° C. | | | | | | | | |
| Mean | 80.78 | 83.66 | 84.16 | 87.39 | 89.43 | 93.21 | 93.11 | 93.32 |
| RSD | 6.5 | 5.8 | 5.1 | 5.1 | 4.8 | 3.3 | 3.9 | 3.0 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) 0.1M HCl Ground—25° C. | | | | | | | | |
| Mean | 87.33 | 89.02 | 91.07 | 93.50 | 92.99 | 97.84 | 101.50 | 101.39 |
| RSD | 30.5 | 30.2 | 24.7 | 17.2 | 18.3 | 7.3 | 1.9 | 2.0 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) 0.1M HCl Whole—25° C. | | | | | | | | |
| Mean | 2.69 | 14.32 | 31.30 | 35.88 | 59.16 | 77.52 | 101.48 | 102.69 |
| RSD | 51.7 | 72.2 | 44.5 | 21.8 | 19.5 | 9.4 | 1.9 | 2.8 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) 0.1M HCl Ground—95° C. | | | | | | | | |
| Mean | 99.59 | 95.96 | 97.03 | 96.96 | 97.30 | 94.15 | 86.08 | 77.39 |
| RSD | 1.9 | 2.1 | 2.0 | 2.2 | 2.3 | 2.3 | 2.4 | 2.5 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) 0.1M HCl Whole—95° C. | | | | | | | | |
| Mean | 48.15 | 71.95 | 81.70 | 89.30 | 93.49 | 100.44 | 93.17 | 82.24 |
| RSD | 17.7 | 8.3 | 5.1 | 4.6 | 2.9 | 3.1 | 1.8 | 2.6 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Vinegar Ground—25° C. | | | | | | | | |
| Mean | 88.42 | 88.76 | 90.61 | 91.82 | 93.93 | 98.38 | 100.89 | 101.12 |
| RSD | 3.6 | 4.2 | 3.3 | 4.3 | 5.3 | 2.5 | 1.8 | 1.4 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-(1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Vinegar Whole—25° C. | | | | | | | | |
| Mean | 17.12 | 18.23 | 20.04 | 35.03 | 42.72 | 58.04 | 101.52 | 105.46 |
| RSD | 207.3 | 171.5 | 158.6 | 97.4 | 67.5 | 36.9 | 5.3 | 2.7 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Vinegar Ground—95° C. | | | | | | | | |
| Mean | 94.28 | 98.54 | 100.73 | 101.69 | 103.65 | 105.12 | 104.81 | 102.88 |
| RSD | 11.0 | 8.6 | 7.3 | 5.4 | 4.6 | 4.0 | 4.5 | 4.4 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Vinegar Whole—95° C. | | | | | | | | |
| Mean | 40.62 | 55.03 | 83.87 | 91.96 | 97.91 | 111.12 | 111.29 | 109.85 |
| RSD | 4.1 | 8.9 | 23.7 | 16.5 | 10.8 | 4.7 | 4.5 | 5.6 |

Appx93

US 11,007,179 B2

31 | 32

TABLE 9-continued

Extraction efficiencies of active ingredient over time

| | Time Vessel | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino]-methyl)-2-methoxy-benzoic acid released label claim (%) pH 7 Ground—25° C.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mean | 39.81 | 44.07 | 47.83 | 50.48 | 52.76 | 59.47 | 68.50 | 76.49 |
| RSD | 7.5 | 10.7 | 16.1 | 15.7 | 15.1 | 14.4 | 8.8 | 7.9 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-amino]-methyl)-2-methoxy-benzoic acid released label claim (%) pH 7 Whole—25° C.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mean | 3.50 | 6.21 | 9.15 | 10.25 | 13.68 | 22.74 | 42.44 | 54.14 |
| RSD | 32.5 | 67.3 | 65.5 | 41.9 | 15.7 | 18.7 | 16.3 | 10.0 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) pH 7 Ground—95° C.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mean | 58.27 | 77.50 | 82.71 | 87.58 | 90.99 | 98.74 | 98.87 | 96.37 |
| RSD | 23.3 | 13.8 | 9.6 | 5.7 | 4.3 | 5.4 | 4.9 | 5.0 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-amino]-methyl)-2-methoxy-benzoic acid released label claim (%) pH 7 Whole—95° C.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mean | 51.73 | 67.29 | 74.12 | 77.83 | 81.70 | 97.02 | 100.80 | 97.68 |
| RSD | 17.1 | 4.3 | 7.4 | 2.4 | 2.8 | 4.0 | 3.4 | 3.5 |

An analysis of the mean % RSD from these data across the four solvents is shown in the Table 10 below.

TABLE 10

Mean % RSD across the four solvents

| Time, hr | Mean % RSD 25° C. Ground | Mean % RSD 25° C. Whole | Mean % RSD 95° C. Ground | Mean % RSD 95° C. Whole |
|---|---|---|---|---|
| 0.17 | 17.6 | 83.8 | 20.3 | 11.4 |
| 0.33 | 16.7 | 93.7 | 14.6 | 6.8 |
| 0.5 | 15.8 | 75.4 | 11.4 | 10.3 |
| 0.75 | 14.7 | 49.8 | 8.5 | 7.2 |
| 1 | 13.8 | 31.8 | 6.4 | 5.3 |
| 4 | 10.0 | 19.2 | 4.0 | 3.8 |
| 12 | 6.5 | 7.0 | 3.9 | 3.4 |
| 24 | 5.6 | 4.9 | 3.7 | 3.7 |

In general, there was greater variability in extraction of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the tablets with shorter times and at the lower extraction temperature (25° C.) compared to 95° C. Also, there was less variability in extraction of the ground tablet at 25° C. compared to the whole tablet.

Representative time course plots of cumulative percent recovery of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid under

different extraction conditions are shown in FIG. 2. The abbreviations used in the plots are as follows: Gr=ground tablet; Wh=whole, intact tablet.

General observations from these time course data include the following:

With short extraction times (e.g., 10 minutes), ground tablets are more efficiently extracted than whole tablets

With extended extraction time (e.g., 24 hours), there is little difference in extractability of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from ground versus whole tablets

Extraction under heated conditions (e.g., 95° C.) substantially increases % recovery at shorter extraction times

Acidic solvents are more efficient in extracting 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid than water or pH neutral solvents

L. Investigations of Multiple Tablet Extractions

In addition to extractions of multiple tablets, additional experiments were conducted to determine the optimal conditions for preparation of multiple tablets for injection. Initially, attempts were made to identify the correct combination(s) of solvent and ground tablets that would yield the most concentrated recoverable solution of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from tablets. Based on these initial

US 11,007,179 B2

33

34

assessments, a study was designed in which extractions were conducted with powdered tablets at 25° C. and 95° C. with the equivalent of four tablets. The extractions were conducted for 10 minutes, one hour, and 12 hours with 10 mL of water, vinegar, 0.1M HCl, and saline. The extraction vials were shaken on an orbital shaker at 200 rpm. Following extraction, extracts were filtered with a 0.45 µm PTFE filter for HPLC analyses.

Result Summary and Discussion

The mean extraction efficiencies and concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid over time in this extraction assessment are shown in Table 11 below. Data for the four solvents are listed in order from lowest (water) to highest polarity and acidity (0.1M HCl).

TABLE 11

Extraction efficiencies and concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid over time

| Solvent | Extraction Time | % Recovery, 25° C. | Conc. (mg/mL), 25° C. | % Recovery, 95° C. | Conc. (mg/mL), 95° C. |
|---|---|---|---|---|---|
| Water | 10 min | 8.1 | 3.3 | 24.2 | 9.7 |
| | 1 hr | 9.5 | 3.8 | 23.6 | 9.4 |
| | 12 hr | 8.9 | 3.6 | 25.1 | 10.0 |
| Saline | 10 min | 8.9 | 3.5 | 18.5 | 7.4 |
| | 1 hr | 9.8 | 3.9 | 22.3 | 8.9 |
| | 12 hr | 9.8 | 3.9 | 24.1 | 9.6 |
| Vinegar | 10 min | 5.6 | 2.2 | 16.0 | 6.4 |
| | 1 hr | 27.7 | 11.1 | 48.0 | 19.2 |
| | 12 hr | 78.8 | 31.5 | 79.5 | 31.8 |

TABLE 11-continued

Extraction efficiencies and concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid over time

| Solvent | Extraction Time | % Recovery, 25° C. | Conc. (mg/mL), 25° C. | % Recovery, 95° C. | Conc. (mg/mL), 95° C. |
|---|---|---|---|---|---|
| 0.1M HCl | 10 min | 18.0 | 7.2 | 34.3 | 13.7 |
| | 1 hr | 39.7 | 15.9 | 70.2 | 28.1 |
| | 12 hr | 88.3 | 35.3 | 90.6 | 36.3 |

These data suggest that the maximal concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that can be extracted with water and saline is approximately 4 mg/mL at room temperature (e.g., 25° C.) and approximately 10 mg/mL under near boiling conditions (e.g., 95° C.). Further, there appeared to be little difference in maximal concentrations with water and saline regardless of extraction time. Use of an acidic solvent such as vinegar and the highly acidic solvent, 0.1M HCl led to the production of more concentrated extracts of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with maximal values of approximately 36 mg/mL being achieved with a 12 hour extraction period. There was both time and temperature dependence on concentration with these two solvents. With vinegar, maximal concentrations over the 10 minute and one hour extraction period were approximately 2-11 mg/mL at 25° C. and 6-19 mg/mL, respectively. With 0.1M HCl, maximal concentrations over the 10 minute and one hour extraction period were approximately 7-16 mg/mL at 25° C. and 14-28 mg/mL, respectively. Given these maximal concentrations, an estimate of the required volume of extracted 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that would deliver 350 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid by injection is shown in Table 12 below.

TABLE 12

Estimate of the required volume of extracted 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that would deliver 350 mg of active ingredient by injection.

| Solvent | Extraction Time | Conc. (mg/mL), 25° C. | Injection Volume (mL) Required for 350 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid at 25° C. | Conc. (mg/mL), 95° C. | Injection Volume (mL) Required for 350 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid at 95° C. |
|---|---|---|---|---|---|
| Water | 10 min | 3.3 | 106.1 | 9.7 | 36.1 |
| | 1 hr | 3.8 | 92.1 | 9.4 | 37.2 |
| | 12 hr | 3.6 | 97.2 | 10 | 35.0 |

JTX-002, page 23 of 29

US 11,007,179 B2

35                                                                                  36

TABLE 12-continued

Estimate of the required volume of extracted 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that would deliver 350 mg of active ingredient by injection.

| Solvent | Extraction Time | Conc. (mg/mL), 25° C. | Injection Volume (mL) Required for 350 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid at 25° C. | Conc. (mg/mL), 95° C. | Injection Volume (mL) Required for 350 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid at 95° C. |
|---|---|---|---|---|---|
| Saline | 10 min | 3.5 | 100.0 | 7.4 | 47.3 |
|  | 1 hr | 3.9 | 89.7 | 8.9 | 39.3 |
|  | 12 hr | 3.9 | 89.7 | 9.6 | 36.5 |
| Vinegar | 10 min | 2.2 | 159.1 | 6.4 | 54.7 |
|  | 1 hr | 11.1 | 31.5 | 19.2 | 18.2 |
|  | 12 hr | 31.5 | 11.1 | 31.8 | 11.0 |
| 0.1M HCl | 10 min | 7.2 | 48.6 | 13.7 | 25.5 |
|  | 1 hr | 15.9 | 22.0 | 28.1 | 12.5 |
|  | 12 hr | 35.3 | 9.9 | 36.3 | 9.6 |

Typical opioid injection volumes are generally in the 1-3 mL range but plausibly could be as high as 10 mL. Assuming that a 350 mg injected dose of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid would be required to produce a euphoric effect, it does not appear feasible that tablets could be prepared for injection with sufficient content of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid when using typical injection solvents (water, saline). Although a sufficiently concentrated solution of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-4,5-dihydro-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid by extraction does appear to be possible through the use of vinegar and 0.1M HCl, it is unlikely that many individuals would be willing to accept the potential toxic risks that these solvents present.

The foregoing examples of the present disclosure have been presented for purposes of illustration and description. Furthermore, these examples are not intended to limit the disclosure to the form disclosed herein. Consequently, variations and modifications commensurate with the teachings of the description of the disclosure, and the skill or knowledge of the relevant art, are within the scope of the present disclosure. The specific embodiments described in the examples provided herein are intended to further explain the best mode known for practicing the disclosure and to enable others skilled in the art to utilize the disclosure in such, or other, embodiments and with various modifications required by the particular applications or uses of the present disclosure. It is intended that the appended claims be construed to include alternative embodiments to the extent permitted by the prior art.

What is claimed is:

1. An abuse-deterrent, mono-phasic pharmaceutical tablet comprising:
   about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid,
   about 60-80% by weight silicified microcrystalline cellulose;
   crospovidone;
   about 5-15% by weight mannitol; and
   optionally, a glidant and/or lubricant.

2. The tablet of claim 1, wherein extraction of the tablet with water or saline at 25° C. for 12 hours results in a concentration of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid of less than or approximately 4 mg/ml.

3. The tablet of claim 1, comprising about 65-75% by weight silicified microcrystalline cellulose, and about 7.5-12.5% by weight mannitol.

4. The tablet of claim 3, comprising about 3-7% by weight crospovidone and a lubricant.

5. The tablet of claim 4, wherein the lubricant is magnesium stearate present in an amount of about 0.55-0.95% by weight.

6. The tablet of claim 5, comprising:
   about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;
   about 390 mg-450 mg of silicified microcrystalline cellulose;
   about 18 mg-42 mg crospovidone;
   about 45 mg-75 mg of mannitol; and
   about 3.3 mg-5.7 mg of magnesium stearate.

US 11,007,179 B2

37

38

7. The tablet of claim 6, comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg-450 mg of silicified microcrystalline cellulose;

about 30 mg of crospovidone;

about 60 mg of mannitol; and

about 4.5 mg of magnesium stearate.

8. The tablet of claim 3, comprising a glidant, wherein the glidant is colloidal silicon dioxide present in an amount of about 0.55-0.95% by weight.

9. The tablet of claim 8, comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg-450 mg of silicified microcrystalline cellulose;

crospovidone;

about 45 mg-75 mg of mannitol; and

about 3.3 mg-5.7 mg of colloidal silicon dioxide.

10. The tablet of claim 9, comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg-450 mg of silicified microcrystalline cellulose;

crospovidone;

about 60 mg of mannitol; and

about 4.5 mg of colloidal silicon dioxide.

11. The tablet of claim 3, comprising about 3%-7% by weight crospovidone, a glidant and a lubricant.

12. An abuse-deterrent, mono-phasic pharmaceutical tablet comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 60-80% by weight silicified microcrystalline cellulose,

crospovidone,

about 5-15% by weight mannitol, and

optionally a glidant and/or a lubricant.

13. The tablet of claim 12, wherein extraction of the tablet with water or saline at 25° C. for 12 hours results in a concentration of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid of less than or approximately 4 mg/ml.

14. The tablet of claim 12, comprising about 65-75% by weight silicified microcrystalline cellulose, and about 7.5-12.5% by weight mannitol.

15. The tablet of claim 14, comprising about 3-7% by weight crospovidone and a lubricant.

16. The tablet of claim 15, wherein the lubricant is magnesium stearate present in an amount of about 0.55-0.95% by weight.

17. The tablet of claim 6, comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of silicified microcrystalline cellulose;

about 24 mg-56 mg crospovidone;

about 60 mg-100 mg of mannitol; and

about 4.4 mg-7.6 mg of magnesium stearate.

18. The tablet of claim 17, comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of silicified microcrystalline cellulose;

about 40 mg of crospovidone;

about 80 mg of mannitol; and

about 6 mg of magnesium stearate.

19. The tablet of claim 14, comprising a glidant, wherein the glidant is colloidal silicon dioxide present in an amount of about 0.55-0.95% by weight.

20. The tablet of claim 19, comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of silicified microcrystalline cellulose;

crospovidone;

about 60 mg-100 mg of mannitol; and

about 4.4 mg-7.6 mg of colloidal silicon dioxide.

21. The tablet of claim 20, comprising:

about 100 mg of 5-(=[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of silicified microcrystalline cellulose;

crospovidone;

about 80 mg of mannitol; and

about 6 mg of colloidal silicon dioxide.

22. The tablet of claim 14, comprising about 3%-7% by weight crospovidone, a glidant and a lubricant.

23. The tablet of claim 22, wherein the glidant is colloidal silicon dioxide and the lubricant is magnesium stearate.

24. The tablet of claim 23, comprising:

100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 65-75% by weight silicified microcrystalline cellulose;

about 4-6% crospovidone;

about 7.5-12.5% by weight mannitol; and

colloidal silicon dioxide and magnesium stearate.

25. The tablet of claim 23, comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of silicified microcrystalline cellulose;

about 24 mg-56 mg of crospovidone;

about 60 mg-100 mg of mannitol; and

colloidal silicon dioxide and magnesium stearate.

US 11,007,179 B2

39

40

**26**. The tablet of claim **25**, comprising about 100 mg of 5-({[((2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of silicified microcrystalline cel-lulose;

about 40 mg of crospovidone;

about 80 mg of mannitol; and

colloidal silicon dioxide and magnesium stearate.

**27**. The tablet of claim **11**, wherein the glidant is colloidal silicon dioxide and the lubricant is magnesium stearate.

**28**. The tablet of claim **27**, comprising:

75 mg of 5-({[((2S)-2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imida-zol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 65-75% by weight silicified microcrystalline cellu-lose;

about 4-6% crospovidone;

about 7.5-12.5% by weight mannitol; and

colloidal silicon dioxide and magnesium stearate.

**29**. The tablet of claim **27**, comprising:

about 75 mg of 5-({[((2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-ben-zoic acid;

about 390 mg-450 mg of silicified microcrystalline cel-lulose;

about 18 mg-42 mg of crospovidone;

about 45 mg-75 mg of mannitol; and

colloidal silicon dioxide and magnesium stearate.

**30**. The tablet of claim **29**, comprising:

about 75 mg of 5-({[((2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-ben-zoic acid;

about 390 mg-450 mg of silicified microcrystalline cel-lulose;

about 30 mg of crospovidone;

about 60 mg of mannitol; and

colloidal silicon dioxide and magnesium stearate.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 11,007,179 B2 | Page 1 of 1 |
| APPLICATION NO. | : 17/066072 | |
| DATED | : May 18, 2021 | |
| INVENTOR(S) | : Tim Costello et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

In Claim 17 (at Column 37, Line 63), please delete:
"The tablet of claim 6"
And replace with:
--The tablet of claim 16--

In Claim 21 (at Column 38, Line 32), please delete:
"about 100 mg of 5-( ≡ [(2S)-2-Amino-3-(4-carbamoyl-2,6-dim -"
And replace with:
--about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dim- --

Signed and Sealed this
Fifth Day of October, 2021

Drew Hirshfeld
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*



PTO-1683
(Rev. 7-96)



**THE UNITED STATES OF AMERICA**

**TO ALL TO WHOM THESE PRESENTS SHALL COME:**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

August 18, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,311,516*
ISSUE DATE: *April 26, 2022*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Miguel Tarver
Certifying Officer

Joint Exhibit
**JTX-006**
1:19-cv-01727-RGA



US011311516B2

(12) **United States Patent**
Costello et al.

(10) Patent No.: **US 11,311,516 B2**
(45) Date of Patent: **\*Apr. 26, 2022**

(54) **OPIOID RECEPTOR MODULATOR DOSAGE FORMULATIONS**

(71) Applicant: **Allergan Holdings Unlimited Company**, Dublin (IE)

(72) Inventors: **Tim Costello**, Rockville, MD (US); **Jens Jozef Ceulemans**, Beerse (BE); **Eugeen Maria Jozef Jans**, Beerse (BE); **Philip Erna H. Heyns**, Beerse (BE)

(73) Assignee: **Allergan Holdings Unlimited Company**, Dublin (IE)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/481,874**

(22) Filed: **Sep. 22, 2021**

(65) **Prior Publication Data**
US 2022/0008394 A1    Jan. 13, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 17/211,274, filed on Mar. 24, 2021, now Pat. No. 11,160,792, which is a continuation of application No. 17/066,072, filed on Oct. 8, 2020, now Pat. No. 11,007,179, which is a continuation of application No. 16/795,044, filed on Feb. 19, 2020, now abandoned, which is a continuation of application No. 16/459,947, filed on Jul. 2, 2019, now abandoned, which is a continuation of application No. 16/213,083, filed on Dec. 7, 2018, now abandoned, which is a continuation of application No. 15/588,304, filed on May 5, 2017, now Pat. No. 10,188,632, which is a continuation of application No. 13/829,984, filed on Mar. 14, 2013, now Pat. No. 9,675,587.

(51) Int. Cl.
A61K 31/4174 (2006.01)
A61K 9/50 (2006.01)
A61K 9/20 (2006.01)
A61K 47/26 (2006.01)
A61K 9/28 (2006.01)
A61P 25/04 (2006.01)

(52) U.S. Cl.
CPC ............ *A61K 31/4174* (2013.01); *A61K 9/20* (2013.01); *A61K 9/2004* (2013.01); *A61K 9/2018* (2013.01); *A61K 9/2027* (2013.01); *A61K 9/2054* (2013.01); *A61K 9/2866* (2013.01); *A61K 9/501* (2013.01); *A61K 47/26* (2013.01); *A61P 25/04* (2018.01)

(58) Field of Classification Search
CPC ........ A61K 9/2004; A61K 47/26; A61K 9/20; A61K 9/2018
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 553,266 A | 1/1896 | Schuman | |
| 3,980,766 A | 9/1976 | Shaw et al. | |
| 5,312,821 A | 5/1994 | Connor et al. | |
| 5,574,159 A | 11/1996 | Chang et al. | |
| 6,013,658 A | 1/2000 | Lau et al. | |
| 6,060,504 A | 5/2000 | Stein et al. | |
| 6,518,292 B1 | 2/2003 | Robi et al. | |
| 6,528,522 B2 | 3/2003 | Shih et al. | |
| 7,741,356 B2 | 6/2010 | Breslin et al. | |
| 7,786,158 B2 | 8/2010 | Breslin et al. | |
| 7,994,206 B2 | 8/2011 | Anzalone et al. | |
| 8,344,011 B2 | 1/2013 | Breslin et al. | |
| 8,609,709 B2 | 12/2013 | Breslin et al. | |
| 8,609,865 B2 | 12/2013 | Anzalone et al. | |
| 8,691,860 B2 | 4/2014 | Anzalone et al. | |
| 8,772,325 B2 | 7/2014 | Breslin et al. | |
| 8,859,604 B2 | 10/2014 | Anzalone et al. | |
| 9,115,091 B2 | 8/2015 | Anzalone et al. | |
| 9,205,076 B2 | 12/2015 | Breslin et al. | |
| 9,364,489 B2 | 6/2016 | Anzalone et al. | |
| 9,675,587 B2 | 6/2017 | Costello et al. | |
| 9,700,542 B2 | 7/2017 | Breslin et al. | |
| 9,789,125 B2 | 10/2017 | Anzalone et al. | |
| 10,188,632 B2 | 1/2019 | Costello et al. | |
| 11,007,179 B2 | 5/2021 | Costello et al. | |
| 11,090,291 B2 | 8/2021 | Costello et al. | |
| 11,160,792 B2 | 11/2021 | Costello et al. | |
| 11,229,627 B1 | 1/2022 | Costello et al. | |
| 2005/0203143 A1 | 9/2005 | Breslin et al. | |
| 2009/0169621 A1 | 7/2009 | Sherwood et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102786476 A | 11/2012 |
| EP | 1055655 A2 | 11/2000 |

(Continued)

OTHER PUBLICATIONS

"Formulation and Process Development for Oral Dosage Forms," 8th Annual PTI Training Program, Aug. 27-31, 2012.
Ahmad et al., "Safety and performance of current abuse-deterrent formulations," Expert Opinion on Drug Metabolism & Toxicology, 14(12): 1255-1271 (2018).
Ananthan "Opioid ligands with mixed μ/δ opioid receptor interactions: an emerging approach to novel analgesics," AAPS Journal, 8(1): E118-E125 (2006).
Bagnol et al., "Cellular localization and distribution of the cloned mu and kappa opioid receptors in rat gastrointestinal tract," Neuroscience, 81(2): 579-591 (1997).

(Continued)

*Primary Examiner* — Mark V Stevens
(74) *Attorney, Agent, or Firm* — Foley Hoag LLP

(57) **ABSTRACT**

Abuse deterrent solid dosage formulations containing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and processes for the preparation and administration of these formulations.

**30 Claims, 2 Drawing Sheets**

**US 11,311,516 B2**

Page 2

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0263476 A1* | 10/2009 | Jobdevairakkam ... | A61K 9/006 424/452 |
| 2010/0129443 A1 | 5/2010 | Pettersson | |
| 2010/0249045 A1 | 9/2010 | Babul | |
| 2010/0324051 A1* | 12/2010 | Breslin ................. | A61P 25/00 514/240 |
| 2011/0002985 A1 | 1/2011 | Shah et al. | |
| 2012/0065221 A1 | 3/2012 | Babul | |
| 2012/0214820 A1 | 8/2012 | Kalyankar et al. | |
| 2012/0282336 A1 | 11/2012 | Abebe et al. | |
| 2014/0256779 A1 | 9/2014 | Breslin et al. | |
| 2014/0271854 A1 | 9/2014 | Costello et al. | |
| 2016/0030393 A1 | 2/2016 | Breslin et al. | |
| 2016/0354389 A1 | 12/2016 | Anzalone et al. | |
| 2017/0304268 A1 | 10/2017 | Costello et al. | |
| 2021/0205268 A1 | 7/2021 | Costello et al. | |
| 2021/0205269 A1 | 7/2021 | Costello et al. | |
| 2022/0008394 A1 | 1/2022 | Costello et al. | |
| 2022/0016034 A1 | 1/2022 | Costello et al. | |
| 2022/0040151 A1 | 2/2022 | Costello et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1208143 A1 | 5/2002 |
| EP | 2653465 A1 | 10/2013 |
| WO | WO-02/36116 A2 | 5/2002 |
| WO | WO-03/033486 A1 | 4/2003 |
| WO | WO-03/092688 A2 | 11/2003 |
| WO | WO-2003/097051 A2 | 11/2003 |
| WO | WO-2005/053587 A1 | 6/2005 |
| WO | WO-2005/090315 A1 | 9/2005 |
| WO | WO-2007/043061 A1 | 4/2007 |
| WO | WO-2008/068471 A1 | 6/2008 |
| WO | WO-2009122431 A2 | 10/2009 |
| WO | WO-2010/132431 A1 | 11/2010 |
| WO | WO-2014/159245 A1 | 10/2014 |

OTHER PUBLICATIONS

Balboni et al., "Opioid pseudopeptides containing heteroaromatic or heteroaliphatic nuclei," Peptides, 21(11): 1163-1671 (2000).
Barber, A. et al., A pharmacological profile of the novel, peripherally-selective k-opioid receptor agonist, EMD 61753, Br. J. Pharmacol., 113:1317-1327 (1994).
Barber, Andrew et al., "Review: Central & Peripheral Nervous Systems—Novel developments with selective, non-peptidic kappa-opioid receptor agonists," Expert Opinion on Investigational Drugs, 6(10): 1351-1368 (1997).
Binder et al., "Effect of the peripherally selective K-opioid agonist, asimadoline, on adjuvant arthritis," Br. J. of Pharmacol., 124(4): 647-654 (1998).
Bitar et al., "Specific opiate receptors on isolated mammalian gastric smooth muscle cells," Nature, 297(5861): 72-74 (1982).
Black et al., "The kappa opioid receptor is associated with the perception of visceral pain," Gut, 43: 312-313 (1998).
Brandt et al., "An evidence-based position statement on the management of irritable bowel syndrome," The American journal of gastroenterology, 104(Suppl 1): S1-S35 (2009).
Breslin et al., "Identification of a dual δ or antagonist/μ agonist as a potential therapeutic for diarrhea-predominant irritable bowel syndrome (IBS-d)," Bioorganic & Medicinal Chemistry Letters, 22(14): 4869-4872 (2012).
Callahan, Michael J., "Irritable Bowel Syndrome Neuropharmacology: A Review of Approved and Investigational Compounds," J. of Clinical Gastroenterology, 35(Suppl. 1): S58-S67 (2002).
Camilleri, M. et al., "Consensus report: clinical perspectives, mechanisms, diagnosis and management of irritable bowel syndrome," Alimentary Pharmacol. & Therap., 16: 1407-1430 (2002).
Camilleri, M. et al., "Visceral hypersensitivity: facts, speculations, and challenges," Gut, 48: 125-131 (2001).
Camilleri., Michael, "Management of the irritable bowel syndrome," Gastroenterology, 120(3): 652-668 (2001).

Clinical Trial NCT01130272 (As of Mar. 13, 2012)—Efficacy, Safety, and Tolerability of JNJ-27018966 in the Treatment of Irritable Bowel Syndrome With Diarrhea; Last Accessed Aug. 24, 2021.
Clinical Trial NCT01553747 (As of Mar. 7, 2012)—Efficacy, and Tolerability of JNJ-27018966 in the Treatment of Patients With Diarrhea-Predominant Irritable Bowel Syndrome (Protocol JNJ-27018966IBS3002); Last Accessed Aug. 24, 2021.
Coleman, "New Pharmaceutical Approaches to the Treatment of IBS: Future Development & Research," Annals of Gastro, 15(3): 278-279 (2002).
Colorcon, Opadry II, Application Data sheet, Aug. 2009.
Corazziari, Enrico, et al., "Gut Dysfunction in IBS: Role of opioid ligands in irritable bowel syndrome," Canadian J. of Gastroenterol., 13(Supp. A): 71A-75A (1999).
De Schepper, H.U., et al., "Review: Opioids and the gut: pharmacology and current clinical experience," Neurogastroenterol. Motil 16:383-394 (2004).
Delgado-Aros et al., "Effects of a-opioid agonist, asimadoline, on satiation and GI motor and sensory functions in humans," Am. J. Physiol. Gastrointest. Liver Physiol., 284: G558-G566 (2003).
Delvaux, M., et al., "Effect of asimadoline, a K opioid agonist, on pain induced by colonic distension in patients with irritable bowel syndrome," Aliment Pharmacol. Ther., 20: 237-246 (2004).
Dietis et al., "Simultaneous targeting of multiple opioid receptors: a strategy to improve side-effect profile," British Journal of Anaesthesia, 103 (1): 38-49 (2009).
Dokray, "Physiology of Enteric Neuropeptides," in Johnson LR ed Physiology of the Gastrointestinal Track 3rd ed New York Raven, 1194, 169-209 (1994).
Drossman "The functional gastrointestinal disorders and the Rome III process," Gastroenterology, 130(5): 1377-1390 (2006).
Drossman, Rome III The Functional GI Disorders, 3rd Edition, Lawrence: Allen Press Inc., 2006.
Dufour, E., et al., "Synthesis of amidrazones using an engineered papain nitrile hydratase," FEBS Letters, 433: 78-82 (1998).
Extended European Search Report for EP Application No. 20125626.1 dated Jul. 9, 2021.
Extended Search Report for European Patent Application No. 14774006.2, dated Jul. 26, 2016 12 pages.
Holzer, "Opioid receptors in the gastrointestinal tract," Regulatory Peptides, 155(1-3): 11-17 (2009).
International Preliminary Report on Patentability for International (PCT) Patent Application No. PCT/US2014/022666, dated Sep. 24, 2015 12 pages.
International Search Report and Written Opinion for International (PCT) Patent Application No. PCT/US2014/022666, dated Jul. 9, 2014 14 pages.
Joshi, S.K., et al., "K-Opioid Receptor Agonists Modulate Visceral Nociception at a Novel, Peripheral Site of Action," J. of Neuroscience, 20(15): 5874-5829 (2000).
Kamel et al., "Pharmaceutical significance of cellulose: A review," eXPRESS Polymer Letters, 2(11): 758-778 (2008).
Liu, Bao-Hua, et al., "Effects of mu and kappa opioid receptor agonists and antagonists on contraction of isolated colon strips of rats with cathartic colon," World J. Gastroenterol., 10(11): 1672-1674 (2004).
Lovell et al., "Global prevalence of and risk factors for irritable bowel syndrome: a meta-analysis," Clinical gastroenterology and hepatology, 10(7): 712-721 (2012).
Malagelada, J.-R., "Review article: clinical pharmacology models of irritable bowel syndrome," Alimentary Pharmacol. & Therap., 13(Supp. 2): 57-64 (1999).
Mertz, H., "Review article: visceral hypersensitivity," Alimentary Pharm & Therap., 17(5): 623-633 (2003).
Non Final Office Action dated Feb. 7, 2017 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.
Non Final Office Action dated Jan. 8, 2015 for U.S. Appl. No. 14/459,514, filed Aug. 14, 2014.
Non Final Office Action dated Jul. 12, 2016 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.
Non Final Office Action dated Jun. 16, 2014 for U.S. Appl. No. 14/282,828, filed May 20, 2014.

# US 11,311,516 B2
Page 3

(56) **References Cited**

OTHER PUBLICATIONS

Non Final Office Action dated Sep. 17, 2014 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.

Non Final Office Action dated Jun. 30, 2015 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.

Non Final Office Action dated Dec. 31, 2015 for U.S. Appl. No. 13/829,984, filed Mar. 14, 2013.

Notice of Allowance for U.S. Appl. No. 13/829,984, dated Feb. 7, 2017.

Official Action for Eurasia Patent Application No. 201591768, dated May 16, 2017 4 pages.

Official Action with English Translation for China Patent Application No. 201480026522.7, dated Jan. 13, 2017 23 pages.

Official Action with English Translation for Eurasia Patent Application No. 201591768, dated Oct. 5, 2016 5 pages.

Ozaki, Noriyuki, et al., "Differential Effects of μ-, δ-, and κ-Opioid Receptor Agonists on Mechanosensitive Gastric Vagal Afferent Fibers in the Rat," The Am. Physiological Society, 83(4): 2209-2216 (1999).

P&T Product Profiler., "Abstral® Fentanyl Sublingual Tablets For Breakthrough Cancer Pain," vol. 36, Issue 2 Section Three: 30 pages (2011).

Porreca et al., "Potential for Development of Novel Analgesic Agents," Pain: Understanding, Emerging Therapies, and Novel Approaches to Drug Discovery, 407-419 (1st Ed. Taylor & Francis Group LLC) (2003).

Raval and Patel, "Silicified Microcrystalline Cellulose as a Multi-functional Pharmaceutical Excipient," Drug Delivery Technology, Apr. 2009 vol. 9 No 4 pp. 28-32.

Reynolds, James C., "Challenges in the treatment of colonic motility disorders," Am. J. Health-System Pharmacy, 53(Supp 3): S17-S26 (1996).

Riviere et al., "Opioid Receptors: Targets for New Gastrointestinal Drug Development," Drug Development: Molecular Targets for GI Diseases p. 203-38 (Gaginella, T.S., and Guglietta, A., Eds. 2000).

Riviere, Pierre J.-M., "Review: peripheral kappa-opioid agonists for visceral pain," Br. J. of Pharm., 141: 1331-1334 (2004).

Schreiber, Rainer, et al., "The κ-opioid receptor agonist asimadoline inhibits epithelial transport in mouse trachea and colon," Eur. J. of Pharmacol., 503(1-3): 185-190 (2004).

Talley, Nicholas J., "Evaluation of drug treatment in irritable bowel syndrome," Br. J. Clin. Pharmacol., 56(4): 362-369 (2003).

Talley, Nicholas J., "Irritable Bowel Syndrome: Physiology and Management," Medscape Gastroenterology (posted Jun. 7, 2002).

The Handbook of Pharmaceutical Excipients (5th ed. 2006), published by the American Pharmaceutical Association and the Pharmaceutical Society of Great Britain.

Truberzi Summary of Product Characteristics dated Sep. 19, 2016.

U.S. Appl. No. 14/459,514, filed Aug. 14, 2014, Anzalone et al.

Wade et al., "Modulation of gastrointestinal function by MuDelta, a mixed μ.opioid receptor agonist/ μ. opioid receptor antagonist," British Journal of Pharmacology, 167(5): 1111-1125 (2012).

Zhang Xingfang "Performance Manual of the Raw Materials of Foreign Propellants and Explosives," Weapon Industry Press, Nov. 1991, p. 283, 3 pages.

* cited by examiner

## Figure 1



Appx187

## Figure 2







US 11,311,516 B2

**1**

# OPIOID RECEPTOR MODULATOR DOSAGE FORMULATIONS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 17/211,274, filed Mar. 24, 2021; which is a continuation of U.S. patent application Ser. No. 17/066,072, filed Oct. 8, 2020; which is a continuation of U.S. patent application Ser. No. 16/795,044, filed Feb. 19, 2020; which is a continuation of U.S. patent application Ser. No. 16/459, 947, filed Jul. 2, 2019; which is a continuation of U.S. patent application Ser. No. 16/213,083, filed Dec. 7, 2018; which is a continuation of U.S. patent application Ser. No. 15/588, 304, filed May 5, 2017; which is a continuation of U.S. patent application Ser. No. 13/829,984, filed Mar. 14, 2013. The disclosures of the foregoing references are hereby incorporated by reference in their entireties.

## FIELD OF THE DISCLOSURE

The present disclosure relates to oral dosage formulations containing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and processes for the preparation and administration of these formulations.

## BACKGROUND OF THE DISCLOSURE

Delivering an active pharmaceutical ingredient ("5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid") to a patient requires more than just identifying a molecule and its use. An 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid must be formulated for delivery to a patient and this formulation (in addition to the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid activity) is evaluated by regulatory agencies such as the US Food and Drug Administration (FDA) and the European Medicines Agency (EMA). The FDA evaluates the formulation for, among other properties, delivery properties, stability, consistency, and manufacturing controls. An important factor in determining these properties of a particular formulation is the composition and form of the dosage formulation of the 5-({[2-Amino-3-(4-carbamoyl-2, 6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. The formulations for every 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid are different and different formulations containing the same 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid may have very different stability and drug delivery (e.g., pharmacokinetic) properties.

5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid is an opioid receptor modulator that effects simultaneous agonism of the μ opioid receptor (MOR) and antagonism of the δ opioid receptor (DOR) and may be useful in the treatment and prevention of various mammalian disease states, for example pain and

**2**

gastrointestinal disorders such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders (for example, see U.S. Pat. No. 7,741,356 to Breslin et al., which is incorporated herein in its entirety). Irritable bowel syndrome is a common functional gastrointestinal disorder that affects approximately 10-15% of the population in western countries (Lovell et al., Clin Gastroenterol Hepatol 2012; 10(7):712-21). Irritable bowel syndrome is characterized by recurrent abdominal discomfort and pain associated with altered bowel habits (Drossman D A, Gastroenterol 2006; 130(5):1377-1390). Current irritable bowel syndrome subtypes include diarrhea (IBS-D), constipation (IBS-C), or mixed constipation and diarrhea (IBS-M). Irritable bowel syndrome can negatively impact individual's quality of life and results in significant direct and indirect costs (Drossman D A. Rome III The Functional GI Disorders. 3rd Edition. Lawrence: Allen Press, Inc, 2006). Current safe and effective pharmacologic treatments for IBS-D are limited and include antispasmodics, antidepressants, antidiarrheal agents, and alosetron (Brandt et al., Am J Gastroenterol 2009; 104(Suppl 1):S1-35).

Opioid receptors, including mu, delta, and kappa are expressed along the gastrointestinal tract and play a key role in regulating gastrointestinal motility, secretion and visceral sensation (Bagnol et al., Neuroscience 1997; 81(2):579-591; Dokray G J, Physiology of Enteric Neuropeptides. In: Johnson L R ed. Physiology of the Gastrointestinal Tract. 3rd ed. New York: Raven; 1994; 169-209; Bitar et al., Nature 1982; 297(5861):72-74). Exogenous opioids reduce gastrointestinal transit through activation of MOR and can treat diarrhea in acute situations (Holzer P., Regulatory Peptides 2009; 155:11-17). Agents that simultaneously activate MOR while antagonizing DOR have differential gastrointestinal effects and may possess increased analgesic potency compared to pure MOR agonists (Ananthan S. Opioid ligands with mixed μ/δ opioid receptor interactions: an emerging approach to novel analgesics. AAPS Journal 2006; 8(1):E118-E125; Dietis et al., British Journal of Anaesthesia 2009; 103(1): 38-49). Such a mixed MOR agonist/DOR antagonist profile may offer an advantage in treating both the diarrhea and abdominal pain associated with IBS-D.

5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid may be particularly useful for reducing pain and diarrhea in patients with irritable bowel syndrome with diarrhea (IBS-D) without constipating side effects. In vitro, it reduces contractility in intestinal tissue and inhibits neurogenically-mediated secretion (Wade et al., Br J Pharmacol 2012; 167(5):1111-1125). In vivo, it reduces gastrointestinal transit and fecal output in stressed and non-stressed mice over a wide dose-range without fully inhibiting gastrointestinal transit (ibid.). In contrast, loperamide had a narrow dose range in the same stressed and non-stressed models and completely prevented fecal output in a dose-dependent manner (ibid.).

5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and methods of making this molecule are disclosed in U.S. Pat. No. 7,741,356. Example 9 of U.S. Pat. No. 7,741,356 makes the hydrochloride salt of 5-({[2-amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Applicants have also discovered a process of making the zwitterion of 5-({[2-amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propio-

US 11,311,516 B2

3 4

nyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and two novel crystals of this zwitterion (for example, see U.S. Patent Publication No. 2011/0263868 to Anzalone, et. al., which is incorporated herein in its entirety).

Oral administration of 5-({[2-amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid is efficacious in normalizing gastrointestinal (GI) motility in stressed subjects and providing anti-visceral hyperalgesic effects in rats by acting at peripheral opioid receptors in the gastrointestinal tract. It has also been noted that parenteral administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid results in CNS-related effects in animal models, which is believed to be due to the mu-opioid receptor ("MOR") agonist properties.

The recent draft guidance issued for industry by the US Food and Drug Administration (Food and Drug Administration 2010) for the assessment of abuse potential of drugs provides general instructions for in vitro laboratory assessment procedures. This draft guidance states that "[i]nformation should be obtained on how much drug substance might be released and any changes that could take place in the rate of release of the drug from the drug product if it is misused either intentionally or unintentionally." The guidance further states that the "effects of pH, temperature, and solvent polarity on disruption of the drug product matrix should be evaluated. Additional experimental variables may include exposure times to the solvent, agitation, varying the surface area (such as from intact to being ground, crushed, or cut into pieces), and ease of crushing tablets or destroying the dosage from matrix." These guidelines pertain to compounds perceived to have any potential for abuse, misuse and/or diversion, which include, but are not limited to, opioid receptor agonists. The goal is to determine the effects that certain formulations may have in limiting or preventing abuse of the active ingredient, in this instance, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, in order to decrease abuse or diversion of the marketed dosage formulations and prevent harm and addiction in the public to the extent possible.

Therefore abuse liability assessment of oral dosage formulations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was undertaken to identify oral formulation compositions and characteristics that may provide effective treatment of opioid receptor disorders while minimizing or elimination potential for abuse or diversion of these oral formulations.

SUMMARY OF DISCLOSURE

The present inventors have discovered solid oral pharmaceutical formulations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with improved stability and shelf life and unique physico-chemical features that may deter or limit abuse of the active ingredient or diversion of the oral formulations. Thus, embodiments provided by this disclosure include an abuse deterrent pharmaceutical formulation of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

One embodiment of the disclosure provides a solid pharmaceutical formulation comprising 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone (polyvinylpolypyrrolidone); highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magnesium stearate. In a specific embodiment, this pharmaceutical formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a pharmaceutical formulation consisting of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate.

One embodiment of the disclosure provides a solid pharmaceutical formulation comprising 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and inert ingredients including silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone (polyvinylpolypyrrolidone; highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magnesium stearate. In a specific embodiment, this pharmaceutical formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a pharmaceutical formulation consisting of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and the inert ingredients silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate.

One embodiment of the disclosure provides a solid oral dosage formulation comprising 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone (polyvinylpolypyrrolidone; highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magnesium stearate. In a specific embodiment, this solid oral dosage formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a solid oral dosage formulation consisting of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate. In these embodiments, the oral dosage formulations may be coated, including sugar coated, gelatin coated, film coated or enteric coated, by standard techniques.

Another embodiment of the disclosure provides an oral tablet formulation comprising 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone (polyvinylpolypyrrolidone; highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magnesium stearate. In a specific embodiment, this oral tablet formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides an oral tablet formulation consisting of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-

US 11,311,516 B2

| 5 | 6 |

1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-ben-zoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate. In these embodiments, the oral tablet formulations may be coated, including sugar coated, gelatin coated, film coated or enteric coated, by standard techniques.

Another embodiment of the disclosure provides a film-coated, oral tablet formulation comprising 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phe-nyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrystalline cellulose, colloidal silicon dioxide, crospovidone (polyvinylpolypyrrolidone; highly cross-linked polyvinylpyrrolidone (PVP)), mannitol, and magne-sium stearate, and a film coating. In a specific embodiment, this film-coated, oral tablet formulation may be substantially or completely free of a separate opioid antagonist, such as naloxone. A related embodiment provides a film-coated, oral tablet formulation consisting of 5-({[2-Amino-3-(4-carbam-oyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imi-dazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and an inert ingredient selected from silicified microcrys-talline cellulose, colloidal silicon dioxide, crospovidone, mannitol, and magnesium stearate, and a film coating. In these embodiments, the film coating may be an aqueous film coating.

A specific embodiment is an abuse deterrent, mono-phasic pharmaceutical composition suitable for single dose admin-istration for treating or ameliorating a condition mediated by an opioid receptor consisting essentially of about 20 mg/dose to about 200 mg/dose of 5-({[2-Amino-3-(4-car-bamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, from about 60-80% by weight of silicified microcrys-talline cellulose, from about 2-8% by weight of colloidal silica, from about 50-90% by weight of mannitol, from about 20-50% by weight of crospovidone, and from about 2-8% by weight of magnesium stearate.

Another embodiment provided by this disclosure is a method of treating or ameliorating a condition mediated by an opioid receptor by administering 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-ben-zoic acid in a solid oral formulation of this disclosure to a subject in need of such treatment. In a specific embodiment, this administration may be made in the absence of the separate or concurrent administration of an opioid antago-nist, such as naloxone. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount between 20 mg and 200 mg.

In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the sub-ject in an amount between about 10 mg and about 125 mg. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the sub-ject in an amount between about 50 mg and about 100 mg. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-

ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the sub-ject in an amount of about 75 mg. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount of about 100 mg.

In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formu-lation of this disclosure to the subject between two administrations per day and eight administrations per day. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formu-lation of this disclosure to the subject between two administrations per day and six administrations per day. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formu-lation of this disclosure to the subject between two administrations per day and four administrations per day. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-ethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formu-lation of this disclosure to the subject on a twice-daily dosing regimen. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-car-bamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on a once-daily dosing regimen.

This Summary of the Disclosure is neither intended nor should it be construed as being representative of the full extent and scope of the present disclosure. Moreover, ref-erences made herein to "the present disclosure," or aspects thereof, should be understood to mean certain embodiments of the present disclosure and should not necessarily be construed as limiting all embodiments to a particular description. The present disclosure is set forth in various levels of detail in the Summary of the Disclosure as well as in the attached drawings and the Description of Embodi-ments and no limitation as to the scope of the present disclosure is intended by either the inclusion or non-inclu-sion of elements, components, etc. in this Summary of the Disclosure. Additional aspects of the present disclosure will become more readily apparent from the Description of Embodiments, particularly when taken together with the drawings.

BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 depicts the manufacturing process for 75-mg and 100-mg oral tablets of the present disclosure.

FIG. 2, shows representative time course plots of cumu-lative percent recovery of active ingredient under different extraction conditions: A, ground vs. whole tablet; B, 25° C. vs. 95° C.; C, water vs. 0.1M HCl.

DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

The present disclosure is drawn to solid dosage formula-tions containing 5-({[2-Amino-3-(4-carbamoyl-2,6-dim-

US 11,311,516 B2

| 7 | 8 |

ethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-methyl)-2-methoxy-benzoic acid that deter or minimize the abuse or diversion of these formulations, as well as processes for the preparation and administration of these formulations.

For the purposes of this disclosure, reference to "5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid" also means "5-[[[-2-amino-3-2-(aminocarbonyl)-2,6-dimethylphenyl]-1-oxopropyl]-[1-(4-phenyl-1H-imidazol-2-yl)ethyl]amino]methyl]-2-methoxybenzoic acid", and it is intended that the two chemical names can be used interchangeably. Reference to the "active ingredient" includes 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and pharmaceutically acceptable enantiomers, diastereomers, racemates, zwitterions, and salts thereof.

Because 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-amino}-methyl)-2-methoxy-benzoic acid includes at least two chiral centers, it may exist as diastereomers. These isomers may be separated by conventional techniques such as preparative chromatography and may be prepared in racemic form or as individual diastereomers by either stereospecific synthesis or by resolution. The compounds may, for example, be resolved into their component diastereomers by standard techniques, such as the formation of stereoisomeric pairs by salt formation with an optically active acid, such as (−)-di-p-toluoyl-D-tartaric acid and/or (+)-di-p-toluoyl-L-tartaric acid followed by fractional crystallization and regeneration of the free base. The compounds may also be resolved by formation of stereoisomeric esters or amides, followed by chromatographic separation and removal of the chiral auxiliary. Alternatively, the compounds may be resolved using a chiral HPLC column. It is to be understood that all stereoisomers, racemic mixtures, diastereomers and enantiomers are encompassed within the scope of any reference to "5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid" or the "active ingredient" in this disclosure.

For example, reference to "5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid" or the "active ingredient" specifically includes:

a) 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-amino}-methyl)-2-methoxy-benzoic acid,

b) 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid,

c) 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, and/or

d) 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, as well as

e) a hydrobromic, hydriodic, perchloric, sulfuric, nitric, phosphoric, acetic, propionic, glycolic, lactic, succinic, maleic, fumaric, malic, tartaric, citric, benzoic, mandelic, methanesulfonic, hydroxyethanesulfonic, benzenesulfonic, oxalic, pamoic, 2-naphthalenesulfonic,

p-toluenesulfonic, cyclohexanesulfamic, salicylic, saccharinic or trifluoroacetic acid salt of any one of these compounds, or

f) a benzathine, chloroprocaine, choline, diethanolamine, ethylenediamine, meglumine, procaine, aluminum, calcium, lithium, magnesium, potassium, sodium, or zinc salt of any one of these compounds.

Similarly, reference to "5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-methyl]-amino}-methyl)-2-methoxy-benzoic acid" or the "active ingredient" specifically includes a compound having the chemical structure:



, and/or



, and/or



, and/or

US 11,311,516 B2

9

-continued



10

The term "therapeutically effective amount," as used herein, refers to that amount of the therapeutic agent sufficient to treat or ameliorate the disease or disorder, as described above. For example, for the given parameter, a therapeutically effective amount will show an increase or decrease of at least about 5%, 10%, 15%, 20%, 25%, 30%, 40%, 50%, 60%, 70%, 80%, 90%, or 100%. Therapeutic efficacy can also be expressed as "-fold" increase or decrease. For example, a therapeutically effective amount can have at least a 1.2-fold, 1.5-fold, 2-fold, 5-fold, or more effect over a control value. Therapeutic efficacy related to irritable bowel syndrome, preferably diarrhea-predominant irritable bowel syndrome, can be expressed in measurements of worst abdominal pain (WAP) or stool consistency score (Bristol Stool Scale or BSS).

The term "solid dosage formulation" as used herein includes tablets, capsules, pills and like and may be present as conventional or extended-release compositions.

The terminology used herein is for describing particular embodiments and is not intended to be limiting. As used herein, the singular forms "a," "and" and "the" include plural referents unless the content and context clearly dictate otherwise. Thus, for example, a reference to "a marker" includes a combination of two or more such markers. Unless defined otherwise, all scientific and technical terms are to be understood as having the same meaning as commonly used in the art to which they pertain. For the purposes of the present disclosure, the following terms are defined below.

Also, the use of "or" means "and/or" unless stated otherwise. Similarly, "comprise," "comprises," "comprising," "include," "includes," and "including" are interchangeable and not intended to be limiting.

It is to be further understood that where descriptions of various embodiments use the term "comprising," those skilled in the art would understand that in some specific instances, an embodiment can be alternatively described using language "consisting essentially of" or "consisting of."

In some embodiments related to the treatment of opioid receptor related disorders, the dose of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino]-methyl)-2-methoxy-benzoic acid that can be incorporated into the formulations of the present disclosure depends on the desired treatment dosage to be administered and can range from about 20 mg to about 200 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In other embodiments, the dose of the active ingredient can range from about 10 mg to about 125 mg. In some embodiments, the dose of the active ingredient in the formulations of this disclosure is between about 10 mg and about 200 mg, e.g., 10 mg, 15 mg, 20 mg, 25 mg, 30 mg, 35 mg, 40 mg, 45 mg, 50 mg, 55 mg, 60 mg, 65 mg, 70 mg, 75 mg, 80 mg, 85 mg, 90 mg, 95 mg, 100 mg, 105 mg, 110 mg, 115 mg, 120 mg, 125 mg, 130 mg, 135 mg, 140 mg, 145 mg, 150 mg, 155 mg, 160 mg, 165 mg, 170 mg, 175 mg, 180 mg, 185 mg, 190 mg, 195 mg, or 200 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In one embodiment, the dose is about 75 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In another embodiment, the dose is about 100 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In another embodiment,

as well as a hydrobromic, hydriodic, perchloric, sulfuric, nitric, phosphoric, acetic, propionic, glycolic, lactic, succinic, maleic, fumaric, malic, tartaric, citric, benzoic, mandelic, methanesulfonic, hydroxyethanesulfonic, benzenesulfonic, oxalic, pamoic, 2-naphthalenesulfonic, p-toluenesulfonic, cyclohexanesulfamic, salicylic, saccharinic or trifluoroacetic acid salt, or a benzathine, chloroprocaine, choline, diethanolamine, ethylenediamine, meglumine, procaine, aluminum, calcium, lithium, magnesium, potassium, sodium, or zinc salt of any one of these chemical structures.

As used in this disclosure, the terms "subject," "patient," "individual," etc. are not intended to be limiting and can be generally interchanged. That is, an individual described as a "patient" does not necessarily have a given disease, but may be merely seeking medical advice.

As used herein, the terms "treat" and "prevent" are not intended to be absolute terms. Treatment can refer to any delay in onset, reduction in the frequency or severity of symptoms, amelioration of symptoms, improvement in patient comfort and/or gastrointestinal function, etc. The effect of treatment can be compared to an individual or pool of individuals not receiving a given treatment, or to the same patient prior to, or after cessation of, treatment.

The term "prevent" or "ameliorate" refers to a decrease in the occurrence of opioid receptor disease or disorder symptoms in a patient. The prevention or amelioration may be complete (no detectable symptoms) or partial, such that fewer symptoms are observed than would likely occur absent treatment.

The phrase "opioid receptor related disorders" refers to various mammalian disease states including, for example, pain and gastrointestinal disorders such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders, as described in greater detail in U.S. Pat. No. 7,741,356 to Breslin, et al., which is incorporated herein in its entirety.

The term "abusive" or "abusive manner" refers to uses of the formulations of this disclosure beyond oral administration, such as by injecting or snorting.

The term "abuse deterrent," as used herein, refers to a formulation of the present invention which possesses physico-chemical characteristics that allow the therapeutic use of the opioid receptor modulator active ingredient by oral administration to a subject in need of such treatment with very limited potential for abuse or misuse of the formulation, i.e., by extracting and ingesting the active ingredient by snorting or injection.

US 11,311,516 B2

11

the dose is about 50 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In yet another embodiment, the dose is about 150 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. In yet another embodiment, the dose is about 37.5 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

Dose proportionality occurs when increases in the administered dose are accompanied by proportional increases in a pharmacokinetic parameter. The dosage formulations of the present disclosure are preferably designed as a dose proportional formulation in the range of about 25 mg to 100 mg of the active ingredient 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

Abuse deterrent formulations of the present invention include solid pharmaceutical dosage formulations containing:

from about 5-20% by weight of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, preferably from about 10-15% by weight of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy benzoic acid, preferably about 12.5% by weight of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

from about 60-80% by weight of silicified microcrystalline cellulose (USP Silicified Microcrystalline Cellulose; intimately associated microcrystalline cellulose and colloidal silicon dioxide particles; in a preferred example, high density silicified microcrystalline cellulose "HD-90"); preferably from about 65-75% by weight of silicified microcrystalline cellulose, preferably about 71% by weight of silica fine microcrystalline cellulose;

from about 0.45-1.0% by weight of a glidant, e.g., colloidal silica, preferably from about 0.55-0.95% by weight of colloidal silica, in one preferred embodiment, about 0.65%-0.85% by weight of colloidal silica, in another preferred embodiment, about 0.75% by weight of colloidal silica;

from about 1-20% by weight of mannitol (mannitol, USP), preferably from about 5-15% by weight of mannitol, in one preferred embodiment, about 7.5%-12.5% by weight of mannitol, in another preferred embodiment, about 10% by weight of mannitol;

from about 2-8% by weight of crospovidone (highly cross-linked modification of polyvinylpyrrolidone (PVP)), preferably from about 3-7% by weight of crospovidone, in one preferred embodiment, about 4-6% by weight of crospovidone, in another preferred embodiment, about 5% by weight of crospovidone; and,

from about 0.45-1% by weight of magnesium stearate (Magnesium Stearate USP), preferably from about 0.55-0.95% by weight of magnesium stearate, in one preferred embodiment, about 0.65%-0.85% by weight of magnesium stearate, in another preferred embodiment, about 0.75% by weight of magnesium stearate.

12

In some embodiments, the abuse deterrent solid pharmaceutical dosage formulations are coated with a film coating. In some embodiments, the coating is a water-soluble, pH-independent film coating. Such coating allows for immediate disintegration for fast, active release of the contents of the solid dosage formulation. One such commercially available coating useful in the solid dosage formulations of the present disclosure is Opadry®, and preferably Opadry II®. In specific embodiments, the abuse deterrent solid pharmaceutical dosage formulations include a film coating present in an amount of from about 0.5-5.5% by weight film coating, preferably from about 1-5% by weight film coating, in one preferred embodiment, about 2-4% by weight film coating, in another preferred embodiment, about 3% by weight film coating.

In some instances, opioid receptor agonist drugs have been formulated and marketed with an opioid antagonist (such as the opioid antagonist naloxone), to render the formulation abuse resistant. The present invention is also based, at least in part, on the surprising discovery, that the formulations of the present disclosure have abuse deterrent characteristics. For example, such formulation is non-tamperable thereby limiting ease of isolation and purification of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the formulation. Thus, in specific embodiments of the present disclosure, the formulations are substantially free of naloxone. In related embodiments of the present disclosure, the formulations are completely free of naloxone. Such formulations are advantageous because they can provide effective abuse deterrence in the absence of naloxone.

The formulations can also optionally include an inert pharmaceutically acceptable dissolution-rate-modifying agent, a pharmaceutically acceptable plasticizer, a pharmaceutically acceptable coloring agent (e.g., FD&C Blue #1), a pharmaceutically acceptable opacifier (e.g., titanium dioxide), pharmaceutically acceptable anti-oxidant (e.g., tocopherol acetate), a pharmaceutically acceptable preservative, flavorants (e.g., saccharin and peppermint), neutralizing agents (e.g., sodium hydroxide), buffering agents (e.g., monobasic, or tribasic sodium phosphate), or combinations thereof. Preferably, these components are individually present at no more than about 1% of the final weight of the formulation, but the amount may vary depending on the other components of the formulation.

For preparing formulations of the present disclosure, such as tablets, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid is mixed with one or more pharmaceutical excipients to form a solid preformulation composition containing, in preferred embodiments, a homogeneous mixture of the excipient(s) with the active ingredient. When referring to these preformulation compositions as "homogeneous," it is meant that the active ingredient are dispersed evenly throughout the composition so that the composition may be readily subdivided into equally effective unit dosage forms such as tablets or capsules. This solid preformulation is then subdivided into unit dosage forms of the type described above containing from, for example, about 10 to about 200 milligrams of the active ingredient.

According to one embodiment, a solid dosage formulation of the present disclosure is prepared by:
 i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with

US 11,311,516 B2

13                                                    14

the pharmaceutically acceptable inert excipients: silici-fied microcrystalline cellulose, mannitol, colloidal silica and crospovidone;

ii) comilling the above blend with the addition of mag-nesium stearate;

iii) compressing the dry blend into suitably sized tablets, or filling into capsules.

According to another embodiment, a solid dosage formu-lation is prepared using direct compression, by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipients silici-fied microcrystalline cellulose, mannitol, colloidal silica, and crospovidone;

ii) lubricating the blend by the addition of magnesium stearate;

iii) compressing the blend into suitably sized tablets.

According to another embodiment, capsules may be for-mulated by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipients silici-fied microcrystalline cellulose, mannitol, colloidal silica, and crospovidone;

ii) lubricating the blend by the addition of magnesium stearate,

iii) filling the blend into capsule shells.

According to another embodiment, capsules may also be formulated by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipients silici-fied microcrystalline cellulose, mannitol, colloidal silica, and crospovidone;

ii) comilling the above blend,

iii) adding magnesium stearate to lubricate the blend,

iv) filling the blend into capsule shells.

According to another embodiment, capsules may also be formulated by:

i) blending 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with the pharmaceutically acceptable inert excipients silici-fied microcrystalline cellulose, mannitol, colloidal silica, and crospovidone;

ii) comilling the above blend,

iii) adding magnesium stearate to lubricate the blend,

iv) compressing the blend into tablets.

In these embodiments of preparing the dosage formula-tions of this disclosure, the tablets or capsules may be film coated and/or packaged in bulk or unit-dosage packaging (i.e. blister packaging).

The active ingredient in the formulations of the present disclosure are useful opioid receptor modulators. In particu-lar, certain compounds are opioid receptor agonists useful in the treatment or amelioration of conditions such as pain and gastrointestinal disorders. Examples of pain intended to be within the scope of the present invention include, but are not limited to, centrally mediated pain, peripherally mediated pain, structural or soft tissue injury related pain, pain related to inflammation, progressive disease related pain, neuro-pathic pain and acute pain such as caused by acute injury, trauma or surgery, and chronic pain such as caused by neuropathic pain conditions, diabetic peripheral neuropathy,

post-herpetic neuralgia, trigeminal neuralgia, post-stroke pain syndromes or cluster or migraine headaches. The active ingredient in the formulations of the present disclosure are preferably useful for treating or ameliorating abdominal pain. Examples of gastrointestinal disorders intended to be within the scope of this invention include, but are not limited to, diarrheic syndromes, motility disorders such as irritable bowel syndrome including diarrhea-predominant, constipa-tion-predominant or alternating irritable bowel syndrome, and visceral pain and diarrhea associated with inflammatory bowel disease including ulcerative colitis and Crohn's dis-ease.

Examples of gastrointestinal disorders where -({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid may be useful include constipation-predominant irritable bowel syndrome, post-operative ileus and constipation, including but not limited to the constipa-tion associated with treatment of chronic pain with opiates. Modulation of more than one opioid receptor subtype is also useful as follows: a compound that is a mixed mu OR agonist and delta OR antagonist could have antidiarrheal properties without being profoundly constipating. A com-pound that is a mixed mu OR agonist and delta OR agonist are useful in cases of severe diarrhea that are refractory to treatment with pure mu OR agonists, or has additional utility in treating visceral pain associated with inflammation and diarrhea.

The daily dose of a solid dosage formulation of the present disclosure may be a dose that is therapeutically effective for the treatment of irritable bowel syndrome, preferably diarrhea-predominant irritable bowel syndrome, wherein a patient has an average decrease of daily WAP scores from the patient's baseline WAP (for example a baseline WAP score of $\geq 3.0$ (on a 0-10 numerical rating scale, where 0 indicates no pain and 10 worst pain imagin-able) of about $\geq 10\%$, preferably a decrease in WAP score of about $\geq 20\%$, more preferably a decrease in WAP score of about $\geq 30\%$. The daily dose of a dosage formulation of the present disclosure may be a dose that is therapeutically effective for the treatment of irritable bowel syndrome, preferably diarrhea-predominant irritable bowel syndrome, wherein a patient achieves an average BSS score (wherein 1 equals hard, lumpy stools and 7 equals watery, liquid stools) of between 2 and 5, preferably 3 or 4.

The daily dose of a solid dosage formulation of the present disclosure may be varied over a wide range from about 20 mg to about 7000 mg of the active ingredient per adult human per day; preferably the dose will be in the range of from about 50 mg to about 2100 mg of the active ingredient per adult human per day. For oral administration, the formulations are preferably provided in the form of film-coated tablets containing about 75, about 100 or about 200 milligrams, more preferably about 75 or about 100 milligrams, of the active ingredient for the symptomatic adjustment of the dosage to the subject to be treated. Advantageously, dosage formulations of the present disclo-sure may be administered in a single daily dose or the total daily dosage may be administered in divided doses of two, three or four times daily. If administered twice daily, each dose may be administered at about 6 hours to about 12 hours apart per day, preferably about 8 hours to about 12 hours apart per day, preferably about 10 hours to about 12 hours apart per day, preferably about 10 hours apart per day, or preferably about 12 hours apart per day. In these preferred embodiments, the total daily dose is administered twice daily.

US 11,311,516 B2

15

16

In certain embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on an every-other-day (qod) dosing regimen, or on a thrice-weekly dosing regimen, or on a twice-weekly dosing regimen, or on a once-weekly dosing regimen.

In certain embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on a twice-monthly dosing regimen, or on a once-monthly dosing regimen.

In certain embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in a formulation of this disclosure to the subject on an as-needed (prn) dosing regimen.

Thus, an embodiment provided by this disclosure is a method of treating or ameliorating an opioid receptor related disorder by administering a formulation of this disclosure to a subject in need of such treatment. In one embodiment, this administration may be made in the absence of the separate or concurrent administration of the opioid antagonist naloxone. In specific embodiments, these methods may include the administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to the subject in an amount between about 20 mg and about 200 mg, preferably about 75, about 100 or about 200 milligrams, more preferably about 75 or about 100 milligrams.

In another embodiment, this administration may be made in the absence of, prior to or concurrent with, the administration of food. In one embodiment, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid is administered to the subject with one or more daily meals, more preferably with breakfast and dinner.

Another embodiment of the disclosure relates to any of the formulations of this disclosure for use in the treatment or amelioration of a condition mediated by an opioid receptor,

for example, any pain and gastrointestinal disorders disclosed herein, preferably such as diarrhea syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders.

Another embodiment of the disclosure relates to the use of any of the formulations of this disclosure in the preparation of a medicament for the treatment or amelioration of a condition mediated by an opioid receptor, for example pain and gastrointestinal disorders disclosed herein, such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders.

The disclosure now being generally described will be more readily understood by reference to the following examples, which are included merely for the purposes of illustration of certain aspects of the embodiments of the present disclosure. The examples are not intended to limit the disclosure, as one of skill in the art would recognize from the above teachings and the following examples that other techniques and methods can satisfy the claims and can be employed without departing from the scope of the claimed disclosure.

EXAMPLES

Example 1—Description and Composition of Two Formulations of Disclosure

Description of the Dosage Form

The active ingredient, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was formulated as 75-mg and 100-mg film-coated tablets. The formulation was composed of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and the inactive components listed in Table 1.

Composition

TABLE 1

| | | Strength (label claim) | | | |
|---|---|---|---|---|---|
| | | 75 mg | | 100 mg | |
| Component and Quality Standard (and Grade) | Function | Quantity per mg | % | Quantity per mg | % |
| Active ingredient | Active | 75 | 12.5 | 100 | 12.5 |
| Silicified Microcrystalline cellulose (HD90) (NF, Ph. Eur.) | Filler | 426 | 71.0 | 568 | 71.0 |
| Colloidal silica (NF, Ph. Eur.) | Glidant | 4.5 | 0.75 | 6 | 0.75 |
| Mannitol (USP, Ph. Eur.) | Filler | 60 | 10.0 | 80 | 10.0 |
| Crospovidone (PolyP XL10) (NF, Ph. Eur.) | Disintegrant | 30 | 5.0 | 40 | 5.0 |
| Magnesium stearate (NF, Ph. Eur.) | Lubricant | 4.5 | 0.75 | 6 | 0.75 |
| Nominal Tablet Weight | | 600 | 100 | 800 | 100 |
| Opadry II 85F18422 (Company Specification) | Film coat | 18 | 3.0 | 24 | 3.0 |
| Purified water, USP solvent | Film coat | —[a] | — | —[a] | — |
| Total | — | 618 | — | 824 | — |

[a]Removed during processing

US 11,311,516 B2

17

Example 2—Description of One Manufacturing Process (and Process Controls)

The flow chart for the method of manufacture for the 75- and 100-mg oral tablets is presented in FIG. 1.

Description of the Manufacturing Process of FIG. 1.

1. Screen silicified microcrystalline cellulose, mannitol, crospovidone and colloidal silica through a 20 mesh screen and magnesium stearate through a 30 mesh screen.

2. Transfer the following into a 650-L tote bin: half of the silicified microcrystalline cellulose, all of the active ingredient, mannitol, colloidal silica, crospovidone, and the remaining half of silicified microcrystalline cellulose. Blend at 12 rpm for 10 minutes. Add the magnesium stearate, blend at 12 rpm for 5 minutes and sample.

3. Compress the tablets using a Stoke 34D tablet press or similar with a speed of 35-45 rpm. Collect samples throughout the compression run.

4. Prepare the coating suspension by dispersing the Opadry II 85F18422 in water and mixing. Apply the coating suspension with a spray gun at 300 g/min in a 48 inch Accela Cota coater with following parameters:

TABLE 2

Tablet Coating Parameters

| Coating Parameter | Setting |
|---|---|
| No. of Baffles | 4 |
| Number of Spray Guns | 4 |
| Spray Apparatus | Schlick (Module 9347-1535 with pattern and atomization adjustments) |
| Nozzle Diameter/Air Cap | 1.2 mm/Air Cap 4 mm |
| Delivery System | Peristaltic Pump |
| Gun to Bed Distance[a] | 9" (8-11") |
| Set Point Delivery Rate[a] | 300 ± 50 g/min/4 Guns |
| Pan Speed[a] | 4.5 (4-8) rpm |
| Atomizing Air[a] | 30 ± 5 psi |
| Pattern Air[a] | 25 ± 5 psi |
| Inlet Air Temperature[a] | 60 ± 10° C. |
| Air Volume (Inlet)[a] | 1500 ± 500 cfm |

Guideline only - adjust as required to achieve a suitable coating process

5. Cool the tablets and store in tared, labeled high density polyethylene (HDPE) containers lined with double polyethylene bags with twist ties.

6. Prepare final packaging in ACLAR blisters or HDPE bottles.

Example 3—Abuse Liability Assessment of Oral Formulation

An abuse liability assessment was undertaken in rhesus monkeys to determine the doses and systemic exposure levels following acute intravenous administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that would provide a discriminative stimulus in morphine-conditioned monkeys and positive reinforcing effects (self-administration) in heroin-conditioned monkeys. The drug discrimination studies revealed that morphine-trained monkeys discriminated between saline at an IV dose of ≥10 mg/kg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Self-administration studies revealed that in monkeys conditioned to self-administer heroin, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-

18

methoxy-benzoic acid (3.2 mg/kg/IV infusion) provided reinforcement for self-administration. However, 1 mg/kg did not produce a signal in either morphine- or heroin-conditioned primates.

Thus, at least in animals, oral administration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid does not produce CNS effects that are prototypic of abused drugs. However, parenteral administration does appear to produce these effects. Typically, when this pattern of effects is observed in animals, it is recommended to conduct a human laboratory abuse potential study using both the therapeutic route (i.e., oral), as well as the IV route, which would represent a "worst case scenario."

In addition the recommendation to conduct in vitro studies to determine the ease and feasibility of preparing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid for abuse through alternative routes of administration such as injection or snorting (e.g., in vitro extractability/tamperability studies). This is consistent with the draft "Guidance for Industry: Assessment of Abuse Potential of Drugs" (FDA, 2010). This example discloses the findings of such in vitro extractability/ tamperability studies.

Based on the FDA guidance, a series of in vitro laboratory assessment studies were designed to explore the abuse potential of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Specific areas that were identified for laboratory assessment were as follows:

Physical manipulations and pretreatment effects
Aqueous and organic solvent extractions
Syringeability assessments
Simulated smoking assessments

Laboratory experiments were targeted toward outcomes that could produce tampered product suitable for administration by alternate routes of administration including injection, intranasal administration and smoking. Experiment design began with a consideration of the physical and chemical properties of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and formulation excipients. The solubility profile of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid has been characterized as ranging from "slightly soluble" (1-10 mg/mL) in water to "sparingly soluble" 10-33 mg/mL in acidic pH2 buffered solutions to "freely soluble" (100-1000 mg/mL) in 0.1N NaOH solution. Consequently, a core group of laboratory assessments were directed toward experiments that characterized the "extractability" of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the formulation matrix. The formulation tested was the 75 mg and 100 mg tablets described in Example 1, Table 1.

The first phase of the study consisted of assessing the formulation for ease of physical manipulation (e.g., crushing, film coating removal, and pretreatments), extractability with selected aqueous and organic solvents, effects of filtration on assay results, simulated smoking experiments, and syringeability.

It was determined that first phase assessments of physical manipulations (cutting/crushing/grinding assessments, pretreatment by freezing and heating, and coating removal), and

US 11,311,516 B2

19                                                                                    20

simulated smoking experiments provided a clear and complete body of data on these topics and no further assessments were needed. The first phase assessments of extraction provided a basis for a second, formal phase study of extractions from this formulation.

All assessments of these tablet formulations were performed with the 100 mg 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid dosage tablet (total tablet weight=824 mg) with the exception of physical manipulation experiments and the Time Course study which were performed with the 75 mg strength tablet. The two dosage strengths are dose proportional in relation to excipients (common blend) and have the same coating.

To assure production of reliable, accurate data, the experimental design of laboratory protocols included the following elements: use of sufficient replicates to assess method variability; inclusion of controls for comparison where appropriate; investigation over a broad range of chemical and physical conditions; verification of analytical methods; and use of independent laboratories to whom validated methodologies had been transferred.

A. Physical Manipulations and Pretreatments

The ease of cutting and crushing of the tablets was assessed with a range of readily available household items including razor blades, spoons, pliers, tablet crushers, hammer, rolling pin, and mortar and pestle. The effect of tablet pretreatment by freezing at –20° C. or heating at 100° C. was also assessed. Coating removal was assessed by rubbing tablets with wet paper towels.

Result Summary and Discussion

Although the tablets were slightly difficult to "crack," crushing could readily be accomplished with a variety of common household tools. Freezing or oven heating of the tablets did not affect tablet "crushability." Coating removal could be accomplished easily with a wet paper towel.

B. Extractions

Solvent Extraction

Experiments designed to simulate preparation of the tablets for injection were conducted by extracting a single powdered or intact tablet at 25° C. with 10 mL of solvent for 15, 30 and 60 minutes with aqueous- and organic-based solvents (water, 0.1M HCl, ethanol, hexane, pH 2.0 buffer, pH 4.0 buffer, pH 7.0 buffer, pH 10.0 buffer, saline, 10% ethanol, acetone, and isopropyl alcohol). The water and ethanol extractions were repeated at 95° C.

Result Summary and Discussion

Percent recoveries of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid for solvent extractions at 25° C. were variable with solvent type. Aqueous-based solvents were more efficient than non-polar organic solvents (e.g., hexane). Acidic and basic solvents were more efficient than water or ethanol. Unusual high recoveries of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid were observed unexpectedly for isopropyl alcohol (80% at 60 minutes/25° C., ground tablet) and water (118% at 60 minutes/95° C.). It was noted that these experiments were conducted with unfiltered aliquots leading to the suspicion that un-dissolved particles of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid were being transferred and dissolved in the HPLC media during analysis, thereby falsely raising the true percent of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phe-

nyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid undergoing dissolution (extraction).

Effects of Filtration on 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic Acid Extractability

With the suspicion that unfiltered extractions might be a combination of true extracted (dissolved) 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid and suspensions of undissolved material, additional extractions were performed to determine the effect of filtration. Extracts were first filtered through 0.45 μm PTFE filters prior to HPLC analysis. Single whole and ground tablets were extracted at 25° C. with 10 mL solvent for 15, 30 and 60 minutes with water, acetone, isopropyl alcohol, ethanol, pH 2.0 buffer, pH 4.0 buffer, pH 7.0 buffer, pH 10.0 buffer.

Result Summary and Discussion

Addition of the filtration step reduced recoveries for all solvents. The greatest decreases were observed with the organic solvents. A comparison of the percentage of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid extracted for ground tablets at 60 minutes (25° C. with 10 mL solvent) is shown in Table 3, below. Clearly, undissolved particles led to falsely increased estimates of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid recovery and considerable scatter in individual determinations.

TABLE 3

| Comparison of the percentage of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid extracted from ground tablets | | |
|---|---|---|
| Solvent | % Recovery, Unfiltered | % Recovery, Filtered |
| Water | 63 | 38 |
| Acetone | 30 | 2 |
| Isopropyl Alcohol | 80 | 0 |
| Ethanol | 52 | 5 |
| pH 2 Buffer | 103 | 36 |
| pH 4 Buffer | 58 | 12 |
| pH 7 Buffer | 81 | 22 |
| pH 10 Buffer | 100 | 33 |

C. Syringeability

Experiments were conducted to determine the syringeability of tablet extracts. These assessments were performed on the remainder of solutions (following aliquot removal for determination of percentage of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid recovery) produced in the first phase extractions at 25° C. Solutions were aspirated into disposable syringes equipped with 25 gauge needles.

Result Summary and Discussion

All solutions were successfully loaded into disposable syringes equipped with a 25 gauge needle indicating that extracted solutions offered no resistance to syringeability.

D. Simulated Smoking Assessment

Simulated smoking of the active ingredient was assessed by heating ground or intact tablets in a test tube fitted with

US 11,311,516 B2

21

an apparatus that collected vaporized 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. As heat from a heating block was applied to the sealed test tube, air was drawn through the tube and over the surface of the heated product. The air exited through a collector cartridge (C18 Sep-Pak cartridge) situated over the heated product. Product was heated to 225° C. until the material was charred (usually approximately 5 minutes). Samples were heated for a total of 10 minutes. In addition, pure 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was treated in the same manner. The capacity for the apparatus to collect vaporized 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was verified with a series of tests involving passing a standard solution of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid through the cartridge, and testing for "breakthrough" with serially connected cartridges. Recoveries of standard amounts of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid reference material trapped by the collector were essentially quantitative. Heating ground and intact tablets with a torch to extremely high temperatures was also attempted followed by collection of vaporized material with a bubbler collector.

Result Summary and Discussion

Browning and charring was evident when tablets and ground product were heated to 225° C. in the heating block or to extreme heat with a torch. No detectable 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was vaporized from ground or intact tablets when heated by either method. Only extremely minor traces of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid were vaporized when pure 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid was heated under the same conditions. Mass balance analysis was attempted by analyzing the remaining 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in the heated test tubes. Generally, 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid recoveries from the heated test tube were low likely indicating that heating under these conditions produced thermal decomposition of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Consequently, it seems safe to conclude that smoking is not a viable route of administration for the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

E. Aqueous Solvent Extraction

Small volume extractions were conducted with various household solvents and buffers to simulate extraction procedures that might be used for preparation of solutions for injection. Extractions were performed on six replicates of ground and intact tablets at 25° C. and 95° C. with 10 mL of solvent for 10 minutes. The extractions were shaken on an

22

orbital shaker at 100 rpm, and then aliquots were removed and filtered with 0.45 μm PTFE filters for HPLC analysis. The solvents utilized in these assessments were water, saline, vinegar, 0.1M HCl, 10% ethanol, 40% ethanol, pH 2.0 buffer, pH 4.0 buffer, pH 7.0 buffer, and pH 10.0 buffer. Results were expressed in Table 4 below as % recovery (% label claim) and as concentration (mg/mL).

Result Summary and Discussion

TABLE 4

Summary of mean results (n = 6) is shown in the table below.

| Solvent | ° C. Temp | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|
| Water | 25 | 22.1 | 16.4 | 2.2 | 1.6 |
| | 95 | 39.9 | 38.7 | 4.0 | 3.9 |
| Saline | 25 | 13.7 | 17.0 | 1.4 | 1.7 |
| | 95 | 38.9 | 61.4 | 3.9 | 6.1 |
| Vinegar | 25 | 80.0 | 24.2 | 8.0 | 2.4 |
| | 95 | 77.7 | 77.9 | 7.8 | 7.8 |
| 0.1M HCl | 25 | 33.5 | 50.1 | 3.3 | 5.0 |
| | 95 | 65.4 | 59.6 | 6.5 | 6.0 |
| 10% Ethanol | 25 | 19.3 | 12.6 | 1.9 | 1.3 |
| | 95 | 80.9 | 70.8 | 8.1 | 7.1 |
| 40% Ethanol | 25 | 23.9 | 27.9 | 2.4 | 2.8 |
| | 95 | 91.6 | 64.6 | 9.2 | 6.5 |
| pH 2 Buffer | 25 | 56.1 | 32.7 | 5.6 | 3.3 |
| | 95 | 67.5 | 73.2 | 6.8 | 7.3 |
| pH 4 Buffer | 25 | 8.8 | 8.1 | 0.9 | 0.8 |
| | 95 | 27.8 | 24.2 | 2.8 | 2.4 |
| pH 7 Buffer | 25 | 10.8 | 14.7 | 1.1 | 1.5 |
| | 95 | 41.3 | 40.0 | 4.1 | 4.0 |
| pH 10 Buffer | 25 | 38.5 | 38.3 | 3.9 | 3.8 |
| | 95 | 83.9 | 65.4 | 8.4 | 6.5 |

Although there was considerable variability among replicates, generally, the average amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid release (% recovery) was comparable between ground and intact tablets. As expected, extraction at near boiling conditions (95° C.) increased drug release. The most efficient solvents for extraction (>50%) of ground tablets at 25° C. were vinegar and pH 2 buffer. At elevated temperature, the solvents that allowed >50% recovery for ground product were vinegar, 0.1M HCl, 10% ethanol, 40% ethanol, pH 2 buffer, and pH 10 buffer. Extract concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from ground and intact tablets across all conditions ranged from 0.8 mg/mL to 9.2 mg/mL.

F. Organic Solvent Extraction

This series of extractions was performed in a similar manner as the aqueous solvent extractions previously described. Ground and intact tablets were extracted in 10 mL of solvent for 10 minutes on an orbital shaker at 100 rpm. Aliquots were removed and filtered with 0.45 μm PTFE filters for HPLC analysis. The solvents utilized in these assessments were 95% ethanol, isopropyl alcohol, acetone and hexane.

Result Summary and Discussion

Organic solvent extraction of tablets was inefficient (<10%) across all conditions. The most efficient solvent utilized in this assessment was 95% ethanol that provided an average % recovery of 8.2% of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid (range, 6.0%40.3%).

US 11,311,516 B2

23

## G. Syringe Evaluation

Extracted solutions remaining from the aqueous extractions were assessed for syringeability. In this assessment, a 10 mL syringe fitted with a 25 gauge needle was utilized to withdraw as much of the remaining 7 mL volume of extracted solution as possible into the syringe. A cotton ball was used to filter the solution by inserting the needle in the cotton ball during aspiration of the solution. The volume of solution successfully aspirated into the syringe was estimated and an aliquot was tested to determine the milligram amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid loaded into the syringe.

## Result Summary and Discussion

Of the remaining 7 mL volume of solution remaining from extraction of a powdered tablet, the typical volume that could be loaded into a 10 mL syringe fitted with a 25 gauge needle (cotton ball filtration) was 4-5 mL of solution. Thus, the loss of available solution ranged from approximately 30% to 43% in this simulated assessment of preparing a solution for intravenous injection. The absolute amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid varied with the type of solvent. Overall, there was no evidence of resistance to syringeability in these assessments.

## H. Multiple Tablet Extraction

This initial series of extractions was designed to assess the extraction efficiency of selected aqueous-based solvents for preparation of tablets for injection. The extractions were performed with water and 0.1M HCl on ground tablets with equivalent weight of 2 and 4 tablets. The extraction was conducted with 10 mL of solvent for 10 minutes on an orbital shaker at 100 rpm at 95° C. Following extraction, aliquots were removed and filtered with 0.45 μm PTFE filters for HPLC analysis. The rationale for the design of this study was that individuals might attempt to extract a larger dose of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid through the use of heat, larger volumes and possibly use of acidic media. Although 10 mL volume is large for injection purposes, it is plausible that such a volume might be attempted, especially given the limited solubility of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Also, it should be noted that although injection of a highly acid solution (0.1M HCl) would likely result in discomfort and tissue injury, some individuals may attempt such procedures.

## Result Summary and Discussion

The mean extraction efficiencies and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in this extraction assessment are shown in Table 5.

TABLE 5

Mean extraction efficiencies of active ingredient in extraction assessment

| Solvent | Number of Tablet Equivalents | % Recovery | Concentration, mg/mL |
|---|---|---|---|
| Water | 2 | 41.2 | 8.2 |
| | 4 | 22.4 | 9.0 |

24

TABLE 5-continued

Mean extraction efficiencies of active ingredient in extraction assessment

| Solvent | Number of Tablet Equivalents | % Recovery | Concentration, mg/mL |
|---|---|---|---|
| 0.1M HCl | 2 | 76.8 | 15.4 |
| | 4 | 46.1 | 18.5 |

It would appear that both water and 0.1M HCl have nearly reached capacity for dissolution of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid under the two tablet equivalent extraction condition at 95° C. The effect of doubling the amount of potentially extractable 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid to four equivalents provided nearly equal concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in both water and acid solution. At the same time, % recovery for the 4 tablet condition was approximately one-half of the two tablet condition indicating each solvent had reached a capacity limiting condition.

## I. Large Volume Extraction

Given that the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid exhibits limited solubility in some solvents, extraction with a larger volume might be attempted by individuals attempting to isolate the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid for administration by non-intended routes. This extraction assessment was performed with ground and intact tablets. Extractions were conducted with 30 mL volume of solvents (water, 0.1M HCl, 10% ethanol, and 95% ethanol) at 25° C. for 10 minutes and 24 hours on an orbital shaker at 100 rpm, then filtered with a 0.45 μm PTFE filter for HPLC analysis.

## Result Summary and Discussion

The mean extraction efficiencies and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in this extraction assessment are shown in Table 6 below.

TABLE 6

Extraction efficiencies of active ingredient in extraction assessment

| Solvent | Extraction Time | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|
| Water | 10 min | 19.8 | 0.9 | 0.7 | 0.03 |
| | 24 hr | 22.1 | 18.4 | 0.8 | 0.7 |
| 0.1M HCl | 10 min | 67.6 | 2.9 | 2.3 | 0.1 |
| | 24 hr | 68.1 | 35.9 | 2.5 | 1.3 |
| 10% Ethanol | 10 min | 26.7 | 5.1 | 0.9 | 0.2 |
| | 24 hr | 28.8 | 47.7 | 1.1 | 1.8 |
| 95% Ethanol | 10 min | 27.0 | 0.06 | 0.9 | 0.0 |
| | 24 hr | 29.9 | 5.8 | 1.1 | 0.2 |

There was little difference in percent recovery of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the ground tablet following a 10 minute extraction period as compared to extending the

US 11,311,516 B2

25 26

extraction period to 24 hours. In contrast, extraction of intact tablets for 10 minutes was considerably less efficient than for 24 hours. It is likely that the increased surface area of the ground material was responsible for the rapidness of the 10 minute extraction outcome. All concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in the different solvent extracts were consistently <3 mg/mL.

J. Small Volume Extraction

Smaller volume extractions are commonly used by individuals attempting to prepare a solution for injection. Water and saline are commonly used solvents for injection and were included in this study. Although it seems unlikely that 0.1M HCl would be used as a solvent because of it toxic effects, it was included as a "worst-case scenario" in consideration of the solubility properties of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in the tablets. This extraction assessment was performed with ground and intact tablets. Extractions were conducted with 5 mL volume of solvents (water, saline, and 0.1M HCl) at 25° C. and 95° C. for 10 minutes and 24 hours on an orbital shaker at 100 rpm, then filtered with a 0.45 μm PTFE filter for HPLC analysis.

Result Summary and Discussion

The mean extraction efficiencies and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in this extraction assessment are shown in Table 7 below.

TABLE 7

Extraction efficiencies of active ingredient in extraction assessment

| Solvent | Temp., ° C. | Extraction Time | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|---|
| Water | 25 | 10 min | 16.2 | 16.4 | 3.2 | 3.3 |
| | 25 | 10 min | 34.7 | 32.4 | 6.9 | 6.5 |
| | 25 | 24 hr | 17.1 | 17.2 | 3.4 | 3.5 |
| | 95 | 24 hr | 28.3 | 25.9 | 5.7 | 5.2 |
| Saline | 25 | 10 min | 16.9 | 17.5 | 3.4 | 3.5 |
| | 25 | 10 min | 46.2 | 41.0 | 9.2 | 8.2 |
| | 25 | 24 hr | 17.6 | 17.7 | 3.5 | 3.6 |
| | 95 | 24 hr | 24.1 | 23.5 | 4.8 | 4.7 |
| 0.1M HCl | 25 | 10 min | 100.6 | 86.2 | 20.1 | 17.2 |
| | 25 | 10 min | 90.2 | 102.3 | 18.1 | 20.5 |
| | 25 | 24 hr | 91.8 | 95.1 | 18.4 | 19.0 |
| | 95 | 24 hr | 79.1 | 83.9 | 15.8 | 16.8 |

Increasing the extraction temperature from 25° C. to 95° C. enhanced recovery and solubility of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in water and saline; however extending extraction time did not appear to extract additional drug. Concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in water and saline was consistently <10 mg/mL. The use of 0.1M HCl substantially enhanced recovery (nearly quantitative) and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in solution although extraction for 24 hr at 95° C. appeared to produce loss of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid (decomposition). Concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in the acid extracts were in the range of 16-21 mg/mL.

K. Filter Evaluation

With the discovery that suspensions of material containing 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid were falsely elevating measures of drug release and recovery, an assessment was performed to determine how different types of filtration systems might affect drug release measurements. Extractions were performed on ground and intact tablets. Extractions were conducted with 5 mL volume of solvent (water, 0.1M HCl, 10% ethanol and 95% ethanol) at 25° C. for 10 minutes on an orbital shaker at 100 rpm. Following extraction, extracts were filtered as follows: unfiltered (control); 0.45 μm PTFE filter; cotton ball filter; cigarette filter; and coffee paper filter.

Result Summary and Discussion

The mean extraction efficiencies and concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid in this extraction assessment are shown in Table 8 below.

TABLE 8

Extraction efficiencies of active ingredient in extraction assessment

| Solvent | Filter Type | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|
| Water | Unfiltered | 49.1 | 61.9 | 9.8 | 12.4 |
| | 0.45 μm PTFE filter | 16.5 | 16.9 | 3.3 | 3.4 |
| | Cotton Ball | 18.2 | 16.8 | 3.6 | 3.4 |
| | Cigarette Filter | 18.5 | 16.9 | 3.7 | 3.4 |
| | Coffee Filter | 16.8 | 17.1 | 3.4 | 3.4 |
| 0.1M HCl | Unfiltered | 74.3 | 83.2 | 14.9 | 16.6 |
| | 0.45 μm PTFE filter | 76.7 | 87.4 | 15.3 | 17.5 |
| | Cotton Ball | 56.6 | 86.3 | 11.3 | 17.3 |
| | Cigarette Filter | 37.6 | 82.8 | 7.5 | 16.6 |
| | Coffee Filter | 63.2 | 85.3 | 12.6 | 17.1 |
| 10% Ethanol | Unfiltered | 90.7 | 76.4 | 18.1 | 15.3 |
| | 0.45 μm PTFE filter | 22.4 | 23.5 | 4.5 | 4.7 |

US 11,311,516 B2

27

**TABLE 8-continued**

Extraction efficiencies of active ingredient in extraction assessment

| Solvent | Filter Type | % Recovery, Ground | % Recovery, Intact | Conc. (mg/mL), Ground | Conc. (mg/mL), Intact |
|---|---|---|---|---|---|
| | Cotton Ball | 24.0 | 23.7 | 4.8 | 4.8 |
| | Cigarette Filter | 24.9 | 24.4 | 5.0 | 4.9 |
| | | 22.6 | 22.9 | 4.6 | 4.6 |
| 95% Ethanol | Unfiltered | 62.0 | 0.1 | 12.4 | 0.03 |
| | 0.45 μm PTFE filter | 7.3 | 0.1 | 1.5 | 0.02 |
| | Cotton Ball | 26.7 | 0.04 | 5.3 | 0.01 |
| | Cigarette Filter | 16.0 | 0.02 | 3.2 | 0.0 |
| | Coffee Filter | 10.4 | 0.03 | 2.1 | 0.01 |

Filtration had a substantial effect on apparent drug release in extractions with solvents that exhibit limited solubility (i.e., water, 10% ethanol, 95% ethanol) for the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. Without filtration, the evidence appears persuasive that particle suspension was the cause of these differences. When suspensions were prepared for assay by HPLC, the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid became soluble in the HPLC mobile phase and this accounted for the elevated "readings" (measurements). In contrast, extraction with 0.1M HCl showed little difference in drug release and recovery with or without filtration. Since the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid exhibits considerably greater solubility in 0.1M HCl, there were not suspended particles that would have been filtered out. It should be noted that this somewhat unusual behavior (forming particle suspensions in solvents with limited solubility for the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid) adds a source of considerable variability that would be highly dependent upon conditions employed during extraction. This unique property of the formulation is not expected to be easily discoverable by individuals that might attempt extraction with common household solvents.

28

The sustained amount of time that an extraction solvent is in contact with a formulation can substantially influence how much active is released (and dissolved in the extraction solvent). This is particularly true for actives that exhibit limited solubility in the chosen solvent. Review of data generated in the study involving extraction with 30 mL of solvent for 10 minutes and 24 hours generally indicated greater variability (% RSD) for the shorter extraction time compared to the 24 hour extraction. To assess the influence to extraction time, a detailed time course study was conducted to determine the impact of extraction time on data variability and on percent recovery of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the tablets.

Extractions were performed on single ground and intact tablets (75 mg strength). Extractions were conducted with 22.5 mL volume of solvent (water, 0.1M HCl, vinegar, and pH 7 buffer) at 25° C. and 95° C. on an orbital shaker at 100 rpm. A 2 mL aliquot was withdrawn at each time point. The time points were as follows: 10, 20, 30, 45 and 60 minutes, 4, 12, and 24 hours. Extracts were filtered with a 0.45 μm PTFE filter for HPLC analyses.

Result Summary and Discussion

The mean extraction efficiencies of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid over time and % RSD (n=6 replicates) in this extraction assessment are shown in the Table 9, below.

**TABLE 9**

Extraction efficiencies of active ingredient over time

| Time Vessel | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Water Ground-25° C. | | | | | | | | |
| Mean | 27.21 | 30.10 | 31.45 | 33.55 | 35.51 | 44.16 | 53.07 | 59.37 |
| RSD | 28.6 | 21.7 | 19.0 | 21.7 | 16.3 | 15.7 | 13.5 | 11.0 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Water Whole-25° C. | | | | | | | | |
| Mean | 2.04 | 12.59 | 18.75 | 20.86 | 25.40 | 36.81 | 51.21 | 55.07 |
| RSD | 43.8 | 63.7 | 32.8 | 38.2 | 24.6 | 11.8 | 4.6 | 4.0 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Water Ground 95° C. | | | | | | | | |
| Mean | 56.90 | 64.63 | 70.42 | 75.04 | 81.27 | 91.07 | 94.43 | 94.42 |
| RSD | 45.1 | 33.9 | 26.6 | 20.6 | 14.4 | 4.4 | 3.6 | 3.0 |
| Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Water Whole-95° C. | | | | | | | | |

US 11,311,516 B2

29    30

TABLE 9-continued

Extraction efficiencies of active ingredient over time

| Time Vessel | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 80.78 | 83.66 | 84.16 | 87.39 | 89.43 | 93.21 | 93.11 | 93.32 |
| RSD | 6.5 | 5.8 | 5.1 | 5.1 | 4.8 | 3.3 | 3.9 | 3.0 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) 0.1M HCl Ground-25° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 87.33 | 89.02 | 91.07 | 93.50 | 92.99 | 97.84 | 101.50 | 101.39 |
| RSD | 30.5 | 30.2 | 24.7 | 17.2 | 18.3 | 7.3 | 1.9 | 2.0 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) 0.1M HCl Whole-25° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 2.69 | 14.32 | 31.30 | 35.88 | 59.16 | 77.52 | 101.48 | 102.69 |
| RSD | 51.7 | 72.2 | 44.5 | 21.8 | 19.5 | 9.4 | 1.9 | 2.8 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) 0.1M HCl Ground-95° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 99.59 | 95.96 | 97.03 | 96.96 | 97.30 | 94.15 | 86.08 | 77.39 |
| RSD | 1.9 | 2.1 | 2.0 | 2.2 | 2.3 | 2.3 | 2.4 | 2.5 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) 0.1M HCl Whole-95° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 48.15 | 71.95 | 81.70 | 89.30 | 93.49 | 100.44 | 93.17 | 82.24 |
| RSD | 17.7 | 8.3 | 5.1 | 4.6 | 2.9 | 3.1 | 1.8 | 2.6 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Vinegar Ground-25° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 88.42 | 88.76 | 90.61 | 91.82 | 93.93 | 98.38 | 100.89 | 101.12 |
| RSD | 3.6 | 4.2 | 3.3 | 4.3 | 5.3 | 2.5 | 1.8 | 1.4 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Vinegar Whole-25° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 17.12 | 18.23 | 20.04 | 35.03 | 42.72 | 58.04 | 101.52 | 105.46 |
| RSD | 207.3 | 171.5 | 158.6 | 97.4 | 67.5 | 36.9 | 5.3 | 2.7 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Vinegar Ground-95° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 94.28 | 98.54 | 100.73 | 101.69 | 103.65 | 105.12 | 104.81 | 102.88 |
| RSD | 11.0 | 8.6 | 7.3 | 5.4 | 4.6 | 4.0 | 4.5 | 4.4 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) Vinegar Whole-95° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 40.62 | 55.03 | 83.87 | 91.96 | 97.91 | 111.12 | 111.29 | 109.85 |
| RSD | 4.1 | 8.9 | 23.7 | 16.5 | 10.8 | 4.7 | 4.5 | 5.6 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) pH 7 Ground-25° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 39.81 | 44.07 | 47.83 | 50.48 | 52.76 | 59.47 | 68.50 | 76.49 |
| RSD | 7.5 | 10.7 | 16.1 | 15.7 | 15.1 | 14.4 | 8.8 | 7.9 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) pH 7 Whole-25° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 3.50 | 6.21 | 9.15 | 10.25 | 13.68 | 22.74 | 42.44 | 54.14 |
| RSD | 32.5 | 67.3 | 65.5 | 41.9 | 15.7 | 18.7 | 16.3 | 10.0 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) pH 7 Ground-95° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 58.27 | 77.50 | 82.71 | 87.58 | 90.99 | 98.74 | 98.87 | 96.37 |
| RSD | 23.3 | 13.8 | 9.6 | 5.7 | 4.3 | 5.4 | 4.9 | 5.0 |

Amount of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid released label claim (%) pH 7 Whole-95° C.

| | 10 minutes | 20 minutes | 30 minutes | 45 minutes | 1 Hour | 4 Hours | 12 Hours | 24 Hours |
|---|---|---|---|---|---|---|---|---|
| Mean | 51.73 | 67.29 | 74.12 | 77.83 | 81.70 | 97.02 | 100.80 | 97.68 |
| RSD | 17.1 | 4.3 | 7.4 | 2.4 | 2.8 | 4.0 | 3.4 | 3.5 |

US 11,311,516 B2

31

An analysis of the mean % RSD from these data across the four solvents is shown in the Table 10 below.

TABLE 10

| | Mean % RSD across the four solvents | | | |
|---|---|---|---|---|
| Time, hr | Mean % RSD 25° C. Ground | Mean % RSD 25° C. Ground | Mean % RSD 95° C. Ground | Mean % RSD 95° C. Whole |
| 0.17 | 17.6 | 83.8 | 20.3 | 11.4 |
| 0.33 | 16.7 | 93.7 | 14.6 | 6.8 |
| 0.5 | 15.8 | 75.4 | 11.4 | 10.3 |
| 0.75 | 14.7 | 49.8 | 8.5 | 7.2 |
| 1 | 13.8 | 31.8 | 6.4 | 5.3 |
| 4 | 10.0 | 19.2 | 4.0 | 3.8 |
| 12 | 6.5 | 7.0 | 3.9 | 3.4 |
| 24 | 5.6 | 4.9 | 3.7 | 3.7 |

In general, there was greater variability in extraction of the 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from the tablets with shorter times and at the lower extraction temperature (25° C.) compared to 95° C. Also, there was less variability in extraction of the ground tablet at 25° C. compared to the whole tablet.

Representative time course plots of cumulative percent recovery of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid under different extraction conditions are shown in FIG. 2. The abbreviations used in the plots are as follows:

Gr=ground tablet; Wh=whole, intact tablet.

General observations from these time course data include the following:

With short extraction times (e.g., 10 minutes), ground tablets are more efficiently extracted than whole tablets

With extended extraction times (e.g., 24 hours), there is little difference in extractability of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from ground versus whole tablets

Extraction under heated conditions (e.g., 95° C.) substantially increases % recovery at shorter extraction times

Acidic solvents are more efficient in extracting 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propio-

32

nyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid than water or pH neutral solvents

L. Investigations of Multiple Tablet Extractions

In addition to extractions of multiple tablets, additional experiments were conducted to determine the optimal conditions for preparation of multiple tablets for injection. Initially, attempts were made to identify the correct combination(s) of solvent and ground tablets that would yield the most concentrated recoverable solution of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid from tablets. Based on these initial assessments, a study was designed in which extractions were conducted with powdered tablets at 25° C. and 95° C. with the equivalent of four tablets. The extractions were conducted for 10 minutes, one hour, and 12 hours with 10 mL of water, vinegar, 0.1M HCl, and saline. The extraction vials were shaken on an orbital shaker at 200 rpm. Following extraction, extracts were filtered with a 0.45 μm PTFE filter for HPLC analyses.

Result Summary and Discussion

The mean extraction efficiencies and concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid over time in this extraction assessment are shown in Table 11 below. Data for the four solvents are listed in order from lowest (water) to highest polarity and acidity (0.1M HCl).

TABLE 11

| | Extraction efficiencies and concentrations of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid over time | | | |
|---|---|---|---|---|
| Solvent | Extraction Time | % Recovery, 25° C. | Conc. (mg/mL), 25° C. | % Recovery, 95° C. | Conc. (mg/mL), 95° C. |
| Water | 10 min | 8.1 | 3.3 | 24.2 | 9.7 |
| | 1 hr | 9.5 | 3.8 | 23.6 | 9.4 |
| | 12 hr | 8.9 | 3.6 | 25.1 | 10.0 |
| Saline | 10 min | 8.9 | 3.5 | 18.5 | 7.4 |
| | 1 hr | 9.8 | 3.9 | 22.3 | 8.9 |
| | 12 hr | 9.8 | 3.9 | 24.1 | 9.6 |
| Vinegar | 10 min | 5.6 | 2.2 | 16.0 | 6.4 |
| | 1 hr | 27.7 | 11.1 | 48.0 | 19.2 |
| | 12 hr | 78.8 | 31.5 | 79.5 | 31.8 |
| 0.1M HCl | 10 min | 18.0 | 7.2 | 34.3 | 13.7 |
| | 1 hr | 39.7 | 15.9 | 70.2 | 28.1 |
| | 12 hr | 88.3 | 35.3 | 90.6 | 36.3 |

These data suggest that the maximal concentration of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that can be extracted with water and saline is approximately 4 mg/mL at room temperature (e.g., 25° C.) and approximately 10 mg/mL under near boiling conditions (e.g., 95° C.). Further, there appeared to be little difference in maximal concentrations with water and saline regardless of extraction time. Use of an acidic solvent such as vinegar and the highly acidic solvent, 0.1M HCl led to the production of more concentrated extracts of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid with maximal values of approximately 36 mg/mL being achieved with a 12 hour extraction period. There was both time and temperature dependence on concentration with these two

US 11,311,516 B2

**33**

solvents. With vinegar, maximal concentrations over the 10 minute and one hour extraction period were approximately 2-11 mg/mL at 25° C. and 6-19 mg/mL, respectively. With 0.1M HCl, maximal concentrations over the 10 minute and one hour extraction period were approximately 7-16 mg/mL at 25° C. and 14-28 mg/mL, respectively. Given these maximal concentrations, an estimate of the required volume of extracted 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that would deliver 350 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid by injection is shown in Table 12 below.

TABLE 12

Estimate of the required volume of extracted 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid that would deliver 350 mg of active ingredient by injection.

| Solvent | Extraction Time | Conc. (mg/mL), 25° C. | Injection Volume (mL) Required for 350 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid at 25° C. | Conc. (mg/mL), 95° C. | Injection Volume (mL) Required for 350 mg of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid at 95° C. |
|---|---|---|---|---|---|
| Water | 10 min | 3.3 | 106.1 | 9.7 | 36.1 |
|  | 1 hr | 3.8 | 92.1 | 9.4 | 37.2 |
|  | 12 hr | 3.6 | 97.2 | 10 | 35.0 |
| Saline | 10 min | 3.5 | 100.0 | 7.4 | 47.3 |
|  | 1 hr | 3.9 | 89.7 | 8.9 | 39.3 |
|  | 12 hr | 3.9 | 89.7 | 9.6 | 36.5 |
| Vinegar | 10 min | 2.2 | 159.1 | 6.4 | 54.7 |
|  | 1 hr | 11.1 | 31.5 | 19.2 | 18.2 |
|  | 12 hr | 31.5 | 11.1 | 31.8 | 11.0 |
| 0.1M HCl | 10 min | 7.2 | 48.6 | 13.7 | 25.5 |
|  | 1 hr | 15.9 | 22.0 | 28.1 | 12.5 |
|  | 12 hr | 35.3 | 9.9 | 36.3 | 9.6 |

Typical opioid injection volumes are generally in the 1-3 mL range but plausibly could be as high as 10 mL. Assuming that a 350 mg injected dose of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid would be required to produce a euphoric effect, it does not appear feasible that tablets could be prepared for injection with sufficient content of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid when using typical injection solvents (water, saline). Although a sufficiently concentrated solution of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid by extraction does appear to be possible through the use of vinegar and 0.1M HCl, it is unlikely that many individuals would be willing to accept the potential toxic risks that these solvents present.

The foregoing examples of the present disclosure have been presented for purposes of illustration and description. Furthermore, these examples are not intended to limit the disclosure to the form disclosed herein. Consequently, variations and modifications commensurate with the teachings of the description of the disclosure, and the skill or knowledge

**34**

of the relevant art, are within the scope of the present disclosure. The specific embodiments described in the examples provided herein are intended to further explain the best mode known for practicing the disclosure and to enable others skilled in the art to utilize the disclosure in such, or other, embodiments and with various modifications required by the particular applications or uses of the present disclosure. It is intended that the appended claims be construed to include alternative embodiments to the extent permitted by the prior art.

What is claimed is:

1. A pharmaceutical tablet comprising:
   about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid,
   about 60-80% by weight filler;
   about 2-8% by weight disintegrant; and
   about 10% by weight mannitol.

2. The tablet of claim 1, comprising about 65-75% by weight filler.

3. The tablet of claim 1, further comprising a glidant.

4. The tablet of claim 3, wherein the glidant is colloidal silica.

5. The tablet of claim 4, wherein the colloidal silica is present in an amount of about 0.55-0.95% by weight.

6. The tablet of claim 2, further comprising a lubricant, wherein the lubricant is magnesium stearate.

7. The tablet of claim 6, wherein the magnesium stearate is present in an amount of about 0.45-1.0% by weight.

8. The tablet of claim 3, further comprising a lubricant, wherein the lubricant is magnesium stearate.

9. The tablet of claim 8, wherein the magnesium stearate is present in an amount of about 0.45-1.0% by weight.

10. The tablet of claim 1, wherein the disintegrant is crospovidone.

US 11,311,516 B2

35

**11.** A pharmaceutical tablet comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg 450 mg filler;

about 12 mg 48 mg disintegrant;

about 60 mg of mannitol;

colloidal silica; and

magnesium stearate.

**12.** The tablet of claim **11**, wherein the filler is silicified microcrystalline cellulose, and the disintegrant is crospovidone.

**13.** A pharmaceutical tablet comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid,

about 60-80% by weight filler;

about 2-8% by weight disintegrant; and

about 10% by weight mannitol.

**14.** The tablet of claim **13**, comprising about 65-75% by weight filler.

**15.** The tablet of claim **14**, further comprising a glidant.

**16.** The tablet of claim **15**, wherein the glidant is colloidal silica.

**17.** The tablet of claim **16**, wherein the colloidal silica is present in an amount of about 0.55-0.95% by weight.

**18.** The tablet of claim **14**, further comprising a lubricant, wherein the lubricant is magnesium stearate.

**19.** The tablet of claim **18**, wherein the magnesium stearate is present in an amount of about 0.45-1.0% by weight.

**20.** The tablet of claim **15**, further comprising a lubricant, wherein the lubricant is magnesium stearate.

**21.** The tablet of claim **20**, wherein the magnesium stearate is present in an amount of about 0.45-1.0% by weight.

**22.** The tablet of claim **13**, wherein the disintegrant is crospovidone.

**23.** A pharmaceutical tablet comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of filler;

about 16 mg-64 mg of disintegrant;

about 80 mg of mannitol;

colloidal silica; and

magnesium stearate.

**24.** The tablet of claim **23**, wherein the filler is silicified microcrystalline cellulose, and the disintegrant is crospovidone.

**25.** The pharmaceutical tablet of claim **11**, comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg-450 mg filler;

about 42 mg disintegrant;

about 60 mg mannitol;

about 12 mg colloidal silica;

about 6 mg magnesium stearate; and

about 18 mg of a film coating,

wherein the nominal weight of the tablet without the film coating is about 600 mg and the total weight of the tablet is about 618 mg.

36

**26.** The pharmaceutical tablet of claim **1**, comprising:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 390 mg-450 mg silicified microcrystalline cellulose;

about 30 mg crospovidone;

about 60 mg mannitol;

about 4.5 mg magnesium stearate; and

about 18 mg of a film coating,

wherein the nominal weight of the tablet without the film coating is about 600 mg and the total weight of the tablet is about 618 mg.

**27.** The pharmaceutical tablet of claim **26**, consisting of:

about 75 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 426 mg silicified microcrystalline cellulose;

about 30 mg crospovidone;

about 60 mg mannitol;

about 4.5 mg magnesium stearate; and

about 18 mg of a film coating,

wherein the nominal weight of the tablet without the film coating is about 600 mg and the total weight of the tablet is about 618 mg.

**28.** The pharmaceutical tablet of claim **23**, comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of filler;

about 56 mg of disintegrant;

about 80 mg of mannitol;

about 16 mg of colloidal silica;

about 8 mg of magnesium stearate; and

about 24 mg of a film coating,

wherein the nominal weight of the tablet without the film coating is about 800 mg and the total weight of the tablet is about 824 mg.

**29.** The pharmaceutical tablet of claim **13**, comprising:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 520 mg-600 mg of silicified microcrystalline cellulose;

about 40 mg of crospovidone;

about 80 mg of mannitol;

about 6 mg of magnesium stearate; and

about 24 mg of a film coating,

wherein the nominal weight of the tablet without the film coating is about 800 mg and the total weight of the tablet is about 824 mg.

**30.** The pharmaceutical tablet of claim **29**, consisting of:

about 100 mg of 5-({[(2S)-2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[(1S)-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid;

about 568 mg of silicified microcrystalline cellulose;

about 40 mg of crospovidone;

about 80 mg of mannitol;

about 6 mg of magnesium stearate; and

about 24 mg of a film coating,

US 11,311,516 B2

37

38

wherein the nominal weight of the tablet without the film coating is about 800 mg and the total weight of the tablet is about 824 mg.

* * * * *



PTO-1683
(Rev. 7-96)



U 2052394

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

January 13, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *7,741,356*
ISSUE DATE: *June 22, 2010*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

Plaintiff's Exhibit
**PTX-007**
1:19-cv-01727-RGA



US007741356B2

(12) **United States Patent**
Breslin et al.

(10) Patent No.: **US 7,741,356 B2**
(45) Date of Patent: **Jun. 22, 2010**

(54) **COMPOUNDS AS OPIOID RECEPTOR MODULATORS**

(75) Inventors: **Henry J. Breslin**, Lansdale, PA (US); **Chaozhong Cai**, N. Wales, PA (US); **Wei He**, Audubon, PA (US); **Robert W. Kavash**, Glenside, PA (US)

(73) Assignee: **Janssen Pharmaceutica N.V.**, Beerse (BE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1009 days.

(21) Appl. No.: **11/079,647**

(22) Filed: **Mar. 14, 2005**

(65) **Prior Publication Data**
US 2005/0203143 A1      Sep. 15, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/553,342, filed on Mar. 15, 2004.

(51) **Int. Cl.**
*A61K 31/4174* (2006.01)
*A61K 31/4178* (2006.01)
*C07D 233/64* (2006.01)

(52) **U.S. Cl.** ..................... **514/396**; 514/397; 548/335.5

(58) **Field of Classification Search** ................. 514/396, 514/397; 548/335.5
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,013,658 A * 1/2000 Lau et al. .................... 514/364

FOREIGN PATENT DOCUMENTS

| EP | 1 055 665 A | 11/2000 |
| WO | WO 96/22997 A1 | 8/1996 |
| WO | WO 02/36116 A2 | 5/2002 |
| WO | WO 03/033486 A | 4/2003 |

| WO | WO 03/092688 A2 | 11/2003 |

OTHER PUBLICATIONS

Dufour E, et al; "Synthesis of amidrazones using an engineered papain nitrile hydratase", Elsevier Science Publishers, Amsterdam, NL, vol. 433, No. 1-2, Aug. 14, 1998, pp. 78-82.
Hipskind P, et al "3-Aryl-1,2-diacetamidopropane Derivatives as Novel and Potent NK-1 Receptor Antagonists", Belstein Institute For Organic Chemistry, Frankfurt-Main, DE; XP002330617, Database accession No. BRN: 7491912 abstract, J. Med. Chem., vol. 39, No. 3, 1996, pp. 736-748.
Tam J, et al, "Design and Synthesis of a Multi-Detachable Benzhydrylamine-Resin for Solid Phase Peptide Synthesis", Frankfurt-Main. DE: XP002330618, Database accession No. BRN: 5166497 abstract, Tetrahedron Lett., , vol. 22, No. 30, 1981, pp. 2851-2854.
Santi, D, "Tyrosyl Transfer Ribonucleic Acid Synthetase from *Escherichia coli* B. Analysis of Tyrosine and Adenosine 5-Triphospate Binding Sites", Belstein Institute For Organic Chemistry, Frankfurt-Main, DE; XP002330619, Database accession No. BRN: 7278453 abstract, J. Med. Chem., vol. 16, No. 3, 1973, pp. 273-280.
Search report for International Appl. No. PCT/US2005/008339.

* cited by examiner

*Primary Examiner*—Rei-Tsang Shiao
*Assistant Examiner*—Joseph R Kosack

(57) **ABSTRACT**

The present invention is directed to novel opioid receptor modulators of Formula (I).

Formula (I)

The invention further relates to methods for preparing such compounds, pharmaceutical compositions containing them, and their use in the treatment of disorders that may be ameliorated or treated by the modulation of opioid receptors.

**43 Claims, 3 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

## <u>Figure 1</u>

Recording



distension pressures: 40   40 60 80 40 60 80 40 60 80
(mmHg)      intracolonic          EMG recordings
            balloon positioned    (distension time = 20 sec)

Zymosan treatment



1.5 ml zymosan A        record    treat with    record
(25 mg/ml in 30% EtOH)            compound
intracolonic administration

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000003

**U.S. Patent**     Jun. 22, 2010     Sheet 2 of 3     US 7,741,356 B2

Figure 2.



Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000004

**U.S. Patent**     Jun. 22, 2010     Sheet 3 of 3     US 7,741,356 B2

Figure 3.



** = $P < 0.01$ vs. Control 2
*** = $P < 0.001$ vs. Zymosan

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000005

US 7,741,356 B2

**1**

## COMPOUNDS AS OPIOID RECEPTOR MODULATORS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This Application claims priority to U.S. Provisional Patent Application No. 60/553,342, filed Mar. 15, 2004, which is hereby incorporated by reference in its entirety.

### STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

The research and development of the invention described below was not federally sponsored.

### FIELD OF THE INVENTION

The present invention is directed to novel opioid receptor modulators of Formula (I). The invention further relates to methods for preparing such compounds, pharmaceutical compositions containing them, and their use in the treatment of opioid modulated disorders.

### BACKGROUND OF THE INVENTION

The opioid receptors were identified in the mid-1970's, and were quickly categorized into three sub-sets of receptors (mu, delta and kappa). More recently the original three types of receptors have been further divided into sub-types. Also known is that the family of opioid receptors are members of the G-protein coupled receptor (GPCR) super-family. More physiologically pertinent are the well established facts that opioid receptors are found throughout the central and peripheral nervous system of many mammalian species, including humans, and that modulation of the respective receptors can elicit numerous, albeit different, biological effects, both desirable and undesirable (D. S. Fries, "Analgesics", in *Principles of Medicinal Chemistry*, 4th ed.; W. O. Foye, T. L. Lemke, and D. A. Williams, Eds.; Williams and Wilkins: Baltimore, Md., 1995; pp. 247-269; J. V. Aldrich, "Analgesics", *Burger's Medicinal Chemistry and Drug Discovery, 5th* Edition, Volume 3: Therapeutic Agents, John Wiley & Sons, Inc., 1996, pp. 321-441). In the most current literature, the likelihood of heterodimerization of the sub-classes of opioid receptors has been reported, with respective physiological responses yet undetermined (Pierre J. M. Riviere and Jean-Louis Junien, "Opioid receptors: Targets for new gastrointestinal drug development", Drug Development 2000, pp. 203-238).

A couple biological effects identified for opioid modulators have led to many useful medicinal agents. Most significant are the many centrally acting mu opioid agonist modulators marketed as analgesic agents to attenuate pain (e.g., morphine), as well as peripherally acting mu agonists to regulate motility (e.g., loperamide). Currently, clinical studies are continuing to evaluate medicinal utility of selective delta, mu, and kappa modulators, as well as compounds possessing combined sub-type modulation. It is envisioned such explorations may lead to agents with new utilities, or agents with minimized adverse side effects relative to currently available agents (examples of side effects for morphine includes constipation, respiratory depression, and addiction potential). Some new GI areas where selective or mixed opioid modulators are currently being evaluated includes potential treatment for various diarrheic syndromes, motility disorders (post-operative ileus, constipation), and visceral

**2**

pain (post operative pain, irritable bowel syndrome, and inflammatory bowel disorders) (Pierre J. M. Riviere and Jean-Louis Junien, "Opioid receptors: Targets for new gastrointestinal drug development" Drug Development, 2000, pp. 203-238).

Around the same time the opioid receptors were identified, the enkephalins were identified as a set of endogenous opioid ligands (D. S. Fries, "Analgesics", in *Principles of Medicinal Chemistry*, 4th ed.; W. O. Foye; T. L. Lemke, and D. A. Williams, Eds.; Williams and Wilkins: Baltimore, Md., 1995; pp. 247-269). Schiller discovered that truncating the original pentapeptide enkephalins to simplified dipeptides yielded a series of compounds that maintained opioid activity (Schiller, P. WO 96/06855). However one potential drawback cited for such compounds is the likelihood of their inherent instability (P. W. Schiller et al., Int. J. Pept. Protein Res. 1993, 41 (3), pp. 313-316).

More recently, a series of opioid pseudopeptides containing heteroaromatic or heteroaliphatic nuclei were disclosed, however this series is reported showing a different functional profile than that described in the Schiller works. (L. H. Lazarus et al., *Peptides* 2000, 21, pp. 1663-1671).

Most recently, works around morphine related structures were reported by Wentland, et al, where carboxamido morphine derivatives and it's analogs were prepared (M. P. Wentland et al., *Biorg. Med. Chem. Letters* 2001, 11, pp. 1717-1721; M. P. Wentland et al., *Biorg. Med. Chem. Letters* 2001, 11, pp. 623-626). Wentland found that substitution for the phenol moiety of the morphine related structures with a primary carboxamide led anywhere from equal activities up to 40 fold reduced activities, depending on the opioid receptor and the carboxamide. It was also revealed that any additional N-substitutions on the carboxamide significantly diminished the desired binding activity.

Compounds of the present invention have not been previously disclosed and are believed to provide advantages over related compounds by providing improved pharmacological profiles.

Opioid receptor modulators, agonists or antagonists are useful in the treatment and prevention of various mammalian disease states, for example pain and gastrointestinal disorders such as diarrheic syndromes, motility disorders including post-operative ileus and constipation, and visceral pain including post-operative pain, irritable bowel syndrome and inflammatory bowel disorders.

It is an object of the present invention to provide opioid receptor modulators. It is a further object of the invention to provide opioid receptor agonists and opioid receptor antagonists. It is an object of the present invention to provide opioid receptor ligands that are selective for each type of opioid receptor, mu, delta and kappa. It is a further object of the present invention to provide opioid receptor ligands that modulate two or three opioid receptor types, mu, delta and kappa, simultaneously. It is an object of the invention to provide certain instant compounds that are also useful as intermediates in preparing new opioid receptor modulators. It is also an object of the invention to provide a method of treating or ameliorating a condition mediated by an opioid receptor. And, it is an object of the invention to provide a useful pharmaceutical composition comprising a compound of the present invention useful as an opioid receptor modulator.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000006

US 7,741,356 B2

**3**

## SUMMARY OF THE INVENTION

The present invention is directed to compounds of Formula (I)

Formula (I)



wherein:

R$^1$ is selected from the group consisting of hydrogen, C$_{1-8}$alkyl, cycloalkyl, heterocyclyl, aryl(C$_{1-8}$)alkyl, and heteroaryl(C$_{1-8}$)alkyl; wherein aryl of aryl(C$_{1-8}$)alkyl is optionally fused to a heterocyclyl or cycloalkyl;

and wherein the cycloalkyl and heterocyclyl of R$^1$ are optionally substituted with C$_{1-8}$alkyl, hydroxy(C$_{1-8}$) alkyl, C$_{1-8}$alkoxy, hydroxy, cyano, amino, C$_{1-6}$alkylamino, (C$_{1-6}$alkyl)$_2$amino, halogen, carboxy, aryl(C$_{1-6}$) alkoxycarbonyl, C$_{1-6}$alkoxycarbonyl, aminocarbonyl, C$_{1-8}$alkylaminocarbonyl, (C$_{1-6}$alkyl)$_2$aminocarbonyl, or aminosulfonyl;

and, wherein C$_{1-8}$alkyl of R$^1$ is optionally substituted with one to three substituents independently selected from the group consisting of C$_{1-8}$alkoxy, aryl, cycloalkyl, heterocyclyl, hydroxy, cyano, amino, C$_{1-6}$alkylamino, (C$_{1-6}$alkyl)$_2$amino, halogen, and carboxy;

and wherein the aryl and heteroaryl portion of aryl(C$_{1-6}$) alkyl and heteroaryl(C$_{1-6}$)alkyl are optionally substituted with one to three R$^{11}$ substituents independently selected from the group consisting of C$_{1-8}$alkyl; hydroxy (C$_{1-6}$)alkyl; C$_{1-6}$alkoxy; aryl(C$_{1-6}$)alkyl; aryl(C$_{1-6}$) alkoxy; aryl; heteroaryl optionally substituted with C$_{1-6}$alkyl; cycloalkyl; heterocyclyl; aryloxy; heteroaryloxy; cycloalkyloxy; heterocyclyloxy; amino; C$_{1-6}$alkylamino; (C$_{1-6}$alkyl)$_2$amino; C$_{3-6}$cycloalkylaminocarbonyl; hydroxy(C$_{1-6}$) alkylaminocarbonyl; arylaminocarbonyl wherein aryl is optionally substituted with carboxy or C$_{1-6}$alkoxycarbonyl; heterocyclylcarbonyl; carboxy; C$_{1-6}$alkoxycarbonyl; C$_{1-6}$alkylcarbonyl; C$_{1-6}$alkylcarbonylamino; aminocarbonyl; C$_{1-8}$alkylaminocarbonyl; (C$_{1-6}$alkyl)$_2$aminocarbonyl; cyano; halogen; trifluoromethyl; trifluoromethoxy; or hydroxy;

R$^2$ is selected from the group consisting of hydrogen, C$_{1-8}$alkyl, hydroxy(C$_{1-8}$) alkyl, aryl(C$_{1-6}$)alkoxy(C$_{1-8}$) alkyl, or aryl(C$_{1-8}$)alkyl;

wherein the aryl portion of the aryl-containing substituents of R$^2$ are optionally substituted with one to two substituents independently selected from the group consisting of C$_{1-6}$alkyl, C$_{1-6}$alkoxy, hydroxy, amino, C$_{1-6}$alkylamino, (C$_{1-6}$alkyl)$_2$amino, aminocarbonyl, C$_{1-6}$alkylaminocarbonyl, (C$_{1-6}$alkyl)$_2$aminocarbonyl, cyano, fluoro, chloro, bromo, trifluoromethyl, and trifluoromethoxy; and wherein alkyl and alkoxy substituents of aryl are optionally substituted with hydroxy, amino, C$_{1-6}$alkylamino, (C$_{1-6}$alkyl)$_2$amino, or aryl;

A is selected from the group consisting of aryl, ring system a-1, a-2, a-3, and a-4, optionally substituted with R$^3$ and R$^5$;

**4**



a-1



a-2



a-3

and



a-4

wherein

A-B is selected from the group consisting of N—C, C—N, N—N and C—C;

D-E is selected from the group consisting of O—C, S—C, and O—N;

R$^3$ is one to two substituents independently selected from the group consisting of C$_{1-8}$alkyl, aryl, aryl(C$_{1-8}$)alkyl, aryl (C$_{2-6}$alkenyl, aryl(C$_{2-6}$)alkynyl, heteroaryl, heteroaryl (C$_{1-6}$)alkyl, heteroaryl(C$_{1-6}$)alkenyl, heteroaryl(C$_{2-6}$) alkynyl, amino, C$_{1-6}$alkylamino, (C$_{1-6}$alkyl)$_2$amino, arylamino, heteroarylamino, aryloxy, heteroaryloxy, and halogen;

wherein the aryl and heteroaryl portion of R$^3$ are optionally substituted with one to five substituents independently selected from the group consisting of C$_{1-6}$alkyl, hydroxy (C$_{1-6}$)alkyl, C$_{1-6}$alkoxy, aryl(C$_{1-6}$)alkyl, aryl(C$_{1-6}$)alkoxy, aryl, aryloxy, heteroaryl(C$_{1-6}$)alkyl, heteroaryl(C$_{1-6}$) alkoxy, heteroaryl, heteroaryloxy, arylamino, heteroarylamino, amino, C$_{1-6}$alkylamino, (C$_{1-6}$alkyl)$_2$amino, carboxy(C$_{1-6}$)alkylamino, carboxy, C$_{1-6}$alkylcarbonyl, C$_{1-6}$alkoxycarbonyl, C$_{1-6}$alkylcarbonylamino, aminocarbonyl, C$_{1-6}$alkylaminocarbonyl, (C$_{1-6}$alkyl)$_2$aminocarbonyl, carboxy(C$_{1-6}$) alkylaminocarbonyl, cyano, halogen, trifluoromethyl, trifluoromethoxy, hydroxy, C$_{1-6}$alkylsulfonyl, C$_{1-6}$alkylsulfonylamino, —C(O)—NH—CH(—R$^c$)—C(O)—NH$_2$, and C$_{1-6}$alkyl;

wherein C$_{1-6}$alkyl of R$^3$ is optionally substituted with a substituent selected from the group consisting of hydroxy, carboxy, C$_{1-6}$alkoxycarbonyl, amino, C$_{1-6}$alkylamino, (C$_{1-6}$ alkyl)$_2$amino, aminocarbonyl, (C$_{1-4}$alkylaminocarbonyl, di(C$_{1-4}$alkylaminocarbonyl, aryl, heteroaryl, arylamino, heteroarylamino, aryloxy, heteroaryloxy, aryl (C$_{1-4}$alkoxy, and heteroaryl(C$_{1-4}$alkoxy;

R$^c$ is selected from the group consisting of hydrogen, C$_{1-6}$alkyl, C$_{1-6}$alkylcarbonyl, C$_{1-6}$alkoxycarbonyl, C$_{1-6}$alkylcarbonylamino, aryl(C$_{1-6}$)alkyl, heteroaryl(C$_{1-6}$) alkyl, aryl, and heteroaryl;

R$^4$ is aryl or heteroaryl; wherein R$^4$ is optionally substituted with one to five substituents independently selected from the group R$^{41}$; wherein R$^{41}$ is (C$_{1-6}$) alkyl, (C$_{1-6}$)alkoxy, aryl(C$_{1-6}$)alkoxy, aryl(C$_{1-6}$)alkylcarbonyloxy, heteroaryl

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**5**

$(C_{1-6})$alkylcarbonyloxy, heteroaryl, hydroxy, halogen, aminosulfonyl, formylamino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, $(C_{1-6}$alkyl$)_2$aminocarbonyl, heterocyclylcarbonyl, carboxy, or cyano; and wherein $C_{1-6}$alkyl is optionally substituted with amino, $C_{1-6}$alkylamino, or $(C_{1-6}$ alkyl$)_2$amino; and wherein the aryl portion of aryl $(C_{1-6})$alkylcarbonyloxy is optionally substituted with one to four substituents independently selected from the group consisting of $(C_{1-6})$alkyl, $(C_{1-6})$alkoxy, halogen, cyano, amino, and hydroxy;

$R^5$ is a substituent on a nitrogen atom contained in ring A selected from the group consisting of hydrogen, $C_{1-4}$alkyl, and aryl;

$R^6$ is selected from the group consisting of hydrogen and $C_{1-6}$alkyl;

$R^7$ is selected from the group consisting of hydrogen and $C_{1-6}$alkyl;

$R^a$ and $R^b$ are substituents independently selected from the group consisting of hydrogen and $C_{1-6}$alkyl; or, when $R^a$ and $R^b$ are other than hydrogen, $R^a$ and $R^b$ are optionally taken together with the nitrogen to which they are both attached to form a five to eight membered monocyclic ring;

L is selected from the group consisting of O, S, and $N(R^d)$; wherein $R^d$ is hydrogen, $C_{1-6}$alkyl, or aryl;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

The present invention is also directed to compounds of Formula (I)

Formula (I)



wherein:

$R^1$ is selected from the group consisting of hydrogen, $C_{1-6}$alkyl, cycloalkyl, heterocyclyl, aryl$(C_{1-6})$alkyl, and heteroaryl$(C_{1-6})$alkyl; wherein when $R^1$ is phenyl$(C_{1-6})$ alkyl, phenyl is optionally fused to a heterocyclyl or cycloalkyl;

wherein when $R^1$ is $C_{1-2}$alkyl, said $C_{1-2}$alkyl is optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkoxy, aryl, cycloalkyl, heterocyclyl, hydroxy, cyano, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$amino, trifluoromethyl, and carboxy;

and further, wherein when $R^1$ is $C_{3-6}$alkyl, said $C_{3-6}$alkyl is optionally substituted with one to three substituents independently selected from the group consisting of $C_{1-6}$alkoxy, aryl, cycloalkyl, heterocyclyl, hydroxy, cyano, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$amino, trifluoromethyl, and carboxy;

wherein the cycloalkyl and heterocyclyl of $C_{1-2}$alkyl and $C_{3-6}$alkyl are optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, hydroxy$(C_{1-6})$alkyl, $C_{1-6}$alkoxy, hydroxy, cyano, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$ amino, trifluoromethyl, carboxy, aryl$(C_{1-6})$alkoxycar-

**6**

bonyl, $C_{1-6}$alkoxycarbonyl, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, $(C_{1-6}$alkyl$)_2$aminocarbonyl, and aminosulfonyl;

furthermore, wherein the cycloalkyl and heterocyclyl of $R^1$ are optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, hydroxy$(C_{1-6})$alkyl, $C_{1-6}$alkoxy, hydroxy, cyano, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$amino, trifluoromethyl, carboxy, aryl$(C_{1-6})$alkoxycarbonyl, $C_{1-6}$alkoxycarbonyl, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, $(C_{1-6}$alkyl$)_2$aminocarbonyl, and aminosulfonyl;

furthermore, wherein the aryl and heteroaryl portion of the $R^1$ substituents aryl$(C_{1-6})$alkyl and heteroaryl$(C_{1-6})$alkyl, are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-6}$alkyl; hydroxy$(C_{1-6})$alkyl; $C_{1-6}$alkoxy; $C_{6-10}$aryl$(C_{1-6})$alkyl; $C_{6-10}$aryl$(C_{1-6})$alkoxy; $C_{6-10}$aryl; heteroaryl optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, $C_{1-6}$alkoxy, and carboxy; cycloalkyl; heterocyclyl; $C_{6-10}$aryloxy; heteroaryloxy; cycloalkyloxy; heterocyclyloxy; amino; $C_{1-6}$alkylamino; $(C_{1-6}$alkyl$)_2$amino; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy$(C_{1-6})$ alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-6}$alkoxycarbonyl; heterocyclylcarbonyl; carboxy; $C_{1-6}$alkylcarbonyloxy; $Cr_{1-6}$alkoxycarbonyl; $C_{1-6}$alkylcarbonyl; $C_{1-6}$alkylcarbonylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl; $(C_{1-6}$alkyl$)_2$aminocarbonyl; cyano; halogen; trifluoromethyl; trifluoromethoxy; and hydroxy;

provided that no more than one $R^{11}$ substituent is selected from the group consisting of $C_{6-10}$aryl$(C_{1-6})$alkyl; $C_{6-10}$aryl$(C_{1-6})$alkoxy; $C_{6-10}$aryl; heteroaryl optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, $C_{1-6}$alkoxy, and carboxy; cycloalkyl; heterocyclyl; $C_{6-10}$aryloxy; heteroaryloxy; cycloalkyloxy; $C_{6-10}$arylaminocarbonyl; heterocyclylcarbonyl; and heterocyclyloxy;

$R^2$ is hydrogen, $C_{1-6}$alkyl, hydroxy$(C_{1-6})$alkyl, $C_{6-10}$aryl $(C_{1-6})$alkoxy$(C_{1-6})$alkyl, or $C_{6-10}$aryl$(C_{1-6})$alkyl;

wherein the $C_{6-10}$aryl group in the $C_{6-10}$aryl-containing substituents of $R^2$ are optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, $C_{1-6}$alkoxy, hydroxy, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$amino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, $(C_{1-6}$alkyl$)_2$aminocarbonyl, cyano, fluoro, chloro, bromo, trifluoromethyl, and trifluoromethoxy; and, wherein the $C_{1-6}$alkyl and $C_{1-6}$alkoxy substituents of aryl are optionally substituted with hydroxy, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$ amino, or C1-6 aryl;

A is selected from the group consisting of aryl, ring system a-1, a-2, a-3, and a-4, optionally substituted with $R^3$ and $R^5$;

a-1



Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**7**

-continued

a-2

a-3

and

a-4

wherein

A-B is selected from the group consisting of N—C, C—N, N—N and C—C;

D-E is selected from the group consisting of O—C, S—C, and O—N;

F-G is selected from the group consisting of N—O and C—O;

$R^3$ is one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, aryl, aryl($C_{1-6}$)alkyl, aryl $(C_{2-6})$alkenyl, aryl($C_{2-6}$)alkynyl, heteroaryl, heteroaryl $(C_{1-6})$alkyl, heteroaryl($C_{2-6}$)alkenyl, heteroaryl($C_{2-6}$)alkynyl, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl)$_2$amino, arylamino, heteroarylamino, aryloxy, heteroaryloxy, trifluoromethyl, and halogen;

wherein the aryl, heteroaryl and the aryl and heteroaryl of aryl($C_{1-6}$)alkyl, aryl($C_{2-6}$)alkenyl, aryl($C_{2-6}$)alkynyl, heteroaryl($C_{1-6}$)alkyl, heteroaryl($C_{2-6}$)alkenyl, heteroaryl($C_{2-6}$)alkynyl, arylamino, heteroarylamino, aryloxy, and heteroaryloxy, are optionally substituted with one to five fluoro substituents or one to three substituents independently selected from the group consisting of $C_{1-6}$alkyl, hydroxy($C_{1-6}$)alkyl, $C_{1-6}$alkoxy, $C_{6-10}$aryl $(C_{1-6})$alkoxy, $C_{6-10}$aryl($C_{1-6}$)alkenyl, $C_{6-10}$aryl, $C_{6-10}$aryloxy, heteroaryl($C_{1-6}$)alkoxy, heteroaryl($C_{1-6}$)alkoxy, heteroaryl, heteroaryloxy, $C_{6-10}$arylamino, heteroarylamino, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl)$_2$amino, carboxyl($C_{1-6}$) alkylamino, carboxy, $C_{1-6}$alkylcarbonyl, $C_{1-6}$alkylcarbonylamino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, $(C_{1-6}$alkyl)$_2$aminocarbonyl, carboxy($C_{1-6}$)alkylaminocarbonyl, cyano, halogen, trifluoromethyl, trifluoromethoxy, hydroxy, $C_{1-6}$alkylsulfonyl, and $C_{1-6}$alkylsulfonylamino; provided that no more than one such substituent on the aryl or heteroaryl portion of $R^3$ is selected from the group consisting of $C_{6-10}$aryl($C_{1-6}$)alkyl, $C_{6-10}$aryl $(C_{1-6})$alkoxy, $C_{6-10}$aryl, $C_{6-10}$aryloxy, heteroaryl($C_{1-6}$) alkyl, heteroaryl($C_{1-6}$)alkoxy, heteroaryl, heteroaryloxy, $C_{6-10}$arylamino, and heteroarylamino;

and wherein $C_{1-6}$alkyl, and $C_{1-6}$alkyl of aryl($C_{1-6}$)alkyl and heteroaryl($C_{1-6}$) alkyl is optionally substituted with a substituent selected from the group consisting of hydroxy, carboxy, $C_{1-4}$alkoxycarbonyl, amino, $C_{1-4}$alkylamino, $(C_{1-4}$alkyl)$_2$amino, aminocarbonyl, $(C_{1-4}$alkyl)aminocarbonyl, di($C_{1-4}$alkyl)aminocarbonyl, aryl, heteroaryl, arylamino, heteroarylamino, aryloxy, heteroaryloxy, aryl($C_{1-4}$)alkoxy, and heteroaryl $(C_{1-4})$alkoxy;

**8**

$R^4$ is $C_{6-10}$aryl or a heteroaryl selected from the group consisting of furyl, thienyl, pyrrolyl, oxazolyl, thiazolyl, imidazolyl, pyrazolyl, pyridinyl, pyrimidinyl, pyrazinyl, indolyl, isoindolyl, indolinyl, benzofuryl, benzothienyl, benzimidazolyl, benzthiazolyl, benzoxazolyl, quinolizinyl, quinolinyl, isoquinolinyl and quinazolinyl;

wherein $R^4$ is optionally substituted with one to three $R^{4i}$ substituents independently selected from the group consisting of $(C_{1-6})$alkyl optionally substituted with amino, $C_{1-6}$alkylamino, or $(C_{1-6}$alkyl)$_2$amino; $(C_{1-6})$alkoxy; phenyl($C_{1-6}$)alkoxy; phenyl($C_{1-6}$)alkylcarbonyloxy wherein the C1-6 alkyl is optionally substituted with amino; a non fused 5-membered-heteroaryl ($C_1$-6)alkylcarbonyloxy; a non fused 5-membered-heteroaryl; hydroxy; halogen; aminosulfonyl; formylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl wherein $C_{1-6}$alkyl is optionally substituted with amino, $C_{1-6}$alkylamino, or $(C_{1-6}$alkyl)$_2$amino; $(C_{1-6}$alkyl)$_2$aminocarbonyl wherein each $C_{1-6}$alkyl is optionally substituted with amino, $C_{1-6}$alkylamino, or $(C_{1-6}$alkyl)$_2$amino; heterocyclylcarbonyl wherein heterocyclyl is a 5-7 membered nitrogen-containing ring and said heterocyclyl is attached to the carbonyl carbon via a nitrogen atom; carboxy; or cyano; and wherein the phenyl portion of phenyl($C_{1-6}$) alkylcarbonyloxy is optionally substituted with $(C_{1-6})$alkyl $(C_{1-6})$alkoxy, halogen, cyano, amino, or hydroxy;

provided that no more than one $R^{4i}$ is $(C_{1-6})$alkyl substituted with $C_{1-6}$alkylamino or $(C_{1-6}$alkyl)$_2$amino; amino; aminosulfonyl; formylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl; $(C_{1-6}$alkyl)$_2$aminocarbonyl; heterocyclylcarbonyl; hydroxy; carboxy; or a phenyl- or heteroaryl-containing substituent;

$R^5$ is a substituent on a nitrogen atom of ring A selected from the group consisting of hydrogen and $C_{1-4}$alkyl;

$R^6$ is hydrogen or $C_{1-6}$alkyl;

$R^7$ is hydrogen or $C_{1-6}$alkyl;

$R^a$ and $R^b$ are independently selected from the group consisting of hydrogen, $C_{1-6}$alkyl, and $C_{1-6}$alkoxycarbonyl; alternatively, when $R^a$ and $R^b$ are each other than hydrogen, $R^a$ and $R^b$ are optionally taken together with the nitrogen atom to which they are both attached to form a five to eight membered monocyclic ring;

L is selected from the group consisting of O, S, and N($R^d$) wherein $R^d$ is hydrogen or $C_{1-6}$alkyl;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

Illustrative of the invention is a pharmaceutically acceptable carrier and any of the compounds described above.

The present invention is also directed to methods for producing the instant compounds of Formula (I) and pharmaceutical compositions and medicaments thereof.

The present invention is further directed to methods for treating opioid modulated disorders such as pain and gastrointestinal disorders. Compounds of the present invention are believed to provide advantages over related compounds by providing improved pharmacological profiles. Further specific embodiments of preferred compounds are provided hereinafter.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a schematic of the protocol to determine visceral hyperalgesia in rats.

FIG. **2** and FIG. **3** each show the effect in rat of Cpd 18 on the hyperalgesic response to colorectal balloon distention following zymosan.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000009

US 7,741,356 B2

| 9 | 10 |

## DETAILED DESCRIPTION OF THE INVENTION

Embodiments of the present invention include those compounds wherein $R^1$ is selected from the group consisting of hydrogen, $C_{1-6}$alkyl, aryl($C_{1-4}$)alkyl, and heteroaryl($C_{1-4}$)alkyl;

wherein the aryl and heteroaryl portion of aryl($C_{1-4}$)alkyl and heteroaryl($C_{1-4}$)alkyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-6}$alkoxy; heteroaryl optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-4}$alkyl, $C_{1-4}$alkoxy, and carboxy; carboxy; $C_{1-4}$alkoxycarbonyl; $C_{1-4}$alkoxycarbonyloxy; aminocarbonyl; $C_{1-4}$alkylaminocarbonyl; $C_{3,6}$cycloalkylaminocarbonyl; hydroxy($C_{1-6}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; heterocyclylcarbonyl; cyano; halogen; trifluoromethoxy; or hydroxy; provided that no more than one $R^{11}$ is heteroaryl (optionally substituted with one to two $C_{1-4}$alkyl substituents); $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; or heterocyclylcarbonyl.

Embodiments of the present invention include those compounds wherein $R^1$ is selected from the group consisting of $C_{6-10}$aryl($C_{1-4}$)alkyl, pyridinyl($C_{1-4}$) alkyl, and furanyl($C_{1-4}$) alkyl; wherein($C_{6-10}$aryl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-3}$alkoxy; tetrazolyl; carboxy; $C_{1-4}$alkoxycarbonyl; aminocarbonyl; $C_{1-4}$alkylaminocarbonyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-4}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; morpholin-4-ylcarbonyl; cyano; halogen; and trifluoromethoxy; provided that no more than one $R^{11}$ is $C_{6-10}$arylaminocarbonyl.

Embodiments of the present invention include those compounds wherein $R^1$ is selected from the group consisting of phenyl($C_{1-3}$)alkyl, pyridinyl($C_{1-3}$)alkyl, and furanyl($C_{1-3}$) alkyl; wherein phenyl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-3}$alkoxy; tetrazolyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-4}$)alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; morpholin-4-ylcarbonyl; chloro; fluoro; trifluoromethoxy; $C_{1-4}$alkoxycarbonyl; and carboxy; provided that no more than one $R^{11}$ is $C_{6-10}$arylaminocarbonyl.

Embodiments of the present invention include those compounds wherein $R^1$ is phenylmethyl, pyridinylmethyl, or furanylmethyl; wherein phenyl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of methoxy; tetrazolyl; cyclopropylaminocarbonyl; (2-hydroxyeth-1-yl) aminocarbonyl; methoxycarbonyl; phenylaminocarbonyl wherein phenyl is substituted with carboxy; morpholin-4-ylcarbonyl; and carboxy; provided that no more than one $R^{11}$ is phenylaminocarbonyl.

Embodiments of the present invention include those compounds wherein $R^2$ is a substituent selected from the group consisting of hydrogen, $C_{1-4}$alkyl, hydroxy($C_{1-4}$)alkyl, and phenyl($C_{1-6}$)alkoxy($C_{1-4}$)alkyl;

wherein said phenyl is optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-3}$alkyl, $C_{1-3}$alkoxy, hydroxy, cyano, fluoro, chloro, bromo, trifluoromethyl, and trifluoromethoxy.

Embodiments of the present invention include those compounds wherein $R^2$ is selected from the group consisting of hydrogen and $C_{1-4}$alkyl.

Embodiments of the present invention include those compounds wherein $R^2$ is hydrogen or methyl.

Embodiments of the present invention include those compounds wherein ring A is a-1.

Embodiments of the present invention include those compounds wherein A-B of ring a-1 is selected from the group consisting of N—C and O—N.

Embodiments of the present invention include those compounds wherein A-B of ring a-1 is N—C.

Embodiments of the present invention include those compounds wherein $R^3$ is one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, halogen, and aryl; wherein aryl is optionally substituted with one to three substituents independently selected from the group consisting of halogen, carboxy, aminocarbonyl, $C_{1-3}$alkylsulfonylamino, cyano, hydroxy, amino, $C_{1-3}$alkylamino, and ($C_{1-3}$alkyl)$_2$amino.

Embodiments of the present invention include those compounds wherein $R^3$ is one to two substituents independently selected from the group consisting of $C_{1-3}$alkyl, bromo, and phenyl; wherein phenyl is optionally substituted with one to three substituents independently selected from the group consisting of chloro, fluoro, iodo, carboxy, aminocarbonyl, and cyano.

Embodiments of the present invention include those compounds wherein $R^3$ is one to two substituents independently selected from the group consisting of methyl and phenyl; wherein phenyl is optionally substituted with one to three substituents independently selected from the group consisting of chloro and carboxy.

Embodiments of the present invention include those compounds wherein at least one $R^3$ substituent is phenyl.

Embodiments of the present invention include those compounds wherein $R^3$ is a substituent selected from the group consisting of methyl and phenyl optionally substituted with one to two substituents independently selected from the group consisting of chloro and carboxy.

Embodiments of the present invention include those compounds wherein $R^4$ is $C_{6-10}$aryl optionally substituted with one to three $R^{41}$ substituents independently selected from the group consisting of ($C_{1-3}$)alkyl, ($C_{1-6}$)alkoxy, phenyl($C_{1-6}$) alkoxy; hydroxy; halogen; formylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl; ($C_{1-6}$alkyl)$_2$aminocarbonyl; heterocyclylcarbonyl wherein heterocyclyl is a 5-7 membered nitrogen-containing ring and said heterocyclyl is attached to the carbonyl carbon via a nitrogen atom; carboxy; and cyano; provided that no more than one $R^{41}$ substituent is formylamino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, ($C_{1-6}$alkyl)$_2$ aminocarbonyl, heterocyclylcarbonyl, hydroxy, carboxy, or a phenyl-containing substituent.

Embodiments of the present invention include those compounds wherein $R^4$ is phenyl substituted with one to three $R^{41}$ substituents independently selected from the group consisting of ($C_{1-3}$)alkyl, ($C_{1-3}$)alkoxy, phenyl($C_{1-3}$) alkoxy, hydroxy, $C_{1-6}$alkylaminocarbonyl, and aminocarbonyl; provided that no more than one $R^{41}$ substituent is aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, hydroxy, or a phenyl-containing substituent.

Embodiments of the present invention include those compounds wherein $R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and optionally substituted with one to two substituents independently selected from the group consisting of methyl, methoxy, and benzyloxy.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000010

US 7,741,356 B2

**11**

Embodiments of the present invention include those compounds wherein $R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and optionally substituted with one to two methyl substituents.

Embodiments of the present invention include those compounds wherein $R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and substituted at the 2- and 6-positions with methyl substituents.

Embodiments of the present invention include those compounds wherein $R^5$ is hydrogen or methyl.

Embodiments of the present invention include those compounds wherein $R^5$ is hydrogen.

Embodiments of the present invention include those compounds wherein $R^6$ is hydrogen or methyl.

Embodiments of the present invention include those compounds wherein $R^6$ is hydrogen.

Embodiments of the present invention include those compounds wherein $R^7$ is hydrogen or methyl.

Embodiments of the present invention include those compounds wherein $R^7$ is hydrogen.

Embodiments of the present invention include those compounds wherein $R^a$ and $R^b$ are independently selected from the group consisting of hydrogen and $C_{1-3}$alkyl; or, when $R^a$ and $R^b$ are each other than hydrogen or C1-6alkoxycarbonyl, $R^a$ and $R^b$ are optionally taken together with the nitrogen atom to which they are both attached to form a five to seven membered monocyclic ring.

Embodiments of the present invention include those compounds wherein $R^a$ and $R^b$ are independently hydrogen or methyl.

Embodiments of the present invention include those compounds wherein $R^a$ and $R^b$ are each hydrogen.

Embodiments of the present invention include those compounds wherein L is O.

Embodiments of the present invention include those compounds that are present in their RR, SS, RS, or SR configuration.

Embodiments of the present invention include those compounds that are present in their S,S configuration.

An aspect of the present invention includes compounds of Formula (Ia):

Formula (Ia)



wherein:

$R^1$ is selected from the group consisting of hydrogen, $C_{1-4}$alkyl, aryl($C_{1-4}$)alkyl, and heteroaryl($C_{1-4}$)alkyl; wherein the aryl and heteroaryl portion of aryl($C_{1-4}$)alkyl and heteroaryl($C_{1-4}$)alkyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-6}$alkoxy; heteroaryl optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-4}$alkyl, $C_{1-4}$alkoxy, and carboxy; carboxy; $C_{1-4}$alkoxycarbonyloxy; $C_{1-3}$alkylaminocarbonyl; aminocarbonyl; $C_{1-4}$alkylaminocarbonyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-3}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein

**12**

$C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; heterocyclylcarbonyl; cyano; halogen; trifluoromethoxy; and hydroxy; provided that no more than one $R^{11}$ is heteroaryl (optionally substituted with one to two $C_{1-4}$alkyl substituents); $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; or heterocyclylcarbonyl;

$R^2$ is selected from the group consisting of hydrogen, $C_{1-4}$alkyl, hydroxy($C_{1-4}$) alkyl, and phenyl($C_{1-6}$)alkoxy ($C_{1-4}$)alkyl;

wherein said phenyl is optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-3}$alkyl, $C_{1-3}$alkoxy, hydroxy, cyano, fluorine, chlorine, bromine, trifluoromethyl, and trifluoromethoxy;

$R^3$ is one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, halogen, and aryl; wherein aryl is optionally substituted with one to three substituents independently selected from the group consisting of halogen, carboxy, aminocarbonyl, $C_{1-3}$alkylsulfonylamino, cyano, hydroxy, amino, $C_{1-3}$alkylamino, and ($C_{1-4}$)alkyl; amino;

$R^4$ is $C_{6-10}$aryl optionally substituted with one to three $R^{41}$ substituents independently selected from the group consisting of ($C_{1-3}$)alkyl, ($C_{1-6}$) alkoxy, phenyl($C_{1-6}$) alkoxy; hydroxy; halogen; formylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl; ($C_{1-6}$alkyl)$_2$aminocarbonyl; heterocyclylcarbonyl wherein heterocyclyl is a 5-7 membered nitrogen-containing ring and said heterocyclyl is attached to the carbonyl carbon via a nitrogen atom; carboxy; and cyano;

provided that no more than one $R^{41}$ substituent is formylamino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, ($C_{1-6}$alkyl)$_2$aminocarbonyl, heterocyclylcarbonyl, hydroxy, carboxy, or a phenyl-containing substituent.

$R^5$ is hydrogen or methyl;

$R^a$ and $R^b$ are independently hydrogen or $C_{1-3}$alkyl; or, when $R^a$ and $R^b$ are each other than hydrogen, Ra and Rb are optionally taken together with the nitrogen atom to which they are both attached to form a five to seven membered monocyclic ring;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

Another aspect of the present invention is directed to a compound of Formula (Ia) wherein:

$R^1$ is selected from the group consisting of $C_{6-10}$aryl($C_{1-4}$) alkyl, pyridinyl($C_{1-4}$) alkyl, and furanyl($C_{1-4}$)alkyl; wherein $C_{6-10}$aryl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-3}$alkoxy; tetrazolyl; carboxy; $C_{1-3}$alkoxycarbonyl; aminocarbonyl; $C_{1-4}$alkylaminocarbonyl; $C_{1-3}$alkylaminocarbonyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-4}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; morpholin-4-ylcarbonyl; cyano; halogen; and trifluoromethoxy; provided that no more than one $R^{11}$ is $C_{6-10}$arylaminocarbonyl;

$R^2$ is hydrogen or $C_{1-4}$alkyl;

$R^3$ is one to two substituents independently selected from the group consisting of $C_{1-3}$alkyl, bromo, and phenyl; wherein phenyl is optionally substituted with one to three substituents independently selected from the group consisting of chloro, fluoro, carboxy, aminocarbonyl, and cyano;

$R^4$ is phenyl substituted with one to three $R^{41}$ substituents independently selected from the group consisting of ($C_{1-3}$)alkyl, ($C_{1-3}$)alkoxy, phenyl($C_{1-3}$) alkoxy, hydroxy,

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000011

US 7,741,356 B2

13                                  14

$C_{1-6}$alkylaminocarbonyl, and aminocarbonyl; provided that no more than one $R^{41}$ is aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, hydroxy, or a phenyl-containing substituent;

$R^5$ is hydrogen;

$R^a$ and $R^b$ are independently hydrogen or methyl;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

Another aspect of the present invention is directed to a compound of Formula (Ia) wherein:

$R^1$ is selected from the group consisting of phenyl($C_{1-3}$)alkyl, pyridinyl($C_{1-3}$)alkyl, and furanyl($C_{1-3}$)alkyl; wherein phenyl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-3}$alkoxy; tetrazolyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-4}$)alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; morpholin-4-ylcarbonyl; chloro; fluoro; trifluoromethoxy; and carboxy;

$R^2$ is hydrogen or methyl;

$R^3$ is one to two substituents independently selected from the group consisting of methyl and phenyl; wherein phenyl is optionally substituted with one to three substituents independently selected from the group consisting of chloro and carboxy;

$R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and option-

ally substituted with one to two substituents independently selected from the group consisting of methyl, methoxy, and benzyloxy;

$R^5$ is hydrogen;

$R^a$ and $R^b$ are each hydrogen;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

Another embodiment is directed to compounds of Formula (Ib):

Formula (Ib)



wherein in one embodiment of this invention the variables are as previously defined. In another embodiment of the present invention L is oxygen and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^4$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

TABLE I

| Cpd | $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|---|
| 1 | 2-Aminocarbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 2 | 2-Cyano-phenyl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3 | 2-Bromo-phenyl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 4 | 3-Carboxy-4-methoxy-phenyl-methyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 5 | 3-Carboxy-4-methoxy-phenyl-methyl | H | phenyl | H | H | 4-aminocarbonyl | H |
| 6 | 3-Carboxy-4-methoxy-phenyl-methyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 7 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 8 | 3-(1H-tetrazol-5-yl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 9 | 3-Methoxycarbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 10 | 3-Methoxycarbonyl-phenylmethyl | methyl | naphthalen-1-yl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 11 | 3-Carboxy-phenylmethyl | methyl | naphthalen-1-yl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 12 | 3-Carboxy-phenylmethyl | methyl | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 13 | 4-Carboxy-phenylmethyl | methyl | naphthalen-1-yl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 14 | 3-Methoxy-4-carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 15 | 3,4-Dihydroxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 16 | Piperidin-4-yl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000012

Appx14418

US 7,741,356 B2

**15**                    **16**

TABLE I-continued

| Cpd | R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{61}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|---|
| 17 | 3-Methoxy carbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 18 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 19 | 3,4-Dimethoxy-phenylmethyl | methyl | 3-bromophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 20 | 3,4-Dimethoxy-phenylmethyl | methyl | 3-carboxyphenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 21 | 3,4-Dimethoxy-phenylmethyl | benzyloxy-methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 23 | 3,4-Dimethoxy-phenylmethyl | methyl | 3-aminocarbonyl phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 24 | 3,4-Dimethoxy-phenylmethyl | methyl | 3-cyanophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 25 | Isopropyl | H | quinoxalin-8-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 26 | 3,4-Dimethoxy-phenylmethyl | methyl | 2-bromophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 27 | 3,4-Dimethoxy-phenylmethyl | methyl | 2-cyanophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 28 | 3,4-Dimethoxy-phenylmethyl | methyl | 2-aminocarbonyl phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 29 | 3,4-Dimethoxy-phenylmethyl | methyl | 2-carboxyphenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 30 | 3,4-Dibenzyloxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 31 | [1,3]benzo dioxal-5-yl | methyl | phenyl | H | H | 2,6-dimethyl, 4-hydroxy | H |
| 32 | 4-Methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 33 | 3-Methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 34 | 2,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 35 | 3,4-Dimethoxy-phenylmethyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 36 | Isopropyl | H | 4-methylcarbonyl phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 37 | Isopropyl | H | 3-fluoro, 4-carboxy-phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 38 | Isopropyl | H | 2-phenyl-ethylen-1-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 39 | Isopropyl | H | 4-hydroxymethyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 40 | Benzhydryl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 41 | Isopropyl | H | 4-cyanophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 42 | Benzyl | methyl | 4-trifluoromethyl phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 43 | Isopropyl | H | 3-trifluoromethoxy phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 44 | Isopropyl | H | 4-trifluoromethoxy phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 45 | Isopropyl | H | 3-methanesulfonyl aminophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 46 | Isopropyl | H | 4-(2-carboxyethyl) phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 47 | Isopropyl | H | 3-amino-5-carboxyphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 48 | 3-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 49 | 4-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-carboxy | H |
| 50 | 4-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 51 | 4-Methoxy carbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 52 | 3-Methoxy carbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 53 | 1-Benzyloxy carbonyl- | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000013

US 7,741,356 B2

**17**                                                                 **18**

TABLE I-continued

| Cpd | R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{41}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|---|
| | piperadin-4-yl methyl | | | | | | |
| 54 | Furan-2-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 55 | Furan-3-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 56 | Cyclohexyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 57 | Pyridin-4-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 58 | Benzyl | methyl | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 59 | Benzyl | methyl | 3-fluorophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 60 | Isopropyl | H | 3-cyanophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 61 | Isopropyl | H | 2,5-difluorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 62 | Isopropyl | H | 4-methanesulfonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 64 | Benzyl | benzyloxy methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 65 | Isopropyl | H | Br | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 66 | Isopropyl | H | 4-dimethylamino phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 67 | Isopropyl | H | 3-dimethylamino carbonylphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 68 | Isopropyl | H | 3-hydroxyphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 69 | Isopropyl | H | 4-aminocarbonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 70 | Isopropyl | H | 3-chlorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 71 | Isopropyl | H | 2,4-difluorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 72 | Isopropyl | H | 3-methanesulfonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 73 | Isopropyl | H | 3-aminocarbonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 74 | Benzyl | methyl | 4-trifluoromethyl phenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 75 | 3,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 76 | Benzyl | methyl | 4-fluorophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 77 | 4-Dimethylamino-phenylmethyl | methyl | phenyl | H | Me | 2,6-dimethyl-4-hydroxy | H |
| 78 | 4-Methylamino-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 79 | 4-Methylcarbonyl amino-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 80 | 4-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 81 | 4-Hydroxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 83 | Benzyl | methyl | 4-fluorophenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 84 | Isopropyl | methyl | 4-fluorophenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 85 | Isopropyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 86 | Isopropyl | H | phenyl | H | H | 2,6-dimethyl, 4-aminocarbonyl | H |
| 87 | 3,4-Dichloro-phenylmethyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 88 | 4-Methylcarbonyl oxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 89 | 4-Methoxy carbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 90 | 3-Aminocarbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 91 | 3-Cyano-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000014

Appx14420

US 7,741,356 B2

19      20

TABLE I-continued

| Cpd | $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^3$ | $R^{4i}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|---|
| 92 | Pyridin-3-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 93 | Pyridin-2-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 94 | 1-(R)-Phenylethyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 95 | 1-(S)-Phenylethyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 96 | 2-Methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 97 | 2,6-Dichloro-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 98 | 3-Phenoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 99 | Naphthalen-1-yl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 100 | Naphthalen-2-yl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 101 | 3-Bromo-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 102 | 3,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 103 | 2,4-Dichloro-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 104 | Benzyl | isobutyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 105 | Benzyl | benzyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 106 | Benzyl | isopropyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 107 | Benzyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 108 | 3-Phenyl prop-1-yl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 109 | 2-Phenylethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 111 | 1-Phenylethyl diastereomer A | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 112 | 1-Phenylethyl diastereomer B | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 114 | Benzyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 115 | Isopropyl | H | 4-biphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 116 | Isopropyl | H | 3-fluorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 117 | Isopropyl | H | 2-fluorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 118 | Isopropyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 119 | H | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 120 | Isopropyl | 3-(amino methyl) phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 121 | Isopropyl | 3-amino carbonyl phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 122 | Isopropyl | 3-cyano phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 123 | Isopropyl | H | 4-carboxyphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 124 | Isopropyl | H | pyridin-3-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 125 | Isopropyl | H | 4-methoxyphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 126 | Isopropyl | H | 3,5-difluorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 127 | Cyclohexyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 129 | Carboxymethyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 130 | Isopropyl | H | 3-hydroxymethyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000015

US 7,741,356 B2

21 22

TABLE I-continued

| Cpd | $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^{4\cdot}/R^6$ |
|---|---|---|---|---|---|---|---|
| 131 | Isopropyl | H | pyrimidin-5-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 132 | Isopropyl | H | pyrimidin-5-yl | Me | H | 4-hydroxy | H |
| 133 | Isopropyl | H | 3-carboxyphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 134 | Isopropyl | H | 3-biphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 135 | Isopropyl | H | 2-methoxyphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 136 | Isopropyl | benzyl | phenyl | H | H | 3-aminocarbonyl | H |
| 137 | Isopropyl | isopropyl | phenyl | H | H | 3-aminocarbonyl | H |
| 138 | Isopropyl | benzyloxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 139 | Isopropyl | isobutyl | phenyl | H | H | 2,6-dimethyl-4-[2-(2,6-dimethyl-4-hydroxyphenyl)-1-amino-ethylcarbonxyloxy ]phenyl | H |
| 140 | Isopropyl | isobutyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 141 | Isopropyl | H | 3,5-dichlorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 142 | Isopropyl | H | 3-methoxyphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 143 | Isopropyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 145 | Isopropyl | H | 2-biphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 146 | Isopropyl | H | thiophen-3-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 147 | Isopropyl | H | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 148 | Isopropyl | H | 3-methylcarbonyl aminophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 149 | Isopropyl | H | 4-trifluoromethyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 150 | Isopropyl | H | naphthalen-2-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 151 | Isopropyl | H | 2-trifluoromethyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 152 | Isopropyl | H | thiophen-3-yl | Me | H | 4-hydroxy | H |
| 153 | Isopropyl | H | pyridin-3-yl | Me | H | 4-hydroxy | H |
| 154 | Isopropyl | H | phenyl | Me | H | 4-hydroxy | H |
| 155 | Isopropyl | H | 2-chlorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 156 | Isopropyl | H | naphthalen-1-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 157 | Isopropyl | benzyl | phenyl | H | H | 3-cyano | H |
| 158 | Isopropyl | benzyl | phenyl | H | H | 4-hydroxy | H |
| 159 | Isopropyl | benzyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 160 | Isopropyl | isopropyl | phenyl | H | H | 3-cyano | H |
| 161 | Isopropyl | isopropyl | phenyl | H | H | 4-hydroxy | H |
| 162 | Isopropyl | isopropyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 163 | Isopropyl | H | 4-fluorophenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 164 | Isopropyl | H | 3,5-bis-trifluoromethyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 165 | Isopropyl | H | 2-methylphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 166 | Isopropyl | H | phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 167 | 2-Dimethylamino-1-methyl-eth-1-yl | H | phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 168 | Methyl | isobutyl | phenyl | H | H | 3-aminocarbonyl | H |
| 169 | Methyl | isobutyl | phenyl | H | H | 3-cyano | H |
| 170 | Ethyl | isopropyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 171 | Methyl | isopropyl | phenyl | H | H | 4-hydroxy | H |
| 172 | H | 3-amino carbonyl phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000016

US 7,741,356 B2

23

24

TABLE 1-continued

| Cpd | R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{41}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|---|
| 173 | H | 3-cyano phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 174 | Methyl | isobutyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 175 | H | benzyloxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 176 | H | isobutyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 177 | H | benzyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 178 | Isopropyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 179 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-morpholin-1-ylcarbonyl | H |
| 181 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-ethyl aminocarbonyl | H |
| 183 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-methyl aminocarbonyl | H |
| 185 | H | isopropyl | phenyl | H | H | 3-aminocarbonyl | H |
| 186 | H | isopropyl | phenyl | H | H | 3-cyano | H |
| 187 | H | isopropyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 188 | H | isopropyl | phenyl | H | H | 4-hydroxy | H |
| 189 | Methyl | methyl | phenyl | H | H | 4-aminosulfonyl | H |
| 190 | Cyclohexyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 191 | Cyclohexyl | H | phenyl | H | H | 4-hydroxy | H |
| 192 | Cyclopropyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 193 | Cyclopropyl methyl | H | phenyl | H | H | 4-hydroxy | H |
| 194 | Isopropyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 195 | Isopropyl | H | phenyl | H | H | 4-hydroxy | H |
| 196 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 197 | Ethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 198 | Methyl | H | phenyl | H | H | 4-hydroxy | H |
| 199 | Methyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 202 | Methyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 204 | Methyl | methyl | benzyl | H | H | 4-hydroxy | H |
| 205 | Methyl | methyl | benzyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 207 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 209 | H | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 211 | Methyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 213 | H | methyl | phenyl | H | H | 4-hydroxy | H |
| 215 | Ethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 216 | Ethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 218 | Benzyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 219 | Benzyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 224 | Isopropyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 225 | Isopropyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 226 | 2-Carboxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 227 | 3-Carboxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 229 | 2-Bromo-4,5-dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 230 | 2-Carboxy-4,5-dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 231 | 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | H | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000017

US 7,741,356 B2

25                              26

TABLE I-continued

| Cpd | R¹ | R² | R³⁻¹ | R³⁻² | R⁵ | R⁴¹ | Rᵃ/Rᵇ |
|---|---|---|---|---|---|---|---|
| 232 | 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl | H |
| 233 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl | H |
| 234 | 3,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-imidazol-2-yl | H |
| 236 | 3,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl | H |
| 237 | 3-Carboxy-4-methoxy-phenyl methyl | methyl | 4-chlorophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 238 | 3-Carboxy, 4-methoxy-phenyl methyl | methyl | 4-fluorophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 239 | 3-Carboxy-4-methoxy-phenyl methyl | methyl | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 240 | 4-Carboxy-phenyl methyl | methyl | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 241 | 3-Carboxy-4-methoxy-phenyl methyl | methyl | 4-chlorophenyl | Cl | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 242 | 3-(1H-tetrazol-5-yl)-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 243 | 3-Carboxy-4-trifluoromethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 244 | Bis-3,4-trifluoromethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 245 | 3-Carboxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 246 | Quinolin-4-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 247 | 4-Methoxy naphthalen-1-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 248 | 4-Trifluoromethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 249 | 4-Trifluoromethyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 250 | 4-Isopropyloxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 251 | 3-Ethoxyphenyl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 252 | 5-Methoxycarbonyl-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 253 | 5-Carboxy-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 254 | 6-Carboxy-pyridin-3-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 255 | 6-Methoxycarbonyl-pyridin-3-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 256 | 5-Carboxy-furan-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 257 | 5-Methoxycarbonyl-furan-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 258 | 3,4-Dimethoxy-phenylmethyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 259 | Benzyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 260 | 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 261 | 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 262 | 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 4-hydroxy | H/Me |
| 263 | 3-Carboxy-4-methoxy-phenyl methyl | H | phenyl | H | H | 4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000018

PTX-007, page 18 of 79

Appx14424

US 7,741,356 B2

27                                                                                                28

TABLE 1-continued

| Cpd | R¹ | R² | R³⁻¹ | R³⁻² | R⁵ | R⁴¹ | Rᵃ/Rᵇ |
|---|---|---|---|---|---|---|---|
| 264 | 3-Carboxy-4-methoxy-phenyl methyl | H | phenyl | H | H | 4-hydroxy | H/Me |
| 265 | 3-Carboxy-4-methoxy-phenyl methyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 266 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | | H |
| 267 | 3-(1H-tetrazol-5-yl)-phenylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 268 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 269 | 3-Methoxycarbonyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 270 | 3-Carboxy | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 271 | 3-Methoxycarbonyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 272 | 3-Carboxy | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 274 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-benzyloxy | H/Me |
| 275 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 277 | 3-Carboxy-phenyl | methyl | 4-chlorophenyl | Me | H | 4-aminocarbonyl | H |
| 279 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 286 | 5-Methoxycarbonyl-furan-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 287 | 5-Carboxy-furan-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 288 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | 3-bromophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 289 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-iodophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 290 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | 2-bromophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 291 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-bromophenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 292 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl | H |
| 293 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-chlorophenyl | methyl | H | 4-hydroxy | H |
| 295 | 3-Aminocarbonyl-4-methoxy phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 296 | 3-(Morpholin-4-ylcarbonyl)-4-methoxy methyl phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 297 | -3-Aminocarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 298 | 3-(Morpholin-4-ylcarbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 299 | 3-(2-Hydroxy-eth-1-yl-aminocarbonyl)-4-methoxy phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 300 | 3-(Cyclopropyl aminocarbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 301 | 3-(Phenylamino carbonyl)-4- | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000019

PTX-007, page 19 of 79

Appx14425

US 7,741,356 B2

29      30

TABLE I-continued

| Cpd | R¹ | R² | R³⁻¹ | R³⁻² | R⁵ | R⁴¹ | Rᵃ/Rᵇ |
|---|---|---|---|---|---|---|---|
| | methoxy-phenylmethyl | | | | | | |
| 303 | 5-Methoxycarbonyl-furan-2-ylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 304 | 5-Carboxy-furan-2-ylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 305 | 3-(Phenylamino carbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 306 | 3-(3-carboxyphenyl aminocarbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 307 | 3-(1H-Tetrazol-5-yl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 308 | 3-(4-Carboxyphenyl aminocarbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 309 | 3-(2-t-Butyl-tetrazol-5-yl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 310 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | Methoxy carbonyl |
| 311 | 2-Methoxycarbonyl-pyridin-4-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 312 | 4-Methoxycarbonyl-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 313 | 6-Methoxycarbonyl-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 315 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | Methoxy carbonyl |
| 316 | 2-Carboxy-pyridin-4-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 317 | 6-Carboxy-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |

Exemplified compounds of the present invention include compounds of Formula (Ic):



Formula (Ic)

wherein in one embodiment of this invention the variables are as previously defined. In another embodiment of the present invention L is O and R¹, R², R³⁻¹, R³⁻², R⁵, Rᵃ, Rᵇ, and R⁴¹ are dependently selected from the group consisting of:

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000020

Appx14426

US 7,741,356 B2

31    32

TABLE II

| Cpd | $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|---|
| 22 | 3,4-Dimethoxy-phenylmethyl | benzyloxymethyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 63 | Isopropyl | hydroxymethyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 82 | Isopropyl | methyl | 4-fluorophenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 110 | 2-Phenylethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 113 | Benzyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 128 | Cyclohexyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 144 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 180 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-(morpholin-4-ylcarbonyl) | H |
| 182 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-ethylaminocarbonyl | H |
| 184 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-methylaminocarbonyl | H |
| 203 | Methyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 206 | Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 208 | H | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 210 | Methyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 212 | H | methyl | phenyl | H | H | 4-hydroxy | H |
| 214 | Ethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 217 | Ethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 220 | Benzyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 221 | Benzyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 222 | Isopropyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 223 | Isopropyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 228 | 3-Carboxy-phenylmethyl | methyl | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 276 | 3-Carboxy-phenylmethyl | methyl | 4-chlorophenyl | Me | H | 4-aminocarbonyl | H |
| 278 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 280 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 281 | 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 282 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 283 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 294 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-chlorophenyl | Me | H | 4-hydroxy | H |
| 314 | 6-Methoxycarbonyl-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 318 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-chlorophenyl | H | H | 4-aminocarbonyl | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**33**

Another embodiment is directed to compositions comprised of a compound of Formula (Id):



Formula (Id)

wherein in one embodiment of this invention the variables are as previously defined. In another embodiment of the present invention L is oxygen and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

TABLE III

| Cpd | $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|-----|-------|-------|-----------|-----------|-------|----------|-----------|
| 273 | 3-Carboxy-4-methoxyphenyl methyl | methyl | phenyl | H | H | 4-amino-carbonyl | H |

Exemplified compounds of the present invention include compounds of Formula (Ie):

**34**



Formula (Ie)

wherein in one embodiment of this invention the variables are as previously defined. In another embodiment of the present invention L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

TABLE IV

| Cpd | $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|-----|-------|-------|-----------|-----------|-------|----------|-----------|
| 284 | 3-Methoxy-carbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-amino-carbonyl | H |
| 285 | 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-amino-carbonyl | H |

A further embodiment of the present invention includes representative compounds shown in Table V:

TABLE V

| Cpd | |
|-----|---|
| 4 |  |
| 6 |  |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000022

US 7,741,356 B2

35
36

| TABLE V-continued |
|---|
| Cpd |

8



12



18



20

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000023

US 7,741,356 B2

37 38

TABLE V-continued

| Cpd |
|---|
| 75 |



227



The compounds of the present invention may also be present in the form of pharmaceutically acceptable salts. For use in medicine, the salts of the compounds of this invention refer to non-toxic "pharmaceutically acceptable salts" (*Ref. International J. Pharm.*, 1986, 33, 201-217; *J. Pharm. Sci.*, 1997 (January), 66, 1, 1). Other salts may, however, be useful in the preparation of compounds according to this invention or of their pharmaceutically acceptable salts. Representative organic or inorganic acids include, but are not limited to, hydrochloric, hydrobromic, hydriodic, perchloric, sulfuric, nitric, phosphoric, acetic, propionic, glycolic, lactic, succinic, maleic, fumaric, malic, tartaric, citric, benzoic, mandelic, methanesulfonic, hydroxyethanesulfonic, benzene-sulfonic, oxalic, pamoic, 2-naphthalenesulfonic, p-toluenesulfonic, cyclohexanesulfamic, salicylic, saccharinic or trifluoroacetic acid. Representative organic or inorganic bases include, but are not limited to, basic or cationic salts such as benzathine, chloroprocaine, choline, diethanol-amine, ethylenediamine, meglumine, procaine, aluminum, calcium, lithium, magnesium, potassium, sodium and zinc.

The present invention includes within its scope prodrugs of the compounds of this invention. In general, such prodrugs will be functional derivatives of the compounds which are readily convertible in vivo into the required compound. Thus, in the methods of treatment of the present invention, the term "administering" shall encompass the treatment of the various disorders described with the compound specifically disclosed or with a compound which may not be specifically disclosed, but which converts to the specified compound in vivo after administration to the subject. Conventional procedures for

the selection and preparation of suitable prodrug derivatives are described, for example, in "*Design of Prodrugs*", ed. H. Bundgaard, Elsevier, 1985.

Where the compounds according to this invention have at least one chiral center, they may accordingly exist as enantiomers. Where the compounds possess two or more chiral centers, they may additionally exist as diastereomers. Where the processes for the preparation of the compounds according to the invention give rise to mixtures of stereoisomers, these isomers may be separated by conventional techniques such as preparative chromatography. The compounds may be prepared in racemic form or as individual enantiomers or diastereomers by either stereospecific synthesis or by resolution. The compounds may, for example, be resolved into their component enantiomers or diastereomers by standard techniques, such as the formation of stereoisomeric pairs by salt formation with an optically active acid, such as (−)-di-p-toluoyl-D-tartaric acid and/or (+)-di-p-toluoyl-L-tartaric acid followed by fractional crystallization and regeneration of the free base. The compounds may also be resolved by formation of stereoisomeric esters or amides, followed by chromatographic separation and removal of the chiral auxiliary. Alternatively, the compounds may be resolved using a chiral HPLC column. It is to be understood that all stereoisomers, racemic mixtures, diastereomers and enantiomers thereof are encompassed within the scope of the present invention.

During any of the processes for preparation of the compounds of the present invention, it may be necessary and/or desirable to protect sensitive or reactive groups on any of the molecules concerned. This may be achieved by means of

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000024

Appx14430

US 7,741,356 B2

39

conventional protecting groups, such as those described in *Protective Groups in Organic Chemistry*, ed. J. F. W. McOmie, Plenum Press, 1973; and T. W. Greene & P. G. M. Wuts, *Protective Groups in Organic Synthesis*, John Wiley & Sons, 1991. The protecting groups may be removed at a convenient subsequent stage using methods known in the art.

Furthermore, some of the crystalline forms for the compounds may exist as polymorphs and as such are intended to be included in the present invention. In addition, some of the compounds may form solvates with water (i.e., hydrates) or common organic solvents, and such solvates are also intended to be encompassed within the scope of this invention.

In general, under standard nomenclature rules used throughout this disclosure, the terminal portion of the designated side chain is described first followed by the adjacent functionality toward the point of attachment. Thus, for example, a "phenylC$_1$-C$_6$alkylamidoC$_1$-C$_6$alkyl" substituent refers to a group of the formula:



It is intended that the definition of any substituent or variable at a particular location in a molecule be independent of its definitions elsewhere in that molecule. It is understood that substituents and substitution patterns on the compounds of this invention can be selected by one of ordinary skill in the art to provide compounds that are chemically stable and that can be readily synthesized by techniques known in the art as well as those methods set forth herein.

An "independently" selected substituent refers to a group of substituents, wherein the substituents may be different. Therefore, designated numbers of carbon atoms (e.g. C$_{1-8}$) shall refer independently to the number of carbon atoms in an alkyl or cycloalkyl moiety or to the alkyl portion of a larger substituent in which alkyl appears as its prefix root.

As used herein, unless otherwise noted, "alkyl" whether used alone or as part of a substituent group refers to straight and branched carbon chains having 1 to 8 carbon atoms or any number within this range. The term "alkoxy" refers to an —Oalkyl substituent group, wherein alkyl is as defined supra. Similarly, the terms "alkenyl" and "alkynyl" refer to straight and branched carbon chains having 2 to 8 carbon atoms or any number within this range, wherein an alkenyl chain has at least one double bond in the chain and an alkynyl chain has at least one triple bond in the chain. An alkyl and alkoxy chain may be substituted on a carbon atom. In substituent groups with multiple alkyl groups such as (C$_{1-6}$alkyl)$_2$amino- the C$_{1-6}$alkyl groups of the dialkylamino may be the same or different.

The term "cycloalkyl" refers to saturated or partially unsaturated, moncyclic or polycyclic hydrocarbon rings of from 3 to 14 carbon atom members. Examples of such rings include, and are not limited to cyclopropyl, cyclobutyl, cyclopentyl, cyclohexyl, cycloheptyl and adamantyl. Alternatively, the cycloalkyl ring may be fused to a benzene ring (benzo fused cycloalkyl), a 5 or 6 membered heteroaryl ring (containing one of O, S or N and, optionally, one additional nitrogen) to form a heteroaryl fused cycloalkyl.

The term "heterocyclyl" refers to a nonaromatic cyclic ring of 5 to 7 members in which 1 to 2 members are nitrogen, or a nonaromatic cyclic ring of 5 to 7 members in which zero, one or two members are nitrogen and up to two members are

40

oxygen or sulfur; wherein, optionally, the ring contains zero to one unsaturated bonds, and, optionally, when the ring is of 6 or 7 members, it contains up to two unsaturated bonds. The term "heterocyclyl" includes a 5 to 7 membered monocyclic heterocyclic ring fused to a benzene ring (benzo fused heterocyclyl), a 5 or 6 membered heteroaryl ring (containing one of O, S or N and, optionally, one additional nitrogen), a 5 to 7 membered cycloalkyl or cycloalkenyl ring, a 5 to 7 membered heterocyclyl ring (of the same definition as above but absent the option of a further fused ring) or fused with the carbon of attachment of a cycloalkyl, cycloalkenyl or heterocyclyl ring to form a spiro moiety. For instant compounds of the invention, the carbon atom ring members that form the heterocyclyl ring are fully saturated. Other compounds of the invention may have a partially saturated heterocyclyl ring. The term "heterocyclyl" also includes a 5 to 7 membered monocyclic heterocycle bridged to form bicyclic rings. Such compounds are not considered to be fully aromatic and are not referred to as heteroaryl compounds. Examples of heterocyclyl groups include, and are not limited to, pyrrolinyl (including 2H-pyrrole, 2-pyrrolinyl or 3-pyrrolinyl), pyrrolidinyl, 2-imidazolinyl, imidazolidinyl, 2-pyrazolinyl, pyrazolidinyl, piperidinyl, morpholinyl, thiomorpholinyl and piperazinyl.

The term "aryl" refers to an unsaturated, aromatic monocyclic ring of 6 carbon members or to an unsaturated, aromatic polycyclic ring of from 10 to 14 carbon members. Examples of such aryl rings include, and are not limited to, phenyl, naphthalenyl or anthracenyl. Preferred aryl groups for the practice of this invention are phenyl and naphthalenyl.

The term "heteroaryl" refers to an aromatic ring of 5 or 6 members wherein the ring consists of carbon atoms and has at least one heteroatom member. Suitable heteroatoms include nitrogen, oxygen or sulfur. In the case of 5 membered rings, the heteroaryl ring contains one member of nitrogen, oxygen or sulfur and, in addition, may contain up to three additional nitrogens. In the case of 6 membered rings, the heteroaryl ring may contain from one to three nitrogen atoms. For the case wherein the 6 membered ring has three nitrogens, at most two nitrogen atoms are adjacent. Optionally, the heteroaryl ring is fused to a benzene ring (benzo fused heteroaryl), a 5 or 6 membered heteroaryl ring (containing one of O, S or N and, optionally, one additional nitrogen), a 5 to 7 membered cycloalkyl ring or a 5 to 7 membered heterocyclo ring (as defined supra but absent the option of a further fused ring). Examples of heteroaryl groups include, and are not limited to, furyl, thienyl, pyrrolyl, oxazolyl, thiazolyl, imidazolyl, pyrazolyl, isoxazolyl, isothiazolyl, oxadiazolyl, triazolyl, thiadiazolyl, pyridinyl, pyridazinyl, pyrimidinyl or pyrazinyl; fused heteroaryl groups include indolyl, isoindolyl, indolinyl, benzofuryl, benzothienyl, indazolyl, benzimidazolyl, benzthiazolyl, benzoxazolyl, benzisoxazolyl, benzothiadiazolyl, benzotriazolyl, quinolizinyl, quinolinyl, isoquinolinyl or quinazolinyl.

The term "arylalkyl" means an alkyl group substituted with an aryl group (e.g., benzyl, phenethyl). Similarly, the term "arylalkoxy" indicates an alkoxy group substituted with an aryl group (e.g., benzyloxy).

The term "halogen" refers to fluorine, chlorine, bromine and iodine. Substituents that are substituted with multiple halogens are substituted in a manner that provides compounds, which are stable.

Whenever the term "alkyl" or "aryl" or either of their prefix roots appear in a name of a substituent (e.g., arylalkyl, alkylamino) it shall be interpreted as including those limitations given above for "alkyl" and "aryl." Designated numbers of carbon atoms (e.g., C$_1$-C$_6$) shall refer independently to the number of carbon atoms in an alkyl moiety or to the alkyl

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000025

US 7,741,356 B2

41

portion of a larger substituent in which alkyl appears as its prefix form. For alkyl, and alkoxy substituents the designated number of carbon atoms includes all of the independent member included in the range specified individually and all the combination of ranges within in the range specified. For example C$_{1-6}$ alkyl would include methyl, ethyl, propyl, butyl, pentyl and hexyl individually as well as sub-combinations thereof (e.g. C$_{1-2}$, C$_{1-3}$, C$_{1-4}$, C$_{1-5}$, C$_{2-6}$, C$_{3-6}$, C$_{4-6}$, C$_{5-6}$, C$_{2-5}$, etc.).

The term "therapeutically effective amount" as used herein, means that amount of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue system, animal or human that is being sought by a researcher, veterinarian, medical doctor or other clinician, which includes alleviation of the symptoms of the disease or disorder being treated.

The novel compounds of the present invention are useful opioid receptor modulators. In particular, certain compounds are opioid receptor agonists useful in the treatment or amelioration of conditions such as pain and gastrointestinal disorders. Examples of pain intended to be within the scope of the present invention include, but are not limited to, centrally mediated pain, peripherally mediated pain, structural or soft tissue injury related pain, pain related to inflammation, progressive disease related pain, neuropathic pain and acute pain such as caused by acute injury, trauma or surgery and chronic pain such as caused by neuropathic pain conditions, diabetic peripheral neuropathy, post-herpetic neuralgia, trigeminal neuralgia, post-stroke pain syndromes or cluster or migraine headaches. Examples of gastrointestinal disorders intended to be within the scope of this invention include, but are not limited to, diarrheic syndromes, motility disorders such as diarrhea-predominant, or alternating irritable bowel syndrome, and visceral pain and diarrhea associated with inflammatory bowel disease including ulcerative colitis and Crohn's disease.

Examples of gastrointestinal disorders where opioid receptor ("OR") antagonists are useful include constipation-predominant irritable bowel syndrome, post-operative ileus and constipation, including but not limited to the constipation associated with treatment of chronic pain with opiates. Modulation of more than one opioid receptor subtype is also useful in the treatment of pain. For example, a compound that is a mixed mu OR agonist and delta OR antagonist could have antidiarrheal properties without being profoundly constipating. A compound that is a mixed mu OR agonist and delta OR agonist are useful in cases of severe diarrhea that are refractory to treatment with pure mu OR agonists, or has additional utility in treating visceral pain associated with inflammation and diarrhea.

Accordingly, a compound of the present invention may be administered by any conventional route of administration including, but not limited to oral, nasal, pulmonary, sublingual, ocular, transdermal, rectal, vaginal and parenteral (i.e. subcutaneous, intramuscular, intradermal, intravenous etc.). It is currently preferred that the compounds of the present invention be administered via modes of administration other than pulmonary or parenteral administration. However, the preferred compounds provided in Table IV may be administered via pulmonary or parenteral modes of administration.

To prepare the pharmaceutical compositions of this invention, one or more compounds of Formula (I) or salt thereof as the active ingredient, is intimately admixed with a pharmaceutical carrier according to conventional pharmaceutical compounding techniques, which carrier may take a wide variety of forms depending of the form of preparation desired for administration (e.g. oral or parenteral). Suitable pharmaceutically acceptable carriers are well known in the art. Descrip-

42

tions of some of these pharmaceutically acceptable carriers may be found in *The Handbook of Pharmaceutical Excipients*, published by the American Pharmaceutical Association and the Pharmaceutical Society of Great Britain.

Methods of formulating pharmaceutical compositions have been described in numerous publications such as *Pharmaceutical Dosage Forms: Tablets, Second Edition, Revised and Expanded*, Volumes 1-3, edited by Lieberman et al; *Pharmaceutical Dosage Forms: Parenteral Medications*, Volumes 1-2, edited by Avis et al; and *Pharmaceutical Dosage Forms: Disperse Systems*, Volumes 1-2, edited by Lieberman et al; published by Marcel Dekker, Inc.

In preparing a pharmaceutical composition of the present invention in liquid dosage form for oral, topical and parenteral administration, any of the usual pharmaceutical media or excipients may be employed. Thus, for liquid dosage forms, such as suspensions (i.e. colloids, emulsions and dispersions) and solutions, suitable carriers and additives include, but are not limited to, pharmaceutically acceptable wetting agents, dispersants, flocculation agents, thickeners, pH control agents (i.e. buffers), osmotic agents, coloring agents, flavors, fragrances, preservatives (i.e. to control microbial growth, etc.) and a liquid vehicle may be employed. Not all of the components listed above will be required for each liquid dosage form.

In solid oral preparations such as, for example, dry powders for reconstitution or inhalation, granules, capsules, caplets, gelcaps, pills and tablets (each including immediate release, timed release and sustained release formulations), suitable carriers and additives include but are not limited to diluents, granulating agents, lubricants, binders, glidants, disintegrating agents and the like. Because of their ease of administration, tablets and capsules represent the most advantageous oral dosage unit form, in which case solid pharmaceutical carriers are obviously employed. If desired, tablets may be sugar coated, gelatin coated, film coated or enteric coated by standard techniques.

The pharmaceutical compositions herein will contain, per dosage unit, e.g., tablet, capsule, powder, injection, teaspoonful and the like, an amount of the active ingredient necessary to deliver an effective dose as described above. The pharmaceutical compositions herein will contain, per unit dosage unit, e.g., tablet, capsule, powder, injection, teaspoonful and the like, of from about 0.01 mg/kg to about 300 mg/kg (preferably from about 0.01 mg/kg to about 100 mg/kg; and, more preferably, from about 0.01 mg/kg to about 30 mg/kg) and may be given at a dosage of from about 0.01 mg/kg/day to about 300 mg/kg/day (preferably from about 0.01 mg/kg/day to about 100 mg/kg/day and more preferably from about 0.01 mg/kg/day to about 30 mg/kg/day). Preferably, the method for the treatment of conditions that may be mediated by opioid receptors described in the present invention using any of the compounds as defined herein, the dosage form will contain a pharmaceutically acceptable carrier containing between from about 0.01 mg to about 100 mg; and, more preferably, from about 5 mg to about 50 mg of the compound, and may be constituted into any form suitable for the mode of administration selected. The dosages, however, may be varied depending upon the requirement of the subjects, the severity of the condition being treated and the compound being employed. The use of either daily administration or post-periodic dosing may be employed.

Preferably these compositions are in unit dosage forms from such as tablets, pills, capsules, dry powders for reconstitution or inhalation, granules, lozenges, sterile solutions or suspensions, metered aerosol or liquid sprays, drops, or suppositories for administration by oral, intranasal, sublingual,

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000026

US 7,741,356 B2

43

44

intraocular, transdermal, rectal, vaginal, dry powder inhaler or other inhalation or insufflation means.

For preparing solid pharmaceutical compositions such as tablets, the principal active ingredient is mixed with a pharmaceutical carrier, e.g. conventional tableting ingredients such as diluents, binders, adhesives, disintegrants, lubricants, antiadherents and gildants. Suitable diluents include, but are not limited to, starch (i.e. corn, wheat, or potato starch, which may be hydrolized), lactose (granulated, spray dried or anhydrous), sucrose, sucrose-based diluents (confectioner's sugar; sucrose plus about 7 to 10 weight percent invert sugar; sucrose plus about 3 weight percent modified dextrins; sucrose plus invert sugar, about 4 weight percent invert sugar, about 0.1 to 0.2 weight percent cornstarch and magnesium stearate), dextrose, inositol, mannitol, sorbitol, microcrystalline cellulose (i.e. AVICEL™ microcrystalline cellulose available from FMC Corp.), dicalcium phosphate, calcium sulfate dihydrate, calcium lactate trihydrate and the like. Suitable binders include, but are not limited to acacia gum, guar gum, tragacanth gum, sucrose, gelatin, glucose, starch, and cellulosics (i.e. methylcellulose, sodium carboxymethylcellulose, ethylcellulose, hydroxypropylmethylcellulose, hydroxypropylcellulose, and the like), water soluble or dispersible binders (i.e. alginic acid and salts thereof, magnesium aluminum silicate, hydroxyethylcellulose [i.e. TYLOSE™ available from Hoechst Celanese], polyethylene glycol, polysaccharide acids, bentonites, polyvinylpyrrolidone, polymethacrylates and pregelatinized starch) and the like. Suitable disintegrants include, but are not limited to, starches (corn, potato, etc.), sodium starch glycolates, pregelatinized starches, clays (magnesium aluminum silicate), cellulosics (such as crosslinked sodium carboxymethylcellulose and microcrystalline cellulose), alginates, pregelatinized starches (i.e. corn starch, etc.), gums (i.e. agar, guar, locust bean, karaya, pectin, and tragacanth gum), cross-linked polyvinylpyrrolidone and the like. Suitable lubricants and antiadherents include, but are not limited to, stearates (magnesium, calcium and sodium), stearic acid, talc waxes, stearowet, boric acid, sodium chloride, DL-leucine, carbowax 4000, carbowax 6000, sodium oleate, sodium benzoate, sodium acetate, sodium lauryl sulfate, magnesium lauryl sulfate and the like. Suitable gildants include, but are not limited to, talc, cornstarch, silica (i.e. CAB-O-SIL™ silica available from Cabot, SYLOID™ silica available from W. R. Grace/Davison, and AEROSIL™ silica available from Degussa) and the like. Sweeteners and flavorants may be added to chewable solid dosage forms to improve the palatability of the oral dosage form. Additionally, colorants and coatings may be added or applied to the solid dosage form for ease of identification of the drug or for aesthetic purposes. These carriers are formulated with the pharmaceutical active to provide an accurate, appropriate dose of the pharmaceutical active with a therapeutic release profile.

Generally these carriers are mixed with the pharmaceutical active to form a solid preformulation composition containing a homogenous mixture of the pharmaceutical active of the present invention, or a pharmaceutically acceptable salt thereof. Generally the preformulation will be formed by one of three common methods: (a) wet granulation, (b) dry granulation and (c) dry blending. When referring to these preformulation compositions as homogeneous, it is meant that the active ingredient is dispersed evenly throughout the composition so that the composition may be readily subdivided into equally effective dosage forms such as tablets, pills and capsules. This solid preformulation composition is then subdivided into unit dosage forms of the type described above containing from about 0.1 mg to about 500 mg of the active ingredient of the present invention. The tablets or pills containing the novel compositions may also be formulated in multilayer tablets or pills to provide a sustained or provide dual-release products. For example, a dual release tablet or pill can comprise an inner dosage and an outer dosage component, the latter being in the form of an envelope over the former. The two components can be separated by an enteric layer, which serves to resist disintegration in the stomach and permits the inner component to pass intact into the duodenum or to be delayed in release. A variety of materials can be used for such enteric layers or coatings, such materials including a number of polymeric materials such as shellac, cellulose acetate (i.e. cellulose acetate phthalate, cellulose acetate trimetllitate), polyvinyl acetate phthalate, hydroxypropyl methylcellulose phthalate, hydroxypropyl methylcellulose acetate succinate, methacrylate and ethylacrylate copolymers, methacrylate and methyl methacrylate copolymers and the like. Sustained release tablets may also be made by film coating or wet granulation using slightly soluble or insoluble substances in solution (which for a wet granulation acts as the binding agents) or low melting solids a molten form (which in a wet granulation may incorporate the active ingredient). These materials include natural and synthetic polymers waxes, hydrogenated oils, fatty acids and alcohols (i.e. beeswax, carnauba wax, cetyl alcohol, cetylstearyl alcohol, and the like), esters of fatty acids metallic soaps, and other acceptable materials that can be used to granulate, coat, entrap or otherwise limit the solubility of an active ingredient to achieve a prolonged or sustained release product.

The liquid forms in which the novel compositions of the present invention may be incorporated for administration orally or by injection include, but are not limited to aqueous solutions, suitably flavored syrups, aqueous or oil suspensions, and flavored emulsions with edible oils such as cottonseed oil, sesame oil, coconut oil or peanut oil, as well as elixirs and similar pharmaceutical vehicles. Suitable suspending agents for aqueous suspensions, include synthetic and natural gums such as, acacia, agar, alginate (i.e. propylene alginate, sodium alginate and the like), guar, karaya, locust bean, pectin, tragacanth, and xanthan gum, cellulosics such as sodium carboxymethylcellulose, methylcellulose, hydroxymethylcellulose, hydroxyethylcellulose, hydroxypropyl cellulose and hydroxypropyl methylcellulose, and combinations thereof, synthetic polymers such as polyvinyl pyrrolidone, carbomer (i.e. carboxypolymethylene), and polyethylene glycol; clays such as bentonite, hectorite, attapulgite or sepiolite; and other pharmaceutically acceptable suspending agents such as lecithin, gelatin or the like. Suitable surfactants include but are not limited to sodium docusate, sodium lauryl sulfate, polysorbate, octoxynol-9, nonoxynol-10, polysorbate 20, polysorbate 40, polysorbate 60, polysorbate 80, polyoxamer 188, polyoxamer 235 and combinations thereof. Suitable deflocculating or dispersing agent include pharmaceutical grade lecithins. Suitable flocculating agent include but are not limited to simple neutral electrolytes (i.e. sodium chloride, potassium, chloride, and the like), highly charged insoluble polymers and polyelectrolyte species, water soluble divalent or trivalent ions (i.e. calcium salts, alums or sulfates, citrates and phosphates (which can be used jointly in formulations as pH buffers and flocculating agents). Suitable preservatives include but are not limited to parabens (i.e. methyl, ethyl, n-propyl and n-butyl), sorbic acid, thimerosal, quaternary ammonium salts, benzyl alcohol, benzoic acid, chlorhexidine gluconate, phenylethanol and the like. There are many liquid vehicles that may be used in liquid pharmaceutical dosage forms, however, the liquid vehicle that is used in a particular dosage form must be compatible

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000027

Appx14433

US 7,741,356 B2

<table>
<tr><td>45</td><td>46</td></tr>
</table>

with the suspending agent(s). For example, nonpolar liquid vehicles such as fatty esters and oils liquid vehicles are best used with suspending agents such as low HLB (Hydrophile-Lipophile Balance) surfactants, stearalkonium hectorite, water insoluble resins, water insoluble film forming polymers and the like. Conversely, polar liquids such as water, alcohols, polyols and glycols are best used with suspending agents such as higher HLB surfactants, clays silicates, gums, water soluble cellulosics, water soluble polymers and the like.

Furthermore, compounds of the present invention can be administered in an intranasal dosage form via topical use of suitable intranasal vehicles or via transdermal skin patches, the composition of which are well known to those of ordinary skill in that art. To be administered in the form of a transdermal delivery system, the administration of a therapeutic dose will, of course, be continuous rather than intermittent throughout the dosage regimen.

Compounds of this invention may be administered in any of the foregoing compositions and dosage regimens or by means of those compositions and dosage regimens established in the art whenever treatment of disorders that may be mediated or ameliorated by opioid receptors for a subject in need thereof.

The daily dose of a pharmaceutical composition of the present invention may be varied over a wide range from about 0.1 mg to about 7000 mg per adult human per day; most preferably the dose will be in the range of from about 0.7 mg to about 2100 mg per adult human per day. For oral administration, the compositions are preferably provided in the form of tablets containing, 0.01, 0.05, 0.1, 0.5, 1.0, 2.5, 5.0, 10.0, 15.0, 25.0, 50.0, 100, 150, 200, 250 and 500 milligrams of the active ingredient for the symptomatic adjustment of the dosage to the subject to be treated. An effective amount of the drug is ordinarily supplied at a dosage level of from about 0.01 mg/kg to about 300 mg/kg of body weight per day. Preferably, the range is from about 0.01 mg/kg to about 100 mg/kg of body weight per day; and, most preferably, from about 0.01 mg/kg to about 30 mg/kg of body weight per day. Advantageously, a compound of the present invention may be administered in a single daily dose or the total daily dosage may be administered in divided doses of two, three or four times daily.

Optimal dosages to be administered may be readily determined by those skilled in the art, and will vary with the particular compound used, the mode of administration, the strength of the preparation, and the advancement of the disease condition. In addition, factors associated with the particular subject being treated, including subject age, weight, diet and time of administration, will result in the need to adjust the dose to an appropriate therapeutic level.

Representative IUPAC names for the compounds of the present invention were derived using the AutoNom version 2.1 nomenclature software program provided by Beilstein Informationssysteme.

Abbreviations used in the instant specification, particularly the Schemes and Examples, are as follows:

BOC=tert-butoxycarbonyl
BuLi=n-butyllithium
CBZ=benzyloxycarbonyl
Cpd or Cmpd=compound
d=day/days
DIPEA diisopropylethylamine
DPPF=1,1'-bis(diphenylphosphino)ferrocene
DPPP=1,3-Bis(diphenylphosphino)propane
EDCI or EDC=1-[3-(dimethylamino)propyl]-3-ethylcarbodiimide hydrochloride
EtOAc=ethyl acetate
EtOH=ethanol
h=hour/hours
HMDS=1,1,3,3-Hexamethyldisilazane
HOBt/HOBT=hydroxybenzotiazole
M=molar
MeCN=acetonitrile
MeOH=methanol
min=minutes
PyBOP=Benzotriazol-1-yl-oxy-tris-pyrrolidinophosphonium hexafluorophosphate
rt/RT=room temperature
TFA=trifluoroacetic acid
OTf=triflate
Ts=tosyl

SYNTHETIC METHODS

Representative compounds of the present invention can be synthesized in accordance with the general synthetic methods described below and are illustrated more particularly in the schemes that follow. Since the schemes are an illustration, the invention should not be construed as being limited by the chemical reactions and conditions expressed. The preparation of the various starting materials used in the schemes is well within the skill of persons versed in the art.

The following schemes describe general synthetic methods whereby intermediate and target compounds of the present invention may be prepared. Additional representative compounds and stereoisomers, racemic mixtures, diasteromers and enantiomers thereof can be synthesized using the intermediates prepared in accordance to the general schemes and other materials, compounds and reagents known to those skilled in the art. All such compounds, stereoisomers, racemic mixtures, diasteromers and enantiomers thereof are intended to be encompassed within the scope of the present invention.

Certain intermediates and compounds of the present invention may be prepared according to the process outlined in Scheme A below.

Scheme A



Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

47 48

-continued



A-1 → A-2 (Aminoketone Coupling) → A-4 + A-5 ($H_2N$—$R_5$ or $NH_4OAc$)

A-4 → A-6 (-CBZ(BOC))

A-7 → A-8 (Aminoketone Coupling) → A-9 ($H_2N$—$R^5$) → A-10 (-CBZ(BOC))

A carboxylic acid of the formula A-1, available either commercially or prepared by reported protocols in the scientific literature, may be coupled to an α-aminoketone using standard peptide coupling conditions with a coupling agent such as EDCI and an additive such as HOBt to provide a compound of formula A-2. Compound A-2 may be condensed with an amine of the formula $H_2N$—$R_5$ or ammonium acetate and cyclized upon heating in acetic acid to a compound of formula A-4.

The protecting group of compound A-4 may be removed using conditions known to those skilled in the art that are appropriate for the particular protecting group to afford a compound of the formula A-6. For instance, hydrogenation in the presence of a palladium catalyst is one method for the removal of a CBZ protecting group, whereas treatment with an acid such as TFA is effective for a BOC group deprotection.

A compound of formula A-6 may be substituted using reductive amination with an appropriately substituted aldehyde or ketone in the presence of a hydride source, such as

sodium borohydride or sodium triacetoxyborohydride, provide compounds of formula A-10.

Alternatively, a compound of formula A-3 may be condensed with a dicarbonyl compound of the formula $R_3(C{=}O)_2R_3$ and an amine of the formula $H_2N$—$R_5$ upon heating in acetic acid to afford a compound of the formula A-4. When compound A-3 is protected with a BOC group, a by-product of formula A-5 may be produced. Compounds of formula A-4 or A-5 may be treated with a hydride source such as lithium aluminum hydride to give certain compounds of formula A-10.

Similarly, a compound of formula A-7 may be coupled to an α-aminoketone as described above for compounds of formula A-1 to yield the corresponding compounds of formula A-8. A compound of formula A-8 may then be cyclized in the presence of an amine of formula $H_2N$—$R_5$ or ammonium acetate and subsequently deprotected as described above to arrive at compounds of formula A-10.

Certain compounds of the present invention may be prepared according to the process outlined in Scheme B below.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

49 50



Scheme.B

$R^{5a}$ = a N-protecting group,
more particularly,
$R^{5a}$ = SEM, MOM or the like

More specifically, a compound of formula B-1 (wherein the imidazole nitrogen is substituted with $R^5$, as defined herein, or $R^{5a}$, a nitrogen protecting group such as SEM, MOM, or the like) may be deprotonated with an organometallic base such as n-butyllithium and then treated with a suitably substituted amide to yield a compound of formula B-2.

Compound B-2 may be brominated to yield a mixture of regioisomers of formula B-3. A compound of formula B-3 may be further elaborated via a reductive amination with an amine of the formula $H_2N$—$R^1$ in the presence of a hydride source as described in Scheme A to afford a compound of formula B-4.

The amine of a compound of formula B-4 may be coupled with a suitable carboxylic acid under standard peptide coupling conditions with a coupling agent such as EDCI and an additive such as HOBt to yield compounds of formula B-5.

Certain $R^3$ substituents of the present invention in which a carbon atom is the point of attachment may be introduced into

a compound of formula B-5 through a transition metal-catalyzed cross coupling reaction to afford compounds of formula B-6. Suitable palladium catalysts include palladium tetrakis triphenylphosphine and the like. Suitable Lewis acids for the reaction include boronic acids and the like. Compounds protected with $R^{5a}$ may be deprotected under acidic conditions to yield compounds of formula B-7.

In a similar manner, an intermediate B-2 when optionally protected with $R^{5a}$ may be reductively alkylated using methods described above to give a compound of formula B-8, followed by removal of protecting group $R^{5a}$ using conditions described herein to yield a compound of formula B-9.

One skilled in the art will recognize that substituent L (depicted as O in the formulae of Scheme B) may be further elaborated to S or N($R^d$) of the present invention using conventional, known chemical methods.

Certain compounds of the present invention may be prepared according to the process outlined in Scheme C below.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

51

Scheme C



A-10,
B-8, or B-9
+
C-1
→ Coupling
C-2

More specifically, a compound of formula A-10, B-8, or B-9 may be elaborated to a compound of formula C-2 through coupling with a suitable carboxylic acid under standard peptide coupling conditions as described above. One skilled in the art will recognize that substituent L in a compound of formula C-2 (depicted as O) may be converted to S or N(R$^d$) of the present invention using conventional, known chemical methods.

Suitably substituted carboxylic acids of the present invention may either be commercially available or prepared by reported protocols in the scientific literature. Several chemical routes for preparing certain compounds of formula C-1 are outlined below in Schemes D and E.

52

Specifically, a compound of formula D-1 may be treated with trifluoromethanesulfonic anhydride to afford the triflate compound of formula D-2. A compound of formula D-2 may be converted to a compound of formula D-4 by a variety chemical routes which utilize conventional chemical methods known to those skilled in the art. For example, the bromo group of a compound of formula D-2 may undergo a carboxylation reaction via an initial carbonylation under a carbon monoxide atmosphere in the presence of an appropriate palladium catalyst and DPPF, followed by an aqueous basic workup to afford a compound of formula D-3. Subsequently, the carboxyl group may be converted to a substituent of R$^{41a}$ of formula D-4 using standard peptide coupling conditions. Alternatively, a compound of formula D-4 may be directly prepared via a carbonylation of compound of formula D-2, followed by treatment with HMDS, or a primary or secondary amine.

The compound of formula D-5, known or prepared by known methods, may be treated with EDC in the presence of copper (I) chloride to afford the corresponding alkene of formula D6. A compound of formula D-6 may then undergo a Heck reaction with a compound of formula D-4 in the presence of an appropriate palladium catalyst and phosphino ligand to afford a compound of formula D7. Subsequent hydrogenation of the alkenyl substituent using standard hydrogen reduction methods affords a compound of formula D-8.

Scheme E demonstrates an alternative method for preparing intermediate D-7 of the present invention. A compound of formula E-1 may be elaborated to a compound of formula E-4 using the appropriately adapted synthetic steps described in Scheme D. One skilled in the art will recognize that this

VIB-PAT00000031

US 7,741,356 B2

**53**

transformation may be achieved by manipulation of the reaction sequence. A compound of formula E-4 may be converted to its corresponding nitrile via an aromatic nucleophilic displacement reaction with cyanide anion. One skilled in the art will recognize that a nitrile substituent is a viable synthon for a substituent of $R^{41a}$.

**54**

A compound of formula E-4 may participate in a Horner-Wadsworth-Emmons reaction with a compound of formula E-7 in the presence of an organometallic base such as n-butyllithium to afford a compound of formula D-7. This intermediate may be further elaborated as described in Scheme D, herein.

Scheme E



Certain compounds of the present invention may be prepared according to the process outlined in Scheme F below.

Scheme F



Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000032

**PTX-007, page 32 of 79**

Appx14438

US 7,741,356 B2

**55**

-continued



F-3

Nitrile to Amide Conversion →



F-4



F-5

X = I, Br, —OTs, —OTf

Pd Coupling functionalization →



F-4

$R^{11}$ = CN, —$CO_2H$, -alkoxycarbonyl

More specifically, a compound of formula F-1, wherein $R^{11}$ is an alkoxycarbonyl as defined above, may be saponified to its corresponding acid, a compound of formula F-2.

A compound of formula F-3 wherein $R^{11}$ is a cyano substituent may be elaborated to its corresponding aminocarbonyl, compound F-4 by treatment with hydrogen peroxide in the presence of hydroxide anion. Similarly, when $R^3$ is a cyano-substituted aryl ring, it may be treated as described above to form an aminocarbonyl-substituted aryl ring.

**56**

Certain substitutents of $R^{11}$ may be installed via a palladium catalyzed coupling reaction with an X-substituted precursor. For example, a compound of formula F-5 wherein X is iodide, bromide, tosylate, triflate, or the like may be treated with $Zn(CN)_2$ in the presence of palladium tetrakis triphenylphosphine to give a compound of formula F-6 wherein $R^{11}$ is cyano.

Treatment of a compound of formula F-5 with $Pd(OAc)_2$ and a ligand such as 1,1-bis(diphenylphosphino)ferrocene under a carbon monoxide atmosphere provides a compound of formula F-6 wherein $R^{11}$ is a carboxy substituent.

The palladium catalyzed couplings described above may also be used to install cyano, carboxy, and alkoxycarbonyl substituents onto an aryl ring at $R^3$.

SPECIFIC EXAMPLES

Specific compounds which are representative of this invention were prepared as per the following examples and reaction sequences; the examples and the diagrams depicting the reaction sequences are offered by way of illustration, to aid in the understanding of the invention and should not be construed to limit in any way the invention set forth in the claims which follow thereafter. The instant compounds may also be used as intermediates in subsequent examples to produce additional compounds of the present invention. No attempt has been made to optimize the yields obtained in any of the reactions. One skilled in the art would know how to increase such yields through routine variations in reaction times, temperatures, solvents and/or reagents.

Reagents were purchased from commercial sources. Nuclear magnetic resonance (NMR) spectra for hydrogen atoms were measured in the indicated solvent with (TMS) as the internal standard on a Bruker Biospin, Inc. DPX-300 (300 MHz) spectrometer. The values are expressed in parts per million down field from TMS. The mass spectra (MS) were determined on a Micromass Platform LC spectrometer or an Agilent LC spectrometer using electrospray techniques. Microwave accelerated reactions were performed using either a CEM Discover or a Personal Chemistry Smith Synthesizer microwave instrument. Stereoisomeric compounds may be characterized as racemic mixtures or as separate diastereomers and enantiomers thereof using X-ray crystallography and other methods known to one skilled in the art. Unless otherwise noted, the materials used in the examples were obtained from readily available commercial suppliers or synthesized by standard methods known to one skilled in the art of chemical synthesis. The substituent groups, which vary between examples, are hydrogen unless otherwise noted.

Example 1

2-Amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-N-isopropyl-N-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-propionamide



1a

→

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000033

**PTX-007, page 33 of 79**

Appx14439

US 7,741,356 B2

57

-continued



1b

1c

1d

1e

1f

A. [1-(2-Oxo-2-phenyl-ethylcarbamoyl)-ethyl]-carbamic acid benzyl ester. To a solution of commercially available N-α-CBZ-L-alanine (2.11 g, 9.5 mmol) in dichloromethane (50 mL) was added 2-aminoacetophenone hydrochloride (1.62 g, 9.5 mmol). The resulting solution was cooled to 0° C. and N-methylmorpholine (1.15 g, 11 mmol), 1-hydroxybenzotriazole (2.55 g, 18.9 mmol) and 1-[3-(dimethylamino)propyl]-3-ethylcarbodiimide hydrochloride (2.35 g, 12.3 mmol) in that order were added under an Argon atmosphere. The reaction mixture was warmed to room temperature and stirred overnight. The reaction was quenched by addition of saturated aqueous NaHCO₃ solution; the separated organic phase was washed with 2N citric acid, saturated NaHCO₃ solution and brine, then dried over MgSO₄ overnight. After filtration and concentration, the residue was purified by column chromatography on silica gel (eluent, EtOAc:hexane-1:1) to give the pure product: [1-(2-oxo-2-phenyl-ethylcarbamoyl)-ethyl]-carbamic acid benzyl ester (2.68 g, 83%). ¹H NMR (300 MHz, CDCl₃): δ 1.46 (3H, d), 4.39 (1H, m), 4.75

58

(2H, d), 5.13 (2H, d), 5.40 (1H, m), 7.03 (1H, m), 7.36 (5H, m), 7.50 (2H, m), 7.63 (1H, m), 7.97(2H, m).
MS(ES⁺): 341.1 (100%).

B. [1-(4-Phenyl-1H-imidazol-2-yl)-ethyl]-carbamic acid benzyl ester. To a suspension of [1-(2-oxo-2-phenyl-ethylcarbamoyl)-ethyl]-carbamic acid benzyl ester (2.60 g, 7.64 mmol) in xylene (60 mL) was added NH₄OAc (10.3 g, 134 mmol) and HOAc (5 mL). The resulting mixture was heated at reflux for 7 h. After being cooled to room temperature, brine was added and the mixture was separated. The aqueous phase was extracted with EtOAc, and the combined organic phases were dried over Na₂SO₄ overnight. After filtration and concentration, the residue was purified by column chromatography on silica gel (eluent, EtOAc:hexane-1:1) to give the title compound (2.33 g, 95%). ¹H NMR (300 MHz, CDCl₃): δ 1.65 (3H, d), 5.06 (1H, m), 5.14 (1H, q), 5.94 (1H, m), 7.32 (10H, m), 7.59 (2H, d). MS(ES⁺): 322.2 (100%).

C. 1-(4-Phenyl-1H-imidazol-2-yl)-ethylamine. To a solution of [1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamic acid benzyl ester (1.5 g, 4.67 mmol) in methanol (25 mL) was added 10% palladium on carbon (0.16 g). The mixture was shaken in a hydrogenation apparatus at rt under a hydrogen atmosphere (10 psi) for 8 h. Filtration followed by evaporation to dryness under reduced pressure gave the crude product 1-(4-Phenyl-1H-imidazol-2-yl)-ethylamine (0.88 g, 100%). ¹H NMR (300 MHz, CDCl₃): δ 1.53 (3H, d), 4.33 (1H, q), 7.23 (3H, m), 7.37 (2H, m), 7.67 (2H, m). MS(ES⁺): 188.1 (38%).

D. Isopropyl-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amine. 1-(4-Phenyl-1H-imidazol-2-yl)-ethylamine (0.20 g, 1.07 mmol) and acetone (0.062 g, 1.07 mmol) were mixed in 1,2-dichloroethane (4 mL), followed by the addition of NaBH (OAc)₃ (0.34 g, 1.61 mmol). The resulting mixture was stirred at rt for 3 h. The reaction was quenched with saturated NaHCO₃ solution. The mixture was extracted with EtOAc and the combined extracts were dried over Na₂SO₄. Filtration followed by evaporation to dryness under reduced pressure gave the crude isopropyl-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amine (0.23 g, 100%) which was used for the next reaction without further purification. ¹H NMR (300 MHz, CDCl₃): δ 1.10 (3H, m), 1.18 (3H, d), 1.57 (1H, d), 2.86 (1H, m), 4.32 (1H, m), 7.24 (2H, m), 7.36 (2H, m), 7.69 (2H, m). MS(ES⁺): 230.2 (100%).

E. (2-(4-Hydroxy-2,6-dimethyl-phenyl)-1-{isopropyl-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamoyl}-ethyl)-carbamic acid tert-butyl ester. Into a solution of 2-tert-Butoxycarbonylamino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionic acid (0.18 g, 0.6 mmol) in DMF (7 mL) was added isopropyl-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amine (0.11 g, 0.5 mmol), 1-hydroxybenzotriazole (0.22 g, 1.6 mmol) and 1-[3-(dimethylamino)propyl]-3-ethylcarbodiimide hydrochloride (0.12 g, 0.6 mmol). The resulting mixture was stirred under an Argon atmosphere at rt overnight. The reaction mixture was extracted with EtOAc and the combined organic extracts were washed sequentially with saturated aqueous NaHCO₃ solution, 1N NaHCO₃, saturated aqueous NaHCO₃ solution, and brine. The organic phase was then dried over MgSO₄, filtered, and the filtrate was concentrated under reduced pressure. The resulting residue was purified by flash column chromatography (eluent: EtOAc) to afford the product (2-(4-hydroxy-2,6-dimethyl-phenyl)-1-{isopropyl-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamoyl}-ethyl)-carbamic acid tert-butyl ester (0.13 g, 50%). MS(ES⁺): 521.5 (100%).

F. 2-Amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-N-isopropyl-N-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-propionamide. A solution of (2-(4-hydroxy-2,6-dimethyl-phenyl)-1-

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**59**

{isopropyl-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamoyl}-ethyl-carbamic acid tert-butyl ester (0.13 g, 0.25 mmol) in trifluoroacetic acid (5 mL) was stirred at rt for 2 h. Upon removal of the solvents, the residue was purified by preparative LC and lyophilized to give the TFA salt of the title compound as a white powder (0.042 g). $^1$H NMR (300 MHz, CDCl$_3$): δ 0.48 (3H, d), 1.17 (3H, d), 1.76 (3H, d), 2.28 (6H, s), 3.19 (2H, m), 3.74 (1H, m), 4.70 (1H, m), 4.82 (1H, q), 6.56 (2H, s), 7.45 (4H, m), 7.74 (2H, m). MS(ES$^+$): 421.2 (100%).

Example 2

Methyl-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-amine and

Ethyl-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-amine



**60**

1-(2-oxo-2-phenyl-ethylcarbamoyl)-propyl]-carbamic acid tert-butyl ester (Cpd 2a), 1.89 g (50%) of [2-methyl-1-(4-phenyl-1-H-imidazol-2-yl)-propyl]-carbamic acid tert-butyl ester (Cpd 2b), and 0.60 g of a mixture of N-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-acetamide (Cpd 2c) and acetamide.

Cpd 2c was purified by dissolving it in hot CH$_3$CN and cooling to 0° C. Collection of the precipitate by suction filtration afforded 0.21 g (7%) of N-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-acetamide, Cpd 2c, as a white powder (HPLC: 100% @254 nm and 214 nm). $^1$H NMR (300 MHz, CDCl$_3$): δ 7.63 (2H, br s), 7.33 (2H, t, J=7.5 Hz), 7.25-7.18 (2H, m), 4.78 (1H, br s), 2.35 (1H, br m), 2.02 (3H, s), 1.03 (3H, d, J=6.7 Hz), 0.87 (3H, d, J=6.7 Hz); MS (ES$^+$) (relative intensity): 258.3 (100) (M+1).

C. Methyl-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-amine. A solution of [2-methyl-1-(4-phenyl-1-H-imidazol-2-yl)-propyl]-carbamic acid tert-butyl ester (0.095 g, 0.30

mmol) in THF (2.0 mL) was added dropwise over 10 min to a refluxing 1.0 M solution of LiAlH$_4$ in THF (3.0 mL). The reaction was maintained at reflux for 2 h, cooled to room temperature, and quenched by sequential treatment with 0.11 mL of cold water (5° C.), 0.11 mL of 15% NaOH in aqueous solution, and 0.33 mL of cold water (5° C.). The resultant solid was removed by suction filtration and the filtrate (pH 8-9) was extracted three times with EtOAc. The combined organic fractions were dried over MgSO$_4$, filtered, and concentrated to afford 0.58 g (84%) of methyl-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-amine as a light yellow oil (HPLC: 97% @254 nm and 214 nm). $^1$H NMR (300 MHz, CDCl$_3$): δ 7.69 (2H, d, J=7.4 Hz), 7.36 (2H, t, J=7.6 Hz), 7.26 (1H, s), 7.25-7.20 (1H, m), 3.62 (1H, d, J=6.3 Hz), 2.35 (3H, s), 2.06 (1H, m), 0.99 (3H, d, J=6.7 Hz), 0.89 (3H, d, J=6.7 Hz);

A. [2-Methyl-1-(2-oxo-2-phenyl-ethylcarbamoyl)-propyl]-carbamic acid tert-butyl ester. Compound 2a was prepared according to Example 1 using the appropriate reagents, starting materials and methods known to those skilled in the art.

B. [2-Methyl-1-(4-phenyl-1-H-imidazol-2-yl)-propyl]-carbamic acid tert-butyl ester. Following the procedure described in Example 1 for the conversion of Compound 1a to Compound 1b, and using the appropriate reagents and methods known to those skilled in the art, [2-methyl-1-(4-phenyl-1-H-imidazol-2-yl)-propyl]-carbamic acid tert-butyl ester, Cpd 2b, was prepared.

Subsequent to workup, the crude product mixture was subjected to flash silica gel chromatography (eluents: CH$_2$Cl$_2$, followed by 4:1 CH$_2$Cl$_2$/Et$_2$O, then EtOAc). Processing of the fractions afforded 1.08 g (27%) of recovered [2-methyl-

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000035

US 7,741,356 B2

<table>
<tr><td>61</td><td>62</td></tr>
</table>

MS (ES+) (relative intensity): 230.2 (100) (M+1).

D. Ethyl-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-amine. A solution of N-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-acetamide (0.077g, 0.30 mmol) in THF (2.0 mL) was added dropwise over 10 min to a refluxing 1.0 M solution of LiAlH$_4$ in THF (3.0 mL). The reaction was maintained at reflux for 11 h, cooled to rt, and quenched by sequential treatment with 0.11 mL of cold water (5° C.), 0.11 mL of 15% NaOH in water solution, and 0.33 mL of cold water (5° C.). The resultant solid was removed by suction filtration and the filtrate (pH 8-9) was extracted three times with EtOAc. The combined organic fractions were dried over MgSO$_4$, filtered, and concentrated to afford 0.069 g of a 5:1 mixture (determined by $^1$H NMR) of ethyl-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-amine and recovered Cpd 2c as a colorless oil (HPLC: peaks overlap). $^1$H NMR (300 MHz, CDCl$_3$): δ 7.67 (2H, br s), 7.35 (2H, t, J=7.6 Hz), 7.26-7.17 (2H, m), 3.72 (1H, d, J=6.0 Hz), 2.56 (2H, dq, J=13.0, 7.1 Hz), 2.05 (1H, m), 1.08 (3H, t, J=7.1 Hz), 0.97 (3H,d, J=6.7 Hz), 0.89 (3H, d, J=6.7 Hz); MS (ES+) (relative intensity): 244.2 (100) (M+1). This sample was of sufficient quality to use in the next reaction without further purification.

Methyl-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-amine and ethyl-[2-methyl-1-(4-phenyl-1H-imidazol-2-yl)-propyl]-amine may be substituted for Cpd 1d of Example 1 and elaborated to compounds of the present invention with the appropriate reagents, starting materials and purification methods known to those skilled in the art.

Example 3

(3,4-Dimethoxy-benzyl)-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amine



A solution of 1-(4-phenyl-1H-imidazol-2-yl)-ethylamine (0.061 g, 0.33 mmol) of Example 1, and 0.55 g (0.33 mmol) of 3,4-dimethoxybenzaldehyde in 5 mL of anhydrous methanol was stirred at room temperature for 1 h and then cooled to about 0-10° C. in an ice bath for 1 h. The reaction was treated carefully with 0.019 g (0.49 mmol) of sodium borohydride in one portion and maintained at about 0-10° C. for 21 h. Cold 2M aqueous HCl was added dropwise (30 drops), the mixture was stirred for 5 min, and then partially concentrated in vacuo unheated. The residual material was taken up in EtOAc to yield a suspension that was treated with 5 mL of cold 3M aqueous NaOH and stirred vigorously until clear. The phases were separated and the aqueous layer was extracted three times additional with EtOAc. The combined extracts were dried over MgSO$_4$, filtered, and concentrated to afford 0.11 g of (3,4-dimethoxy-benzyl)-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amine as a light yellow oil (HPLC: 87% @254 nm and 66% @214 nm). MS (ES+) (relative intensity): 338.1 (100) (M+1). This sample was of sufficient quality to use in the next reaction without further purification. The title compound may

be substituted for Cpd 1 d of Example 1 and elaborated to compounds of the present invention with the appropriate reagents, starting materials and purification methods known to those skilled in the art.

Example 4

1-[4-(4-Fluoro-phenyl)-1H-imidazol-2-yl]-ethylamine



A. {1-[4-(4-Fluoro-phenyl)-1H-imidazol-2-yl]-ethyl}-carbamic acid tert-butyl ester. A mixture of ammonium acetate (19.3 g, 250 mmol) and glacial HOAc (35 mL) was stirred mechanically and heated to about 100° C. to give a colorless solution in 5-10 min. After cooling to rt, a solid mixture of N-t-BOC-L-Alaninal (commercially available from Aldrich) and 4-fluorophenyl glyoxal hydrate was added in portions while stirring to give a yellow mixture. The resulting mixture was heated at 100° C. for approximately 2 h before cooling to rt. The mixture was cooled to 0-5C, then basified by dropwise addition of conc. NH$_4$OH (25 mL), H$_2$O (25 mL), and EtOAc (40 mL), and additional conc. NH$_4$OH (50 mL) to render the mixture alkaline. The phases were separated and the aqueous phase was re-extracted with EtOAc. The combined organic phases were filtered through dicalite to remove an orange solid and were washed with saturated aqueous NaCl. The organic phase was then dried over MgSO$_4$, filtered, and concentrated under reduced pressure to give 4.27 g of an orange-brown residue. The residue was dissolved in a solution of MeCN (22 mL) and DMSO (3 mL) then purified by preparative HPLC on a Kromasil 10u C18 250x50 mm column, eluting with a 35:65 MeCN:H$_2$O gradient. The pure fractions were combined and lyophilized to give 1.77 g of the product as a yellow-white powder (42%; TFA salt). MS: m/z 306.1 (MH+).

B. 1-[4-(4-Fluoro-phenyl)-1H-imidazol-2-yl]-ethylamine. {1-[4-(4-Fluoro-phenyl)-1H-imidazol-2-yl]-ethyl}-carbamic acid tert-butyl ester may be BOC-deprotected using the procedure described in Example 1 for the conversion of Cpd 1e to Cpd 1f. Upon completion of the BOC-deprotection, the resulting amine may be substituted for Cpd 1c of Example 1 and elaborated to compounds of the present invention with the appropriate reagents, starting materials and purification methods known to those skilled in the art.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000036

US 7,741,356 B2

**63**

Example 5

Isopropyl-[4(5)-phenyl-1-(2-trimethylsilanyl-ethoxymethyl)-1H-imidazol-2-ylmethyl]-amine (mixture of regioisomers)



5a
Mixture of regioisomers



5b

A. Cpd 5a Regioisomers. Into a cooled solution of 4(5)-phenyl-1-(2-trimethylsilanyl-ethoxymethyl)-1H-imidazole (*Tet. Lett.* 1986, 27(35), 4095-8) (7.70 g, 28.1 mmol) in dry THF (60 mL) was added n-butyllithium (2.5 M in hexane, 22.5 mL, 56.2 mmol) at −78° C. under $N_2$. The resulting mixture was stirred at −78° C. for 1 h, followed by the addition of DMF (4.35 mL, 56.2 mmol). After being stirred at −78° C. for an additional hour, the reaction was warmed to room temperature and stirred overnight. The reaction was quenched by the addition of saturated aqueous $NaHCO_3$ solution and extracted with EtOAc. The combined organic extracts were dried over $Na_2SO_4$. After filtration and evaporation, the residue was purified by flash column chromatography (eluent: EtOAc:hexane, 1:9) to give 4(5)-phenyl-1-(2-trimethylsilanyl-ethoxymethyl)-1H-imidazole-2-carbaldehyde (5.11 g, 60%) as a mixture of regioisomers. $^1$H NMR (300 MHz, $CDCl_3$): δ 0.00 (9H, s), 2.98 (2H, t), 3.62 (2H, t), 5.83 (2H, s), 7.36 (1H, m), 7.44 (2H, m), 7.65 (1H, s), 7.86 (1H, m). MS(ES$^+$): 303.0 (42%).

B. Cpd 5b Regioisomers. Isopropylamine (0.18 g, 3 mmol) and a regioisomeric mixture of 4(5)-phenyl-1-(2-trimethylsilanyl-ethoxymethyl)-1H-imidazole-2-carbaldehyde (0.91 g, 3 mmol) were mixed in 1,2-dichloroethane (10 mL), followed by addition of sodium triacetoxyborohydride (0.95 g, 4.5 mmol). The resulting mixture was stirred at room temperature for 5 h. The reaction was quenched with saturated aqueous $NaHCO_3$ solution. The resultant mixture was extracted with EtOAc and the combined organic phases were dried over $Na_2SO_4$. After filtration and concentration, the residue was purified by flash column chromatography (eluent: $CH_2Cl_2$: $CH_3OH$, 7:3) to give isopropyl-[4(5)-phenyl-1-(2-trimethylsilanyl-ethoxymethyl)-1H-imidazol-2-ylmethyl]-amine (0.70 g, 68%) as a mixture of regioisomers. $^1$H NMR (300 MHz, $CDCl_3$): δ 0.00 (9H, s), 0.94 (2H, t), 1.11 (6H, d), 2.89 (1H, m), 3.56 (2H, t), 3.94 (2H, s), 5.39 (2H, s), 7.25 (2H, m), 7.37 (2H, m), 7.76 (2H, d). MS(ES$^+$): 346.6 (75%).

**64**

Compound 5b may be substituted for Cpd 1d of Example 1 and elaborated to compounds of the present invention with the appropriate reagents, starting materials and purification methods known to those skilled in the art.

Example 6

2-Amino-3-(4-hydroxy-phenyl)-N-isopropyl-N-(5-methyl-4-phenyl-1H-imidazol-2-ylmethyl)-propionamide Trifluoroacetate (1:2)



6a
Mixtures of regioisomers



6b



6c



6d

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000037

US 7,741,356 B2

65

-continued



6e

A. Cpd 6a Regioisomers. Bromine (1.17 mL, 22.76 mmol) was added slowly to an ice cooled regioisomeric mixture of 4(5)-methyl-1-(2-trimethylsilanyl-ethoxymethyl)-1H-imidazole-2-carbaldehyde (5.47 g, 22.76 mmol; JOC, 1986, 51 (10), 1891-4) in CHCl₃ (75 mL.). The reaction was warmed to rt after 1.5 h, and then was stirred an additional 1 h. The reaction mixture was then extracted with saturated aqueous NaHCO₃, and the organic phase was then dried over Na₂SO₄, filtered, and concentrated under reduced pressure to give 7.46 g of crude material. This material was vacuum distilled (bp 127-135° C.; 1 mm Hg) to yield 3.16 g (43%) of a regioisomeric mixture, Cpd 6a, as a yellow liquid, which was used without further purification. ¹H NMR (CDCl₃) δ 0 (S, 9H), 0.9-1.0 (t, 2H), 2.35 (s, 3H), 3.5-3.6 (t, 2H), 5.8 (s, 2H), 9.75 (s,1H).

B. Cpd 6b Regioisomers. Isopropyl amine (0.30 g, 5 mmol) in 1,2-dichloroethane (2 mL) was added to a 5° C. solution of regioisomers Cpd 6a (0.96 g, 3 mmol) in 1,2-dichloroethane (70 mL). After stirring for 5 min, sodium triacetoxyborohydride (1.80 g, 8.5 mmol) was added neat to the reaction mixture. The mixture was gradually warmed to rt and stirred for 24 h. At this time, an additional portion of sodium triacetoxyborohydride (0.60g, 2.8 mmol) was added and the reaction was stirred an additional 16 h. The reaction was then cooled to approximately 10° C. and treated while stirring with saturated aqueous NaHCO₃. After stirring for 15 min, the layers were separated and the organic phase was dried over Na₂SO₄, filtered, and concentrated under reduced pressure to give 1.20 g (T.W. 1.09 g) of a regioisomeric mixture, Cpd 6b, as a yellow oil which was used directly without further purification.

C. Cpd 6c Regioisomers. Isobutyl chloroformate (0.43 g, 3.15 mmol) was added neat to a 0° C. solution containing 2-tert-butoxycarbonylamino-3-(4-tert-butoxy-phenyl)-propionic acid (1.21 g, 3.6 mmol; Advanced Chem Tech), N-methylmorpholine (362 μL., 3.3 mmol), and CH₂Cl₂ (60 mL). After stirring 1.5 h, Cpd 6b (1.09 g, 3 mmol) was added to the reaction mixture. The reaction mixture was then warmed to room temperature and stirred for 16 h. The reaction mixture was then adsorbed onto silica gel, and flash chromatographed on a silica gel column eluting with 25% ethyl acetate/hexane. The desired fractions were combined and concentrated under reduced pressure to give 715 mg (35%) of regioisomers of Cpd 6c as a clear oil (TLC: 25% EtOAc/hexane R_f 0.3; homogeneous; HPLC: 100% at 254 and 214 nm, 7.51 min).

D. Cpd 6d Regioisomers. To the regioisomers of Cpd 6c (90 mg, 0.132 mmol) in 1,2-dimethoxyethane (2 mL) was added phenyl boronic acid (32.2 mg, 0.26 mmol) followed by 2M Na₂CO₃(aq) (0.53 mL., 1.06 mmol). The resulting mixture was degassed with N₂ for 5 min and then palladium tetrakis triphenylphosphine (53 mg, 0.046 mmol) was added neat. The reaction vessel was capped and warmed to 80° C. for 14 h with rapid stirring. After cooling to room temperature the mixture was dried over MgSO₄, filtered through dicalite,

66

and concentrated under a stream of N₂. The residue was dissolved in a small amount of EtOAc and flash chromatographed on a silica gel column (Eluent: 5%-25% EtOAc/hexane). The desired fractions were concentrated under reduced pressure to yield 55 mg (61%) as regioisomeric mixture of Cpd 6d, which was used without further purification (TLC: 25% EtOAc/hexane R_f 0.3; HPLC: 100% at 254 nm; 88% at 214 nm, 6.50 min).

E. 2-Amino-3-(4-hydroxy-phenyl)-N-isopropyl-N-(5-methyl-4-phenyl-1H-imidazol-2-ylmethyl)-propionamide Trifluoroacetate (1:2). Trifluoroacetic acid (1 mL) was added to the Cpd 6d regioisomers (55 mg, 0.081 mmol) at room temperature. After 6 h, the excess TFA was removed under a stream of N₂. The residue was dissolved in a small amount of acetonitrile and purified by preparative HPLC on a YMC C18 100×20 mm column. The purest fractions were combined and lyophilized to give 37 mg (74%) of the title compound as a white lyophil (TLC: 5:1 CHCl₃:MeOH R_f 0.55, homogeneous; HPLC: 100% at 214 nm; HPLC/MS: m/z 393 (MH⁺)). ¹H NMR (MeOH-d₄) δ 0.85-0.9 (d, 3H), 1.2-1.25 (d, 3H), 2.45 (s, 3H), 3.05-3.1 (t, 2H), 4.0-4.15 (m, 1H), 4.55-4.6 (d, 1H), 4.7-4.85 (m, 2H), 6.65-6.7 (d, 2H), 6.95-7.0 (d, 2H), 7.45-7.6 (m, 5H).

Example 7

(3,4-Dichloro-benzyl)-(4-phenyl-1H-imidazol-2-ylmethyl)-amine Trifluoroacetate (1:2)



Using the procedure described in Example 5 and substituting 3,4-dichloro-benzylamine for isopropylamine, (3,4-dichloro-benzyl)-[4(5)-phenyl-1-(2-trimethylsilanyl-ethoxymethyl)-1H-imidazol-2-ylmethyl]-amine was prepared as a pair of regioisomers. A sample (95 mg, 0.21 mmol) of this compound was dissolved in TFA (3 mL) at room temperature. After 2 h the mixture was concentrated under a stream of nitrogen. The residue was purified by reverse phase HPLC, the purest fractions were combined and lyophilized to yield desired product (3,4-dichloro-benzyl)-(4-phenyl-1H-imidazol-2-ylmethyl)-amine as an off white lyophil.

Following the procedure described in Example 1, substituting (3,4-dichloro-benzyl)-(4(5)-phenyl-1H-imidazol-2-ylmethyl)-amine for Cpd 1 d, compounds of the present invention may be synthesized with the appropriate reagents, starting materials, and purification methods known to those skilled in the art.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**67**

Example 8

(S)-2-tert-Butoxycarbonylamino-3-(2,6-dimethyl-4-trifluoromethanesulfonylphenyl)-propionic acid methyl ester



8a



8b



8c



8d

A. (S)-2-tert-Butoxycarbonylamino-3-(2,6-dimethyl-4-trifluoromethanesulfonylphenyl)-propionic acid methyl ester. Into a cool solution of Boc-L-(2,6-diMe)Tyr-OMe (7.0 g, 21.6 mmol; Sources: Chiramer or RSP AminoAcidAnalogues) and N-phenyltrifluoromethanesulfonimide (7.9 g, 22.0 mmol) in dichloromethane (60 mL) was added triethylamine (3.25 mL, 23.3 mmol). The resulting solution was stirred at 0° C. for 1 h and slowly warmed to rt. Upon completion, the reaction was quenched by addition of water. The separated organic phase was washed with 1 N NaOH aqueous solution, water and dried over $Na_2SO_4$ overnight. After filtra-

**68**

tion and evaporation, the residue was purified by flash column chromatography (eluent: EtOAc-hexane: 3:7) to give the desired product (9.74 g, 99%) as a clear oil; [1]H NMR (300 MHz, $CDCl_3$): δ 1.36 (9H, s), 2.39 (6H, s), 3.06 (2H, d, J=7.7 Hz), 3.64 (3H, s), 4.51-4.59 (1H, m), 5.12 (1H, d, J=8.5 Hz), 6.92 (2H, s); MS (ES+) (relative intensity): 355.8 (100) (M−Boc)+.

B. (S)$_4$-(2-tert-Butoxycarbonylamino-2-methoxycarbonylethyl)-3,5-dimethylbenzoic acid. To a suspension of (S)-2-tert-butoxycarbonylamino-3-(2,6-dimethyl-4-trifluoromethanesulfonylphenyl)-propionic acid methyl ester (9.68 g, 21.3 mmol), $K_2CO_3$ (14.1 g, 0.102 mol), Pd(OAc)$_2$ (0.48 g, 2.13 mmol) and 1,1′-bis(diphenylphosphino)ferrocene (2.56 g, 4.47 mmol) in DMF (48 mL) was bubbled in gaseous CO for 15 min. The mixture was heated to 60° C. for 8 h with a CO balloon. The cool mixture was partitioned between NaHCO$_3$ and EtOAc, and filtered. The aqueous layer was separated, acidified with 10% citric acid aqueous solution, extracted with EtOAc, and finally dried over $Na_2SO_4$. Filtration and concentration of the filtrate resulted in a residue. The residue was recrystallized from EtOAc-hexanes to afford the desired product (7.05 g, 94%); [1]H NMR (300 MHz, $CDCl_3$): δ 1.36 (9H, s), 2.42 (6H, s), 3.14 (2H, J=7.4 Hz), 3.65 (3H, s), 4.57-4.59 (1H, m), 5.14 (1H, d, J=8.6 Hz), 7.75 (2H, s); MS(ES+) (relative intensity): 251.9 (100) (M−Boc)+.

C. (S)-2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethylphenyl)propionic acid methyl ester. Into a stirring solution of (S)-4-(2-tert-butoxycarbonylamino-2-methoxycarbonylethyl)-3,5-dimethyl benzoic acid (3.00 g, 8.54 mmol), PyBOP (6.68 g, 12.8 mmol) and HOBt (1.74 g, 12.8 mmol) in DMF (36 mL) was added DIPEA (5.96 mL, 34.2 mmol) and NH$_4$Cl (0.92 g, 17.1 mmol). The resulting mixture was stirred at rt for 40 min before being partitioned between aqueous NH$_4$Cl solution and EtOAc. The separated organic phase was washed sequentially with 2N citric acid aqueous solution, saturated aqueous NaHCO$_3$ solution, and brine, then dried over $Na_2SO_4$ overnight. After filtration and concentration, the residue was purified by flash column chromatography (eluent: EtOAc) to give the product. (3.00 g, 100%); [1]H NMR (300 MHz, $CDCl_3$): δ 1.36 (9H, s), 2.39 (6H, s), 3.11 (2H, J=7.2 Hz), 3.65 (3H, s), 4.53-4.56 (1H, m), 5.12 (1H, d, J=8.7 Hz), 5.65 (1H, brs), 6.09 (1H, br s), 7.46 (2H, s); MS(ES+) (relative intensity): 250.9 (100) (M−Boc)+.

D. (S)-2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethylphenyl)propionic acid. Into an ice-cooled solution of methyl ester from Step C (2.99 g, 8.54 mmol) in THF (50 mL) was added an aqueous LiOH solution (1N, 50 mL) and stirred at 0° C. Upon consumption of the starting materials, the organic solvents were removed and the aqueous phase was neutralized with cooled 1N HCl at 0° C., and extracted with EtOAc, and dried over $Na_2SO_4$ overnight. Filtration and evaporation to dryness led to the title acid (S)-2-tert-butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethylphenyl)propionic acid (2.51 g, 87%); [1]H NMR (300 MHz, DMSO-d$_6$): δ 1.30 (9H, s), 2.32 (6H, s), 2.95 (1H, dd, J=8.8, 13.9 Hz), 3.10 (1H, dd, J=6.2, 14.0 Hz), 4.02-4.12 (1H, m), 7.18-7.23 (2H, m), 7.48 (2H, s), 7.80 (1H, s);

MS(ES+) (relative intensity): 236.9 (6) (M−Boc)+.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000039

Appx14445

US 7,741,356 B2

**69**

Example 9

5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid



9a



9b



9c

A. 2-Methoxy-5{1-(4-phenyl-1 H-imidazol-2-yl)-ethylamino]-methyl}-benzoic acid methyl ester. Using the procedures described for Example 3, substituting 5-formyl-2-methoxy-benzoic acid methyl ester (WO 02/22612) for 3,4-

**70**

dimethoxybenzaldehyde, 2-methoxy-5-{[1-(4-phenyl-1H-imidazol-2-yl)-ethylamino]-methyl}-benzoic acid methyl ester was prepared.

B. 5-({[2-tert-Butoxycarbonyl methyl-3-(4-carbamoyl-2, 6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid methyl ester. Using the procedure of Example 1 for the conversion of Cpd 1d to Cpd 1e, substituting 2-methoxy-5-{[1-(4-phenyl-1H-imidazol-2-yl)-ethylamino]-methyl}-benzoic acid methyl ester for Cpd 1 d and substituting 2-tert-Butoxy-carbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl-propionic acid of Example 8 for 2-tert-Butoxycarbonylamino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionic acid, Cpd 9a was prepared.

C. 5-({[2-tert-butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. 5-({[2-tert-Butoxycarbonyl methyl-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid methyl ester was dissolved in an ice-chilled (0-10° C.), mixed solvent system of THF (10 mL) and MeOH (5 mL). A LiOH.H$_2$O/water suspension (2.48 M; 3.77 mL) was added dropwise, then the reaction was allowed to warm to room temperature and stirred overnight. The resulting mixture was cooled in an ice bath and the basic solution was neutralized with 2N citric acid until slightly acidic. The mixture was concentrated under reduced pressure to remove the volatile materials, after which time the remaining aqueous phase was extracted with EtOAc (3×26 mL). These combined organic phases were dried over MgSO$_4$, filtered, and concentrated under reduced pressure to give 2.26 g (146% of theory) of pale yellowish white solid. This crude material was dissolved in a 10% MeOH/CH$_2$Cl$_2$ solution and adsorbed onto 30 g of silica. The adsorbed material was divided and chromatographed on an ISCO normal phase column over two runs, using a 40 g Redi-Sep column for both runs. The solvent system was a gradient MeOH/CH$_2$Cl$_2$ system as follows: Initial 100% CH$_2$Cl$_2$, 98%-92% over 40 min; 90% over 12 min; and then 88% over 13 min. The desired product eluted cleanly between 44-61 min. The desired fractions were combined and concentrated under reduced pressure to yield 1.74 g (113% of theory) of 5-({[2-tert-butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid, Cpd 9b, as a white solid.

D. 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid. A portion of Cpd 9b (0.27g, 0.41 mmol) was dissolved in EtOAc (39 mL)/THF (5 mL), filtered, and subsequently treated with gaseous HCl for 15 min. After completion of the HCl addition, the reaction was slowly warmed to room temperature and a solid precipitate formed. After 5 h the reaction appeared >97% complete by LC (@214 nm; 2.56 min.). The stirring was continued over 3 d, then the solid was collected and rinsed with a small amount of EtOAc. The resulting solid was dried under high

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

Appx14446

VIB-PAT00000040

US 7,741,356 B2

**71**

vacuum under refluxing toluene for 2.5 h to yield 0.19 g (71%) of desired Cpd 9c as a white solid di-HCl salt.

Example 10



•2HCl

A.  4-{[1-(4-Phenyl-1H-imidazol-2-yl)-ethylamino]-methyl}-benzoic acid methyl ester. Using the procedure described for Example 3, substituting 4-formyl-benzoic acid methyl ester for 3,4-dimethoxybenzaldehyde, 4-{[1-(4-phenyl-1H-imidazol-2-yl)-ethylamino]-methyl}-benzoic acid methyl ester was prepared.

B.  4-({[2-Amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-benzoic acid methyl ester. 4-{[1-(4-phenyl-1H-imidazol-2-yl)-ethylamino]-methyl}-benzoic acid methyl ester was substituted for Cpd 1d of Example 1 and elaborated according to the procedure of Example 1 to prepare the product.

C.  4-({[2-Amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-benzoic acid. A solution of 4-({[2-amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-benzoic acid methyl ester (TFA salt), (0.043 g, 0.067 mmol) in 5 mL of THF was cooled in an ice bath. A cold (5-10° C.) 3M aqueous solution of LiOH (5 mL) was added and the reaction mixture was stirred vigorously while cold. Chilled (5-10C) 2M aqueous HCl (7.5 mL) was added dropwise to neutralize the mixture was stirred for 5 min, and then partially concentrated in vacuo unheated. The resultant aqueous suspension was extracted seven times with EtOAc. The extracts were dried over Na$_2$SO$_4$, filtered, and concentrated to afford 0.030 g of 4-({[2-amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-benzoic acid as a white powder. The material was taken up in EtOH and treated with 1 M HCl in Et$_2$O. The solution was concentrated and the residue was triturated with CH$_3$CN. A 0.021 g (53%) sample of 4-({[2-amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-benzoic acid was collected as its HCl salt. MS (ES$^+$) (relative intensity): 513.2 (100) (M+1).

**72**

Example 11

3-({[2-Amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-benzamide



A.  3-{[1-(4-phenyl-1H-imidazol-2-yl)-ethylamino]-methyl}-benzonitrile. Using the procedure described for Example 3, substituting 3-formyl-benzonitrile for 3,4-dimethoxybenzaldehyde, the product was prepared.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

73

74

B. [1-{(3-Cyano-benzyl)-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamoyl}-2-(4-hydroxy-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester. 3-{[1-(4-phenyl-1H-imidazol-2-yl)-ethylamino]-methyl}-benzonitrile was substituted for Cpd 1d of Example 1 and elaborated according to the procedure of Example 1 to prepare the product.

C. [1-{(3-Carbamoyl-benzyl)-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamoyl}-2-(4-hydroxy-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester. A solution of [1-{(3-cyano-benzyl)-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamoyl}-2-(4-hydroxy-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester (0.070 g, 0.12 mmol) in 3 mL of EtOH was treated with 1.0 mL of 30% hydrogen peroxide followed immediately by 0.1 mL of a 6M aqueous solution of NaOH. The reaction mixture was stirred vigorously for 18 h and quenched by pouring into chilled (5-10C) water. The aqueous solution was extracted five times with Et$_2$O and the combined extracts were dried over MgSO$_4$, filtered, and concentrated to provide 0.051 g of [1-{(3-carbamoyl-benzyl)-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamoyl}-2-(4-hydroxy-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester as a colorless residue (HPLC: 84% @254 nm and 77% @214 nm). MS (ES$^+$) (relative intensity): 612.5 (100) (M+1). This sample was of sufficient quality to use in the next reaction without further purification.

D. 3-({[2-Amino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-benzamide. [1-{(3-cyano-benzyl)-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-carbamoyl}-2-(4-hydroxy-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester may be BOC-deprotected using the procedure described in Example 1 for the conversion of Cpd 1e to Cpd 1f to provide the title compound.

Example 12

4-{2-Amino-2-[{1-[4-(2-cyano-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-ethyl}-3,5-dimethyl-benzamide



12a



12b



12c

-continued



12d



12e



12f



12g

A. {1-[2-(2-Bromo-phenyl)-2-oxo-ethylcarbamoyl]-ethyl}-carbamic acid tert-butyl ester. Compound 2a was prepared according to Example 1 using the appropriate reagents, starting materials and methods known to those skilled in the art.

B. {1-[4-(2-Bromo-phenyl)-1H-imidazol-2-yl]-ethyl}-carbamic acid tert-butyl ester. Following the procedure

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000042

US 7,741,356 B2

**75**

described in Example 1 for the conversion of Compound 1a to Compound 1b, and using the appropriate reagents and methods known to those skilled in the art, Cpd 12b, was prepared.

C.    1-[4-(4-Bromo-phenyl)-1H-imidazol-2-yl]-ethylamine. Using the procedure described for the conversion of Cpd 1e to 1f, Compound 12c was prepared.

D.    [1-[{1-[4-(2-Bromo-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-2-(4-carbamoyl-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester. Using the procedure described in Example 9, Step D, and substituting 1-[4-(4-bromo-phenyl)-1H-imidazol-2-yl]-ethylamine for 1-(4-phenyl-1H-imidazol-2-yl)-ethylamine, the product was prepared.

E.    {2-(4-Carbamoyl-2,6-dimethyl-phenyl)-1-[{1-[4-(2-cyano-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-ethyl}-carbamic acid tert-butyl ester. To a solution of [1-[{1-[4-(2-bromo-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-2-(4-carbamoyl-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester (294 mg; 0.4 mmol) in DMF (2 mL) was added Zn(CN)$_2$ (28 mg; 0.24 mmol). The resulting mixture was degassed with Argon for 5 min, then Pd(PPh$_3$)$_4$ (92 mg; 0.08 mmol) was added neat, and the system was immediately warmed to 100° C. After heating for 6 h, the reaction was cooled to rt and partitioned between EtOAc and water. The organic phase was dried over Na$_2$SO$_4$, filtered, and concentrated under reduced pressure. The crude material was subjected to reverse phase HPLC (water/acetonitrile/0.1% TFA). The fractions of interest were combined, basified with saturated aqueous NaHCO$_3$ and extracted twice with EtOAc. The EtOAc extracts were combined, dried over Na$_2$SO$_4$, filtered, and concentrated to afford 146 mg (54%) of desired {2-(4-carbamoyl-2,6-dimethyl-phenyl)-1-[{1-[4-(2-cyano-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-ethyl}-carbamic acid tert-butyl ester (HPLC; 96% @ 254 nm and 97% @ 214 nm). This sample was of sufficient quality to use in the next reaction without further purification.

F.    4-{2-Amino-2-[{1-[4-(2-cyano-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-ethyl}-3,5-dimethyl-benzamide. {2-(4-carbamoyl-2,6-dimethyl-phenyl)-1-[{1-[4-(2-cyano-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-ethyl}-carbamic acid tert-butyl ester may be BOC-deprotected using the procedure described in Example 1 for the conversion of Cpd 1e to Cpd 1f to give the title compound.

## Example 13

3-(2-{1-[[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-(3,4-dimethoxy-benzyl)-amino]-ethyl}-1H-imidazol-4-yl)-benzoic acid



**76**

-continued



A.    1-[4-(3-Bromo-phenyl)-1H-imidazol-2-yl]-ethylamine. Using the procedure described in Example 12, and the appropriately substituted starting materials and reagents, 1-[4-(3-bromo-phenyl)-1H-imidazol-2-yl]-ethylamine was prepared.

B.    {1-[4-(3-Bromo-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-amine-. Using the procedure described in Example 3, and substituting 1-[4-(3-bromo-phenyl)-1H-imidazol-2-yl]-ethylamine for 1-(4-phenyl-1H-imidazol-2-yl)-ethylamine, the product was prepared.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000043

US 7,741,356 B2

**77**

C.    [1-[{1-[4-(3-Bromo-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-2-(4-carbamoyl-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert butyl ester. Using the procedure of Example 1 for the conversion of Cpd 1d to Cpd 1e, substituting {1-[4-(3-Bromo-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-amine for Cpd 1d and substituting 2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl-propionic acid of Example 8 for 2-tert-Butoxycarbonylamino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionic acid, the product was prepared.

D.    3-(2-{1-[2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-(3,4-dimethoxy-benzyl)-amino}-ethyl]-1H-imidazol-4-yl)-benzoic acid. To a solution of [1-[{1-[4-(3-bromo-phenyl)-1H-imidazol-2-yl]-ethyl}-(3,4-dimethoxy-benzyl)-carbamoyl]-2-(4-carbamoyl-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester (290 mg; 0.40 mmol) in DMF (5 mL) was added K$_2$CO$_3$ (262 mg; 1.9 mmol) and the resulting mixture was degassed with Argon for 5 min. At this time, Pd(OAc)$_2$ (8.9 mg; 0.04 mmol) and 1,1-bis(diphenylphosphino) ferrocene (46 mg; 0.083 mmol) were added. Carbon monoxide was then bubbled through the resulting mixture for 10 min at rt, the reaction was capped, and warmed to 100° C. for 6 h. After cooling to rt the mixture was partitioned between EtOAc and water, filtered through Celite, and then separated. The aqueous phase was then washed with a second portion of EtOAc. The aqueous phase was then acidified to pH 5 with 2N citric acid and the resulting aqueous solution extracted with EtOAc (4×). These latter EtOAc extracts were combined, dried over Na$_2$SO$_4$, filtered, and concentrated under reduced pressure to give the crude product (HPLC: 87% at 254 nm).

E.    3-(2-{1-[[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-(3,4-dimethoxy-benzyl)-amino]-ethyl}-1H-imidazol-4-yl)-benzoic acid. 3-(2-{1-[[2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-(3,4-dimethoxy-benzyl)-amino]-ethyl}-1H-imidazol-4-yl)-benzoic acid may be BOC-deprotected using the procedure described in Example 1 for the conversion of Cpd 1e to Cpd 1f to give the title compound.

Example 14

4-(2-Amino-2-{[2-hydroxy-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-isopropyl-carbamoyl}-ethyl)-3,5-dimethyl-benzamide



**78**

-continued



A.    [2-Benzyloxy-1-(2-oxo-2-phenyl-ethylcarbamoyl)-ethyl]-carbamic acid tert butyl ester. The product was prepared using the procedure described in Example 1 and substituting N-α-BOC-L-serine benzyl ester for N-α-CBZ-L-alanine.

B.    [2-Benzyloxy-1-(4-phenyl-1H-imidazol-2-yl-ethyl]-carbamic acid tert butyl ester. By the procedure described in Example 1 for the conversion of Cpd 1a to Cpd 1b, [2-ben-

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000044

US 7,741,356 B2

**79**

zyloxy-1-(2-oxo-2-phenyl-ethylcarbamoyl-ethyl]-carbamic acid tert butyl ester was converted to the product.

C.    [2-Benzyloxy-1-(4-phenyl-1H-imidazol-2-yl-ethyl-amine. [2-Benzyloxy-1-(4-phenyl-1H-imidazol-2-yl-ethyl]-carbamic acid tert butyl ester may be BOC-deprotected using the procedure described in Example 1 for the conversion of Cpd 1e to Cpd 1f to give the product.

D.    [2-Benzyloxy-1-(4-phenyl-1H-imidazol-2-yl-ethyl]-isopropyl-amine. By the procedure described in Example 1 for the conversion of Cpd 1c to Cpd 1d, [2-benzyloxy-1-(4-phenyl-1H-imidazol-2-yl-ethylamine was converted to the product.

E.    [1-{[2-Benzyloxy-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-isopropyl-carbamoyl}-2-(4-carbamoyl-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester. Using the procedure of Example 1 for the conversion of Cpd 1d to Cpd 1e, substituting [2-benzyloxy-1-(4-phenyl-1H-imidazol-2-yl-ethyl]-isopropyl-amine for Cpd 1d and substituting 2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl-propionic acid of Example 8 for 2-tert-butoxycarbonylamino-3-(4-hydroxy-2,6-dimethyl-phenyl)-propionic acid, the product was prepared.

F. 4-(2-Amino-2-{[2-hydroxy-1-4-phenyl-1H-imidazol-2-yl)-ethyl]-isopropyl-carbamoyl}-ethyl)-3,5-dimethyl-ben-

**80**

zamide (TFA salt). A solution of [1-{[2-benzyloxy-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-isopropyl-carbamoyl}-2-(4-carbamoyl-2,6-dimethyl-phenyl)-ethyl]-carbamic acid tert-butyl ester, (0.287 g, 0.439 mmol), in chloroform (10 mL) was cooled in an ice bath and treated with 0.62 mL (4.4 mmol) of iodotrimethylsilane. The reaction, which immediately clouded, was warmed slowly to room temperature while stirring. After 16 h, the reaction was cooled in an ice bath to 5-10° C. and treated with 100 mL of MeOH. The quenched mixture was stirred at 5-10° C. for 30 min, removed from the ice bath and stirred for an additional 30 min, and concentrated in vacuo to obtain 0.488 g of orange residue that was subjected to reverse phase HPLC (water/acetonitrile/0.1% TFA). The fractions of interest were combined and the sample was lyophilized to afford 0.150 g (59%) of 4-(2-amino-2-{[2-hydroxy-1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-isopropyl-carbamoyl}-ethyl)-3,5-dimethyl-benzamide (TFA salt) as a white powder (HPLC: 99% @ 254 nm and 100% @ 214 nm). MS (ES+) (relative intensity): 464.1 (100)(M+1).

Example 15

(S)-2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2, 6-dimethyl-phenyl)-propionic acid



Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000045

US 7,741,356 B2

81

A. Trifluoromethanesulfonic acid 4-bromo-3,5-dimethyl-phenyl ester. To a cooled (0° C.) solution of 4-bromo-3,5-dimethylphenol (3.05 g, 15.2 mmol) in pyridine (8 mL) was added trifluoromethanesulfonic anhydride (5.0 g, 17.7 mmol) dropwise. After completion of addition, the resulting mixture was stirred at 0° C. for 15 min, and then at rt overnight. The reaction was quenched by addition of water, and then extracted with EtOAc. The organic extracts were washed sequentially with water, 2N HCl (2×), brine, and then dried over MgSO4. Filtration and evaporation to dryness afforded Compound 15b (5.30 g, 95%) as a colorless oil. ¹H NMR (300 MHz, CDCl₃): δ 2.45 (6H, s), 7.00 (2H, s).

B. 4-Bromo-3,5-dimethylbenzoic acid. To a solution of Compound 15b (6.57 g, 19.7 mmol) in DMF (65 mL) were added K₂CO₃ (13.1 g, 94.7 mmol), Pd(OAc)₂ (0.44 g, 1.97 mmol) and 1,1'-bis(diphenylphosphino)ferrocene (2.29 g, 4.14 mmol). The resulting mixture was bubbled in gaseous CO for 10 min and was heated to 60° C. for 7.5 h with a CO₍g₎ balloon. The cooled mixture was partitioned between aqueous NaHCO₃ and EtOAc, and filtered. The aqueous phase was separated, acidified with aqueous 6N HCl, extracted with EtOAc, and finally dried over Na₂SO₄. Filtration and concentration of the filtrate resulted in the crude Compound 15c as a brown residue, which was used in the next step without further purification.

C. 4-Bromo-3,5-dimethyl-benzamide. A suspension of Compound 15c in DCM (40 mL) was added SOCl₂ (3.1 mL, 42 mmol) and the mixture was heated at reflux for 2 h. Upon removal of the solvent by evaporation, the residue was dissolved in DCM (40 mL) and ammonium hydroxide (28% NH₃, in water, 2.8 mL) was added. The mixture was heated at 50° C. for 2 h and concentrated. The residue was diluted with H₂O, extracted with EtOAc, and the organic portion was dried over Na₂SO₄. After filtration and evaporation, the residue was purified by flash column chromatography (eluent: EtOAc) to give the Compound 15d (2.90 g, 65% for 2 steps) as an off-white solid. ¹H NMR (300 MHz, CD₃CN): δ 2.45 (6H, s), 5.94 (1H, br s), 6.71 (1H, br s), 7.57 (2H, s); MS(ES⁺)(relative intensity): 228.0 (100%) (M+1).

Method B: A mixture of Compound 15b (3.33 g, 10 mmol), PdCl₂ (0.053 g, 0.3 mmol), hexamethyldisilazane (HMDS, 8.4 mL, 40 mmol), and dppp (0.12 g, 0.3 mmol) was bubbled with a gaseous CO for 5 min and then stirred in a CO balloon at 80° C. for 4 h. To the reaction mixture was added MeOH (5 mL). The mixture was stirred for 10 min, diluted with 2N H₂SO₄ (200 mL), and then extracted with EtOAc. The EtOAc extract was washed with saturated aqueous NaHCO₃, brine, and then dried over Na₂SO₄. Filtration and evaporation of the resultant filtrate gave a residue, which was purified by flash column chromatography (eluent: EtOAc) to give Compound 15d (1.60 g, 70%) as a white solid.

D. 2-tert-Butoxycarbonylaminoacrylic acid methyl ester. To a suspension of N-Boc-serine methyl ester (Cpd 15e, 2.19 g, 10 mmol) and EDC (2.01 g, 10.5 mmol) in DCM (70 mL) was added CuCl (1.04 g, 10.5 mmol). The reaction mixture was stirred at rt for 72 h. Upon removal of the solvent, the residue was diluted with EtOAc, washed sequentially with water and brine and then dried over MgSO₄. The crude product was purified by flash column chromatography (eluent: EtOAc:hexane~1:4) to give Compound 15e (1.90 g, 94%) as a colorless oil. ¹H NMR (300 MHz, CDCl₃): δ 1.49 (9H, s), 3.83 (3H, s), 5.73 (1H, d, J=1.5 Hz), 6.16 (1H, s), 7.02 (1H, s).

E. (Z)-2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)acrylic acid methyl ester. A flask charged with Compound 15d (0.46 g, 2.0 mmol), Compound 15f (0.80 g, 4.0 mmol), tri-o-tolylphosphine (0.098 g, 0.32 mmol), DMF (8 mL) was purged with N₂₍g₎ 3 times. After the addi-

82

tion of tris(dibenzylideneacetone)dipalladium (0) (0.074 g, 0.08 mmol) and TEA (0.31 mL, 2.2 mol), the reaction mixture was heated at 110° C. for 24 h. At that time, the reaction was quenched by addition of water, and then extracted with EtOAc. The organic phase was washed with 1 N HCl, saturated aqueous NaHCO₃, brine, and dried over MgSO₄. The mixture was concentrated to a residue, which was purified by flash column chromatography (eluent: EtOAc:hexane~1:1 to EtOAc only) to give Compound 15g (0.40 g, 57%) as a white solid. ¹H NMR (300 MHz, CD₃OD): δ 1.36 (9H, s), 2.26 (6H, s), 3.83 (3H, s), 7.10 (1H, s), 7.56 (2H, s); ¹³C NMR (75 MHz, DMSO-d₆): δ 17.6, 25.7, 50.2, 78.7, 124.9, 126.4, 128.3, 131.2, 135.2, 135.5, 152.8, 164.3,169.6; MS (ES⁺) (relative intensity): 349.1 (38%)(M+1).

F. (S)-2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)propionic acid methyl ester. Into a reactor charged with a solution of Compound 15g (0.56 g, 1.6 mmol) in degassed MeOH (80 mL) was added [Rh(cod)(R,R-DI-PAMP)]⁺BF₄⁻ under a stream of argon. The reactor was sealed and flushed with H₂, stirred at 60° C. under 1000 psi of H₂ for 14 d. The crude product was purified by flash column chromatography (eluent: EtOAc:hexane ~1:1) to afford Compound 8c (0.54 g, 96%) as a white solid. ee: >99%; ¹H NMR (300 MHz, CDCl₃): δ 1.36 (9H, s), 2.39 (6H, s), 3.11 (2H, J=7.2 Hz), 3.65 (3H, s), 4.53-4.56 (1H, m), 5.12 (1H, d, J=8.7 Hz), 5.65 (1H, br s), 6.09 (1H, br s), 7.46 (2H, s); MS(ES⁺) (relative intensity): 250.9 (100) (M–Boc)⁺.

G. (S)-2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)propionic acid. Into an ice-cooled solution of Compound 8c (0.22 g-0.63 mmol) in THF (3.5 mL) was added an aqueous LiOH solution (1 N, 3.5 mL) and stirred at 0° C. Upon completion of the reaction, the reaction was concentrated and the aqueous phase was neutralized with cooled aqueous 1 N HCl at 0° C., and extracted with EtOAc. The combined extracts were dried over Na₂SO₄ overnight. Filtration and evaporation of the filtrate to dryness led to Compound 8d (0.20 g, 94%) as a white solid. ¹H NMR (300 MHz, DMSO-d₆): δ 1.30 (9H, s), 2.32 (6H, s), 2.95 (1H, dd, J=8.8, 13.9 Hz), 3.10 (1H, dd, J=6.2, 14.0 Hz), 4.02-4.12 (1H, m), 7.18-7.23 (2H, m), 7.48 (2H, s), 7.80 (1H, s); MS(ES⁺) (relative intensity): 236.9 (6) (M–Boc)⁺.

Example 16

Racemic 2-tert-Butoxycarbonylamino-3-(4-carbam-oyl-2,6-dimethyl-phenyl)-propionic acid



Cpd 15g

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

83                                                            84

-continued



16a



16b

A. Racemic 2-tert-butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)propionic acid methyl ester. To a reactor charged with a solution of Compound 15g (0.68 g, 1.95 mmol) in MeOH (80 mL) was added 10% Pd-C (0.5 g). The reactor was connected to a hydrogenator and shaken under 51 psi of $H_2$ overnight. The mixture was filtered through a pad of Celite and the filtrate was concentrated to dryness to give Compound 16a (0.676 g, 99%) as a white solid. The $^1$H NMR spectrum was identical to that of (S)-2-tert-butoxycarbonyl-lamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)propionic acid methyl ester, Compound 8c.

B. Racemic 2-tert-butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)propionic acid. Using the procedure described for Example 15, for the preparation of (S)-2-tert-Butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phe-nyl)propionic acid, racemic 2-tert-butoxycarbonylamino-3-(4-carbamoyl-2,6-dimethyl-phenyl)propionic acid, Compound 16b, was prepared.

Using the procedures of the Examples above and the appro-priate reagents, starting materials and purification methods known to those skilled in the art, other compounds of the present invention may be prepared including but not limited to:

TABLE VI

Mass Spectral Data for Selected Compounds

| Cpd | Theoretical MW | Measured MW (MH+) |
|---|---|---|
| 1 | 538 | 539 |
| 2 | 520 | 521 |
| 3 | 573 | 574 |
| 4 | 541 | 542 |
| 5 | 527 | 528 |
| 6 | 555 | 556 |
| 7 | 569 | 570 |
| 8 | 593 | 594 |
| 9 | 553 | 554 |
| 10 | 603 | 604 |
| 11 | 589 | 590 |
| 12 | 587.2 | 588.3 |
| 13 | 589.3 | 590.2 |
| 14 | 569.3 | 570.2 |
| 15 | 500.2 | 499.2 |
| 16 | 475.3 | 476.1 |
| 17 | 583.28 | 584.5 |
| 18 | 569.26 | 570.2 |

TABLE VI-continued

Mass Spectral Data for Selected Compounds

| Cpd | Theoretical MW | Measured MW (MH+) |
|---|---|---|
| 19 | 633.2 | 634.0 |
| 20 | 599.3 | 600.2 |
| 21 | 634.3 | 635.2 |
| 22 | 634.3 | 635.2 |
| 23 | 598.3 | 599.2 |
| 24 | 580.3 | 581.1 |
| 25 | 471.26 | 472.4 |
| 26 | 633.2 | 634.0 |
| 27 | 580.3 | 581.1 |
| 28 | 598.3 | 599.2 |
| 29 | 599.3 | 600.0 |
| 30 | 680.3 | 681.2 |
| 31 | 512.2 | 513 |
| 32 | 498.3 | 499.1 |
| 33 | 498.3 | 499.1 |
| 34 | 528.3 | 529.2 |
| 35 | 514.3 | 515.1 |
| 36 | 462.26 | 463.4 |
| 37 | 482.23 | 483.4 |
| 38 | 446.27 | 447.5 |
| 39 | 450.26 | 451.5 |
| 40 | 530.3 | 531.2 |
| 41 | 445.3 | 446.1 |
| 42 | 563.3 | 564.2 |
| 43 | 504.23 | 505.3 |
| 44 | 504.23 | 505.3 |
| 45 | 513.24 | 514.3 |
| 46 | 492.27 | 493.2 |
| 47 | 479.25 | 480.1 |
| 48 | 512.2 | 513.2 |
| 49 | 540.2 | 541 |
| 50 | 539.25 | 540.2 |
| 51 | 553.3 | 554.1 |
| 52 | 526.3 | 527.1 |
| 53 | 609.3 | 610.2 |
| 54 | 458.2 | 459 |
| 55 | 458.2 | 459 |
| 56 | 474.3 | 475.2 |
| 57 | 469.25 | 470.1 |
| 58 | 543.2 | 543.3 |
| 59 | 513.3 | 514.2 |
| 60 | 445.3 | 446.2 |
| 61 | 456.2 | 457.1 |
| 62 | 498.2 | 499.1 |
| 63 | 436.3 | 437.1 |
| 64 | 601.3 | 602.2 |
| 65 | 422.1 | 423.2 |
| 66 | 463.3 | 464.5 |
| 67 | 491.3 | 492.1 |
| 68 | 436.3 | 437.1 |
| 69 | 463.3 | 464.1 |
| 70 | 454.2 | 455.0 |
| 71 | 456.2 | 457.0 |
| 72 | 498.2 | 499.1 |
| 73 | 463.3 | 464.2 |
| 74 | 577.3 | 578.6 |
| 75 | 555.3 | 555.8 |
| 76 | 513.3 | 514.2 |
| 77 | 525.3 | 526.3 |
| 78 | 497.3 | 498.3 |
| 79 | 525.3 | 526.2 |
| 80 | 512.2 | 513.2 |
| 81 | 484.2 | 485.4 |
| 82 | 438.24 | 439.2 |
| 83 | 486.24 | 487.5 |
| 84 | 438.24 | 439.0 |
| 85 | 463.3 | 464.2 |
| 86 | 433.2 | 434.2 |
| 87 | 522.2 | 523 |
| 88 | 526.3 | 527.4 |
| 89 | 526.3 | 527.4 |
| 90 | 511.3 | 512.4 |
| 91 | 493.2 | 494.4 |
| 92 | 469.2 | 470.2 |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000047

Appx14453

US 7,741,356 B2

85

86

#### TABLE VI-continued

Mass Spectral Data for Selected Compounds

| Cpd | Theoretical MW | Measured MW (MH⁺) |
|-----|------|------|
| 93 | 469.2 | 470.4 |
| 94 | 495.3 | 496.2 |
| 95 | 495.3 | 496.2 |
| 96 | 498.3 | 499.2 |
| 97 | 536.2 | 537.2 |
| 98 | 560.3 | 561.2 |
| 99 | 518.3 | 519.2 |
| 100 | 518.3 | 519.2 |
| 101 | 546.2 | 547.2 |
| 102 | 528.3 | 529.2 |
| 103 | 536.2 | 537.2 |
| 104 | 510.3 | 511.2 |
| 105 | 544.3 | 545.3 |
| 106 | 496.3 | 497.2 |
| 107 | 481.3 | 482.3 |
| 108 | 523.3 | 524.8 |
| 109 | 509.3 | 510.4 |
| 110 | 509.3 | 510.3 |
| 111 | 509.3 | 510 |
| 112 | 509.3 | 510 |
| 113 | 495.3 | 496.4 |
| 114 | 495.3 | 496.1 |
| 115 | 496.28 | 497.4 |
| 115 | 496.28 | 497.4 |
| 116 | 438.24 | 439.4 |
| 117 | 438.24 | 439.4 |
| 118 | 436.2 | 437.3 |
| 119 | 394.2 | 395.2 |
| 120 | 525.3 | 526.2 |
| 121 | 539.3 | 540.3 |
| 122 | 521.3 | 522.3 |
| 123 | 464 | 465 |
| 124 | 421 | 422 |
| 125 | 450.26 | 451.5 |
| 126 | 456.23 | 457.3 |
| 127 | 487.3 | 488.5 |
| 128 | 487.3 | 488.6 |
| 129 | 422.2 | 423.3 |
| 130 | 450 | 451 |
| 131 | 422.2 | 423.3 |
| 132 | 394.2 | 395.2 |
| 133 | 464.2 | 465.3 |
| 134 | 496.3 | 497.4 |
| 135 | 450.26 | 451.37 |
| 136 | 495.3 | 496.4 |
| 137 | 447.3 | 448.4 |
| 138 | 526.3 | 527.4 |
| 139 | 653.4 | 654.5 |
| 140 | 462.3 | 463.4 |
| 141 | 488.17 | 489.16 |
| 142 | 450.26 | 451.40 |
| 143 | 447.3 | 448.4 |
| 144 | 419.2 | 420.3 |
| 145 | 496.28 | 497.32 |
| 146 | 426.21 | 427.39 |
| 147 | 454.21 | 455.22 |
| 148 | 477.3 | 478 |
| 149 | 488.2 | 489 |
| 150 | 470.3 | 471 |
| 151 | 488.2 | 489 |
| 152 | 398.2 | 399 |
| 153 | 393 | 394 |
| 154 | 392 | 393 |
| 155 | 454.21 | 455.21 |
| 156 | 470.27 | 471.36 |
| 157 | 477.2 | 478.4 |
| 158 | 468.2 | 469.4 |
| 159 | 496.3 | 497.4 |
| 160 | 429.2 | 430.4 |
| 161 | 420.2 | 421.4 |
| 162 | 448.3 | 449.4 |
| 163 | 438.24 | 439.1 |
| 164 | 556.23 | 557.1 |
| 165 | 434.27 | 435.1 |

#### TABLE VI-continued

Mass Spectral Data for Selected Compounds

| Cpd | Theoretical MW | Measured MW (MH⁺) |
|-----|------|------|
| 166 | 420.25 | 421.1 |
| 167 | 449.3 | 450.2 |
| 168 | 433.3 | 434.2 |
| 169 | 415.2 | 416.2 |
| 170 | 434.3 | 435.3 |
| 171 | 392.2 | 393.3 |
| 172 | 497.2 | 498.3 |
| 173 | 479.2 | 480.3 |
| 174 | 434.3 | 435.3 |
| 175 | 484.2 | 485.2 |
| 176 | 420.2 | 421.4 |
| 177 | 454.2 | 455.3 |
| 178 | 433.3 | 434.1 |
| 179 | 489.3 | 490.1 |
| 180 | 489.3 | 489.9 |
| 181 | 447.3 | 448.1 |
| 182 | 447.3 | 448.3 |
| 183 | 433.3 | 434.2 |
| 184 | 433.3 | 434.2 |
| 185 | 405.2 | 406.2 |
| 186 | 387.2 | 388.2 |
| 187 | 406.2 | 407.2 |
| 188 | 378.2 | 379.2 |
| 189 | 427.2 | 428 |
| 190 | 446.3 | 447.4 |
| 191 | 418.2 | 419.4 |
| 192 | 418.2 | 419.3 |
| 193 | 390.2 | 391.3 |
| 194 | 406.2 | 407.5 |
| 195 | 378.2 | 379.3 |
| 196 | 419.2 | 420.4 |
| 197 | 433.3 | 434.1 |
| 198 | 350.2 | 351.1 |
| 199 | 378.2 | 379.2 |
| 202 | 391.2 | 392 |
| 203 | 391.2 | 391.9 |
| 204 | 378.2 | 379 |
| 205 | 406.2 | 407 |
| 206 | 392.2 | 393.3 |
| 207 | 392.2 | 393.2 |
| 208 | 378.2 | 379.3 |
| 209 | 378.2 | 379.2 |
| 210 | 364.2 | 365.2 |
| 211 | 364.2 | 365.2 |
| 212 | 350.2 | 351.2 |
| 213 | 350.2 | 351.1 |
| 214 | 378.2 | 379.1 |
| 215 | 378.2 | 379.1 |
| 216 | 406.2 | 407.2 |
| 217 | 406.2 | 407.1 |
| 218 | 468.3 | 469.4 |
| 219 | 440.2 | 441.3 |
| 220 | 468.3 | 469.4 |
| 221 | 440.2 | 441.2 |
| 222 | 392.2 | 393.2 |
| 223 | 420.3 | 421.2 |
| 224 | 420.3 | 421.1 |
| 225 | 392.2 | 393.2 |
| 226 | 539 | 540 |
| 227 | 539 | 540 |
| 228 | 587 | 588 |
| 229 | 633 | 634 |
| 230 | 599.3 | 599.8 |
| 231 | 512.2 | 513.2 |
| 239 | 617.2 | 618.2 |
| 242 | 563.3 | 564.2 |
| 246 | 519.3 | 520.0 |
| 247 | 548.3 | 549.2 |
| 248 | 552.2 | 553.2 |
| 249 | 536.2 | 537.0 |
| 250 | 526.3 | 527.2 |
| 251 | 512.3 | 513.2 |
| 252 | 554.3 | 555.3 |
| 253 | 540.2 | 541.2 |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000048

US 7,741,356 B2

**87**

TABLE VI-continued

Mass Spectral Data for Selected Compounds

| Cpd | Theoretical MW | Measured MW (MH+) |
|---|---|---|
| 254 | 540.2 | 541.2 |
| 255 | 554.3 | 555.3 |
| 256 | 529.2 | 530.2 |
| 257 | 543.2 | 543.9 |
| 260 | 542.2 | 542.3 |
| 261 | 514.2 | 515.1 |
| 262 | 528.2 | 529.1 |
| 266 | 512.2 | 513.2 |
| 267 | 535.2 | 536.0 |
| 268 | 556.3 | 557.2 |
| 269 | 525.2 | 526.0 |
| 270 | 511.2 | 512.2 |
| 271 | 539.2 | 540.2 |
| 272 | 525.2 | 526.0 |
| 273 | 541.2 | 542.4 |
| 274 | 618.3 | 619.2 |
| 275 | 589.2 | 590.2 |
| 276 | 559.2 | 560.2 |
| 277 | 559.2 | 560.2 |
| 278 | 617.2 | 618.2 |
| 279 | 528.2 | 528.9 |
| 280 | 583.3 | 584.4 |
| 281 | 555.2 | 556.2 |
| 282 | 569.3 | 570.2 |
| 283 | 541.2 | 542.2 |
| 284 | 555.2 | 556.3 |
| 285 | 541.2 | 542.4 |
| 286 | 516.2 | 517.0 |
| 287 | 502.2 | 503.1 |
| 288 | 648.6 | 648.0 |
| 289 | 695.2 | 695.7 |
| 290 | 648.6 | 648.0 |
| 291 | 648.6 | 648.0 |
| 292 | 526.3 | 527.4 |
| 293 | 562.2 | 563.2 |
| 294 | 562.2 | 563.2 |
| 295 | 568.3 | 569.3 |
| 296 | 638.3 | 638.8 |
| 297 | 513.2 | 513.7 |
| 298 | 583.3 | 583.8 |
| 299 | 612.3 | 613.3 |
| 300 | 608.3 | 609.3 |
| 301 | 644.3 | 644.7 |
| 303 | 515.2 | 515.8 |
| 304 | 501.2 | 502.2 |
| 305 | 617.3 | 617.8 |
| 306 | 661.3 | 661.8 |
| 307 | 566.3 | 566.8 |
| 308 | 661.3 | 661.8 |
| 309 | 649.3 | 650.0 |
| 310 | 641.3 | 642.3 |
| 311 | 554.3 | 555.3 |
| 312 | 554.3 | 555.3 |
| 313 | 554.3 | 555.3 |
| 314 | 554.3 | 555.3 |
| 315 | 627.3 | 628.3 |
| 316 | 540.2 | 541.3 |
| 317 | 540.2 | 541.3 |
| 318 | 589.2 | 590.2 |

**88**

BIOLOGICAL EXAMPLES

Opioid receptor binding affinity of the compounds of the present invention was determined according to the following procedures and the indicated results were obtained.

Example 1

Rat Brain Delta Opioid Receptor Binding Assay

Male, Wistar rats (150-250 g, VAF, Charles River, Kingston, N.Y.) are killed by cervical dislocation, and their brains removed and placed immediately in ice cold Tris HCl buffer (50 mM, pH 7.4). The forebrains are separated from the remainder of the brain by a coronal transection, beginning dorsally at the colliculi and passing ventrally through the midbrain-pontine junction. After dissection, the forebrains are homogenized in Tris buffer in a Teflon® glass homogenizer. The homogenate is diluted to a concentration of 1 g of forebrain tissue per 80 mL. Tris and centrifuged at 39,000×g for 10 min. The pellet is resuspended in the same volume of Tris buffer containing 5 mM $MgCl_2$ with several brief pulses from a Polytron homogenizer. This particulate preparation is used for the delta opioid binding assays. Following incubation with the delta selective peptide ligand ~4 nM [$^3$H]DPDPE at 25° C. for 2.5 h in a 96-well plate with total volume of 1 mL, the plate contents are filtered through Wallac filtermat B sheets on a Tomtec 96-well harvester. The filters are rinsed three times with 2 mL of 10 mM HEPES (pH 7.4), and dried in a microwave oven 2 min twice. To each sample area 2×50 µL. of Betaplate Scint scintillation fluid (LKB) is added and on a LKB (Wallac) 1205 BetaPlate liquid scintillation counter.

The data are used to calculate either the % inhibition compared to control binding (when only a single concentration of test compound is evaluated) or a $K_i$ value (when a range of concentrations is tested). % inhibition is calculated as: [(total dpm-test compound dpm)/(total dpm-nonspecific dpm)] *100. Kd and Ki values were calculated using GraphPad PRISM data analysis program. The biological activity of the compounds of the present invention is shown in Table VII.

Example 1a

Rat Brain Delta Opioid Receptor Binding Assay-Version 1a

Male, Wistar rats (150-250 g, VAF, Charles River, Kingston, N.Y.) were killed by cervical dislocation, and their brains removed and placed immediately in ice-cold Tris HCl buffer (50 mM, pH 7.4). The forebrains were separated from the remainder of the brain by a coronal transection, beginning dorsally at the colliculi and passing ventrally through the midbrain-pontine junction. After dissection, the forebrains were homogenized in Tris buffer in a Teflon®-glass homogenizer. The homogenate was diluted to a concentration of 1 g of forebrain tissue per 80 mL. Tris and centrifuged at 39,000×g for 10 min. The pellet was resuspended in the same volume of Tris buffer containing 5 mM $MgCl_2$ with several brief pulses from a Polytron homogenizer. This particulate preparation was used for the delta opioid binding assay. Following incubation with 0.1 nM of the delta selective ligand [$^3$H]naltrindole at 25° C. for 2.5 h in a 96-well plate with total 1 mL, the plate contents were filtered through Wallac filtermat B sheets on a Tomtec 96-well harvester. The filters were rinsed three times with 2 mL of 10 mM HEPES (pH 7.4), and dried in a microwave oven. To each sample area, Betaplate

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**89**

Scint scintillation fluid (LKB) was added and the resulting radioactivity quantified on a LKB (Wallac) 1205 BetaPlate liquid scintillation counter. Kd and Ki values were calculated using the GraphPad PRISM data analysis program. The biological activity of the compounds of the present invention is shown in Table VII.

### Example 2

#### Rat Brain Mu Opioid Receptor Binding Assay

Male, Wistar rats (150-250 g, VAF, Charles River, Kingston, N.Y.) are killed by cervical dislocation, and their brains removed and placed immediately in ice cold Tris HCl buffer (50 mM, pH 7.4). The forebrains are separated from the remainder of the brain by a coronal transection, beginning dorsally at the colliculi and passing ventrally through the midbrain-pontine junction. After dissection, the forebrains are homogenized in Tris buffer in a Teflon® glass homogenizer. The homogenate is diluted to a concentration of 1 g of forebrain tissue per 80 mL Tris and centrifuged at 39,000×g for 10 min. The pellet is resuspended in the same volume of Tris buffer containing 5 mM $MgCl_2$ with several brief pulses from a Polytron homogenizer. This particulate preparation is used for the mu-opioid binding assays. Following incubation with the mu selective peptide ligand .about. 0.8 nM [$^3$H] DAMGO at 25° C. for 2.5 h in a 96-well plate with total 1 mL, the plate contents are filtered through Wallac filtermat B sheets on a Tomtec 96-well harvester. The filters are rinsed three times with 2 mL of 10 mM HEPES (pH7.4), and dried in a microwave oven 2 min twice. To each sample area 2×50 μL of Betaplate Scint scintillation fluid (LKB) is added and analyzed on a LKB (Wallac) 1205 BetaPlate liquid scintillation counter.

The data are used to calculate either the % inhibition compared to control binding (when only a single concentration of test compound is evaluated) or a $K_i$ value (when a range of concentrations is tested). % inhibition is calculated as: [(total dpm-test compound dpm)/(total dpm-nonspecific dpm)] *100. Kd and Ki values were calculated using GraphPad PRISM data analysis program. The biological activity of the compounds of the present invention is shown in Table VII.

### Example 2a

#### Rat Brain Mu Opioid Receptor Binding Assay-Version 2a

Male, Wistar rats (150-250 g, VAF, Charles River, Kingston, N.Y.) were killed by cervical dislocation, and their brains removed and placed immediately in ice-cold Tris HCl buffer (50 mM, pH 7.4). The forebrains were separated from the remainder of the brain by a coronal transection, beginning dorsally at the colliculi and passing ventrally through the midbrain-pontine junction. After dissection, the forebrains were homogenized in Tris buffer in a Teflon®-glass homogenizer. The homogenate was diluted to a concentration of 1 g of forebrain tissue per 80 mL Tris and centrifuged at 39,000×g for 10 min. The pellet was resuspended in the same volume of Tris buffer containing 5 mM $MgCl_2$ with several brief pulses from a Polytron homogenizer. This particulate preparation was used for the mu opioid binding assay. Following incubation with 0.8 nM of the mu selective ligand [$^3$H]DAMGO at 25° C. for 2.5 h in a 96-well plate with total 1 mL, the plate contents were filtered through Wallac filtermat B sheets on a Tomtec 96-well harvester. The filters were rinsed three times with 2 mL of 10 mM HEPES (pH 7.4), and

**90**

dried in a microwave oven. To each sample area, Betaplate Scint scintillation fluid (LKB) was added and the resulting radioactivity quantified on a LKB (Wallac) 1205 BetaPlate liquid scintillation counter. Kd and Ki values were calculated using the GraphPad PRISM data analysis program.

TABLE VII

| Cpd | r Ki δ * (nM) | r Ki δ * Ver. 1a (nM) | r Ki μ * (nM) |
|---|---|---|---|
| 1 | 13.2 | | 1.1 |
| 2 | | | |
| 3 | | | |
| 4 | 11, 17 | | 2.41 |
| 5 | 630, 183 | | 1.19 |
| 6 | 1.7 | | |
| 7 | | | |
| 8 | 0.43, 0.15 | | 0.51 |
| 9 | 0.11 | | 0.16 |
| 10 | | | |
| 11 | 0.54 | | 0.23 |
| 12 | 0.08 | | |
| 13 | | | |
| 14 | 0.36 | | |
| 15 | | | |
| 16 | | | |
| 17 | 60 | | 0.22 |
| 18 | 0.38-14.4 | | 0.75, 1.1 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |
| 29 | 28 | | 25 |
| 30 | | | |
| 31 | | | |
| 32 | | | |
| 33 | | | |
| 34 | | | |
| 35 | | | |
| 36 | | | |
| 37 | | | |
| 38 | | | |
| 39 | | | |
| 40 | | | |
| 41 | | | |
| 42 | | | |
| 43 | | | |
| 44 | | | |
| 45 | | | |
| 46 | | | |
| 47 | | | |
| 48 | | 0.24 | 0.14 |
| 49 | | | |
| 50 | 0.58 | | 1.68 |
| 51 | | | |
| 52 | | | |
| 53 | | | |
| 54 | | | |
| 55 | | | |
| 56 | | | |
| 57 | | | |
| 58 | | | |
| 59 | | | |
| 60 | | | |
| 61 | | | |
| 62 | | | |
| 63 | | | |
| 64 | | | |
| 65 | | | |
| 66 | | | |
| 67 | | | |
| 68 | | | |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000050

US 7,741,356 B2

**91**

TABLE VII-continued

| Cpd | r Ki δ* (nM) | r Ki δ* Ver. 1a (nM) | r Ki μ* (nM) |
|---|---|---|---|
| 69 | | | |
| 70 | | | |
| 71 | | | |
| 72 | | | |
| 73 | | | |
| 74 | | | |
| 75 | 0.66 | | 0.51 |
| 76 | | | |
| 77 | | | |
| 78 | | | |
| 79 | | | |
| 80 | | | |
| 81 | | | |
| 82 | | | |
| 83 | | | |
| 84 | | | |
| 85 | | | |
| 86 | | | |
| 87 | | | |
| 88 | | | |
| 89 | | | |
| 90 | | | |
| 91 | | | |
| 92 | | | |
| 93 | | | |
| 94 | | | |
| 95 | | | |
| 96 | | | |
| 97 | | | |
| 98 | | | |
| 99 | | | |
| 100 | | | |
| 101 | | | |
| 102 | | | |
| 103 | | | |
| 104 | | | |
| 105 | | | |
| 106 | | | |
| 107 | | | |
| 108 | | | |
| 109 | | | |
| 110 | | | |
| 111 | | | |
| 112 | | | |
| 113 | | | |
| 114 | 12 | | 0.26 |
| 115 | | | |
| 116 | | | |
| 117 | | | |
| 118 | | | |
| 119 | | | |
| 120 | | | |
| 121 | | | |
| 122 | | | |
| 123 | | | |
| 124 | | | |
| 125 | | | |
| 126 | | | |
| 127 | | | |
| 128 | | | |
| 129 | | | |
| 130 | | | |
| 131 | | | |
| 132 | | | |
| 133 | | | |
| 134 | | | |
| 135 | | | |
| 136 | | | |
| 137 | | | |
| 138 | | | |
| 139 | | | |
| 140 | | | |
| 141 | | | |
| 142 | | | |
| 143 | | | |

**92**

TABLE VII-continued

| Cpd | r Ki δ* (nM) | r Ki δ* Ver. 1a (nM) | r Ki μ* (nM) |
|---|---|---|---|
| 144 | | | |
| 145 | | | |
| 146 | | | |
| 147 | | | |
| 149 | | | |
| 150 | | | |
| 151 | | | |
| 152 | | | |
| 153 | | | |
| 154 | | | |
| 155 | | | |
| 156 | | | |
| 157 | | | |
| 158 | | | |
| 159 | | | |
| 160 | | | |
| 161 | | | |
| 162 | | | |
| 163 | 4.51 | | 0.03 |
| 164 | 120 | | 0.38 |
| 165 | 23.6 | | 0.07 |
| 166 | 5.58, 12.03 | | 0.03, 0.07 |
| 167 | 10000 | | 3.15 |
| 168 | 8867 | | 5322 |
| 169 | 10000 | | 853 |
| 170 | 32.6 | | 0.48 |
| 171 | 10000 | | 141 |
| 172 | 10000 | | 150 |
| 173 | 5069 | | 45.7 |
| 174 | | | |
| 175 | 166 | | 3.60 |
| 176 | 10000 | | 156 |
| 177 | 255 | | 13.4 |
| 178 | 104 | | 0.6 |
| 179 | 10000 | | 7116 |
| 180 | 5221 | | 1209 |
| 181 | 341 | | 1.3 |
| 182 | 1859 | | 7 |
| 183 | 604 | | 4 |
| 184 | 10000 | | 19.5 |
| 185 | 182 | | 6716 |
| 186 | 515 | | 5314 |
| 187 | 5198 | | 121 |
| 188 | 541 | | 307 |
| 189 | 360 | | 277 |
| 190 | 13.8 | | 2.61 |
| 191 | 727.3 | | 189 |
| 192 | 7.64 | | 0.09 |
| 193 | 182.1 | | 21.1 |
| 194 | 14.8 | | 0.06 |
| 195 | 306.2 | | 9.29 |
| 196 | | | |
| 197 | 4.27 | | 0.9 |
| 198 | 5178 | | 152 |
| 199 | 26.3 | | 0.3 |
| 202 | 31.5 | | 5.9 |
| 203 | 49.3 | | 29.1 |
| 204 | | | |
| 205 | 4.44 | | 0.14 |
| 206 | 5.8 | | 0.2 |
| 207 | 5.3, 5.37, 14.7 | | 0.05, 0.08, 0.1 |
| 208 | 33 | | 1.3 |
| 209 | 708 | | 17 |
| 210 | 1862 | | 420.3 |
| 211 | 180 | | 5.9 |
| 212 | 1278 | | 103 |
| 213 | 5658 | | 1263 |
| 214 | 308 | | 44 |
| 215 | 126 | | 0.43 |
| 216 | 1.14 | | 0.04 |
| 217 | 5.4 | | 1.08 |
| 218 | 1.45 | | 0.03 |
| 219 | 87.83 | | 0.87 |
| 220 | 6921 | | 157.2 |
| 221 | 9.58 | | 0.36 |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**93**

**94**

TABLE VII-continued

| Cpd | r Ki δ * (nM) | r Ki δ * Ver. 1a (nM) | r Ki μ * (nM) |
|---|---|---|---|
| 222 | 394 | | 91.2 |
| 223 | 2.6 | | 0.87 |
| 224 | 1.41 | | 0.03 |
| 225 | 112 | | 0.73 |
| 226 | 48 | | |
| 227 | 0.08, 0.46 | | 0.96 |
| 228 | 27.8 | | 0.35 |
| 229 | | | |
| 230 | 10 | | 5 |
| 231 | 1070 | | 6.19 |
| 239 | 0.1 | | 0.44 |
| 242 | 0.18 | | 0.59 |
| 246 | 0.035 | | 0.15 |
| 247 | 0.4 | | 0.61 |
| 248 | 0.44 | | 0.11 |
| 249 | 0.18 | | 0.12 |
| 250 | 0.21 | | 0.06 |
| 249 | 0.18 | | 0.12 |
| 250 | 0.21 | | 0.06 |
| 251 | 0.26 | | 0.08 |
| 249 | 0.18 | | 0.12 |
| 250 | 0.21 | | 0.06 |
| 251 | 0.26 | | 0.08 |
| 256 | 3.82 | | 7.08 |
| 257 | | 14.0 | 1.22 |
| 260 | 0.13 | | 0.24 |
| 261 | 8.01 | | 0.79 |
| 262 | 17.5 | | 1.1 |
| 266 | | | |
| 267 | 0.46 | | 1.53 |
| 268 | | | |
| 269 | 0.61 | 6.24 | 0.37 |
| 270 | 1.03 | 4.47 | 1.37 |
| 271 | 12.2 | | 0.27 |
| 272 | 15.6 | | 1.1 |
| 273 | 1140 | | 754 |
| 274 | | | |
| 275 | 0.47 | | 0.69 |
| 276 | 115 | | 47 |
| 277 | 0.14 | | 0.44 |
| 278 | 49 | | 12 |
| 279 | 5.2 | | 0.137 |
| 280 | 32 | | 3 |
| 281 | 721 | | 399 |
| 282 | 907 | | 185 |
| 283 | 6735 | | 3572 |
| 284 | 1526 | | 1033 |
| 285 | 2897 | | 1868 |
| 286 | 0.11 | | 0.05 |
| 287 | 0.14 | | 0.13 |
| 288 | 0.17 | | 0.43 |
| 288 | 0.17 | | 0.43 |
| 289 | 0.1, 3.8 | | 0.25 |
| 290 | 0.69 | | 0.43 |
| 291 | 0.12 | | 0.47 |
| 292 | 100 | | 0.65 |
| 293 | 3175 | | 646 |
| 295 | 3.95 | | 0.18 |
| 296 | 2.2 | | 0.49 |
| 297 | 44 | | 0.11 |
| 298 | 44 | | 0.3 |
| 299 | 1.16 | | 0.44 |
| 300 | 0.29 | | 0.09 |
| 301 | 0.76 | | 0.09 |
| 303 | | 24.5 | 3.87 |
| 304 | | 119 | 161 |
| 305 | | 1.24 | 0.2 |
| 306 | | 0.18 | 0.9 |
| 307 | | 0.07 | 0.4 |
| 308 | | 0.48 | 1.2 |
| 318 | 1220 | | 357 |

* The binding assays described above may be associated with a margin of error between 10-20%.

Example 3

Human Mu Opioid Receptor Binding Assay

Membranes from Chinese Hamster Ovary cells expressing the human μopioid receptor (Perkin Elmer #RBHOMM400UA) are homogenized in assay buffer (50 mM Tris, pH 7.5 with 5 mM $MgCl_2$) using a glass tissue grinder, Teflon pestle and a Steadfast Stirrer (Fisher Scientific). The concentration of membranes is adjusted to 300 μg/mL in assay buffer and 100 μL is dispensed into each well of the assay plate, a 96 well round bottom polypropylene plate. Compounds to be tested are solubilized in DMSO (Pierce), 10 mM, then diluted in assay buffer to 6x the desired final concentration. The ligand, $^3$H-Damgo (Perkin Elmer #NET-902) is also diluted in assay buffer to 3.6 nM. In a second 96 well round bottom polypropylene plate, known as the premix plate, 60 μL of the 6x compound is combined with 60 μL of 3.6 nM $^3$H-Damgo. From this premix plate 50 μL is transferred to the assay plate containing the membranes, in duplicate. The assay plate is incubated for 2 h at room temperature. A GF/C 96 well filter plate (Perkin Elmer #6005174) is pretreated with 0.3% polyethylenimine for 30 min. The contents of the assay plate are filtered through the filter plate using a Packard Filtermate Harvester, and washed 3 times with 0.9% saline that is 4° C. The filter plate is dried, the underside sealed, and 30 μL Microscint20 (Packard #6013621) added to each well. A Topcount-NXT Microplate Scintillation Counter (Packard) is used to measure emitted energies in the range of 2.9 to 35 KeV. Results are compared to maximum binding, wells receiving no inhibitors. Nonspecific binding is determined in the presence of 1 μM unlabeled Damgo (Tocris #1171). The biological activity of the compounds of the present invention is shown in Table VIII.

The biological activity of the compounds of the present invention may also be measured in a human delta opioid receptor binding assay using the following example.

Example 4

Human Delta Opioid Receptor Binding Assay

This assay is designed to test the ability of a compound to interfere with the binding of tritiated Naltrindole to the human delta subtype 2 opioid receptor. Membranes from Chinese Hamster Ovary cells expressing the human delta subtype 2 opioid receptor (Perkin Elmer #RBHODM400UA) are homogenized in assay buffer (50 mM Tris, pH 7.5 with 5 mM $MgCl_2$) using a glass tissue grinder, Teflon pestle and a Steadfast Stirrer (Fisher Scientific). The concentration of membranes is adjusted to 100 μg/mL in assay buffer and 100 μL is dispensed into each well of the assay plate, a 96 well round bottom polypropylene plate. Compounds to be tested are solubilized in DMSO (Pierce), 10 mM, then diluted in assay buffer to 6x the desired final concentration. The ligand, $^3$H-Naltrindole (Perkin Elmer #NET-1065) is also diluted in assay buffer to 6 nM. In a second 96 well round bottom polypropylene plate, known as the premix plate, 60 μL of the 6x compound is combined with 60 μL of 6 nM $^3$H-Naltrindole. From this premix plate 50 μL is transferred to the assay plate containing the membranes, in duplicate. The assay plate is incubated for 30 min at room temperature. A GF/C 96 well filter plate (Perkin Elmer #6005174) is pretreated with 0.3% polyethylenimine for 30 min. The contents of the assay plate are filtered through the filter plate using a Packard Filtermate Harvester, and washed 3 times with 0.9% saline that is 4° C. The filter plate is dried, the underside sealed, and 30 μL

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

95

Microscint20 (Packard #6013621) added to each well. A Top-count-NXT Microplate Scintillation Counter (Packard) is used to measure emitted energies in the range of 2.9 to 35 KeV. Results are compared to maximum binding, wells receiving no inhibitors. Nonspecific binding is determined in the presence of 1 μM unlabelled Naltrindole (Sigma #N115).

Biological activity measured for select compounds of the present invention are listed in Table VIII below, including δ- and μ-opioid receptor binding ($K_i$), as determined using the procedures outlined above.

TABLE VIII

| Cpd | hKi δ * (nM) | hKi μ * (nM) |
|-----|--------------|--------------|
| 1 | | 3.6 |
| 2 | | 2.9 |
| 3 | | 13 |
| 4 | | 5.5 |
| 5 | | 3.9 |
| 6 | | 2 |
| 7 | | 6.8 |
| 8 | | 2.5, 4.4 |
| 9 | | 10.9 |
| 10 | | 15.5 |
| 11 | | 5.1 |
| 12 | | 4.1 |
| 13 | | 4.8 |
| 14 | | 4.7 |
| 15 | | 285 |
| 16 | | 16 |
| 17 | | 2.2 |
| 18 | | 1.7 |
| 19 | | 18.2 |
| 20 | | 63 |
| 21 | | 37.6 |
| 22 | | ~200 |
| 23 | | 34.3 |
| 24 | | 9.3 |
| 26 | | 17 |
| 27 | | 30 |
| 28 | | 44 |
| 29 | | 38 |
| 30 | | 34 |
| 31 | | 19 |
| 32 | | 6.8 |
| 33 | | 6.9 |
| 34 | | 19 |
| 35 | | 2.8 |
| 36 | | 5.6 |
| 37 | | 183 |
| 38 | | 19 |
| 39 | | 0.9 |
| 40 | | 152 |
| 41 | | 1.6 |
| 42 | | 5.8 |
| 43 | | 6.9 |
| 44 | | 8.7 |
| 45 | | 1.2 |
| 46 | | 35 |
| 47 | | 22 |
| 48 | | 0.4 |
| 50 | | 1.4 |
| 51 | 113 | 2.7 |
| 52 | 66 | 12.1 |
| 53 | 96 | 13.1 |
| 54 | 172 | 1.1 |
| 55 | 44 | 1.8 |
| 56 | 225 | 65.3 |
| 57 | 2.2 | 0.66 |
| 58 | 70 | 8.5 |
| 59 | 120 | 5.1 |
| 60 | 114 | 2 |
| 61 | 243 | 3 |
| 62 | 69 | 2.4 |
| 63 | 473 | 58 |
| 64 | 1108 | 117 |

96

TABLE VIII-continued

| Cpd | hKi δ * (nM) | hKi μ * (nM) |
|-----|--------------|--------------|
| 65 | 517 | 0.36 |
| 66 | 550 | 6.5 |
| 67 | 438 | 4.5 |
| 68 | 59 | 0.6 |
| 69 | 272 | 4.4 |
| 70 | 85 | 2.6 |
| 71 | 102 | 0.57 |
| 72 | 71 | 1.03 |
| 73 | 151 | 1.9 |
| 74 | 63 | 9.8 |
| 75 | 8.5 | 2.6 |
| 76 | 43.1 | 1.6 |
| 77 | 13.5 | 1.8 |
| 78 | 28.9 | 2.4 |
| 79 | 11.5 | 1.7 |
| 80 | 0.95 | 1.09 |
| 81 | 15.7 | 1.7 |
| 82 | 46 | 2.39 |
| 83 | 48 | 4.67 |
| 84 | 9.6 | 1.1 |
| 85 | 1175 | 5.4 |
| 86 | 400 | 1 |
| 87 | 38.9 | 12.6 |
| 88 | 16.2 | 5.8 |
| 89 | 19.3 | 9.2 |
| 90 | 6.6 | 0.7 |
| 91 | 15 | 4.8 |
| 92 | 5.4 | 0.25 |
| 93 | 9.5 | 0.9 |
| 94 | 403 | 4.1 |
| 95 | 278 | 7.8 |
| 96 | 14.6 | 9.7 |
| 97 | 6.3 | 19.2 |
| 98 | 54 | 48 |
| 99 | 19.3 | 16 |
| 100 | 88 | 20 |
| 101 | 47 | 24 |
| 102 | 5.2 | 3.5 |
| 103 | 9.7 | 23 |
| 104 | 484 | 100 |
| 105 | 742 | 410 |
| 106 | 279 | 150 |
| 107 | 584 | 2.95 |
| 108 | 43.3 | 23.5 |
| 109 | 77 | 8.2 |
| 110 | 1402 | 191 |
| 111 | 307 | 6.4 |
| 112 | 135 | 9.5 |
| 113 | | 16 |
| 114 | 49 | 1.39 |
| 115 | 321 | 68 |
| 116 | 30.3 | 0.54 |
| 117 | 118 | 0.24 |
| 118 | 316, 212 | 1.04 |
| 119 | >10,000 | 185 |
| 120 | 740 | 20.8 |
| 121 | 182 | 25.3 |
| 122 | 107 | 12.8 |
| 123 | 84 | 47 |
| 124 | 1279 | 1.7 |
| 125 | 237 | 8.6 |
| 126 | 164 | 7.8 |
| 127 | 710 | 47 |
| 128 | | 58 |
| 129 | | 25.3 |
| 130 | 712 | 1.6 |
| 131 | 675 | 3.1 |
| 132 | | 166 |
| 133 | 108 | 11.5 |
| 134 | 463 | 121 |
| 135 | 1040 | 7 |
| 136 | 1607 | 726 |
| 137 | | 445 |
| 138 | 1183 | 104 |
| 139 | 1263 | 58 |
| 140 | 985 | 79 |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000053

PTX-007, page 53 of 79

Appx14459

US 7,741,356 B2

97

98

TABLE VIII-continued

| Cpd | hKi δ * (nM) | hKi μ * (nM) |
|---|---|---|
| 141 | 252 | 52 |
| 142 | 454 | 8.2 |
| 143 | 69 | 1.6 |
| 144 | 251 | 1.3 |
| 145 | 267 | |
| 146 | 71 | |
| 147 | 241 | |
| 149 | 408 | |
| 150 | 992 | |
| 151 | 1295 | |
| 152 | >10,000 | |
| 153 | >10,000 | |
| 154 | >10,000 | 1 |
| 155 | 345 | |
| 156 | 380 | 0.59 |
| 157 | >10,000 | 2.2 |
| 158 | >10,000 | 0.23 |
| 159 | 400 | 8.6 |
| 160 | >10000 | >1000 |
| 161 | >10000 | >1000 |
| 162 | 173 | 7.6 |
| 163 | 301, 63 | 0.67 |
| 164 | | 16.3 |
| 165 | 322 | 0.45 |
| 166 | 300, 375 | 0.39, 0.5 |
| 167 | | 4.2 |
| 190 | 285 | |
| 191 | >10,000 | |
| 192 | | 0.62 |
| 193 | >10,000 | |
| 194 | 103 | 0.13 |
| 195 | >10,000 | 9.8 |
| 196 | | |
| 197 | | |
| 198 | >10,000 | 140 |
| 199 | 209 | 0.29 |
| 203 | 501 | 13.7 |
| 204 | | 7.7 |
| 205 | | |
| 206 | 275.4 | |
| 207 | 132.2 | |
| 208 | | 1.2 |
| 209 | | 23 |
| 210 | | 0.29 |
| 211 | | |
| 212 | | 55 |
| 213 | | >1000 |
| 214 | | 29 |
| 215 | | 1.5 |
| 216 | | |
| 217 | 506 | |
| 218 | 189 | 3.92 |
| 219 | | 16.2 |
| 220 | | 377 |
| 221 | | 0.42 |
| 222 | | 185 |
| 223 | | |
| 224 | 81.3 | 0.65 |
| 225 | | 1.4 |
| 226 | | 7.91 |
| 227 | | 1.92 |
| 228 | | 15.9 |
| 229 | | 12 |
| 231 | | 28 |
| 239 | | |
| 242 | | 2.35 |
| 246 | | 5.63 |
| 256 | | 2 |
| 257 | | 3.4 |
| 260 | | 0.58 |
| 261 | | 2.58, 1.3 |
| 262 | | 3.24 |
| 266 | | 69 |
| 267 | | 6.88 |
| 268 | | 5.79 |
| 269 | | 21.5 |

TABLE VIII-continued

| Cpd | hKi δ * (nM) | hKi μ * (nM) |
|---|---|---|
| 270 | | 3.27 |
| 271 | | 15.5 |
| 272 | | 1.93 |
| 273 | | 325 |
| 274 | | >1000 |
| 289 | | 2.2 |
| 303 | | 3.8 |
| 304 | | 41 |

Example 5

Delta Opioid Receptor Functional Assay:
[$^{35}$S]GTPγS Binding Assay in CHO-hδ Cell
Membranes, Version 1

Preparation of Membranes

CHO-hδ cell membranes were purchased from Receptor Biology, Inc. (Baltimore, Md.). 10 mg/ml of membrane protein suspended in 10 mM TRIS-HC pH 7.2, 2 mM EDTA, 10% sucrose.

Membranes were maintained at 4-8° C. A portion (1 ml) of membranes was added into 15 mL cold binding assay buffer. The assay buffer contained 50 mM HEPES, pH 7.6, 5 mM MgCl$_2$, 100 mM NaCl, 1 mM DTT and 1 mM EDTA. The membrane suspension was homogenized with a Polytron for 2 times and centrifuged at 3000 rpm for 10 min. The supernent was then centrifuged at 18,000 rpm for 20 min. The pellet was saved in a tube and 10 ml assay buffer was added into the tube. The pellet and buffer were mixed with a Polytron.

Incubation Procedure

The pellet membranes (20 μg/ml) were preincubated with SPA (10 mg/ml) at 25° C. for 45 min in the assay buffer. The SPA (5 mg/ml) coupled with membranes (10 μg/ml) was then incubated with 0.5 nM [$^{35}$S]GTPγS in the same HEPES buffer containing 50 μM GDP in total volume of 200 μl. Increasing concentrations of receptor agonists were used to stimulate [$^{35}$S]GTPγS binding. The basal binding was tested in the absent agonists and no specific binding was tested in the present 10 μM unlabeled GTPγS. The data were analyzed on a Top counter.

Data

The % of Basal=(stimulate−non specific)*100/(basal−non specific). EC50 values were calculated using a Prism program.

Example 6

Delta Opioid Receptor Functional Assay:
[$^{35}$S]GTPγS Binding Assay in NG108-15 Cell
Membranes, Version 2

Preparation of Membranes

NG108-15 cell membranes were purchased from Applied Cell Sciences (Rockville, Md.). 8 mg/ml of membrane protein suspended in 10 mM TRIS-HC pH 7.2, 2 mM EDTA, 10% sucrose.

Membranes were maintained at 4-8° C. A portion (1 ml) of membranes was added into 10 ml cold binding assay buffer. The assay buffer contained 50 mM Tris, pH 7.6, 5 mM MgCl$_2$,

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

99                                                                                    100

100 mM NaCl, 1 mM DTT and 1 mM EGTA. The membrane suspension was homogenized with a Polytron for 2 times and centrifuged at 3000 rpm for 10 min. The supernent was then centrifuged at 18,000 rpm for 20 min. The pellet was saved in a tube and 10 ml assay buffer was added into the tube. The pellet and buffer were mixed with a Polytron.

Incubation Procedure

The pellet membranes (75 μg/ml) were preincubated with SPA (10 mg/ml) at 25° C. for 45 min in the assay buffer. The SPA (5 mg/ml) coupled with membranes (37.5 μg/ml) was then incubated with 0.1 nM [$^{35}$S] GTPγS in the same Tris buffer containing 100 μM GDP in total volume of 200 μl. Increasing concentrations of receptor agonists were used to stimulate [$^{35}$S] GTPγS binding. The basal binding was tested in the absent agonists and no specific binding was tested in the present 10 μM unlabeled GTPγS. The data were analyzed on a Top counter.

Data Analysis

The following parameters were calculated:

$$\% \text{ Stimulation} = \frac{(test\ compound\ cpm - non\text{-}specific\ cpm)}{(Basal\ cpm - non\text{-}specific\ cpm)} \times 100$$

$$\% \text{ Inhibition} = (\% \text{ stimulation by } 1\ \mu M\ SNC80 -$$
$$\% \text{ stimulation by } 1\ \mu M\ SNC80 \text{ in presence of test compound}) \times$$
$$100/(\% \text{ Stimulation by } 1\ \mu M\ SNC80 - 100)$$

% of Basal=(stimulate−non specific)*100/(basal−non specific).

EC$_{50}$ values were calculated using GraphPad Prism.

Example 7

Mu Opioid Receptor Functional Assay: [$^{35}$S]GTPγS Binding Assays in CHO-hMOR cell membranes, Versions 1 and 2

CHO-hMOR cell membranes were purchased from Receptor Biology, Inc. (Baltimore, Md.). About 10 mg/ml of membrane protein was suspended in 10 mM TRIS-HCl pH 7.2, 2 mM EDTA, 10% sucrose, and the suspension kept on ice. One ml of membranes was added to 15 ml cold binding assay buffer containing 50 mM HEPES, pH 7.6, 5 mM MgCl$_2$, 100 mM NaCl, 1 mM DTT and 1 mM EDTA. The membrane suspension was homogenized with a Polytron and centrifuged at 3,000 rpm for 10 min. The supernatant was then centrifuged at 18,000 rpm for 20 min. The pellet was resuspended in 10 ml assay buffer with a Polytron.

The membranes were preincubated with wheat germ agglutinin coated SPA beads (Amersham) at 25° C. for 45 min in the assay buffer. The SPA bead (5 mg/ml) coupled membranes (10 μg/ml) were then incubated with 0.5 nM [$^{35}$S] GTPγS in the assay buffer. The basal binding is that taking place in the absence of added test compound; this unmodulated binding is considered as 100%, with agonist stimulated binding rising to levels significantly above this value. A range of concentrations of receptor agonists was used to stimulate [$^{35}$S]GTPγS binding. Both basal and non-specific binding was tested in the absence of agonist; non-specific binding determination included 10 μM unlabeled GTPγS.

Compounds were tested for function as antagonists by evaluating their potential to inhibit agonist-stimulated GTPγS binding. Radioactivity was quantified on a Packard Top-Count. The following parameters were calculated:

$$\% \text{ Stimulation} = \frac{(test\ compound\ cpm - non\text{-}specific\ cpm)}{(Basal\ cpm - non\text{-}specific\ cpm).} \times 100$$

$$\% \text{ Inhibition} = (\% \text{ stimulation by } 1\ \mu M\ SNC80 -$$
$$\% \text{ stimulation by } 1\ \mu M\ SNC80 \text{ in presence of test compound}) \times$$
$$100/(\% \text{ Stimulation by } 1\ \mu M\ SNC80 - 100)$$

EC$_{50}$ values were calculated using GraphPad Prism.

Biological activity measured for select compounds of the present invention are listed in Table VIII below, including δ- and μ-opioid receptor functional data (% I and EC50), as determined from a single set of experiments using the procedures outlined above.

TABLE IX

| Cpd No. | DOR GTP-binding Assay_v1 EC50 (nM) | DOR GTP-binding Assay_v2 EC50 (nM) | DOR GTP-binding Assay v2 (% I) | MOR GTP binding assay v2 EC50 (nM) | MOR GTP binding assay_v2 (% I) | MOR GTP assay_v1 % of Basal | MOR GTP binding assay_v1 (% I) |
|---|---|---|---|---|---|---|---|
| 1 | | 88 | 22.10 | | | | |
| 4 | | 46 | 66.12 | | | | |
| 5 | | >10,000 | 47.12 | 71 | 7.87 | | |
| 8 | | >10,000 | 94.03 | 1.2 | 13.95 | | |
| 9 | | 3.4 | 67.13 | | | | |
| 14 | | 0.6 | 59.70 | | | | |
| 17 | | 1.3 | 68.64 | 2.5 | 8.71 | | |
| 18 | | >10,000 | 100 | | | | |
| 18 | | | | 1.0 | 7.54 | | |
| 20 | | >10,000 | 78.74 | | | | |
| 29 | | >10,000 | 79.05 | | | | |
| 48 | | >10,000 | 108.36 | 2.2 | 24.53 | | |
| 50 | | 1.4 | 60.27 | | | | |
| 51 | | 27 | 66.04 | | | | |
| 75 | | 1.4 | 65.35 | | | | |
| 114 | 35 | | | | | 717.59 | 13.20 |
| 117 | 37 | | | | | 816.16 | 3.31 |
| 122 | | | | | | 278.08 | 41.93 |
| 130 | 16 | | | | | 866.39 | 1.62 |
| 131 | 99 | | | | | 391.98 | 28.64 |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000055

US 7,741,356 B2

101 102

TABLE IX-continued

| Cpd No. | DOR GTP-binding Assay_v1 EC50 (nM) | DOR GTP-binding Assay_v2_ EC50 (nM) | DOR GTP-binding Assay v2 (% I) | MOR GTP binding assay v2 EC50 (nM) | MOR GTP binding assay_v2 (% I) | MOR GTP assay_v1 % of Basal | MOR GTP binding assay_v1 (% I) |
|---|---|---|---|---|---|---|---|
| 146 | 27 | | | | | 740.77 | 2.79 |
| 147 | 51 | | | | | 779.35 | 1.00 |
| 149 | 44 | | | | | 753.53 | 1.00 |
| 150 | 49 | | | | | 476.63 | 53.35 |
| 151 | 350 | | | | | 606.38 | 24.19 |
| 155 | 150 | | | | | 655.93 | 14.32 |
| 163 | 21 | | | | | 1286.00 | 1.00 |
| 164 | 2500 | | | | | 1077.00 | 1.00 |
| 165 | 231 | | | | | 1182.00 | 1.00 |
| 166 | 21 | | | | | 1448.00 | 1.00 |
| 166 | 71 | | | | | 1425.00 | 1.00 |
| 167 | | | | | | 780.00 | 17.00 |
| 170 | 115 | | | | | 1031.00 | 26.00 |
| 173 | | | | | | 147.00 | 85.00 |
| 174 | 20 | | | | | 864.00 | 42.00 |
| 175 | | | | | | 471.00 | 53.00 |
| 177 | | | | | | 625.00 | 23.00 |
| 178 | | | | | | 1059.00 | 10.00 |
| 181 | | | | | | 1304.00 | 1.00 |
| 182 | | | | | | 1091.00 | 6.00 |
| 183 | 2320 | | | | | 962.00 | 27.00 |
| 184 | | | | | | 862.00 | 13.00 |
| 190 | 3830 | | | | | 109,194 | 70.00 |
| 192 | 76 | | | | | 383.00 | 30.00 |
| 193 | | | | | | 182.00 | 54.00 |
| 194 | 189 | | | | | 558.00 | 1.00 |
| 195 | | | | | | 378.00 | 34.00 |
| 196 | 24 | | | | | 620.00 | 1.00 |
| 197 | 140 | | | | | 582.00 | 1.00 |
| 199 | 217 | | | | | 465.00 | 11.00 |
| 202 | 1580 | | | | | 529.00 | 1.00 |
| 203 | 515 | | | | | 331.00 | 20.00 |
| 205 | 32 | | | | | 566.00 | 1.00 |
| 206 | 37 | | | | | 446.00 | 1.00 |
| 207 | 8.65 | | | | | 432, 1160 | 40.00 |
| 207 | 12 | | | | | 1183.00 | 21.00 |
| 208 | | | | | | 475.00 | 1.00 |
| 209 | | | | | | 295.00 | 10.00 |
| 210 | | | | | | 414.00 | 10.00 |
| 211 | | | | | | 371.00 | 10.00 |
| 214 | 26000 | | | | | 295.00 | 3.00 |
| 215 | 1060 | | | | | 606.00 | 1.00 |
| 216 | 16 | | | | | 666.00 | 1.00 |
| 217 | 82 | | | | | 599.00 | 1.00 |
| 218 | 20 | | | | | 599.00 | 1.00 |
| 219 | 3560 | | | | | 611.00 | 1.00 |
| 221 | 308 | | | | | 427.00 | 13.00 |
| 223 | 56 | | | | | 495.00 | 1.00 |
| 224 | 103 | | | | | 694.00 | 1.00 |
| 225 | 2190 | | | | | 657.00 | 1.00 |
| 226 | | >10,000 | 19.71 | | | | |
| 227 | | >10,000 | 66.56 | 60.8 | 36.00 | | |
| 230 | | | 48.93 | | | | |
| 239 | | >10,000 | | | | | |
| 242 | | >10,000 | 91.45 | | | | |
| 246 | | 0.3 | 47.01 | 4.5 | 21.30 | | |
| 247 | | 44 | 41.89 | | | | |
| 248 | | 15 | 31.72 | | | | |
| 249 | | 8 | 20.14 | | | | |
| 250 | | 10 | 34.93 | | | | |
| 251 | | 18 | 53.94 | | | | |
| 252 | | 32.1 | 66.00 | 4.15 | 24.00 | | |
| 253 | | 1.35 | 52.00 | 251 | 28.00 | | |
| 254 | | 6.27 | 62.00 | 316 | 42.00 | | |
| 255 | | 13.1 | 54.00 | 3.48 | 33.00 | | |
| 256 | | >10,000 | 89.19 | 13 | 29.40 | | |
| 257 | | 7.4 | 48.88 | 3.9 | 10.96 | | |
| 260 | | >10,000 | 100.97 | 1.5 | 2.89 | | |
| 261 | | 21 | 30.04 | 17 | 5.88 | | |
| 267 | | 6 | 31.76 | | | | |
| 269 | | 86 | 21.18 | 48 | 1.00 | | |
| 270 | | 1000 | 63.51 | 56 | 6.61 | | |
| 275 | | 3 | 72.08 | | | | |
| 286 | | 2.6 | 34.65 | | | | |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

103                                                                104

TABLE IX-continued

| Cpd No. | DOR GTP-binding Assay_v1 EC50 (nM) | DOR GTP-binding Assay_v2 EC50 (nM) | DOR GTP-binding Assay v2 (% I) | MOR GTP binding assay v2 EC50 (nM) | MOR GTP binding assay_v2 (% I) | MOR GTP assay_v1 % of Basal | MOR GTP binding assay_v1 (% I) |
|---|---|---|---|---|---|---|---|
| 287 | >10,000 | | 84.50 | | | | |
| 288 | >10,000 | | 74.54 | | | | |
| 289 | >10,000 | | 86.27 | | | | |
| 290 | >10,000 | | 52.41 | | | | |
| 291 | >10,000 | | 96.52 | | | | |
| 295 | | 2.2 | 71.66 | 1.4 | 8.21 | | |
| 296 | | 7.9 | 69.41 | 2.2 | 9.35 | | |
| 299 | | 2.3 | | 1.0 | 12.11 | | |
| 300 | | 32 | | 2.6 | 15.40 | | |
| 301 | >10,000 | | 109.56 | 2.6 | 76.20 | | |
| 303 | | 95 | 23.85 | 30 | 1.00 | | |
| 309 | | | | 23.0 | 47.00 | | |
| 310 | | | | 3920 | 51.00 | | |
| 311 | | | | | | | |
| 312 | | 1.02 | 41.00 | | | | |
| 312 | | | | 58.7 | 35.00 | | |
| 313 | | 5.03 | 49 | 50.6 | 29.00 | | |
| 316 | | | | 24.1 | 76 | | |

Example 8

In Vivo Assay-Stress-induced Fecal Output (fecal output for 1 hr)

This assay evaluates the fecal output in novel environment-stressed mice to that of acclimated controls.

Methods: Adult, male, Crl:CD-1 (ICR) mice, weighing ~30-35 g were used in these studies, with a minimum of 10 mice per dose group. One group of mice was assigned as acclimated, or "non-stressed" controls. These control mice were transported from colony housing, where they were housed 3/cage in polycarbonate cages with access to food and water ad lib. to the procedure room. The mice were removed from their home cages and individually housed in 20 cm wide×20 cm deep×15 cm tall cages, equipped with a wire mesh bottom where they remained for a 16-18 hr period of acclimation to their novel environment. Mice were allowed access to food and water ad lib. during acclimation. The other groups of mice were assigned as non-acclimated, or

"stressed" treatment groups. Each mouse in each group was weighed and vehicle, or test compound, was intragastrically administered by oral intubation in 0.5% methylcellulose. Mice were allowed access to water only ad lib. during the test period. After compound administrations, acclimated (control) as well as non-acclimated (stressed) mice were individually housed in a 20 cm wide×20 cm deep×15 cm tall cage, with a wire mesh bottom. An absorbant cardboard is placed beneath the cages. The number of fecal pellets excreted by each mouse was determined at hourly intervals following placement of the mice in the individual cages. Raw Data=# of fecal pellets/mouse/hr. The mean fecal pellet output for each test group was calculated and the results expressed as a percent of mean fecal pellet output of the control group (the acclimated, non-stressed group, to which vehicle only was administered). ANOVA was performed and Tukey's Multiple Comparison Test used to compare the means, which were considered significantly different when $P<0.05$. Data is shown in Table X, XI, and XII.

TABLE X

| Cpd No. | dose (mg/kg) | Fecal Output (# pellets) | | | | | |
|---|---|---|---|---|---|---|---|
| | | control | NES | cpd | NES % ctrl | cpd % control | cpd % NES |
| 18 | 30 | 2.3 | 3.8 | 3.1 | 166.7 | 137.8 | 82.7 |
| 50 | 30 | 2.3 | 7.0 | 3.3 | 304.3 | 143.5 | 47.1 |
| 55 | 30 | 3.9 | 14.1 | 8.3 | 361.5 | 212.8 | 58.9 |
| 57 | 30 | 3.9 | 14.1 | 7.6 | 361.5 | 194.9 | 53.9 |
| 58 | 30 | 2.3 | 7.0 | 3.9 | 304.3 | 169.6 | 55.7 |
| 75 | 30 | 3.1 | 9.1 | 6.4 | 293.5 | 206.5 | 70.3 |
| 75 | 30 | 1.9 | 3.9 | 1.4 | 206.7 | 73.3 | 35.5 |
| 78 | 30 | 3.6 | 7.3 | 3.3 | 202.8 | 91.7 | 45.2 |
| 79 | 30 | 3.6 | 7.3 | 7.1 | 202.8 | 197.2 | 97.3 |
| 80 | 30 | 3.6 | 7.3 | 5.5 | 202.8 | 152.8 | 75.3 |
| 80 | 30 | 3.9 | 13.1 | 10.3 | 335.9 | 264.1 | 78.6 |
| 85 | 30 | 5.4 | 12.0 | 7.9 | 222.2 | 146.3 | 65.8 |
| 87 | 30 | 7.3 | 12.9 | 10.3 | 176.7 | 141.1 | 79.8 |
| 89 | 30 | 5.0 | 11.6 | 6.4 | 232.0 | 128.0 | 55.2 |
| 90 | 30 | 3.1 | 12.9 | 10.3 | 416.1 | 332.3 | 79.8 |
| 91 | 30 | 3.1 | 12.9 | 8.9 | 416.1 | 287.1 | 69.0 |
| 92 | 30 | 3.6 | 11.1 | 9.2 | 308.3 | 255.6 | 82.9 |
| 93 | 30 | 3.6 | 11.1 | 5.0 | 308.3 | 138.9 | 45.0 |
| 94 | 30 | 2.7 | 9.1 | 9.4 | 337.0 | 348.1 | 103.3 |
| 95 | 30 | 2.7 | 9.1 | 8.5 | 337.0 | 314.8 | 93.4 |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000057

US 7,741,356 B2

TABLE X-continued

Fecal Output (# pellets)

| Cpd No. | dose (mg/kg) | control | NES | cpd | NES % ctrl | cpd % control | cpd % NES |
|---|---|---|---|---|---|---|---|
| 97 | 30 | 7.3 | 12.9 | 4.8 | 176.7 | 65.8 | 37.2 |
| 102 | 30 | 5.7 | 15.0 | 3.4 | 263.2 | 59.6 | 22.7 |
| 103 | 30 | 7.3 | 12.9 | 10.2 | 176.7 | 139.7 | 79.1 |
| 107 | 30 | 5.7 | 15.0 | 13.1 | 263.2 | 229.8 | 87.3 |
| 111 | 30 | 7.2 | 10.3 | 4.4 | 143.1 | 60.8 | 42.5 |
| 112 | 30 | 7.2 | 10.3 | 7.2 | 143.1 | 100.0 | 69.9 |
| 114 | 30 | 7.2 | 10.3 | 7.8 | 143.1 | 108.3 | 75.7 |
| 118 | 30 | 5.4 | 12.0 | 7.2 | 222.2 | 133.7 | 60.2 |
| 133 | 30 | 5.5 | 12.1 | 9.9 | 220.0 | 180.0 | 81.8 |
| 143 | 10 | 3.7 | 13.6 | 9.1 | 367.6 | 245.9 | 66.9 |
| 143 | 30 | 7.5 | 9.2 | 5.2 | 122.7 | 69.3 | 56.5 |
| 144 | 30 | 3.7 | 13.6 | 11.5 | 367.6 | 310.8 | 84.6 |
| 178 | 30 | 3.2 | 8.8 | 5.5 | 275.0 | 171.9 | 62.5 |
| 192 | 10 | 5.4 | 12.5 | 10.5 | 231.5 | 194.4 | 84.0 |
| 194 | 10 | 5.4 | 12.5 | 11.8 | 231.5 | 218.5 | 94.4 |
| 194 | 30 | 8.1 | 11.0 | 4.2 | 135.8 | 51.9 | 38.2 |
| 194 | 30 | 3.1 | 4.8 | 4.9 | 154.3 | 157.5 | 102.1 |
| 194 | 30 | 3.7 | 14.0 | 6.2 | 378.4 | 167.6 | 44.3 |
| 196 | 30 | 3.7 | 14.0 | 9.2 | 378.4 | 248.6 | 65.7 |
| 196 | 30 | 1.1 | 9.5 | 4.3 | 863.6 | 390.9 | 45.3 |
| 199 | 10 | 2.7 | 10.5 | 9.1 | 388.9 | 337.0 | 86.7 |
| 199 | 10 | 3.8 | 13.1 | 10.8 | 344.7 | 284.2 | 82.4 |
| 205 | 30 | 3.3 | 9.5 | 2.3 | 287.9 | 70.7 | 24.6 |
| 206 | 10 | 3.8 | 13.1 | 8.6 | 344.7 | 226.3 | 65.6 |
| 207 | 10 | 5.6 | 9.4 | 8.3 | 167.9 | 148.2 | 88.3 |
| 207 | 10 | 7.7 | 13.0 | 5.0 | 168.8 | 64.9 | 38.5 |
| 207 | 10 | 5.7 | 12.8 | 6.6 | 225.9 | 116.5 | 51.6 |
| 207 | 10 | 2.9 | 12.8 | 5.3 | 441.4 | 182.8 | 41.4 |
| 207 | 30 | | 3.5 | 3.2 | | | 91.4 |
| 207 | 30 | 3.5 | 13.0 | 6.4 | 371.4 | 184.1 | 49.6 |
| 216 | 10 | 3.6 | 10.3 | 4.9 | 286.1 | 136.1 | 47.6 |
| 218 | 30 | 2.7 | 10.5 | 3.7 | 388.9 | 137.6 | 35.4 |
| 223 | 30 | 3.1 | 4.8 | 5.0 | 154.3 | 160.7 | 104.2 |
| 224 | 10 | 3.6 | 6.9 | 3.5 | 191.7 | 97.2 | 50.7 |
| 225 | 30 | 3.1 | 4.8 | 7.3 | 154.3 | 234.7 | 152.1 |

TABLE XI

Dose-dependent Mouse Fecal Pellet Output Test

| Cpd No. | # of pellets control | NES | NES (% ctrl) | 0.3 | 0.5 | 1.0 | 3.0 | 5.0 | 6.0 | 10.0 | 30.0 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 75 | | | 235.7 | | | | | | | | |
| 93 | 2.7 | 8.3 | 307.4 | | | | 6.2 | | | 5.5 | 3.2 |
| 97 | 6.1 | 11.6 | 190.2 | | | | 14 | | | 7.5 | 3.5 |
| 97 | 4.8 | 10.1 | 210.4 | | | | 9.1 | | | 10.4 | 2.3 |
| 102 | 5.3 | 10.7 | 201.9 | | | | 6.9 | | | 4.5 | 2.22 |
| 114 | 3.4 | 10 | 294.1 | | | | 9.6 | | | 7.7 | 5.4 |
| 200 | 3.556 | 8.8 | 247.5 | | | | 8.1 | | | 8.2 | 5.8 |
| 207 | 5.2 | 11.4 | 219.2 | 11.4 | | | 12 | | | 4.9 | |
| 207 | 4.8 | 8.6 | 179.2 | | | 9.4 | | | 8.6 | 6.7 | |
| 207 | 3.4 | 10.8 | 317.6 | | | | | | 7.5 | 5.5 | 3.5 |
| 207 | 3.6 | 6.5 | 180.6 | | | | 7.3 | | | 4.8 | 3.4 |
| 224 | 2.2 | 9.6 | 436.4 | | 7.6 | 7.2 | | | | 4.2 | |

TABLE XII

Dose-dependent Mouse Fecal Pellet Output Test: Computed Results

| Cpd No. | Compound (% control) | | | | | | | | Compound (% NES) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.3 | 0.5 | 1.0 | 3.0 | 5.0 | 6.0 | 10.0 | 30.0 | 0.3 | 0.5 | 1.0 | 3.0 | 5.0 | 6.0 | 10.0 | 30 |
| 75 | | | | 223.8 | | | 188.1 | 100 | | | | | | | | |
| 93 | | | | 229.6 | | | 203.7 | 119 | | | | 74.7 | | | 66.22 | 38.55 |
| 97 | | | | 226.2 | | | 123.0 | 57 | | | | 119 | | | 64.66 | 30.17 |
| 97 | | | | 189.6 | | | 216.7 | 48 | | | | 90.1 | | | 103 | 22.77 |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**107** | | **108**

### TABLE XII-continued

Dose-dependent Mouse Fecal Pellet Output Test: Computed Results

| Cpd | Compound (% control) | | | | | | | | Compound (% NES) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | 0.3 | 0.5 | 1.0 | 3.0 | 5.0 | 6.0 | 10.0 | 30.0 | 0.3 | 0.5 | 1.0 | 3.0 | 5.0 | 6.0 | 10.0 | 30 |
| 102 | | | | 130.2 | | | 84.9 | 42 | | | | 64.5 | | | 42.06 | 20.77 |
| 114 | | | | 282.4 | | | 226.5 | 159 | | | | 96 | | | 77 | 54 |
| 200 | | | | 227.8 | | | 230.6 | 163 | | | | 92.05 | | | 93.18 | 65.91 |
| 207 | 219.2 | | | 228.8 | | | 94.2 | | 100 | | | 104.4 | | | 42.98 | |
| 207 | | 195.8 | | | 179.2 | | 139.6 | | | 109 | | | | 100 | 77.91 | |
| 207 | | | | | | 220.6 | 161.8 | 103 | | | | | | 69.44 | 50.93 | 32.41 |
| 207 | | | | 202.8 | | | 133.3 | 94 | | | | 112.3 | | | 73.85 | 52.31 |
| 224 | | 345.5 | 327.3 | | 190.9 | | | | | 79.17 | 75 | | | | 43.75 | |

Example 9

In Vivo Assay: Stress-Induced Entire GI Tract Transit (6 Hour Transit Time Test)

Methods: The animals used in these studies were male CD-1 mice, ave. wt. ~30 g. Procedure: Mice were housed in LAM under 12h/12h light/dark cycle, food & water ad lib. On the day before the experiments, the mice assigned to the "acclimated" (non-stressed) control group were placed into individual wire mesh-bottomed cages, provided food and water ad lib. The acclimated control group was in this new environment for 16-18 hrs prior to beginning the test. On the day of the experiment, mice assigned to experimental groups were housed in home cages were transported to procedure room and remain in their home cages until the start of the transit portion of the study. Mice were intragastrically dosed with compounds (volume remains constant at 0.1 mL/10 g body wt) by oral gavage 30 minutes before carmine (a red vital dye that does not have the drug-adsorbing properties of charcoal) is administered (0.25 mL, 6% carmine in 0.5% methylcellulose). After the carmine marker was administered each mouse was placed in the novel environment cage. One hour after administration of carmine, the fecal pellet output of each animal was recorded. At one-hour intervals thereafter the fecal pellets were examined for the presence of carmine-dye. The number of mice that excreted a carmine-containing fecal pellet at the end of each hour post carmine administration was recorded, until all mice had excreted carmine in a fecal pellet or the end of 6 hrs post carmine administration, whichever occurred first. A variant of this novel environment stress (NES) paradigm is to use the same procedures of dye and compound administrations, but to use restraint (confinement in a small plastic tube for 3 hr) as a stressor (RS=restraint stress), followed by two hours in an individual cage (total of 5 hr fecal transit time). Data is shown in Table XIII. The original data are quantal, i.e. a mouse in the treatment group either did, or did not exhibit entire GI tract transit (excrete colored feces). The mouse entire GI tract (MEGIT) transit test can thus be done in mice that are all acclimated (non-stressed), in which case the data are expressed as % control (vehicle only), or in mice that are exposed to NES or RS, in which cases the data are expressed as % of the vehicle treated NES or RS group. Data is shown in Table XIII.

### TABLE XIII

Mouse entire GI tract transit test (MEGIT or MEGIT-NES or MEGIT-RS*

| Cpd No. | dose (mg) | route | MEGIT-NES Entire GI transit 6 hr (% NES) | MEGIT entire GI transit 6 hr % ctrl | MEGIT-RS entire GI transit 5 hr (% RS) |
|---|---|---|---|---|---|
| 4 | 20 | p.o. | | | 100 |
| 18 | 30 | p.o. | 80 | | |
| 75 | 30 | p.o. | | 125 | |
| 75 | 60 | p.o. | | 0 | |
| 75 | 100 | p.o. | | 0 | |
| 227 | 20 | p.o. | | | 100 |
| 242 | 20 | p.o. | | | 100 |
| 261 | 20 | p.o. | | | 103.6 |
| 270 | 20 | p.o. | | | 112.5 |
| 289 | 20 | p.o. | | | 14.1 |

*RS = restraint stress;
NES = novel environment stress

Example 10

In Vivo Assay: Upper GI tract transit

Methods: The animals used in these studies were male CD-1 mice, ave. wt. ~30 g. Mice were housed under 12h/12h light/dark cycle, food & water ad lib. On the day of the experiment mice were assigned to experimental groups, including one vehicle-only group (=control). At 30 min before administration of carmine dye, animals were dosed with vehicle or vehicle-plus-compound, mice were returned to their home cages after drug administration. After administration of carmine, the animals were either returned to their home cages (non-stressed) or individually placed in the same metal cages as used in the fecal output or entire GI tract transit to induce a novel environment stress. One hour after administration of carmine, mice were sacrificed by cervical dislocation, the abdomen opened midventrally, the small intestine from pylorus to cecum was removed, the mesentery divided in order to lay the intestine straight & flat—without stretching. The total length of intestine and the length of carmine-dyed intestine were measured in order to determine the percent of the upper GI tract over which transit had occurred as follows: {(Length of carmine-dyed intestine)/(Total length of intestine)}×100=% upper GI transit. The data expressed were group means±SD (or s.e.m.) and data expressed as % of control. Statistics: ANOVA with the Tukey-Kramer post-hoc test and means were considered significantly different when $P<0.05$. Data is presented in Table XIV.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000059

US 7,741,356 B2

109

110

TABLE XIV

| | | | Mouse Upper GI Transit Test (MUGIT) |
| Cpd No. | dose (mg) | route | upper GI transit (% ctrl) |
|---|---|---|---|
| 8 | 30 | p.o. | 77.3 |
| 17 | 30 | p.o. | 37.3 |
| 18 | 10 | p.o. | 99.6 |
| 18 | 50 | p.o. | 69.9 |
| 18 | 5 | p.o. | 94.2 |
| 18 | 25 | p.o. | 83.0 |
| 18 | 100 | p.o. | 41.2 |
| 18 | 30 | p.o. | 37.5 |
| 18 | 30 | p.o. | 53.1 |
| 48 | 30 | p.o. | 102.1 |
| 75 | 30 | p.o. | 71.1 |
| 75 | 60 | p.o. | 56.0 |
| 75 | 100 | p.o. | 45.6 |
| 227 | 30 | p.o. | 93.9 |
| 256 | 30 | p.o. | 89.7 |
| 261 | 30 | p.o. | 87.7 |
| 270 | 30 | p.o. | 96.5 |
| 287 | 30 | p.o. | 66.4 |
| 289 | 30 | p.o. | 76.4 |
| 315 | 30 | p.o. | 94.5 |

Example 11

Visceral Hyperalgesia Testing

Method: Rats were chronically instrumented with EMG electrodes in the muscles of the anterior abdominal wall. Distention of an intracolonic balloon, using a barostat apparatus, evoked increases in the EMG recordings that are related to the pressure. Control responses are compared with repeat stimulation 4 hours after zymosan is administered to the colon (FIG. 1). Animals with 10% higher visceromotor responses for at least two distending pressures are considered to exhibit visceral hyperalgesia.

Compound 18 in 5 rats at repeated distentions of 40 mmHg administered at 30 mg/kg, i.p., blocked the hyperalgesic response to colorectal balloon distention following zymosan (FIG. 2 and FIG. 3).

The agonistic or antagonistic activity of the compounds of the invention at the kappa opioid receptor can be determined by known methods, for example, by the procedure described in S. Giuliani, A. Lecci, M. Tramontana, C. A. Maggi, Role of kappa opioid receptors in modulating cholinergic twitches in the circular muscle of guinea-pig colon. Brit J Pharmacol 119, 985-9 (November, 1996).

What is claimed is:

1. A compound of Formula (I)

Formula (I)

wherein:

$R^1$ is selected from the group consisting of hydrogen, $C_{1-6}$alkyl, cycloalkyl, heterocyclyl, aryl($C_{1-6}$)alkyl, and heteroaryl($C_{1-6}$)alkyl; wherein when $R^1$ is phenyl($C_{1-6}$) alkyl, phenyl is optionally fused to a heterocyclyl or cycloalkyl;

wherein when $R^1$ is $C_{1-2}$alkyl, said $C_{1-2}$alkyl is optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkoxy, aryl, cycloalkyl, heterocyclyl, hydroxy, cyano, amino, $C_{1-6}$alkylamino, ($C_{1-6}$alkyl)$_2$amino, trifluoromethyl, and carboxy;

and further, wherein when $R^1$ is $C_{3-6}$alkyl, said $C_{3-6}$alkyl is optionally substituted with one to three substituents independently selected from the group consisting of $C_{1-6}$alkoxy, aryl, cycloalkyl, heterocyclyl, hydroxy, cyano, amino, $C_{1-6}$alkylamino, ($C_{1-6}$alkyl)$_2$amino, trifluoromethyl, and carboxy;

wherein the cycloalkyl and heterocyclyl of $C_{1-2}$alkyl and $C_{3-6}$alkyl are optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, hydroxy($C_{1-6}$)alkyl, $C_{1-6}$alkoxy, hydroxy, cyano, amino, $C_{1-6}$alkylamino, ($C_{1-6}$alkyl)$_2$amino, trifluoromethyl, carboxy, aryl($C_{1-6}$)alkoxycarbonyl, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, ($C_{1-6}$alkyl)$_2$aminocarbonyl, and aminosulfonyl;

furthermore, wherein the cycloalkyl and heterocyclyl of $R^1$ are optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, hydroxy($C_{1-6}$)alkyl, $C_{1-6}$alkoxy, hydroxy, cyano, amino, $C_{1-6}$alkylamino, ($C_{1-6}$alkyl)$_2$amino, trifluoromethyl, carboxy, aryl($C_{1-6}$)alkoxycarbonyl, $C_{1-6}$alkoxycarbonyl, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, ($C_{1-6}$alkyl)$_2$aminocarbonyl, and aminosulfonyl;

furthermore, wherein the aryl and heteroaryl portion of the $R^1$ substituents aryl($C_{1-6}$)alkyl and heteroaryl($C_{1-6}$) alkyl, are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-6}$alkyl; hydroxy($C_{1-6}$)alkyl; $C_{1-6}$alkoxy; $C_{6-10}$aryl($C_{1-6}$)alkyl; $C_{6-10}$aryl($C_{1-6}$) alkoxy; $C_{6-10}$aryl; heteroaryl optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, $C_{1-6}$alkoxy, and carboxy; cycloalkyl; heterocyclyl; $C_{6-10}$aryloxy; heteroaryloxy; cycloalkyloxy; heterocyclyloxy; amino; $C_{1-6}$alkylamino; ($C_{1-6}$alkyl)$_2$amino; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-6}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-6}$alkoxycarbonyl; heterocyclylcarbonyl; carboxy; $C_{1-6}$alkoxycarbonyl; $C_{1-6}$alkoxycarbonyloxy; $C_{1-6}$alkylcarbonyl; $C_{1-6}$alkylcarbonylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl; ($C_{1-6}$alkyl)$_2$aminocarbonyl; cyano; halogen; trifluoromethyl; trifluoromethoxy; and hydroxy;

provided that no more than one $R^{11}$ substituent is selected from the group consisting of $C_{6-10}$aryl($C_{1-6}$)alkyl; $C_{6-10}$aryl($C_{1-6}$)alkoxy; $C_{6-10}$aryl; heteroaryl optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, $C_{1-6}$alkoxy, and carboxy; cycloalkyl; heterocyclyl; $C_{6-10}$aryloxy; heteroaryloxy; cycloalkyloxy; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-6}$alkoxycarbonyl; heterocyclylcarbonyl; and heterocyclyloxy;

$R^2$ is hydrogen, $C_{1-8}$alkyl, hydroxy($C_{1-8}$)alkyl, $C_{6-10}$aryl ($C_{1-6}$)alkoxy($C_{1-6}$)alkyl, or $C_{1-6}$alkyl;

wherein the $C_{6-10}$aryl group in the $C_{6-10}$aryl-containing substituents of $R^2$ are optionally substituted with one to

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000060

US 7,741,356 B2

111

two substituents independently selected from the group consisting of $C_{1-6}$alkyl, $C_{1-6}$alkoxy, hydroxy, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$amino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, $(C_{1-6}$alkyl$)_2$aminocarbonyl, cyano, fluoro, chloro, bromo, trifluoromethyl, and trifluoromethoxy; and, wherein the $C_{1-6}$alkyl and $C_{1-6}$alkoxy substituents of aryl are optionally substituted with hydroxy, amino, $C_{1-6}$alkylamino, and $(C_{1-6}$alkyl$)_2$amino, or aryl;

A is a-1, optionally substituted with $R^3$ and $R^5$;

a-1



wherein

A-B is N—C;

$R^3$ is one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, aryl, aryl$(C_{1-6})$alkyl, aryl$(C_{2-6})$alkenyl, aryl$(C_{2-6})$alkynyl, heteroaryl, heteroaryl$(C_{1-6})$alkyl, heteroaryl$(C_{2-6})$alkenyl, heteroaryl $(C_{2-6})$alkynyl, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$ amino, arylamino, heteroarylamino, aryloxy, heteroaryloxy, trifluoromethyl, and halogen;

wherein the aryl, heteroaryl, and the aryl and heteroaryl of aryl$(C_{1-6})$alkyl, aryl$(C_{2-6})$alkenyl, aryl$(C_{2-6})$alkynyl, heteroaryl$(C_{1-6})$alkyl, heteroaryl$(C_{2-6})$alkenyl, heteroaryl$(C_{2-6})$alkynyl, arylamino, heteroarylamino, aryloxy, and heteroaryloxy, are optionally substituted with one to five fluoro substituents or one to three substituents independently selected from the group consisting of $C_{1-6}$alkyl, hydroxy$(C_{1-6})$alkyl, $C_{1-6}$alkoxy, $C_{6-10}$aryl $(C_{1-6})$alkyl, $C_{6-10}$aryl$(C_{1-6})$alkoxy, heteroaryl $(C_{2-6})$alkynyl, heteroaryl$(C_{1-6})$alkyl, heteroaryl, heteroaryloxy, $C_{6-10}$arylamino, heteroarylamino, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$ amino, carboxy$(C_{1-6})$alkylamino, carboxy, $C_{1-6}$alkylcarbonyl, $C_{1-6}$alkoxycarbonyl, $C_{1-6}$alkylcarbonylamino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, $(C_{1-6}$alkyl$)_2$aminocarbonyl, carboxy$(C_{1-6})$alkylaminocarbonyl, cyano, halogen, trifluoromethyl, trifluoromethoxy, hydroxy, $C_{1-6}$alkylsulfonyl, and $C_{1-6}$alkylsulfonylamino; provided that no more than one such substituent on the aryl or heteroaryl portion of $R^3$ is selected from the group consisting of $C_{6-10}$aryl$(C_{1-6})$alkyl, $C_{6-10}$aryl $(C_{1-6})$alkoxy, $C_{6-10}$aryl, $C_{6-10}$aryloxy, heteroaryl$(C_{1-6})$ alkyl, heteroaryl$(C_{1-6})$alkoxy, heteroaryl, heteroaryloxy, $C_{6-10}$arylamino, heteroarylamino;

and wherein $C_{1-6}$alkyl and $C_{1-6}$alkyl of aryl$(C_{1-6})$alkyl and heteroaryl$(C_{1-6})$alkyl are optionally substituted with a substituent selected from the group consisting of hydroxy, carboxy, $C_{1-4}$alkoxycarbonyl, amino, $C_{1-6}$alkylamino, $(C_{1-6}$alkyl$)_2$amino, aminocarbonyl, $(C_{1-4})$alkylaminocarbonyl, di$(C_{1-4})$alkylaminocarbonyl, aryl, heteroaryl, arylamino, heteroarylamino, aryloxy, heteroaryloxy, aryl$(C_{1-4})$alkoxy, and heteroaryl $(C_{1-4})$alkoxy;

$R^4$ is $C_{6-10}$aryl or a heteroaryl selected from the group consisting of furyl, thienyl, pyrrolyl, oxazolyl, thiazolyl, imidazolyl, pyrazolyl, pyridinyl, pyrimidinyl, pyrazinyl, indolyl, isoindolyl, indolinyl, benzofuryl, benzothienyl,

112

benzimidazolyl, benzthiazolyl, benzoxazolyl, quinolizinyl, quinolinyl, isoquinolinyl and quinazolinyl;

wherein $R^4$ is optionally substituted with one to three $R^{41}$ substituents independently selected from the group consisting of $(C_{1-6})$alkyl optionally substituted with amino, $C_{1-6}$alkylamino, or $(C_{1-6}$alkyl$)_2$amino; $(C_{1-6})$alkoxy; phenyl$(C_{1-6})$alkoxy; phenyl$(C_{1-6})$alkylcarbonyloxy wherein C1-6 alkyl is optionally substituted with amino; a non fused 5-membered-heteroaryl$(C_{1-6})$alkylcarbonyloxy; a non fused 5-membered-heteroaryl; hydroxy; halogen; aminosulfonyl; formylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl wherein $(C_{1-6})$alkyl is optionally substituted with amino, $C_{1-6}$alkylamino, or $(C_{1-6}$ alkyl$)_2$amino; $(C_{1-6}$alkyl$)_2$aminocarbonyl wherein each $(C_{1-6})$alkyl is optionally substituted with amino, $C_{1-6}$alkylamino, or $(C_{1-6}$alkyl$)_2$amino; heterocyclylcarbonyl wherein heterocyclyl is a 5-7 membered nitrogen-containing ring and said heterocyclyl is attached to the carbonyl carbon via a nitrogen atom; carboxy; or cyano; and wherein the phenyl portion of phenyl$(C_{1-6})$alkylcarbonyloxy is optionally substituted with $(C_{1-6})$alkyl $(C_{1-6})$ alkoxy, halogen, cyano, amino, or hydroxy;

provided that no more than one $R^{41}$ is $C_{1-6}$alkyl substituted with $C_{1-6}$alkylamino or $(C_{1-6}$alkyl$)_2$amino; aminosulfonyl; formylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl; $(C_{1-6}$alkyl$)_2$aminocarbonyl; heterocyclylcarbonyl; hydroxy; carboxy; or a phenyl- or heteroaryl-containing substituent;

$R^5$ is a substituent on a nitrogen atom of ring A selected from the group consisting of hydrogen and $C_{1-4}$alkyl;

$R^6$ is hydrogen or $C_{1-6}$alkyl;

$R^7$ is hydrogen or $C_{1-6}$alkyl;

$R^a$ and $R^b$ are independently selected from the group consisting of hydrogen, $C_{1-6}$alkyl, and $C_{1-6}$alkoxycarbonyl; alternatively, when $R^a$ and $R^b$ are each other than hydrogen, $R^a$ and $R^b$ are optionally taken together with the nitrogen atom to which they are both attached to form a five to eight membered monocyclic ring;

L is O;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

2. The compounds of claim 1 wherein $R^1$ is selected from the group consisting of hydrogen, $C_{1-6}$alkyl, $C_{1-4}$alkyl, and heteroaryl$(C_{1-4})$alkyl;

wherein the aryl and heteroaryl portion of aryl$(C_{1-4})$alkyl and heteroaryl$(C_{1-4})$ are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-6}$alkoxy; heteroaryl optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-4}$alkyl, $C_{1-4}$alkoxy, and carboxy; carboxy; $C_{1-4}$alkoxycarbonyl; $C_{1-4}$alkoxycarbonyloxy; aminocarbonyl; $C_{1-4}$alkylaminocarbonyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy$(C_{1-6})$ alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; heterocyclylcarbonyl; cyano; halogen; trifluoromethoxy; and hydroxy; provided that no more than one $R^{11}$ is heteroaryl (optionally substituted with one to two $C_{1-4}$alkyl substituents); $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; or heterocyclylcarbonyl.

3. The compounds of claim 1 wherein $R^1$ is selected from the group consisting of $C_{6-10}$aryl$(C_{1-4})$alkyl, pyridinyl$(C_{1-4})$ alkyl, and furanyl$(C_{1-4})$alkyl; wherein $C_{6-10}$aryl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consist-

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000061

Appx14467

US 7,741,356 B2

113

ing of $C_{1-3}$alkoxy; tetrazolyl; carboxy; $C_{1-4}$alkoxycarbonyl; aminocarbonyl; $C_{1-4}$alkylaminocarbonyl; $C_{1-3}$alkylaminocarbonyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-4}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; cyano; halogen; and trifluoromethoxy; provided that no more than one $R^{11}$ is $C_{6-10}$arylaminocarbonyl.

**4.** The compounds of claim 1 wherein $R^1$ is selected from the group consisting of phenyl($C_{1-3}$)alkyl, pyridinyl($C_{1-3}$) alkyl, and furanyl($C_{1-3}$)alkyl; wherein phenyl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-3}$alkoxy; tetrazolyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-4}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; morpholin-4-ylcarbonyl; chloro; fluoro; trifluoromethoxy; $C_{1-4}$alkoxycarbonyl; and carboxy; provided that no more than one $R^{11}$ is $C_{6-10}$arylaminocarbonyl.

**5.** The compounds of claim 1 wherein $R^1$ is phenylmethyl, pyridinylmethyl, or furanylmethyl; wherein phenyl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of methoxy; tetrazolyl; cyclopropylaminocarbonyl; (2-hydroxyeth-1-yl)aminocarbonyl; methoxycarbonyl; phenylaminocarbonyl wherein phenyl is optionally substituted with carboxy; morpholin-4-ylcarbonyl; and carboxy.

**6.** The compounds of claim 1 wherein $R^2$ is a substituent selected from the group consisting of hydrogen, $C_{1-4}$alkyl, hydroxy($C_{1-4}$)alkyl, and phenyl($C_{1-4}$) alkoxy($C_{1-4}$)alkyl; wherein said phenyl is optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-3}$alkyl, $C_{1-3}$alkoxy, hydroxy, cyano, fluoro, chloro, bromo, trifluoromethyl, and trifluoromethoxy.

**7.** The compounds of claim 1 wherein $R^2$ is a substituent selected from the group consisting of hydrogen and $C_{1-4}$alkyl.

**8.** The compounds of claim 1 wherein $R^2$ is hydrogen or methyl.

**9.** The compounds of claim 1 wherein $R^3$ is one to two substituents independently selected from the group consisting of $C_{1-6}$alkyl, halogen, and aryl; wherein aryl is optionally substituted with one to three substituents independently selected from the group consisting of halogen, carboxy, aminocarbonyl, $C_{1-3}$alkylsulfonylamino, cyano, hydroxy, amino, $C_{1-3}$alkylamino, and ($C_{1-3}$)alkyl)amino.

**10.** The compounds of claim 1 wherein $R^3$ is one to two substituents independently selected from the group consisting of $C_{1-3}$alkyl, bromo, and phenyl; wherein phenyl is optionally substituted with one to three substituents independently selected from the group consisting of chloro, fluoro, iodo, carboxy, aminocarbonyl, and cyano.

**11.** The compounds of claim 1 wherein $R^3$ is one to two substituents independently selected from the group consisting of methyl and phenyl; wherein phenyl is optionally substituted with one to three substituents independently selected from the group consisting of chloro and carboxy.

**12.** The compounds of claim 1 wherein at least one $R^3$ substituent is phenyl.

**13.** The compounds of claim 1 wherein $R^3$ is a substituent selected from the group consisting of methyl and phenyl; wherein phenyl is optionally substituted with one to two substituents independently selected from the group consisting of chloro and carboxy.

**14.** The compounds of claim 1 wherein $R^4$ is $C_{6-10}$aryl optionally substituted with one to three $R^{41}$ substituents independently selected from the group consisting of ($C_{1-3}$)alkyl,

114

($C_{1-6}$)alkoxy, phenyl($C_{1-6}$)alkoxy; hydroxy; halogen; formylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl; ($C_{1-6}$ alkyl)$_2$aminocarbonyl; heterocyclylcarbonyl wherein heterocyclyl is a 5-7 membered nitrogen-containing ring and said heterocyclyl is attached to the carbonyl carbon via a nitrogen atom; carboxy; and cyano;

provided that no more than one $R^{41}$ substituent is formylamino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, ($C_{1-6}$alkyl)$_2$aminocarbonyl, heterocyclylcarbonyl, hydroxy, carboxy, or a phenyl-containing substituent.

**15.** The compounds of claim 1 wherein $R^4$ is phenyl substituted with one to three $R^{41}$ substituents independently selected from the group consisting of ($C_{1-3}$)alkyl, ($C_{1-3}$) alkoxy, phenyl($C_{1-3}$)alkoxy, hydroxy, $C_{1-6}$alkylaminocarbonyl, and aminocarbonyl; provided that no more than one $R^{41}$ substituent is aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, hydroxy, or a phenyl-containing substituent.

**16.** The compounds of claim 1 wherein $R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and optionally substituted with one to two substituents independently selected from the group consisting of methyl, methoxy, and benzyloxy.

**17.** The compounds of claim 1 wherein $R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and optionally substituted with one to two methyl substituents.

**18.** The compounds of claim 1 wherein $R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and substituted at the 2- and 6-positions with methyl substituents.

**19.** The compounds of claim 1 wherein $R^5$ is hydrogen or methyl.

**20.** The compounds of claim 1 wherein $R^5$ is hydrogen.

**21.** The compounds of claim 1 wherein $R^6$ is hydrogen or methyl.

**22.** The compounds of claim 1 wherein $R^6$ is hydrogen.

**23.** The compounds of claim 1 wherein $R^7$ is hydrogen or methyl.

**24.** The compounds of claim 1 wherein $R^7$ is hydrogen.

**25.** The compounds of claim 1 wherein $R^a$ and $R^b$ are independently selected from the group consisting of hydrogen and $C_{1-3}$alkyl; or, when $R^a$ and $R^b$ are each other than hydrogen, $R^a$ and $R^b$ are optionally taken together with the nitrogen atom to which they are both attached to form a five to seven membered monocyclic ring.

**26.** The compounds of claim 1 wherein $R^a$ and $R^b$ are independently hydrogen or methyl.

**27.** The compounds of claim 1 wherein $R^a$ and $R^b$ are each hydrogen.

**28.** The compounds of claim 1 that are present in their RR, SS, RS, and SR configurations.

**29.** The compounds of claim 1 in their S,S configuration.

**30.** A compound of Formula (Ia):

Formula (Ia)



Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

**115**

wherein:

$R^1$ is selected from the group consisting of hydrogen, $C_{1-6}$alkyl, aryl($C_{1-4}$)alkyl, and heteroaryl($C_{1-4}$)alkyl;

wherein the aryl and heteroaryl portion of aryl($C_{1-4}$)alkyl and heteroaryl($C_{1-4}$) alkyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-6}$alkoxy; heteroaryl optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-4}$alkyl, $C_{1-4}$alkoxy, and carboxy; carboxy; $C_{1-4}$alkoxycarbonyl; $C_{1-4}$alkoxycarbonyloxy; aminocarbonyl; $C_{1-4}$alkylaminocarbonyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-6}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; heterocyclylcarbonyl; cyano; halogen; trifluoromethoxy; and hydroxy; provided that no more than one $R^{11}$ is heteroaryl (optionally substituted with one to two $C_{1-4}$alkyl substituents); $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; or heterocyclylcarbonyl;

$R^2$ is selected from the group consisting of hydrogen, $C_{1-4}$alkyl, hydroxy($C_{1-4}$) alkyl, and phenyl($C_{1-6}$)alkoxy ($C_{1-4}$)alkyl;

wherein said phenyl is optionally substituted with one to two substituents independently selected from the group consisting of $C_{1-3}$alkyl, $C_{1-3}$alkoxy, hydroxy, cyano, fluoro, chloro, bromo, trifluoromethyl, and trifluoromethoxy;

$R^3$ is one to two substituents independently selected from the group consisting of $C_{1-4}$alkyl, halogen, and aryl; wherein aryl is optionally substituted with one to three substituents independently selected from the group consisting of halogen, carboxy, aminocarbonyl, $C_{1-3}$alkylsulfonylamino, cyano, hydroxy, amino, $C_{1-3}$alkylamino, and ($C_{1-3}$alkyl)$_2$amino;

$R^4$ is $C_{6-10}$aryl optionally substituted with one to three $R^{41}$ substituents independently selected from the group consisting of ($C_{1-3}$)alkyl, ($C_{1-6}$) alkoxy, phenyl($C_{1-6}$) alkoxy; hydroxy; halogen; formylamino; aminocarbonyl; $C_{1-6}$alkylaminocarbonyl; ($C_{1-6}$alkyl)$_2$ aminocarbonyl; heterocyclylcarbonyl wherein heterocyclyl is a 5-7 membered nitrogen-containing ring and said heterocyclyl is attached to the carbonyl carbon via a nitrogen atom; carboxy; and cyano;

provided that no more than one $R^{41}$ substituent is formylamino, aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, ($C_{1-6}$alkyl)$_2$aminocarbonyl, heterocyclylcarbonyl, hydroxy, carboxy, or a phenyl-containing substituent.

$R^5$ is hydrogen or methyl;

$R^a$ and $R^b$ are independently hydrogen or $C_{1-3}$alkyl; or, when $R^a$ and $R^b$ are each other than hydrogen, $R^a$ and $R^b$ are optionally taken together with the nitrogen atom to which they are both attached to form a five to seven membered monocyclic ring;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

**31.** A compound of Formula (Ia) wherein:

$R^1$ is selected from the group consisting of $C_{6-10}$aryl($C_{1-4}$) alkyl, pyridinyl($C_{1-4}$) alkyl, and furanyl($C_{1-4}$)alkyl; wherein $C_{6-10}$aryl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-3}$alkoxy; tetrazolyl; carboxy; $C_{1-3}$alkoxycarbonyl; aminocarbonyl; $C_{1-3}$alkylaminocarbonyl; $C_{1-3}$alkylaminocarbonyl; $C_{3-6}$cycloalkylaminocarbonyl; hydroxy($C_{1-4}$) alkylaminocarbonyl; $C_{6-10}$arylaminocarbonyl wherein $C_{6-10}$aryl

**116**

is optionally substituted with carboxy or $C_{1-3}$alkoxycarbonyl; morpholin-4-ylcarbonyl; cyano; halogen; trifluoromethoxy; $C_{1-4}$alkoxycarbonyl; or carboxy; provided that no more than one $R^{11}$ is $C_{6-10}$arylaminocarbonyl;

$R^2$ is hydrogen or $C_{1-4}$alkyl;

$R^3$ is one to two substituents independently selected from the group consisting of $C_{1-3}$alkyl, bromo, and phenyl; wherein phenyl is optionally substituted with one to three substituents independently selected from the group consisting of chloro, fluoro, carboxy, aminocarbonyl, and cyano;

$R^4$ is phenyl substituted with one to three substituents independently selected from the group consisting of ($C_{1-3}$) alkyl, ($C_{1-3}$)alkoxy, phenyl($C_{1-3}$)alkoxy, hydroxy, $C_{1-6}$alkylaminocarbonyl, and aminocarbonyl; provided that no more than one $R^{41}$ substituent is aminocarbonyl, $C_{1-6}$alkylaminocarbonyl, hydroxy, or a phenyl-containing substituent;

$R^5$ is hydrogen;

$R^a$ and $R^b$ are independently hydrogen or methyl;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

**32.** A compound of Formula (Ia) wherein:

$R^1$ is selected from the group consisting of phenyl($C_{1-3}$) alkyl, pyridinyl($C_{1-3}$) alkyl, and furanyl($C_{1-3}$)alkyl; wherein phenyl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from the group consisting of $C_{1-3}$alkoxy; tetrazolyl, $C_{1-3}$cycloalkylaminocarbonyl; hydroxy($C_{1-4}$)alkylaminocarbonyl; $C_{1-6}$arylaminocarbonyl wherein $C_{6-10}$aryl is optionally substituted with carboxy or $C_{1-4}$alkoxycarbonyl; morpholin-4-ylcarbonyl; chloro; fluoro; trifluoromethoxy; methoxycarbonyl; and carboxy; provided that no more than one $R^{11}$ is $C_{6-10}$arylaminocarbonyl;

$R^2$ is hydrogen or methyl;

$R^3$ is one to two substituents independently selected from the group consisting of methyl and phenyl; wherein phenyl is optionally substituted with one to three substituents independently selected from the group consisting of chloro and carboxy;

$R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and optionally substituted with one to two substituents independently selected from the group consisting of methyl, methoxy, and benzyloxy;

$R^5$ is hydrogen;

$R^a$ and $R^b$ are each hydrogen;

and pharmaceutically acceptable enantiomers, diastereomers, racemates, and salts thereof.

**33.** A compound according to claim **32** wherein $R^1$ is phenylmethyl, pyridinylmethyl, or furanylmethyl; wherein phenyl, pyridinyl, and furanyl are optionally substituted with one to three $R^{11}$ substituents independently selected from is the group consisting of methoxy, tetrazolyl, cyclopropylaminocarbonyl, (2-hydroxyeth-1-yl)aminocarbonyl, phenylaminocarbonyl wherein phenyl is optionally substituted with carboxy, morpholin-4-ylcarbonyl, methoxycarbonyl, and carboxy; provided that no more than one $R^{11}$ is phenylaminocarbonyl.

**34.** A compound according to claim **32** wherein $R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and optionally substituted with one to two methyl substituents.

**35.** A compound according to claim **32** wherein $R^4$ is phenyl substituted at the 4-position with hydroxy, $C_{1-3}$alkylaminocarbonyl, or aminocarbonyl, and substituted at the 2- and 6-positions with methyl substituents.

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000063

US 7,741,356 B2

| 117 | 118 |
|---|---|

**36**. A compound of Formula (Ib)



Formula (Ib)

wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| 2-Aminocarbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 2-Cyano-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 2-Bromo-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenyl methyl | H | phenyl | H | H | 4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenyl methyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-(1H-tetrazol-5-yl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4- | H |
| 3-Methoxycarbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Methoxy carbonyl-phenylmethyl | methyl | naphthalen-1-yl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-phenylmethyl | methyl | naphthalen-1-yl | H | H | 2,6-dimethyl-4- | H |
| 3-Carboxy-phenylmethyl | methyl | 4-chloro-phenyl | Me | H | 2 ,6-dimethyl-4- | H |
| 4-Carboxy-phenylmethyl | methyl | naphthalen-1-yl | H | H | 2,6-dimethyl-4- | H |
| 3-Methoxy-4-carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dihydroxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Piperidin-4-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Methoxy carbonyl-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | 3-bromo phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | 3-carboxy phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dimethoxy-phenylmethyl | benzyl oxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | 3-amino carbonyl phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

119                                                    120

-continued

Formula (Ib)



wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| 3,4-Dimethoxy-phenylmethyl | methyl | 3-cyano phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Isopropyl | H | quinoxalin-8-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | 2-bromo phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | 2-cyano phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | 2-amino carbonyl phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | 2-carboxy phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dibenzyloxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| [1,3]benzo dioxal-5-yl | methyl | phenyl | H | H | 2,6-dimethyl, 4-hydroxy | H |
| 4-Methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 2,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3,4-Dimethoxy-phenylmethyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-methyl carbonyl phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-fluoro, 4-carboxy-phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 2-phenyl-ethyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | en-1-yl | 4-hydroxy methyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Benzhydryl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-cyano phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | methyl | 4-trifluoro methyl phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Isopropyl | H | 3-trifluoro methoxy phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-trifluoro methoxy phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-methane sulfonyl amino phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-(2-carboxy ethyl) phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-amino-5-carboxy phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000065

US 7,741,356 B2

121             122

-continued

Formula (Ib)



wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| 3-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-carboxy | H |
| 4-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 4-Methoxy carbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Methoxy carbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 1-Benzyloxy carbonyl-piperadin-4-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Furan-2-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Furan-3-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Cyclohexyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Pyridin-4-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | methyl | 4-chloro phenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Benzyl | methyl | 3-fluoro phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Isopropyl | H | 3-cyano phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 2,5-difluoro phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-methane sulfonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | benzyl oxy methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Isopropyl | H | Br | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-dimethyl amino phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-dimethyl amino carbonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-hydroxy phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-amino carbonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-chloro phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 2,4-difluoro phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-methane sulfonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

US 7,741,356 B2

123          124

-continued

Formula (Ib)



wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^4$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| Isopropyl | H | 3-amino carbonyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | methyl | 4-trifluoro methyl phenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | methyl | 4-fluoro phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 4-Dimethylamino-phenylmethyl | methyl | phenyl | H | Me | 2,6-dimethyl-4-hydroxy | H |
| 4-Methylamino-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Methylcarbonyl amino-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Hydroxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | methyl | 4-fluoro phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | methyl | 4-fluoro phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Isopropyl | H | phenyl | H | H | 2,6-dimethyl, 4-aminocarbonyl | H |
| 3,4-Dichloro-phenylmethyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Methylcarbonyl oxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Methoxy carbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Aminocarbonyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Cyano-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Pyridin-3-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Pyridin-2-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 1-(R)-Phenylethyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 1-(R)-Phenylethyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 2-Methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 2,6-Dichloro-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Phenoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Naphthalen-1-yl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Naphthalen-2-yl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Bromo-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000067

US 7,741,356 B2

125                                                                126

-continued

Formula (Ib)



wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| 3,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 2,4-Dichloro-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | isobutyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | benzyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | isopropyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Phenyl prop-1-yl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 2-Phenylethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 1-Phenylethyl diastereomer A | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 1-Phenylethyl diastereomer B | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Benzyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Isopropyl | H | 4-biphenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-fluoro phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 2-fluoro phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| H | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | 3-(amino methyl) phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | 3-amino carbonyl phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | 3-cyano phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-carboxy phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | pyridin-3-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-methoxy phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3,5-difluoro phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Cyclohexyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Carboxymethyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-hydroxy methyl phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | pyrimidin-5-yl | Me | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000068

US 7,741,356 B2

127          128

-continued

Formula (Ib)



wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| Isopropyl | H | pyrimidin-5-yl | | Me | 4-hydroxy | H |
| Isopropyl | H | 3-carboxy phenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-biphenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 2-methoxy phenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | benzyl | phenyl | H | H | 3-aminocarbonyl | H |
| Isopropyl | isopropyl | phenyl | H | H | 3-aminocarbonyl | H |
| Isopropyl | benzyl oxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | isobutyl | phenyl | H | H | 2,6-dimethyl-4-[2-(2,6-dimethyl-4-hydroxyphenyl)-1-amino-ethylcarbonxyloxy] phenyl | H |
| Isopropyl | isobutyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3,5-dichloro phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H hydroxy |
| Isopropyl | H | 3-methoxy phenyl | Me | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Isopropyl | H | 2-biphenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | thiophen-3-yl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-chloro phenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3-methyl carbonyl amino phenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 4-trifluoro methyl phenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | naphthal en-2-yl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 2-trifluoro methyl phenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | thiophen-3-yl | | Me | 4-hydroxy | H |
| Isopropyl | H | pyridin-3-yl | | Me | 4-hydroxy | H |
| Isopropyl | H | phenyl | | Me | 4-hydroxy | H |
| Isopropyl | H | 2-chloro phenyl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | naphthal en-1-yl | | Me | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | benzyl | phenyl | H | H | 3-cyano | H |
| Isopropyl | benzyl | phenyl | H | H | 4-hydroxy | H |
| Isopropyl | benzyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | isopropyl | phenyl | H | H | 3-cyano | H |
| Isopropyl | isopropyl | phenyl | H | H | 4-hydroxy | H |
| Isopropyl | isopropyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000069

Appx14475

US 7,741,356 B2

129    130

-continued

Formula (Ib)



wherein L is O and R$^1$, R$^2$, R$^{3-1}$, R$^{3-2}$, R$^5$, R$^a$, R$^b$, and R$^{41}$ are dependently selected from the group consisting of:

| R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{41}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|
| Isopropyl | H | 4-fluoro phenyl | Me | | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 3,5-bis-trifluoro methyl phenyl | Me | | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | 2-methyl phenyl | Me | | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | phenyl | Me | | 2,6-dimethyl-4-hydroxy | H |
| 2-Dimethylamino-1-methyl-eth-1-yl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Methyl | isobutyl | phenyl | H | H | 3-aminocarbonyl | H |
| Methyl | isobutyl | phenyl | H | H | 3-cyano | H |
| Ethyl | isopropyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Methyl | isopropyl | phenyl | H | H | 4-hydroxy | H |
| H | 3-amino carbonyl phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| H | 3-cyano phenyl methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Methyl | isobutyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| H | benzyl oxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| H | isobutyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| H | benzyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-morpholin-1-ylcarbonyl | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-ethylamino carbonyl | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-methylamino carbonyl | H |
| H | isopropyl | phenyl | H | H | 3-aminocarbonyl | H |
| H | isopropyl | phenyl | H | H | 3-cyano | H |
| H | isopropyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| H | isopropyl | phenyl | H | H | 4-hydroxy | H |
| Methyl | methyl | phenyl | H | H | 4-aminosulfonyl | H |
| Cyclohexyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Cyclohexyl | H | phenyl | H | H | 2,6-dimethyl-4-4-hydroxy | H |
| Cyclopropyl methyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Cyclopropyl methyl | H | phenyl | H | H | 4-hydroxy | H |
| Isopropyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | H | phenyl | H | H | 4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000070

**PTX-007, page 70 of 79**

Appx14476

US 7,741,356 B2

131                                                                 132

-continued



Formula (Ib)

wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Ethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Methyl | H | phenyl | H | H | 4-hydroxy | H |
| Methyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Methyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| Methyl | methyl | benzyl | H | H | 4-hydroxy | H |
| Methyl | methyl | benzyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| H | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Methyl | methyl | phenyl | H | H | 4-hydroxy | H |
| H | methyl | phenyl | H | H | 4-hydroxy | H |
| Ethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| Ethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | methyl | phenyl | H | H | 4-hydroxy | H |
| Isopropyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 2-Carboxy-phenyl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-phenyl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 2-Bromo-4,5-dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 2-Carboxy-4,5-dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenyl-methyl | methyl | phenyl | H | H | H | H |
| 3-Carboxy-4-methoxy-phenyl-methyl | methyl | phenyl | H | H | 2,6-dimethyl | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-imidazol-2-yl | H |
| 3,4-Dimethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl | H |
| 3-Carboxy-4-methoxy-phenyl methyl | methyl | 4-chloro | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenyl-methyl | methyl | 4-chloro | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenyl-methyl | methyl | 4-chloro | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 4-Carboxy- | methyl | 4-chloro | Me | H | 2,6-dimethyl-4- | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000071

US 7,741,356 B2

133                                                                          134

-continued



Formula (Ib)

wherein L is O and R$^1$, R$^2$, R$^{3-1}$, R$^{3-2}$, R$^5$, R$^a$,
R$^b$, and R$^{41}$ are dependently selected from the
group consisting of:

| R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{41}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|
| phenylmethyl | | phenyl | | | aminocarbonyl | |
| 3-Carboxy-4-methoxy-phenyl methyl | methyl | 4-chloro phenyl | Cl | | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-(1H-tetrazol-5-yl)-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-trifluoromethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Bis-3,4-trifluoromethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Quinolin-4-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Methoxy naphthalen-1-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Trifluoromethoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Trifluoromethyl-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 4-Isopropyloxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Ethoxyphenyl-methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 5-Methoxycarbonyl-pyridin-2-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 5-Carboxy-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 6-Carboxy-pyridin-3-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 6-Methoxycarbonyl-pyridin-3-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 5-Carboxy-furan-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 5-Methoxy carbonyl-furan-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3,4-Dimethoxy-phenylmethyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Benzyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 3-Carboxy-4-methoxy-phenyl methyl | methyl | phenyl | H | H | 4-hydroxy | H/Me |
| 3-Carboxy-4-methoxy-phenyl methyl | H | phenyl | H | H | 4-hydroxy | |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000072

US 7,741,356 B2

135      136

-continued

Formula (Ib)



wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^4$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| 3-Carboxy-4-methoxy-phenyl methyl | H | phenyl | H | H | 4-hydroxy | H/Me |
| 3-Carboxy-4-methoxy-phenyl methyl | H | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | H | H |
| 3-(1H-tetrazol-5-yl)-phenylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Methoxycarbonyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 3-Carboxy | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 3-Methoxycarbonyl | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy | H | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-benzyloxy- | H/Me |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 3-Carboxy-phenyl | methyl | 4-chloro | Me | H | 4-aminocarbonyl | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 5-Methoxycarbonyl-furan-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 5-Carboxy-furan-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | 3-bromo phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-iodo | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | 2-bromo phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-bromo | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-chloro | methyl | H | 4-hydroxy | H |
| 3-Aminocarbonyl-4-methoxy phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-(Morpholin-4-ylcarbonyl)-4-methoxy phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| -3-Aminocarbonyl- | methyl | phenyl | H | H | 4-hydroxy | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000073

US 7,741,356 B2

137          138

-continued

Formula (Ib)



wherein L is O and $R^1$, $R^2$, $R^{3\text{-}1}$, $R^{3\text{-}2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3\text{-}1}$ | $R^{3\text{-}2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| 4-methoxy-phenylmethyl 3-(Morpholin-4-ylcarbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| 3-(2-Hydroxy eth-1-yl-aminocarbonyl)-4-methoxy phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-(Cyclopropyl aminocarbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-(Phenylamino carbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 5-Methoxycarbonyl-furan-2-ylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 5-Carboxy-furan-2-ylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 3-(Phenylamino carbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-(3-carboxyphenyl aminocarbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-(1H-Tetrazol-5-yl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-(4-Carboxyphenyl aminocarbonyl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-(2-t-Butyl-tetrazol-5-yl)-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | Methoxy-carbonyl |
| 2-Methoxycarbonyl-pyridin-4-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 4-Methoxycarbonyl-pyridin-2-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 6-Methoxycarbonyl-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | Methoxy-carbonyl |
| 2-Carboxy-pyridin-4-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |

and

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000074

US 7,741,356 B2

| 139 | 140 |

-continued



Formula (Ib)

wherein L is O and R$^1$, R$^2$, R$^{3-1}$, R$^{3-2}$, R$^5$, R$^a$, R$^b$, and R$^{41}$ are dependently selected from the group consisting of:

| R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{41}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|
| 6-Carboxy-pyridin-2-ylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H. |

**37.** A compound of Formula (Ic)



Formula (Ic)

wherein L is O and R$^1$, R$^2$, R$^{3-1}$, R$^{3-2}$, R$^5$, R$^a$, R$^b$, and R$^{41}$ are dependently selected from the group consisting of:

| R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{41}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|
| 3,4-Dimethoxy-phenylmethyl | benzyloxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | hydroxy methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Isopropyl | methyl | 4-fluorophenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 2-Phenylethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Benzyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Cyclohexyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-(morpholin-4-carbonyl) | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-ethylamino carbonyl | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-methylamino carbonyl | H |
| Methyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| Methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| H | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Methyl | methyl | phenyl | H | H | 4-hydroxy | H |
| H | methyl | phenyl | H | H | 4-hydroxy | H |
| Ethyl | methyl | phenyl | H | H | 4-hydroxy | H |
| Ethyl | methyl | phenyl | H | H | 2,6-dimethyl-4- | H |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000075

US 7,741,356 B2

141  142

-continued

Formula (Ic)



wherein L is O and $R^1$, $R^2$, $R^{3-1}$, $R^{3-2}$, $R^5$, $R^a$, $R^b$, and $R^{41}$ are dependently selected from the group consisting of:

| $R^1$ | $R^2$ | $R^{3-1}$ | $R^{3-2}$ | $R^5$ | $R^{41}$ | $R^a/R^b$ |
|---|---|---|---|---|---|---|
| Benzyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| Benzyl | methyl | phenyl | H | H | 4-hydroxy | H |
| Isopropyl | methyl | phenyl | H | H | 4-hydroxy | H |
| Isopropyl | methyl | phenyl | H | H | 2,6-dimethyl-4-hydroxy | H |
| 3-Carboxy-phenyl methyl | methyl | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-phenyl | methyl | 4-chlorophenyl | Me | H | 4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-chlorophenyl | Me | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Methoxycarbonyl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-aminocarbonyl | H |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-chlorophenyl | Me | H | 4-hydroxy | H |
| 6-Methoxy-carbonyl-pyridin-2-yl methyl | methyl | phenyl | H | H | 2,6-dimethyl-4-aminocarbonyl | H |
| and | | | | | | |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | 4-chlorophenyl | H | H | 4-aminocarbonyl | H. |

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000076

US 7,741,356 B2

143 | 144

**38.** A compound of Formula (Id)

-continued

Formula (Id)

wherein L is O and R$^1$, R$^2$, R$^{3-1}$, R$^{3-2}$, R$^5$, R$^4$, R$^b$, and R$^{41}$ are dependently selected from the group consisting of:

| R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{41}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|
| 3-Carboxy-4-methoxyphenyl methyl | methyl | phenyl | H | H | 4-amino-carbonyl | H. |

**39.** A compound of Formula (Ie)

Formula (Ie)

wherein L is O and R$^1$, R$^2$, R$^{3-1}$, R$^{3-2}$, R$^5$, R$^4$, R$^b$, and R$^{41}$ are dependently selected from the group consisting of:

| R$^1$ | R$^2$ | R$^{3-1}$ | R$^{3-2}$ | R$^5$ | R$^{41}$ | R$^a$/R$^b$ |
|---|---|---|---|---|---|---|
| 3-Methoxycarbon-yl-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-amino-carbonyl | |
| and | | | | | | |
| 3-Carboxy-4-methoxy-phenylmethyl | methyl | phenyl | H | H | 4-amino-carbonyl | H. |

**40.** A compound selected from the group consisting of



Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000077

**PTX-007, page 77 of 79**

Appx14483

US 7,741,356 B2

| 145 | 146 |
|---|---|
| -continued | -continued |







**41**. A composition comprising the compound of claim **1** and a pharmaceutically acceptable carrier.

**42**. The compound of claim **1** that is the hydrochloride salt of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid dihydrochloride.

**43**. The composition of claim **41** wherein the compound is the hydrochloride salt of 5-({[2-Amino-3-(4-carbamoyl-2,6-dimethyl-phenyl)-propionyl]-[1-(4-phenyl-1H-imidazol-2-yl)-ethyl]-amino}-methyl)-2-methoxy-benzoic acid.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000078

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,741,356 B2                                              Page 1 of 1
APPLICATION NO.   : 11/079647
DATED             : June 22, 2010
INVENTOR(S)       : Breslin et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1107 days.

Signed and Sealed this
Twenty-third Day of September, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 01-10-2020

VIB-PAT00000079

## **CERTIFICATE OF SERVICE**

I, Eric Dittmann, hereby certify that, on December 28, 2023, the

foregoing document was filed using the Court's CM/ECF system and a copy

served on the parties' counsel of record via ECF.


Date: December 28, 2023                    /s/ Eric W. Dittmann
                                           Eric W. Dittmann
                                           PAUL HASTINGS LLP
                                           200 Park Avenue
                                           New York, NY 10166
                                           (212) 318-6000
                                           ericdittmann@paulhastings.com